LAW OFFICES

# WILLIAMS & CONNOLLY LLP*

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

www.wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

BRENDAN V. SULLIVAN, JR.
JERRY L. SHULMAN
ROBERT B. BARNETT
DAVID E. KENDALL
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON
KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
DAVID D. AUFHAUSER
BRUCE R. GENDERSON
F. LANE HEARD III
STEVEN R. KUNEY
PAUL MOGIN
MARK S. LEVINSTEIN
DANIEL F. KATZ
WILLIAM R. MURRAY, JR.
EVA PETKO ESBER
STEPHEN D. RABER
DAVID C. KIERNAN
LON E. MUSSLEWHITE
HEIDI K. HUBBARD
GLENN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
DAVID S. BLATT

DANE H. BUTSWINKAS
LAURIE S. FULTON
DENNIS M. BLACK
LYNDA SCHULER
CHARLES D. NIEMEIER
PAUL K. DUEFFERT
R. HACKNEY WIEGMANN
ROBERT M. CARY
KEVIN M. HODGES
DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
PAUL B. GAFFNEY
EMMET T. FLOOD
ROBERT A. VAN KIRK
MARCIE R. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN E. SCHMIDTLEIN
CRAIG D. SINGER
J. ANDREW KEYES
M. ELAINE HORN
ENU MAINIGI
MICHAEL F. O'CONNOR
PAUL T. HOURIHAN
WILLIAM J. BACHMAN
MARGARET A. KEELEY
EDWARD J. BENNETT
TOBIN J. ROMERO
BETH A. LEVENE
THOMAS G. WARD
WILLIAM T. BURKE
LISA M. DUGGAN

JOHN E. JOINER
NICHOLAS J. BOYLE
ADAM L. PERLMAN
ANDREW W. RUDGE
DENEEN C. HOWELL
ALEX G. ROMAIN
DAVID A. FORKNER
JONATHAN M. LANDY
CHRISTOPHER N. MANNING
RYAN T. SCARBOROUGH
JENNIFER G. WICHT
STEPHEN D. ANDREWS
KANNON K. SHANMUGAM
MALACHI B. JONES
THOMAS H. L. SELBY
KEVIN HARDY
EDWARD C. BARNIDGE
JOSEPH M. TERRY
AARON P. MAURER
JON R. FETTEROLF
F. GREG BOWMAN
ANA C. REYES
JONATHAN B. PITT
DAVID I. BERL
ELLEN E. OBERWETTER
EDWARD C. REDDINGTON
DANIEL P. SHANAHAN
VIDYA ATRE MIRMIRA
JESSAMYN S. BERNIKER
RICHMOND T. MOORE
KENNETH J. BROWN
LUBA SHUR
PATRICK H. KIM
WILLIAM P. ASHWORTH

LANCE A. WADE
CHARLES DAVANT, IV
DOV P. GROSSMAN
HOLLY M. CONLEY
MATTHEW V. JOHNSON
CARL R. METZ
JOHN McNICHOLS
DAVID S. KURTZER-ELLENBOGEN
PAUL E. BOEHM
STEPHEN J. FUZESI
KATHERINE M. TURNER
JESSE T. SMALLWOOD
STANLEY E. FISHER
JOHN S. WILLIAMS
C. BRYAN WILSON
SAMUEL B. DAVIDOFF
AMANDA M. MACDONALD
BETH A. STEWART
STEVEN M. PYSER
GRANT A. GEYERMAN
DAVID M. KRINSKY

OF COUNSEL
JEREMIAH C. COLLINS
DAVID POVICH
JOHN W. VARDAMAN
PAUL MARTIN WOLFF
JOHN G. KESTER
WILLIAM E. McDANIELS
RICHARD M. COOPER
ROBERT P. WATKINS
GERSON A. ZWEIFACH

July 7, 2014

Mr. Daniel E. O'Toole
Circuit Executive and Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

      Re:   <u>In Re Edward R. Reines, No. MA 14-0004</u>

Dear Mr. O'Toole:

      In successive emails this afternoon, we are filing the Response Of Edward R. Reines To Order To Show Cause and its attachments and exhibits.

      Thank you for your attention to this matter. If the filing prompts any questions, please give me a call.

      Sincerely,

Michael Sundermeyer

cc: Edward R. Reines, Esq.

Enclosures

MA 14-0004

# In the United States Court of Appeals for the Federal Circuit

Filed Under Seal

---

IN RE EDWARD R. REINES,

*Respondent*

---

## RESPONSE OF EDWARD R. REINES TO ORDER TO SHOW CAUSE

---

MICHAEL S. SUNDERMEYER
WILLIAM T. BURKE
PETER J. ANTHONY

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

**Personal Statement of Edward R. Reines**

I seriously regret the consequences to the Court and Judge Rader from my forwarding of his email of March 5. I did not anticipate or intend any of this. Let me explain. The oral arguments on March 4 were some of my best work as an advocate. I had represented my clients to the best of my ability and was gratified that a member of the panel had complimented the presentations. I saw nothing untoward about the kind compliment or the email passing along that compliment, neither of which addressed the merits of the cases. I forwarded the email to people in my personal and professional network who I thought would be interested—my mom, my brothers and sister, friends, clients, former clients, prospective clients, lawyers with whom I have worked, and law firm colleagues. I did so because I was proud of my performance and the compliment and, as regards clients, former clients, and prospective clients, because the compliment regarding my advocacy might properly encourage them to consider me as their advocate in the future.

I did not forward the email to advertise a friendship with Judge Rader. I hope I have many friends among the judges and bar of this Court. Over the last couple decades, I have worked professionally in many ways to assist my clients, the Court, its members, and its bar, and I treasure the friendships that have developed during that work and take pride that I have been recognized as a loyal supporter of the Court. But I perceive no need or utility to advertise those friendships, and I am aghast at the suggestion that I was implying that I could somehow improperly influence case outcomes. It is not true. It did not even occur to me that forwarding the email might be misconstrued as a suggestion that I could improperly influence the Court on the basis of friendship. I intended to suggest only that I was capable of excellent advocacy as illustrated by my performance in the back-to-back oral arguments in March. And Judge Rader's encouragement that I show the email to others reinforced my sense that it was appropriate to share.

Consistent with the following submission by my counsel and the accompanying opinions of independent experts, I respectfully believe that I have not violated professional standards. But that belief in no way diminishes my regret for the consequences of forwarding the email. I would never intentionally harm the interests of this Court or any of its members. In hindsight, it was a mistake to distribute the Email, and I apologize for having done so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing Personal Statement of Edward R. Reines is true and correct.

Executed on:  July 7, 2014

Edward R. Reines

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ...........................................................................................1

    A.    Mr. Reines has Honorably Served the Federal Circuit, the Northern

          District of California, Their Bars, and the Administration of Justice in

          Patent Cases. ............................................................................................1

    B.    Mr. Reines is a Professional Friend of Chief Judge Rader and of Many

          Other Judges and Lawyers. .......................................................................4

    C.    Mr. Reines Forwarded Chief Judge Rader's Email of March 4, 2014

          Because it Complimented his Oral Advocacy. .........................................5

    D.    Judicial Endorsements Are Commonplace in California and Around the

          Country. ...................................................................................................12

    E.    Independent Experts Have Concluded that Mr. Reines Did Not Violate

          Professional Standards. ..........................................................................13

    F.    Emails Requested by the Court and a Few Additional Emails are Attached.........18

ARGUMENT .........................................................................................................19

    A.    The First Amendment Protects Mr. Reines's Distribution Of Accurate

          Information About Himself.......................................................................20

    B.    Standard of Proof ....................................................................................23

    C.    Mr. Reines Did Not Violate Fed. R. App. P. 46. ....................................24

    D.    Mr. Reines Did Not Violate Model Rule 8.4(e).......................................26

    D.    Mr. Reines Did Not Violate Any California Rule of Professional Conduct..........33

CONCLUSION…...................................................................................................39

## STATEMENT OF FACTS

**A.    Mr. Reines has Honorably Served the Federal Circuit, the Northern District of California, Their Bars, and the Administration of Justice in Patent Cases.[1]**

Edward Reines has litigated patent cases for more than 23 years, initially in federal district courts and then in the Federal Circuit. He has worked on many Federal Circuit appeals. Today, his practice continues in both venues.

As part of his practice, Mr. Reines has worked enthusiastically to improve education in patent law, the practice of patent law, the relationship between patent lawyers and the Courts, and, when requested by Courts, the administration of justice in patent cases.

In the Northern District of California, for example, he began participating in the development of court rules for patent cases in 1999. From 2006 to the present, he has served on the Court's Patent Rules Advisory Committee, pursuant to appointments by two Chief Judges of the Court. In 2009, Chief Judge Walker asked Mr. Reines to chair the Court's Advisory Committee on Form Protective Orders. Since 2012, he also has been a member of the Court's e-discovery working group, pursuant to an appointment by Judge Hamilton and Magistrate Judge Laporte. From 2010–12, Mr. Reines was appointed by the judges of the

---

[1] The facts in this Statement are verified by Mr. Reines's Declaration, which is Attachment A; documented by Exhibits 1–71 and by the evidence authenticated by the Declaration of Peter J. Anthony, which is Attachment J; and supported by the opinions of six independent experts, which are Attachments D–I.

1

Northern District of California as a lawyer-representative to the Ninth Circuit Judicial Conference. He is the current president of the Northern District of California Chapter of the Federal Bar Association, following service as its vice president and as an active member.

During this same period, Mr. Reines developed patent law classes at both the University of California, Berkeley, School of Law and Stanford University Law School and participated in many CLE programs. He has co-taught the Berkeley class every year since 2002 and the Stanford class every other year since 2010. A number of federal judges have been involved in the classes as co-teachers and mock judges on simulated motions panels. Mr. Reines organized and led numerous CLE programs at the Stanford University Law School, University of California, Berkeley, School of Law, Columbia University Law School, and Santa Clara University School of Law. He also organized and participated in programs for AIPLA, IPO, FBA, FCBA, SFIPLA, PLI, and Sedona.

Since 1999, Mr. Reines has actively participated in the Federal Circuit Bar Association. For ten years beginning in 1999, he undertook a substantial role in organizing and/or programming the Association's annual Bench-Bar meeting. In additional to multiple committee memberships, he was elected to the Association's board of governors in 2001, and to the positions of secretary (2005), president-elect (2006), and president (2007).

For the Federal Circuit itself, Mr. Reines served in 2007, at the request of Chief Judge Michel, on the Patent Litigation Advisory Group to the Chief Judge, an informal six-person group addressing the state of patent law. Chief Judge Michel also asked him in 2007 to chair a Bench-Bar project concerning model jury instructions. After serving *ex officio* on the Federal Circuit Advisory Council in 2007, Mr. Reines was appointed to the Council by Chief Judge Michel in 2009, and he became the chair of the Council in 2010 by appointment of Chief Judge Rader.

In these several positions over the last 13 years, Mr. Reines has helped the Bench and Bar address, and hopefully improve, the practice of patent law and the administration of justice in patent cases in a number of areas, including district court patent rules, electronic discovery, and model jury instructions.

Mr. Reines also worked to support and protect the Federal Circuit's jurisdiction. He organized and chaired the Ad Hoc Committee To Study *Holmes Group*. The Committee proposed changes to the Court's jurisdictional statute to ensure that all patent claims, including counterclaims, remain subject to exclusive federal jurisdiction and are appealed to this Court. Congress closed the *Holmes Group* loophole as part of the America Invents Act. Mr. Reines also helped persuade Congress not to pass an appellate transfer provision as part of the AIA that would have codified a form of "issue jurisdiction" for the Court. As part of a

3

different effort, he actively advocated against a legislative proposal to promote interlocutory appeals of claim construction decisions.

Last but certainly not least, Mr. Reines has promoted the administration of justice in the courtroom by his *pro bono* litigation on behalf of veterans and their families. He represented Leroy Comer in *Comer v. Peake,* 552 F.3d 1362 (Fed. Cir. 2009), and anonymously donated the Court's fee award to the Federal Circuit Bar Association as a scholarship. For the spouses of veterans, he litigated *Sharp v. United States*, 580 F.3d 1234 (Fed. Cir. 2009). His work in *Sharp* was recognized by two appreciation awards.

Throughout these many activities, Mr. Reines believes he has developed friendships with many judges. Together, they shared CLE panels, co-taught law school classes, corresponded regarding judicial clerkship applications, met at judicial conferences, and participated in international delegations—in Mr. Reines's view, all for the advancement of patent law and the administration of justice in patent cases.

### B. Mr. Reines is a Professional Friend of Chief Judge Rader and of Many Other Judges and Lawyers.

Mr. Reines became a friend of Chief Judge Rader through the professional activities discussed above. They did not come to know one another through their personal lives. They are not family friends. They are not golf partners or softball teammates. They live on opposite sides of the country. They became friends

4

through their work on Federal Circuit projects, Bar activities, CLE programs, law

school education, international delegations, etc.—work devoted to the

improvement of patent law, its practice, and the administration of justice. For

example, it was known in the patent litigation community that, as Chair of the

Federal Circuit Advisory Council, Mr. Reines had worked extensively on

bench/bar matters with the Chief Judge and thus was a professional friend. In the

course of such work, Mr. Reines also developed what he hopes were friendships

with many others, including Chief Judge Michel, judges of the Federal Circuit and

District Courts, and patent law practitioners across the country.

### C.    Mr. Reines Forwarded Chief Judge Rader's Email of March 4, 2014 Because it Complimented his Oral Advocacy.

On March 4, 2014, Mr. Reines argued two cases in the Federal Circuit. He

prepared long and hard for these arguments. He believes that on that Tuesday he

advocated for his clients as well as he was able, and that it was one of the best days

of his legal career.

On March 5, 2014, he was surprised and gratified at receiving from Chief

Judge Rader an email relaying an unusually generous compliment about his oral

advocacy during the two arguments ("the Email"). The compliment did not

address the merits of the case. It did not indicate anything about how the panel

might vote in the case. It simply confirmed that he had done a very good job at his

craft of appellate advocacy. He took pride in the compliment and appreciated that it had been made and relayed.

The fact that the Email had come from Judge Rader did not strike Mr. Reines as inappropriate. The compliment itself was consistent with Mr. Reines's relief and satisfaction that he had performed well for his clients. The forwarding of the compliment by Judge Rader was consistent with Judge Rader's well-known gregarious style. The Email's use of the word "friend" raised no question in Mr. Reines's mind. That term is commonplace in Judge Rader's lexicon. Mr. Reines had heard the Judge use it scores of times with reference to many people in professional settings. *E.g.,* Exs. 31, 70–71. The Judge's penchant for turns of phrase is also well known; so his sign-off did not strike Mr. Reines as remarkable.

Nor did the notion that a judge would consider Mr. Reines a friend raise any question. As noted above, from Mr. Reines's years of work on patent law issues outside the courtroom, he believes he has developed professional friendships with lawyers and judges alike. Instead of the word "friend," Mr. Reines focused on the compliment in the Email—which of course did not come from Judge Rader and had nothing to do with any friendship—because it acknowledged his hard work, preparation, and oral advocacy as a lawyer.

The Email expressly encouraged Mr. Reines to pass along the compliment. Without that suggestion, Mr. Reines does not know whether he would have

6

forwarded the Email or to whom. He has received compliments about his work before and did not forward them to anyone. After thinking about the suggestion, however, he decided that he would pass along the Email. This was his decision, and he takes full responsibility for it. So he forwarded the compliment to a number of people—his mother, brothers and sister, friends, clients, former clients, prospective clients, and lawyers.

Thus, Mr. Reines distributed the Email to specifically selected persons, not to the public. The distribution was not an advertisement. The recipients were nearly all lawyers with whom Mr. Reines had worked, or family members. Most recipients were selected because the unusually generous compliment from an unnamed jurist might encourage them to consider Mr. Reines for representation in future matters. Mr. Reines thought such distribution was appropriate because information about an appellate lawyer's skill at oral advocacy is an appropriate consideration in the selection of counsel. It never occurred to him that the sophisticated representatives of major clients and prospective clients like Intel, Yahoo!, Hewlett Packard, CBS, NBC Universal, Verizon, Samsung, Adobe, General Electric, Facebook, and Ebay would think that Chief Judge Rader could be improperly influenced because an advocate before him happened to be a friend from their years of professional interaction. To Mr. Reines, the Email did not

suggest any such thing, and the distribution of the Email did not suggest any such thing.

Mr. Reines's focus on the Email's compliment is confirmed by its distribution to his family and friends. He thought that they would appreciate news that he had done a very good job in his chosen profession. He did not think—and did not suggest—that his family would hold him in higher regard because a judge was a friend.

Mr. Reines's focus on the Email's compliment is also confirmed by the texts of his emails to clients, former clients, and prospective clients:

- There is no mention of any friendship with Judge Rader.

- There is no mention of access or influence.

- Most of the distribution emails are short and request that limited or no redistribution occur. Unsophisticated persons therefore would not receive the emails. *E.g.,* Ex. 11.

- Mr. Reines's few longer emails to entities not party to the argued cases address performance, advocacy skills, and/or substantive reputation—not friendship or improper influence.[2] *E.g.,* Ex. 38.

---

[2] In this regard, the Riverbend email, Ex. 49, was not drafted or forwarded by Mr. Reines. It was drafted and sent by one of Mr. Reines's partners, a transactional lawyer not familiar with appellate litigation or this Court, with the assistance of the marketing department. As far as Mr. Reines knows, it is the only email that was distributed by the law firm without his review. It was inaccurate. It referenced a District Court judge as though he would be "involved in the appeal," and it did so at a time when it was impossible to know which judges would be assigned to the appeal. When Mr. Reines saw the email, he disapproved it and ensured that it would not be used again.

- His emails to clients in the argued cases moved beyond the short text to discuss issues in the cases. Exs. 4–9. Those privileged portions of those communications have been redacted in the attached exhibits. The redactions are immaterial to the issues raised in the Order to Show Cause.[3]

That Mr. Reines's distribution of the Email did not suggest improper influence or attempt to trade on Judge Rader's friendship is also proved by the responses of the recipients. All of the response emails were positive, and they focused overwhelmingly on the compliment about his oral advocacy. None of the responses mentioned anything remotely related to improper influence.

It is worth noting that one of a number of non-client lawyer-recipients was retired Chief Judge Farnan of the United States District Court for the District of Delaware. Ex. 3. Here is his response:

Congratulations on such well deserved recognition. I will certainly keep it in mind. And thank you for sharing – I appreciate it very much.

---

[3] Mr. Reines has not sought permission from his clients to disclose the substance of attorney-client communications unrelated to the focus of the Order to Show Cause because he does not want to prompt waiver of the clients' attorney-client privilege. Under California law, courts do not have the power to order disclosure of attorney-client privileged communications, including for *in camera* review, because the privilege is statutory and absolute. If this Court, which is not bound by California law, orders disclosure of the redacted communications for *in camera* review to determine the privileged nature of the redactions, Mr. Reines will inform his clients of the order to allow them to address the issue and thereafter will abide by the order.

9

At the time, then, this distinguished federal jurist expressed no concern about the forwarding of the Email, and he interpreted Mr. Reines's message to be related to the compliment—the "well-deserved recognition." Like Judge Farnan, none of the other numerous in-house lawyers who received the Email expressed any ethical concern about its distribution.

Two responses—both by lawyers—referenced the word "friend." *See* Exs. 28, 48. And a third response by a lawyer dubbed Judge Rader a "fan" of Mr. Reines. *See* Ex. 40. But none of these or any other responses suggest anything about improper influence, and in reply to the third response Mr. Reines focused again on the compliment. *Id.*

At the same time, the vast majority of responses also focused the compliment about his oral advocacy:

- Mr. Baldauf at Newegg (a colleague of Mr. Lee): "Congratulations bud. It is well deserved. You are the best at what you do and I'm glad you are on our side." Ex. 27.

- Mr. Slotin at NBC Universal: "Congratulations! Quite a compliment!" Ex. 25.

- Mr. Busse at Netgear (a colleague of Mr. Kim): "Wow. That's impressive, Ed. Thanks for sending this along. I don't think my mom has ever spoken that highly of me." Ex. 48.

- Ms. Waltman at CBS: "Wow . . . pretty darn impressive . . . (although totally well deserved) . . . if you don't mind, I would like to share it with Ken Richieri at the NY Times apropos of HLP oral argument." Ex. 12.[4]

- Mr. Rainey at General Electric: "Knowing you as I do, I am not surprised. Great words for a star advocate!!" Ex. 18.

- Mr. Luftman at NetApp: "Awesome man. Congrats on the kudos." Ex. 26.

- Mr. Fitzgerald at Pure Storage: "Well done. Did you go to the event at rosewood tonight?" Ex. 42.

- Ms. Ward at eBay: "That's terrific praise and so thoughtful of Chief Judge Rader to write to you which speaks of the high regard he and others have for you. Congratulations!" Ex. 16.

- Mr. Sherman at eBay: "I echo Anup's comments. I haven't yet seen you in action in the courtroom, but it was completely evident in the event in your offices last month that the judges had an enormous amount of respect for you." Ex. 15.

- Mr. Pasika at Thermo Fisher Scientific: "Thanks for sharing. That's really, well, neat and high praise indeed." Ex. 7.

- Mr. Rhodes at 3M: "Congratulations, Ed. You should be rightly proud of such high praise. We will keep you in mind, for sure, in our trips to the Federal Circuit." Ex. 46.

- Ms. Waltman at CBS to Mr. Richieri at the New York Times Company:

  It was nice talking to you today. As promised, here is some info on Ed Reines. His bio can be found at the following link: http://www.weil.com/edwardreines/.

---

[4] Mr. Richieri is the General Counsel of the New York Times Company, which at the time was in a common interest group with CBS in a matter in which Mr. Reines represented CBS.

Also attached please find a listing of some of his recent appellate cases, an article about him that appeared in today's *San Francisco Journal*, as well as an email from Chief Judge Rader that he authorized me to share with you. In addition to his outstanding advocacy skills and his well-deserved stellar reputation, he happens to be an all-around good guy. I know he's done work for some of the members of the JDG group, so if you are looking for additional feedback, you should feel free to reach out to Kevin Kramer at Yahoo! or Andrea Townsend at Turner.

I also spoke to Ed after our call and he said he would welcome the opportunity to meet with you in person the next time he is in New York. In any event, I've probably given you more than you need or want, but if you want any additional information, please let me know.

Ex. 50.

### D.    Judicial Endorsements Are Commonplace in California and Around the Country.

Attorneys in California and other states routinely advertise judicial endorsements, even to the general public. *See* Ex. 51-69. The following exemplify the practice:

- "Steve has appeared in my court on dozens of occasions and has conducted several trials. I am always impressed with his professionalism, courtroom presence, and his tenacity in defending his clients. Over the years, I have recommended him to friends who need a criminal lawyer. Steve is a great person, and a great advocate." Ex. 69 (CA)

- "Lead Counsel has performed its work at every juncture with integrity and competence. It has worked as hard as a litigation of this importance demands, which for some of the attorneys, including the senior attorneys from Lead Counsel on whose shoulders the principal

responsibility for this litigation rests, has meant an onerous work
schedule for over two years." Ex. 53 (NY)

- "Mr. Cosca has now appeared before me on multiple occasions,
including to try two murder cases. He always does an excellent job"
Ex. 57 (CA)

- "Excellent trial lawyer. Always a pleasure to have in my courtroom"
Ex. 57 (CA)

- Mr. Kurzman has appeared before me on numerous occasions... He is
always thoroughly prepared and is an extremely effective advocate.
Mr. Kurzman's moral character is of the highest caliber. He is highly
regarded in the legal community. Ex. 62 (MN).

- "The hallmarks of a truly phenomenal criminal lawyer are the ability
to be both a great trial lawyer and a strong negotiator, while
maintaining credibility at all times. William Petrillo possesses these
skills. He has earned a stellar reputation within the legal community
as an outstanding, gifted trial attorney. Always a gentleman, honest
and ethical, Mr. Petrillo is a fierce, persuasive litigator and a tough,
fair negotiator. I would unequivocally recommend him to anyone in
need of a criminal lawyer." Ex. 68 (NY)

Like these endorsements, Mr. Reines's forwarding of the Email was intended to,

and did, focus on judicial compliment of performance.

### E. Independent Experts Have Concluded that Mr. Reines Did Not Violate Professional Standards.

Attached to this Response are independent expert opinions from Professor

Thomas Morgan; retired California Justices Gary Hastings, Fred Morrison, and

Margaret Grignon; Mark Tuft, the former Chair of the California Committee on

Professional Responsibility and Conduct; and Ellen Pansky, the former Chair of

the Los Angeles Committee on Professional Responsibility. All of these opinions

13

conclude that Mr. Reines has not violated the professional standards alleged in the

Order to Show Cause.

Professor Morgan is one of the leading American legal ethicists. For forty

years he has taught and researched the subject. He has been one of the official

Reporters of the American Law Institute's *Restatement of the Law: The Law*

*Governing Lawyers* and of the American Bar Association's Commission on

Revision of the Model Rules of Professional Conduct, the Ethics 2000

Commission, which led to revision of the ABA Model Rules of Professional

Conduct in 2002. He presently serves on the Editorial Board of the ABA/BNA

Lawyers' Manual of Professional Conduct, which the Order to Show Cause

references. He has received two awards for lifetime contributions to legal ethics

scholarship—the American Bar Foundation Keck Award in 2000 and the New

York State Bar Association Sanford D. Levy Award in 2008. Professor Morgan

has concluded that Mr. Reines did not engage in "conduct unbecoming a member

of the bar" in violation of Federal Rule of Appellate Procedure 46(b)(1)(B) and did

not violate ABA Model Rules 8.4(e), 7.1, or 7.3. He also cautions, based on his

scholarship since the Supreme Court's landmark decision in *Bates v. State Bar of*

*Arizona*, 433 U.S. 350 (1977), " . . . for this Court to impose discipline on Mr.

Reines would be legally unjustified and raise constitutional questions."

Declaration of Thomas D. Morgan ¶ 5 ("Morgan Decl.").

14

Regarding California professional standards, five experts have reviewed Mr. Reines's emails.  The Honorable Margaret M. Grignon spent 20 years as a California judge, including 14 years as an Associate Justice on the California Court of Appeal, Second District.  She presently is a partner in the Los Angeles office of Reed Smith, specializing in appellate advocacy.  Judge Grignon has concluded that Mr. Reines did not violate California Rule 1-400 and that Model Rule 8.4(e) does not apply because it has not been adopted by California.  As to Rule 1-400, she concludes that the Rule does not apply to the vast majority of the emails in question because they are lawyer-to-lawyer communications.  As to one email that was not sent to a lawyer, she opines that it is not a "communication" under the Rule because it was a report to the inventor of a patent regarding argument about that patent, not an offer concerning future employment.  In any event, the email was not misleading "to the public" because it was sent only to a highly sophisticated executive who would not "have been at any significant risk of being misled into believing that Attorney Reines had improper influence over any judge of this Court in any legal proceeding before him or her."  Declaration of Hon. Margaret M. Grignon (Ret.) at 5 ("Grignon Decl.").

The Honorable J. Gary Hastings is also a former Associate Justice of the California Court of Appeal, Second District.  He is a founding member of the Benjamin Aranda III Inn of Court, which has extensively studied the use of social

media by attorneys and judges. He concludes that Mr. Reines violated neither Model Rule 8.4(e) nor any California rule of professional conduct as "Mr. Reines says nothing to suggest [] improper influence." July 6, 2014 Ltr. of the Hon. J. Gary Hastings (Ret.) at 5 ("Hastings Ltr."). He opines that the emails were not advertisements under the California or ABA Model Rules, or solicitations under Rule 1-400 or ABA Model Rule 7.3. Some of the emails were "communications" under Rule 1-400, but all of them are covered by certain exceptions to the Rule— including the exception for lawyer-to-lawyer communications—and were permissible.

The Honorable Fred K. Morrison is a former Associate Justice of the California Court of Appeal, Third District. He currently practices as an ADR neutral for JAMS. Justice Morrison adopts and agrees with the reasoning of Justice Hastings. Justice Morrison also concludes that Mr. Reines did not violate Model Rule 8.4(e) because "[t]he email was primarily about [Mr. Reines's] advocacy, which is a proper means of influencing the Court." July 7, 2014 Ltr. of the Hon. Fred Morrison (Ret.) at 2 ("Morrison Ltr."). "The expression of friendship, by itself," Justice Morrison concludes, "is not sufficient to imply improper influence." *Id.*

Mark Tuft is the former Chair of the California Committee on Professional Responsibility and Conduct and the current Vice Chair of the California

16

Commission for the Revision of the Rules of Professional Conduct. In addition to his public service, Mr. Tuft co-authored the *California Practice Guide on Professional Responsibility* and has been an adjunct professor of legal ethics at University of San Francisco School of Law. Citing long-standing California authority, he opines that neither the distribution nor the substance of Mr. Reines's emails to current, former, or prospective clients violates California Rule 1-400 because, *inter alia*, Rule 1-400 does not apply as lawyer-to-lawyer communications, the emails were not false, and they were not distributed to the public. Declaration of Mark L. Tuft at ¶ 15, 19 ("Tuft Decl."). He also opines that California's Standard 6, cited by the Court in its Order to Show Cause, is similarly inapplicable. *Id.* at ¶ 18.

Ellen Pansky is a recognized expert of California ethics rules and has been qualified as such in numerous legal malpractice actions. She is the former Chair of the Los Angeles County Bar Association's Committee on Professional Responsibility and Ethics, a former prosecutor for the State Bar of California, and a former Assistant General Counsel of California's Bar. She concludes that it is "simply not improper for either a judge or a lawyer to refer to one another as 'friends.'" July 7, 2014 Ltr. of Ellen Pansky at ¶ 7 ("Pansky Ltr."). Further, she determined that "nothing in the email drafted by Chief Judge Rader, or in Mr. Reines's forwarding emails, can reasonably be interpreted as an improper or

17

misleading suggestion that Mr. Reines held special influence over Judge Rader"
because "the focus of Judge Rader's email was a description of the exception
quality of [Mr. Reines's] skill." *Id.* ¶ 5. She also concludes that Mr. Reines "did
not violate any California rules restricting false, confusing and misleading
advertisements disseminated to the public " because, among other things, he did
not send the emails "to the public," *id.* at ¶ 3; that Standard 6 to Rule 1-400
regarding firm names and designations is "completely inapplicable," *id.* at ¶ 4; and
that Mr. Reines's emails were permissible lawyer-to-lawyer communications (with
certain exceptions that do not violate the Rule), *id.* at ¶ 8.

> ### F.     Emails Requested by the Court and a Few Additional Emails are Attached.

Pursuant to the Court's request, emails to Mr. Reines's clients, former
clients, and prospective clients, as well as responses to those emails are attached.
Also attached are two emails sent by two lawyers at Mr. Reines's law firm and Ms.
Waltman's email to Mr. Richieri. Although not requested by the Court also
attached are Mr. Reines's emails to his family and his emails to and from Chief
Judge Farnan. These emails bear Exhibit numbers 1–50. Finally, attached as
Attachments B and C are an index of these emails and a privilege log of attorney-
client communications and mental-impression work product redacted from the
emails.

## ARGUMENT

Edward R. Reines did not violate professional standards when he sent Chief Judge Rader's March 5, 2014 email to his mother, brothers, and sister, and to selected friends, lawyer colleagues and co-counsel, clients, former clients, and prospective clients. Mr. Reines's regret and apology for sending the Email are clear and sincere. And it is equally clear that the violations alleged in the Order to Show Cause did not occur and that it would be inappropriate—indeed, unconstitutional—to impose professional discipline.

The Order to Show Cause stated: "It has been alleged that you disseminated [the Email] to clients and to potential clients in soliciting their business implying a special relationship with [Chief Judge Rader]," and did so "during a time when you had cases pending before him." The Order then asks whether this allegation, if proved, would constitute a violation of any of the following sources of law:

- Fed. R. App. P. 46(b)(1)(a), which prohibits "conduct unbecoming a member of the court's bar";

- ABA Model Rule of Professional Conduct 8.4(e) ("ABA Model Rules"), which states: "It is professional misconduct for a lawyer to . . . state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law"; or

- California Rule of Professional Conduct 1-400 and Standard 6, which address, respectively, lawyer advertising/solicitation and the names of law firms.

Mr. Reines's constitutionally protected distribution of the Email conformed to all of these Rules, each of which is addressed below.

### A.     The First Amendment Protects Mr. Reines's Distribution Of Accurate Information About Himself.

In addition to family and friends, Mr. Reines forwarded the Email to selected professional contacts, all but three of whom were lawyers, *see* Attachments A and B, to encourage them to consider Mr. Reines for future representation before the Federal Circuit.  There was nothing inaccurate, misleading, or unlawful in these communications, and therefore the First Amendment protects them as commercial speech. *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 377 (1977) ("allowing restrained advertising" by lawyers will "facilitate the process of intelligent selection of lawyers" (internal quotation marks omitted)); *see also* Morgan Decl. ¶ 9.

Commercial speech may be prohibited when it is inherently misleading. *See, e.g., Ibanez v. Fla. Dep't of Bus. & Prof'l. Regulation, Bd. of Accountancy*, 512 U.S. 136, 144–45 (1994); *Peel v. Att'y Registration & Disciplinary Comm'n*, 496 U.S. 91, 110 (1990); *Alexander v. Cahill*, 598 F.3d 79, 90–91 & n.8 (2d Cir. 2010) (Calabresi, J.) (striking down New York's ban on client testimonials). When such speech has only some potential to mislead, evidence of actual deception is required to overcome the constitutional protection. *Ibanez*, 512 U.S. at 145 ("Given the complete absence of any evidence of deception, the Board's

concern about the possibility of deception in hypothetical cases is not sufficient to rebut the constitutional presumption favoring disclosure over concealment." (citations and internal quotation marks omitted)); *see also Cahill*, 598 F.3d at 91 n.8 ("It is not clear, however, that a state has a substantial interest in prohibiting *potentially* misleading advertising, as opposed to inherently or actually misleading advertising." (emphasis in the original)).

Furthermore, the principal permissible motivation to regulate speech about legal services is protection of the public: "[B]ecause the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising." *Bates*, 433 U.S. at 383–84. Thus, a lawyer's commercial speech directed to other lawyers is treated differently from communications with the general public. *See, e.g.*, ABA Model Rules 7.3(1)(a) (allowing direct in person solicitation of a lawyer); Morgan Decl. ¶ 9.

Mr. Reines's commercial speech in this case is constitutionally protected. He directed it only to specifically selected sophisticated persons, all but three of whom were lawyers. By forwarding an email that he actually received, the speech contained no misrepresentation or deception. Morgan at ¶ 9. Nor did the Email mislead its sophisticated audience. Grignon at 5–6; Pansky at ¶ 8. For example, even if the speech were construed as a testimonial or endorsement, it is not

21

inherently misleading. As the Second Circuit recently explained, neither "consensus [nor] common sense support the conclusion that . . . testimonials or endorsements [about lawyers] are inherently misleading." *Cahill*, 598 F.3d at 92. The Email contained a compliment about Mr. Reines's performance during oral argument in two cases on a single day. It did not say that Mr. Reines would perform equally well in future engagements for other clients. Nor did it say that hiring him would improperly influence the outcome or cause the Court to decide the cases based on anything other than their legal merit.

Indeed, in the adversarial system of justice, litigants appropriately hire skilled oral advocates to explain the legal merits of their respective positions. So how did the litigants and potential litigants in this case perceive Mr. Reines's speech about the Email? They perceived it exactly as Mr. Reines intended to convey it—that he had received an unusually generous compliment about his oral advocacy. *See* Exs. 4–9, 12, 15, 16, 20, 26, 40, 42, 44, 46. There is no evidence that the Email—testimonial/endorsement or not—misled the recipients.

Furthermore, as Professor Morgan opines, the Email itself provided the reasonable factual foundation for Mr. Reines's message about his skill as an advocate. Morgan Decl. ¶ 9(g). Mr. Reines circulated specific and reliable feedback about two oral arguments. The Email told that story "accurately and

22

completely," and its distribution therefore is constitutionally protected speech that complies with Model Rules of Professional Conduct 7.1 and 7.3. *Id.*[5]

## B. Standard of Proof

To establish a disciplinary violation of a Rule of Professional Conduct requires clear and convincing evidence. *See, e.g., In re Liotti*, 667 F.3d 419, 426 (4th Cir. 2011); *Shepherd v. ABC*, 62 F.3d 1469, 1473 (D.C. Cir. 1995); *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992); ABA Standards for Imposing Sanctions on Lawyers § 1.3 (1992) ("ABA Standards"); *see generally McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1372–73 (Fed. Cir. 2003) (holding that imposition of attorneys' fees for attorney misconduct requires proof by clear and convincing evidence).

This standard requires:

> evidence so substantial such that it produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*Medrano*, 956 F.2d at 102 (quoting *Cruzan ex rel. Cruzan v. Mo. Dep't. of Health*, 497 U.S. 261, 285 n.11 (1990)) (internal quotation marks omitted). When any inference is made, the standard insists upon "the single most reasonable inference

---

[5] In the wake of *Bates* and its progeny, even public advertising of endorsements by judges is commonplace and permissible. *See infra* at 35–36; Anthony Decl. and accompanying Exhibits 51–69.

able to be drawn from the evidence." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc) (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366–67 (Fed. Cir. 2008)) (applying the clear and convincing standard to deceptive intent inquiry).  It is error to "overlook[] one inference in favor of another equally reasonable inference." *Scanner Tech Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008).

### C.    **Mr. Reines Did Not Violate Fed. R. App. P. 46.**

Federal Rule of Appellate Procedure 46 authorizes the Court to discipline an attorney for "conduct unbecoming a member of the bar or for failure to comply with any court rule." Fed. R. App. P. 46(c); *see also id.* 46(b)(1)(B).  This Court promulgated the Federal Circuit Attorney Discipline Rules, which provide more specifically that grounds for discipline of members of the Bar of the Court include, in relevant part:

> (d)    Act or Omission.  An act or omission by an attorney that violates the Federal Rules of Appellate Procedure, the Federal Circuit Rules, these rules, or orders or instructions of the court . . . .

> (e)    Conduct Unbecoming.  Any conduct before the court unbecoming a member of the bar may be the basis for discipline.

Fed. Cir. Att'y Discipline Rule 2(d)–(e) (2011).  Other than the alleged "conduct-unbecoming," which would violate Federal Rule of Appellate Procedure 46 and Federal Circuit Attorney Discipline Rule 2(e), the Order to Show Cause does not

allege that Mr. Reines violated any other rule, order, or instruction of the Court. Consequently, discipline in this case may be imposed only under the "conduct-unbecoming" standard.

An attorney engages in "conduct unbecoming a member of the bar" when the conduct is "contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or to the courts, or conduct inimical to the administration of justice." *In re Snyder*, 472 U.S. 634, 645 (1985).

This standard is not necessarily satisfied by violation of a rule of professional conduct. Rather, "conduct unbecoming within the meaning of Rule 46(c) has generally been understood to involve significant elements of aggravation, such as deliberately misleading the court or displaying egregious misjudgment." *In re Lightfoot*, 217 F.3d 914, 916 (7th Cir. 2000) (collecting cases); *see also In re Bagdade*, 334 F.3d 568, 585 (7th Cir. 2003) (per curiam) (same). Negligence will suffice only when it involves a misrepresentation, omission, or failure to inquire. *Lightfoot*, 217 F.3d at 916.

Further, the conduct-unbecoming standard is not an amorphous vehicle allowing the Court to impose sanctions at will. Rather, the Court must find that the attorney engaged in misconduct based upon the "case law, applicable court rules, and the lore of the profession *as embodied in codes of professional conduct.*" *In re Snyder*, 472 U.S. at 645 (emphasis added) (internal quotation marks omitted). In

order to be sanctionable, then, alleged conduct must violate a promulgated rule of behavior and not be based on some "transcendental code of conduct" that exists only "in the subjective opinion of the court." *In re Finkelstein*, 901 F.2d 1560, 1565 (11th Cir. 1990); *see also In re Giradi*, 611 F.3d 1027, 1035 (9th Cir. 2010) (holding that when determining whether an attorney engaged in conduct unbecoming, the court may look to case law, court rules, and "codes of professional conduct").[6]

Therefore, to discipline Mr. Reines under Rule 46, the Court must not only find a violation of a rule of professional conduct by clear and convincing evidence, but it must also find that the violation is sufficiently serious that it demonstrates "an unfitness to discharge continuing obligations to clients or to the courts, or conduct inimical to the administration of justice." *Snyder*, 472 U.S. at 645. As established below, the allegations against Mr. Reines fail these requirements.

### D.    Mr. Reines Did Not Violate Model Rule 8.4(e).

Under ABA Model Rule 8.4(e), it is improper for a lawyer to state or imply an ability to influence improperly a judge; specifically:

---

[6] Nor would it be proper for the Court to sanction Mr. Reines based on a perceived breach of judicial ethics by Judge Rader in sending the Email to Mr. Reines. Attorneys are not regulated by, or charged with knowledge of, the standards of judicial ethics. *See, e.g.,* Morgan Decl. ¶ 8.e.; Preamble to ABA Model Code of Judicial Conduct ("The Model Code of Judicial Conduct establishes standards for the ethical conduct of ***judges and judicial candidates***." (emphasis added)).

> It is professional misconduct for a lawyer to: . . . (e) state or imply an
> ability to influence improperly a government agency or official or to
> achieve results by means that violate the Rules of Professional Conduct
> or other law.

Mr. Reines never stated an ability to influence improperly Judge Rader or any

other member of the Court. As a result, for discipline under Rule 8.4(e), there

must be clear and convincing evidence that Mr. Reines implied an ability to do

so.

Case law interpreting Rule 8.4(e), including decisions cited by the Lawyers'

Manual on Professional Conduct, at 101:703 (ABA/BNA Mar. 30, 2011)

("Lawyers' Manual"), makes clear that Rule 8.4(e) is limited either to direct

lawyer assertions of influence or to exclusive inferences to the same effect. *See,*

*e.g.*, *In re Pstrak*, 575 S.E.2d 559, 559–60 (S.C. 2003) (per curiam) (lawyer's

written request for a client plea deal falsely claimed he was the town prosecutor

and said he had plans to vacation with the mayor); *In re Davidson*, 761 N.E.2d

854, 855 (Ind. 2002) (per curiam) (intoxicated lawyer threatened to shoot police

officers and claimed to have influence over the police department by virtue of his

friendship with a particular judge) (cited by Lawyers' Manual); *In re Danks*, 669

N.E.2d 992, 993 (Ind. 1996) (per curiam) (attorney, during his arrest, informed the

police that he was an attorney for the Police Department Merit Commission and

that the police officer should speak with the police chief before arresting him)

(cited by Lawyers' Manual); *A Miss. Att'y v. Miss. State Bar*, 453 So. 2d 1023,

27

1025 (Miss. 1984) (en banc) (in the presence of the judge and opposing counsel, a lawyer stated that the judge would not hold him in contempt since he helped the judge get elected) (cited by Lawyers' Manual).

*In re Allen*, 470 N.E.2d 1312 (Ind. 1984), which is also cited by the Lawyer Manual, is instructive. Lawyer, Allen, mentioned his client's case to another lawyer, who stated that "he had played golf with the judge, had eaten dinner with the judge, and had discussed the outcome of cases with the judge, in chambers." *Id.* at 1313. These comments "implied that if he was employed . . . he could affect the outcome in defendant's favor." *Id.* Allen informed his client of the statements made by the other lawyer and recommended that his client hire the other lawyer as co-counsel because he "would be able to have some influence with the judge" and that "a favorable decision could be reached in the case." *Id.* Based on the clear and convincing evidence that Allen made statements proposing improper influence, the Supreme Court of Indiana found that he had violated Rule 8.4(e). In doing so, however, the court was careful to draw a distinction between permissible and impermissible relationships with the Court. It reasoned that:

> The implication is not that of simply good professional rapport or mutual respect between lawyer and judge; it is an implication of a special standing in which the proposed co-counsel routinely speaks to the judge about cases, outside the courtroom, and by which method the proposed co-counsel could achieve special treatment for the defendant, an outcome which could not be achieved through regular channels.

*Id.* at 1314.   Thus, it is not a violation of Rule 8.4(e) to state that a judge and lawyer are friends.   Indeed, as the expert opinion of Ellen Pansky makes clear, it is not a violation of any ethical rule for a lawyer and judge to be friends, even close friends.  A judge may be close friends with a lawyer who appears before her, even be the godfather of the lawyer's child.  A judge need only disclose the relationship, because it raises concerns about a judge's impartiality, when the relationship is one akin to a close familial relationship.  Morgan Decl. ¶ 7; Hastings Ltr. at 6–7.

Mr. Reines did not violate Rule 8.4(e).  First, he did not intend to imply that he could influence Judge Rader.  Reines Decl. ¶ 20.  Some courts have viewed a lack of intent to imply influence as singularly dispositive. *See In re Bolton*, 820 So. 2d 548, 553 (La. 2002) (per curiam) (affirming disciplinary board's determination that because the lawyer did not intend to offer a bribe or otherwise influence the outcome of the case that there was no violation of 8.4(e)).  As Mr. Reines states in his Declaration, by forwarding the Email, he intended only to pass along the compliment about his advocacy in the hope of being considered as counsel for future appeals. Reines Decl. ¶¶ 14–20.  Furthermore, nothing in Mr. Reines's emails to his current clients or potential clients indicates that he intended to convey anything else.  He repeatedly referred to the Email as "feedback" regarding

his performance at oral argument. *See* Ex. 4 ("I write because I have some unusual feedback for you from the Chief Judge."); Ex. 6 ("Below is a very complimentary email from Chief Judge Rader about the argument, that provides some feedback."); Ex. 12 ("I thought you might be interested in this feedback from the [sic] Chief Judge Rader.").

In the clearest example of how Mr. Reines contemporaneously viewed the Email, Mr. Reines stated: "Just yesterday Chief Judge Rader sent me an email reporting how impressed the Federal Circuit judges were in appeals I argued Tuesday." Ex. 38. There is not a single word about improper influence or about access to, or friendship with, Judge Rader. Simply put, the evidence proves that Mr. Reines intended solely to pass along the feedback about advocacy—a proper means of influencing the court—in the hope that he would be hired as an advocate in the future. *See* Morgan Decl. ¶ 8(f); Hastings Ltr. at 5; Morrison Ltr. at 3; Pansky Ltr. at ¶ 5.

Second, the responses that Mr. Reines received from sophisticated clients and prospective clients confirm that he had not implied anything about improper influence. *See* Grignon Ltr. at 5; Pansky Ltr. at ¶ 5. The responses repeatedly congratulated Mr. Reines on the positive feedback. *See, e.g.*, Statement of Facts, *supra* at 13. None of the responses suggested that the recipient had interpreted Mr. Reines's email as suggesting an ability

to influence the Court improperly. The recipients saw the emails for what they were—a proud lawyer passing along praise of his performance in the hope that the recipients would consider him for future appeals.

Although not a client or former client, the retired Chief Judge of the United States District Court for the District of Delaware—a person with a uniquely relevant perspective on today's allegations—had the same reaction: "Congratulations on such well deserved recognition. . . . [T]hank you for sharing – I appreciate it very much." Ex. 3. Judge Farnan obviously did not believe that Mr. Reines was suggesting improper influence or that forwarding the Email was somehow improper.

In sum, there is no violation of Rule 8.4(e) because neither the Email, nor Mr. Reines's emails, nor recipient responses conveyed or implied anything related to improper influence.

Third, even if the Email (incorrectly) could be read somehow to imply improper influence, it is not "the single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290. To the contrary, a more reasonable inference from the Email is that the two men are friends from working together professionally, and that in the litigation of cases each would act professionally according to his role. For example, the Email references Mr. Reines's performance, but not the merits of any case, and

31

points out that the two teach a class together at Berkeley. The word "friend" in this context reasonably implies that Judge Rader respects Mr. Reines's abilities as a lawyer and teacher and that he enjoys their association. Another reasonable inference is that Judge Rader has many friends and is pleased to acknowledge that fact. In Exhibit 70, for example, Judge Rader acknowledges a number of friends as he makes a speech: The Chief Judge of the Supreme People's Court of China is his "dear friend"; David Kappos of Cravath, Swaine & Moore is his friend; as are unnamed employees of Intel and 3M. *Id.* at 5, 6, 9; *see also* Exs. 31, 71.

The only correspondence regarding the Email that discusses Mr. Reines's relationship with Judge Rader is an email that Mr. Reines did not draft, edit, or see before it was sent. Ex. 49; Reines Decl. ¶ 21. One of Mr. Reines's partners, who is a transactional lawyer not familiar with appellate litigation or this Court, sent the email. It contained, for example, inaccurate statements noted above. When Mr. Reines saw the email, he objected to it and ensured that similar language would not be used again. Reines Decl. ¶ 21. There is no basis, of course, to impose discipline upon Mr. Reines for the words of others.

We are aware of no case finding a violation of Rule 8.4(e) in circumstances similar to those here, where a lawyer forwards to his family,

friends, and a select group of his professional associates an email from a

Judge that compliments the lawyer's advocacy and calls him a friend, but

does not suggest any improper influence. The discipline contemplated by

the Order to Show Cause is thus unprecedented.

### D.    Mr. Reines Did Not Violate Any California Rule of Professional Conduct.

The Order to Show Cause cites Rule 1-400 of the California Rules of

Professional Conduct, which deals with attorney advertising and solicitation.[7] Mr.

Reines's emails do not, however, qualify as a "solicitation" because they were not

delivered in person or by telephone and were not directed at any person known to

be represented by counsel. Cal. Prof'l. Conduct R. 1-400(B).

All of the client, former client, and prospective client emails were sent to

lawyers. In a few instances non-lawyers also were copied. Exs. 8, 47. But Rule 1-

400 generally does not apply to lawyer-to-lawyer communications. Justice

Grignon Ltr. at 4; Tuft Decl. ¶¶ 13–15. As Mr. Tuft, the former Chairman of

California's Committee on Professional Responsibility and Conduct, has opined,

---

[7] Though not raised by the Court's Order, we note that Section 6157.1 of California's Business and Professional Code, which also regulates attorney advertising, does not apply. Section 6157 defines an "advertisement" for purposes of these rules as a communication "disseminated by television or radio, by any print medium, including, but not limited to, newspapers and billboards, or by means of a mailing directed to . . . members of the public[,] not a specific person." Cal. Bus. & Prof. Code § 6157 (West 2014). Mr. Reines's forwarding of the Email, therefore, does not constitute an "advertisement" for purposes of the statute.

"Lawyer-to-lawyer communications do not come within the scope of [Rule 1-400] even if the communications seek professional employment through the assistance or recommendation of the recipient lawyer, or even if the communications seek professional employment by the recipient lawyer." Tuft Decl. ¶ 13 (Citing Cal. State Bar Formal Opn. 2004-165). This is so because Rule 1-400 is primarily designed to protect the public from fraud and undue influence and thus does not apply to lawyer-to-lawyer communications because "lawyers are unlikely to be affected by such vexatious conduct." Cal. State Bar Formal Opn. 2004-165.

The Court also cites Standard 6 of Rule 1-400. That Standard, however, is inapplicable on its face. *See* Grignon at ¶ 6; Hastings Ltr. at 5–6; Tuft Decl. ¶¶ 16–18; Pansky Ltr. at ¶ 4. It applies only to a "'communication' in the form of a *firm name, trade name, fictitious name, or other professional designation* which states or implies a relationship between any member in private practice and *a government agency or instrumentality* or a public or non-profit legal service organization." Cal. Prof'l Conduct R. 1-400 & Standard 6 (emphasis added). In Ethics Opinion No. 2004-167, the State Bar of California's Standing Committee on Professional Responsibility and Conduct clarified that "Standard 6's reach is narrow, applying only to 'firm name[s], trade name[s], fictitious name[s], and professional designation[s].'" *Id.* at 3. Mr. Reines's forwarding of the Email plainly has

nothing to do with the use of a "firm name" or other "professional designation" that might implicate Standard 6.

The remainder of Rule 1-400 is equally inapplicable to the non-lawyer recipients. Rules 1-400(D)(2) and (D)(3) apply only to communications that might be misleading to "the public." *Leoni v. State Bar*, 704 P.2d 183, 194 (1985) (analyzing the prior, identical Rule 2-101(A)); *see also Bates*, 433 U.S. at 383 (regulation of some commercial speech is permissible because "*the public* lacks sophistication concerning legal services . . . ." (emphasis added)); Grignon Ltr. at 4; Tuft Decl. ¶¶ 13–14; Pansky Ltr. at ¶ 8. Because Mr. Reines's emails were sent to selected sophisticated persons, most of whom were lawyers, Rules that prohibit communications misleading to the public are inapplicable. Grignon Ltr. at 5; Pansky Ltr. at ¶ 3.

Even when sent to the public, judicial endorsements of lawyers can be distributed under Standard 2 of Rule 1-400. Furthermore, California judges are not prohibited from providing recommendations and reference letters to lawyers. Pansky Ltr. ¶ 2. A rudimentary internet search reveals that attorneys in California and elsewhere routinely list judicial endorsements on their public websites. *See* Exs. 51-69. For example, Chris Cosca, a California criminal attorney, includes testimonials from four Superior Court Judges. Ex. 57. He begins his testimonial page with a statement from The Honorable Helena Geown, a Sacramento County

35

Superior Court Judge who states, "Mr. Cosca has now appeared before me on multiple occasions, including to try two murder cases. He always does an excellent job. This case was no exception. He is professional, prepared and a joy to have in the courtroom." *Id.* Like the Cosca post, Mr. Reines's emails focused only on performance. Unlike the Cosca post, which is available to anyone with an internet connection, Mr. Reines limited distribution of the complimentary Rader Email to a select group of lawyers and other highly sophisticated consumers of legal services. Once again, there is no violation of Rule 1-400.

Finally, as a matter of California law, the emails are not misleading or deceptive. Hastings Ltr. at 3–5; Morrison Ltr. at 2; Grignon Ltr. at 4–5; Tuft Decl. ¶ 15; Pansky Ltr. at ¶ 9. To determine what constitutes "misleading" or "deceptive" advertising, the California courts turn to the identical standard found in Section 17200[8] of the California Business and Professions Code for guidance. *Leoni v. State Bar*, 704 P.2d at 193 ("In analyzing the [advertisements at issue], we are guided by the policy of consumer protection and examine the standard for misleading advertising as stated in Business and Professions Code sections 17200 and 17500 because of the statute's similarity to Rule 2-101.").

---

[8] Section 17200 states in relevant part, "unfair competition shall mean and include . . . deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 (West 2014).

Thus, California courts apply a "reasonable consumer" standard, taking into account the group the advertisement targets. *See Lavie v. Procter & Gamble Co.*, 129 Cal. Rptr. 2d 486, 492–99 (Ct. App. 2003)*; Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.*, 290 F. Supp. 2d 1034, 1041 (N.D. Cal. 2003), *aff'd*, 421 F.3d 981 (9th Cir. 2005). "Where the practice is targeted to a sophisticated purchaser, the question of whether it is misleading to the public will be viewed from the vantage point of members of the targeted group, not others to whom it is not primarily directed." *Ariz. Cartridge*, 290 F. Supp. 2d at 1041 (quoting *Lavie*, 129 Cal. Rptr. 2d at 498) (internal quotation marks omitted).

In this case, communications distributed to a select group of sophisticated persons, mostly lawyers, were not misleading. These persons, almost all of whom knew Mr. Reines, would not have reasonably interpreted the compliment about his advocacy or the word "friend" as a suggestion that he and Judge Rader had a familial-like relationship that could lead to improper influence. Rather, a reasonable lawyer or sophisticated corporate executive would have understood that Mr. Reines was within Judge Rader's circle of friends from his many years of public service and that Mr. Reines had performed well during the oral arguments in question. *See, e.g,* Hastings Ltr. at 5–6; Grignon Ltr. at 5–6. There is nothing misleading or improper about such a communication, as demonstrated by the reactions of the recipients, none of whom said anything to suggest that Mr. Reines

had implied improper influence.  In sum, Mr. Reines did not violate Rule 1-400

because he did not communicate in a false or misleading way.[9]

\* \* \* \* \* \*

---

[9] Because the communication was not false or misleading to its intended audience, the presumption that a testimonial or endorsement that does not contain a disclaimer violates Rule-1-400 is rebutted, if it applies at all.  *See* Cal. Prof'l. Conduct R. 1-400 & Standard 2.  Grignon Ltr. at 5.  Assuming the Email qualifies as a "testimonial" or "endorsement," the recipients of the Email would have understood, even without a disclaimer, that simply because Mr. Reines performed well at two oral arguments a particular result in future cases is not guaranteed.  *See id.*  Regardless, a violation of this Standard, which would be at most a technical violation, does not demonstrate "an unfitness to discharge continuing obligations to clients or to the courts, or conduct inimical to the administration of justice." *Snyder*, 472 U.S. at 645.  Therefore, it does not constitute conduct in violation of Fed. R. App. P. 46.

## CONCLUSION

Mr. Reines did not violate any professional standard by forwarding Chief Judge Rader's Email. We respectfully submit that a hearing is not necessary to reach that conclusion. At the same time, if the Court would find a hearing—with or without live testimony—useful, Mr. Reines would be pleased to participate. If live testimony is to be presented, Mr. Reines respectfully requests full and fair pre-hearing discovery of all complaining witnesses.

Respectfully submitted,

**EDWARD R. REINES**

By Counsel

WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C. 20005
(202) 434-5000 (telephone)
(202) 434-5029 (facsimile)
*Counsel for Respondent*

Michael S. Sundermeyer
William T. Burke
Peter J. Anthony

Dated: July 7, 2014

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD COUNT LIMITATIONS

I, Peter J. Anthony, counsel for Respondent Edward R. Reines and a member of

the Bar of this Court, certify that the attached Submission of Edward R. Reines is

proportionately spaced, has a typeface of 14 points or more, and contains 9,472

words.

Dated: July 7, 2014

Peter J. Anthony, Esq.

## DECLARATION OF EDWARD R. REINES

I, Edward R. Reines, declare under penalty of perjury under the laws of the United

States of America that I have personal knowledge of the facts contained in this

Declaration and that they are true and correct.

<u>Background</u>

1.    I have practiced in the area of patent litigation for more than 23 years,

initially in federal district courts and then in the Federal Circuit.

2.    I have worked on many Federal Circuit appeals.

3.    In 1999, I began participating in the development of court rules for

patent cases in the U.S. District Court for the Northern District of California.

From 2006 to the present, pursuant to appointments by two Chief Judges of the

Court, I served on the Court's Patent Rules Advisory Committee.  In 2009, then-

Chief Judge Walker asked me to chair the Court's Advisory Committee on Form

Protective Orders.  Since 2012, pursuant to an appointment by Judge Hamilton

and Magistrate Judge Laporte, I have been a member of the Court's e-discovery

working group.  From 2010 through 2012, I was selected by the judges of the

Northern District as a lawyer-representative to the Ninth Circuit Judicial

Conference.  I am the current President of the Northern District of California

Chapter of the Federal Bar Association, following service as its vice president and

an active member.

4.      During this same time, I developed and taught patent law classes at both the University of California, Berkeley, School of Law and Stanford University Law School.  I have co-taught the Berkeley class every year since 2002 and the Stanford class every other year since 2010.  A number of federal judges have been involved in the class as both co-teachers and mock judges on simulated motions panels.  I have organized and led numerous CLEs programs at the Stanford University Law School, University of California, Berkeley, School of Law, Columbia University Law School, and Santa Clara University School of Law.  I have also organized and participated in programs for AIPLA, IPO, FBA, FCBA, SFIPLA, PLI and Sedona.

5.      Since 1999, I have actively participated in the Federal Circuit Bar Association.  For ten years beginning in 1999, I undertook a substantial role in organizing and/or programming the Association's annual Bench-Bar meeting.  In additional to my multiple committee memberships, I was elected to the Association's board of governors in 2001, and to the positions of secretary (2005), president-elect (2006), and president (2007).

6.      For the Federal Circuit itself, I served in 2007, at the request of Chief Judge Michel, on the Patent Litigation Advisory Group to the Chief Judge, a six person group addressing the state of patent law.  Chief Judge Michel also asked me in 2007 to chair a Bench-Bar project concerning model jury instructions.

After serving ex officio on the Federal Circuit Advisory Council in 2007, I was appointed to the Council by Chief Judge Michel in 2009, and I became the chair of the Council in 2010 by appointment of Chief Judge Rader.

7.    I have worked to support and protect the Federal Circuit's jurisdiction. I organized and chaired the Ad Hoc Committee To Study Holmes Group. The committee proposed changes to this Court's jurisdictional statute to ensure all patent claims, including counterclaims, remained subject to exclusive federal jurisdiction and are appealed to this Court. Congress relied on this and my testimony as it closed the Holmes Group loophole as part of the America Invents Act. I also helped persuade Congress not to pass an appellate transfer provision as part of the AIA that would have codified a form of "issue jurisdiction" for this Court. As part of a different effort, I actively advocated against a legislative proposal to promote interlocutory appeals of claim construction decisions.

8.    In *pro bono* cases, I represented Leroy Comer in *Comer v. Peake,* 552 F.3d 1362 (Fed. Cir. 2009), and anonymously donated the Court's fee award to the Federal Circuit Bar Association as a scholarship. For the spouses of veterans, I litigated *Sharp v. United States*, 580 F.3d 1234 (Fed. Cir. 2009). This work was recognized by two appreciation awards.

9.    Through the activities described in Paragraphs 3-8 above, I have developed friendships with many judges. I have shared CLE panels, co-taught

law school classes, corresponded regarding judicial clerkship applications, met at judicial conferences, worked hundreds of hours on bench-bar projects with collectively at least a dozen different judges, and participated in international delegations with these judges.

<u>My Friendship with Chief Judge Rader</u>

10.    I became friends with Chief Judge Rader through the professional activities described above: Federal Circuit projects, Bar activities, CLE programs, law school education, foreign delegations, etc. For example, it was known in the patent litigation community that, as Chair of the Federal Circuit Advisory Council, I had worked extensively on bench/bar matters with the Chief Judge and thus was a professional friend. We are not golf partners or softball teammates. We are not family friends. We live on opposite sides of the country. Chief Judge Rader is one of what I hope are my many friends among the judges of the Federal Circuit and District Courts, and patent law practitioners across the country.

<u>The March 5, 2014 Email</u>

11.    On March 4, 2014, I argued two cases in the Federal Circuit.

12.    I believe that on that Tuesday I advocated for my clients as well as I was able, and that it was one of the best days of my legal career.

13.    On March 5, 2014, I was surprised and gratified at receiving from Chief Judge Rader an email relaying an unusually generous compliment about my

4

oral advocacy during the two arguments ("the Email").  The compliment did not address the merits of the case.  It did not indicate anything about how the panel might vote in the case.  It simply confirmed that I had done a very good job at my craft of appellate advocacy.  I took pride in the compliment and appreciated that it had been made and relayed.

14.    The fact that the Email had come from Judge Rader did not strike me as inappropriate.  The compliment itself was consistent with my relief and satisfaction that I had performed well for my clients.  Judge Rader forwarding the compliment was also consistent with his well-known gregarious style.

15.    The Email's use of the word "friend" raised no questions in my mind. That term is commonplace in Judge Rader's lexicon.  I have heard Judge Rader use it scores of times with references to many people in professional settings.  The sign-off did not strike me as remarkable given Judge Rader's well-known penchant for turns of phrase.  I was focused on the compliment in the Email.

16.    Judge Rader expressly encouraged me to pass along the compliment. If he had not done so, I do not know whether I would have forwarded the Email or to whom.  I have received compliments about my work before and did not forward them to anyone.  After thinking about the suggestion, I decided that I would pass along the Email.

17.    This was my decision, and I take full responsibility for it.

18.     I forwarded the compliment to a number of people—my mom,

brothers and sister, friends, clients, former clients, prospective clients, and

lawyers.  I did not distribute it to the general public.

19.     I selected the recipients because the unusually generous compliment

from an unnamed jurist was a source of pride and might encourage them to

consider me for representation in future matters.  I thought such distribution was

appropriate because information about my skill at oral advocacy is an appropriate

consideration in the selection of counsel.

20.     It never occurred to me that the selected recipients of the Email would

think that Judge Rader could be improperly influenced because an advocate before

him happened to be a friend from their years of professional interaction.  To me,

the Email did not suggest any such thing and the distribution of the email did not

suggest any such thing.  Indeed, I would never have included in these emails the

suggestion that Judge Rader would judge with bias in my matters.  That

suggestion would obviously be unprofessional and seen as such by my personal

and professional network.

21.     The only communication forwarding the Email that discussed my

relationship with Judge Rader is an email that I did not draft, edit, or see before it

was sent.  *See* Ex. 49.  One of my partners, who is a transactional lawyer not

familiar with appellate litigation or this Court, sent the email, and it was

unacceptable.  For example, it contained inaccurate statements.  It referenced a District Court Judge as though he would be "involved in the appeal," and it did so at a time when it was impossible to know which judges would be assigned to the appeal.  When I saw the email after it was sent, I objected to it and ensured that it would not be used again.

22.     Among the group of clients, former clients, and prospective clients who received the email, only three were non-lawyers:  Mike Hunkapiller, Mark Stevenson, and Julia Keelty.  Mr. Hunkapiller has a PhD in Chemical Biology and is the CEO of a life sciences company.  He was the inventor of the patent at issue in the Promega appeal.  I emailed him to report on the Promega oral argument.  Mr. Stevenson was a Life Technologies executive.  I sent an email to him and the company's general counsel to report on the Promega oral argument.  Ms. Keelty is associated with a company named Arachnid that inquired as to whether Weil Gotshal could represent it.  In response, my partner sent an email to Ms. Keelty and a lawyer at Arachnid.

* * *

23.     True and authentic copies of emails I sent to my mom, my brothers and sister, and Chief Judge Farnan are attached as Exhibits 1, 2, and 3.

24.     True and authentic copies of the current, former, and prospective client emails and responses requested by the Court are attached as Exhibits 4–49.

7

25.     A true and authentic copy of an email from one of my clients to a co-defendant in a joint defense group regarding whether I should handle an argument on behalf of the joint defense group is attached as Exhibit 50.

26.     Attachment B to the Response to the Order to Show Cause is a list of current, former, and potential clients who, to my knowledge, received the Email. The chart includes the dates of dissemination and the names and email addresses of the recipients. ¶

\* \* \*

27.     As the Court is probably aware, I continue to represent clients in pending cases before the Court.  I have informed the clients of the pendency of this sealed matter, and they have instructed me to continue the representations.  As a matter of professional responsibility, I am not in a position to withdraw from these representations, even if withdrawal were in my own personal interests, during the pendency of this matter.

\* \* \* \* \* \*

I declare under penalty of perjury under the laws of the United States of America that the foregoing Declaration of Edward R. Reines is true and correct.

Executed on July 7, 2014

_____

Edward R. Reines

8

Attachment B -
List of Recipients

| ORGANIZATION | EXHIBIT | NAME | TITLE/RELATIONSHIP | DATE OF DISSEMINATION | CLIENT STATUS | E-MAIL ADDRESS |
|---|---|---|---|---|---|---|
| Family | | | | | | |
| | 1, 2 | Reines, Miriam | Mother | 3/5/2014 | Not Applicable | mreines@nyc.rr.com |
| | 2 | Reines, Daniel | Brother | 3/7/2014 | Not Applicable | dreines@emory.edu |
| | 2 | Reines, Larry | Brother | 3/7/2014 | Not Applicable | Larryreines@gmail.com |
| | 2 | Reines, Mike | Brother | 3/7/2014 | Not Applicable | mreines@mac.com |
| | 2 | Reines, Sarah | Sister | 3/7/2014 | Not Applicable | Sreines@nyc.rr.com |
| Farnan LLP | | | | | | |
| | 3 | Farnan, Joseph J. | Attorney; retired Judge | 3/9/2014 | Not Applicable | farnan@farnanlaw.com |
| CalTech | | | | | | |
| | 4 | Cochran, Adam | Associate General Counsel | 3/5/2014 | Involved in Promega Oral Argument | adam.cochran@caltech.edu |
| | 4 | D'Apuzzo, Chantal | Associate General Counsel | 3/5/2014 | Involved in Promega Oral Argument | chantal@caltech.edu |
| | 4 | Lum, Jennifer | Deputy General Counsel | 3/5/2014 | Involved in Promega Oral Argument | Jennifer.Lum@caltech.edu |
| | 4 | Stratman, Victoria | General Counsel | 3/5/2014 | Involved in Promega Oral Argument | victoria.stratman@caltech.edu |
| Thermo Fisher/ Life Tech | | | | | | |
| | 5 | Finst, Rip | Counsel | 3/5/2014 | Involved in Promega Oral Argument | Rip.Finst@thermofisher.com |
| | 6 | Hammond, Alan | Head of IP (lawyer) | 3/5/2014 | Involved in Promega Oral Argument | ahammondfamily@gmail.com |
| | 5, 7 | Lee, Peter Y. | Chief Counsel | 3/5/2014 | Involved in Promega Oral Argument | peter.lee@thermofisher.com |
| | 8 | MacLeod, Genoffir | General Counsel | 3/5/2014 | Involved in Promega Oral Argument | Genoffir.MacLeod@thermofisher.com |
| | 5, 7 | Pasika, Hugh | IP Counsel Leader | 3/5/2014 | Involved in Promega Oral Argument | Hugh.Pasika@thermofisher.com |
| | 9 | Schmidt, Bradford | Lead Litigation Counsel | 3/5/2014 | Involved in Promega Oral Argument | bradford@bschmidtlaw.com |
| | 8 | Stevenson, Mark | EVP and President of Life Science Solutions | 3/5/2014 | Involved in Promega Oral Argument | mark.stevenson@thermofisher.com |
| Adobe | | | | | | |
| | 10 | Robins, Karen | Director of Litigation | 3/5/2014 | Current | karobins@adobe.com |
| Apple | | | | | | |
| | 11 | Harlow, Jackie | Litigation Counsel | 3/5/2014 | Current | jharlow@apple.com |
| | 11 | Krall, Noreen | Chief Litigation Counsel | 3/5/2014 | Current | nkrall@apple.com |
| | 11 | Melaugh, David | Director, Patent Litigation | 3/5/2014 | Current | melaugh@apple.com |
| | 11 | Risher, Jeff | Director, Patent Litigation | 3/5/2014 | Current | jrisher@apple.com |
| CBS | | | | | | |
| | 12 | Waltman, Naomi | SVP, Associate General Counsel | 3/5/2014 | Current | naomi.waltman@cbs.com |
| | 12 | Wan, Daniel | Senior Counsel, Patents and Litigation | 3/5/2014 | Current | daniel.wan@cbsinteractive.com |
| Cisco | | | | | | |

Attachment B -
List of Recipients

| ORGANIZATION | EXHIBIT | NAME | TITLE/RELATIONSHIP | DATE OF DISSEMINATION | CLIENT STATUS | E-MAIL ADDRESS |
|---|---|---|---|---|---|---|
| | 13 | Beckwith, Marta | Senior Director, IP Litigation | 3/5/2014 | Current | mabeckwi@cisco.com |
| | 13 | Chandler, Mark | General Counsel | 3/5/2014 | Current | machandl@cisco.com |
| | 13 | Poynter, Leah | Senior Corporate Counsel, IP Litigation | 3/5/2014 | Current | lepoynte@cisco.com |
| | 13,14 | Rubin, Neal | Director, Litigation | 3/5/2014 | Current | nrubin@cisco.com |
| | 13 | Zylan, Kathleen | Associate General Counsel | 3/5/2014 | Current | zylank@cisco.com |
| eBay | | | | | | |
| | 15, 16 | Bens, Rory | Associate General Counsel, Patents | 3/6/2014 | Current | robens@ebay.com |
| | 15, 16 | Sherman, Howard | Patent Counsel | 3/6/2014 | Current | hsherman@ebay.com |
| | 15, 16 | Tikku, Anup | Patent Counsel | 3/6/2014 | Current | atikku@ebay.com |
| | 15, 16 | Ward, Emily | VP, Deputy General Counsel | 3/6/2014 | Current | eward@ebay.com |
| Facebook | | | | | | |
| | 17 | Dubois, Christen | Associate General Counsel | 3/5/2014 | Current | cdubois@fb.com |
| | 17 | O'Rourke, Sam | VP & Deputy General Counsel | 3/5/2014 | Current | sam@fb.com |
| GE | | | | | | |
| | 18 | Rainey, Richard | Executive Counsel, IP Litigation | 3/5/2014 | Current | richard.rainey1@ge.com |
| HP | | | | | | |
| | 19, 20 | Bright, Cynthia | VP & Associate General Counsel, IP Litigation & Public Policy | 3/5/2014 | Current | cynthia.bright@hp.com |
| | 19, 20 | Roeder, Paul | SVP & DGC, Litigation | 3/5/2014 | Current | paul.roeder@hp.com |
| Illumina | | | | | | |
| | 21 | Dadswell, Charles | SVP, General Counsel | 3/5/2014 | Current | cdadswell@illumina.com |
| Intel | | | | | | |
| | 22 | Stabinsky, Allon | Director of Patent Litigation | 3/5/2014 | Current | allon.stabinsky@intel.com |
| Maxim Intergrated | | | | | | |
| | 23 | Cheng, Jason | Associate Counsel | 3/5/2014 | Current | jason.cheng@maximintegrated |
| | 23 | Fuller, Mary | Managing Director & Associate General Counsel | 3/5/2014 | Current | Mary.Fuller@maximintegrated.com |
| | 23 | Medlin, Ed | VP, General Counsel | 3/5/2014 | Current | ed.medlin@maximintegrated.com |
| Microsoft | | | | | | |
| | 24 | Culbert, Andy | Associate General Counsel | 3/5/2014 | Current | andycu@microsoft.com |
| | 24 | Fu, Isabella | Associate General Counsel | 3/5/2014 | Current | Isabella.Fu@microsoft.com |
| | 24 | Killough, David | Assistant General Counsel | 3/5/2014 | Current | davkill@microsoft.com |
| NBC | | | | | | |
| | 25 | Lane, Hilary | SVP, Litigation & Information Governance | 3/5/2014 | Current | Hilary.Lane@nbcuni.com |
| | 25 | Slotin, Ian | VP, Intellectual Property | 3/5/2014 | Current | Ian.Slotin@nbcuni.com |
| Netapp | | | | | | |
| | 26 | Luftman, Douglas | VP, Innovation Services & Chief Intellectual Property Counsel | 3/5/2014 | Current | Douglas.Luftman@netapp.com |

Attachment B -
List of Recipients

| ORGANIZATION | EXHIBIT | NAME | TITLE/RELATIONSHIP | DATE OF DISSEMINATION | CLIENT STATUS | E-MAIL ADDRESS |
|---|---|---|---|---|---|---|
| Newegg | | | | | | |
| | 27, 28 | Baldauf, Kent | Outside Counsel | 3/5/2014 | Current | KBaldaufJr@webblaw.com |
| | 27, 28 | Cheng, Lee | Chief Legal Officer, SVP, Corporate Development and Corporate Secretary | 3/5/2014 | Current | lee.c.cheng@newegg.com |
| | 27, 28 | Fong, Kevin | Outside Counsel | 3/5/2014 | Current | kevin.fong@pillsburylaw.com |
| Samsung | | | | | | |
| | 29 | Kang, Anthony | Legal Counsel | 3/5/2014 | Current | anthony.k@samsung.com |
| SAP | | | | | | |
| | 30 | Buccino, Lisa | Senior IP Counsel | 3/5/2014 | Current | lisa.buccino@sap.com |
| | 30 | DiBartolomeo, Anthony | SVP, Chief IP Counsel | 3/5/2014 | Current | anthony.dibartolomeo@sap.com |
| | 30,31 | Hamel, Kevin | Head of Global Litigation | 3/5/2014 | Current | kevin.hamel@sap.com |
| Turner | | | | | | |
| | 32 | Townsend, Andrea | Assistant General Counsel | 3/5/2014 | Current | Andrea.Townsend@turner.com |
| Verizon | | | | | | |
| | 33 | Coyne, Mary | Associate General Counsel | 3/5/2014 | Current | mary.coyne@verizon.com |
| | 33 | Holden, Michael | Associate General Counsel & Head of IP Litigation | 3/5/2014 | Current | michael.holden@verizon.com |
| | 33 | Levine, Gail | VP & Associate General Counsel | 3/5/2014 | Current | gail.f.levine@verizon.com |
| Xilinx | | | | | | |
| | 34 | Liu, Justin | Senior Director, IP (lawyer) | 3/5/2014 | Current | justinl@xilinx.com |
| | 34 | Smoot, Scott Hoover | SVP, General Counsel, Secretary and Chief Compliance Officer | 3/5/2014 | Current | scott.hover-smoot@xilinx.com |
| Yahoo | | | | | | |
| | 35, 36 | Brightman, David | VP, Associate General Counsel - IP Litigation | 3/5/2014 | Current | dbright@yahoo-inc.com |
| | 35, 36, 37 | Kramer, Kevin | Deputy General Counsel | 3/5/2014 | Current | kramer@yahoo-inc.com |
| | 35, 36 | Phan, Hieu | Legal Director, IP Litigation & Conflicts | 3/5/2014 | Current | hphan@yahoo-inc.com |
| Fairchild Semi | | | | | | |
| | 38 | Delva, Paul | SVP, General Counsel and Corporate Secretary | 3/6/2014 | Former Client | paul.delva@fairchildsemi.com |
| Intuit | | | | | | |
| | 39 | Faye, Chris | Assistant General Counsel | 3/9/2014 | Former Client | Chris_Faye@intuit.com |
| | 39 | Gupta, Anirma | VP & Deputy General Counsel | 3/9/2014 | Former Client | Anirma_Gupta@intuit.com |
| Netflix | | | | | | |
| | 40 | Peterson, Isaac | Patent Litigation Counsel | 3/5/2014 | Former Client | ipeterson@netflix.com |
| | 40 | Ware, Hillary | VP & Associate General Counsel | 3/6/2014 | Former Client | hware@netflix.com |
| Palo Alto Networks | | | | | | |
| | 41 | Ritter, Michael | Dir. of IP Strategy (lawyer) | 3/7/2014 | Former Client | mritter@paloaltonetworks.com |
| Pure Storage | | | | | | |
| | 42 | FitzGerald, Joe | VP Legal | 3/5/2014 | Former Client | fitz@purestorage.com |

Attachment B -
List of Recipients

| ORGANIZATION | EXHIBIT | NAME | TITLE/RELATIONSHIP | DATE OF DISSEMINATION | CLIENT STATUS | E-MAIL ADDRESS |
|---|---|---|---|---|---|---|
| Red Hat, Inc | | | | | | |
| | 43 | Perry, David | Senior Patent Counsel | 3/13/2014 | Former Client | dperry@redhat.com |
| | 43 | Tiller, Robert | VP & Assistant General Counsel | 3/13/2014 | Former Client | rtiller@redhat.com |
| Telegraph Hill Partners | | | | | | |
| | 44 | Grossman, Paul | Venture Partner (lawyer) | 3/5/2014 | Former Employee of Life-Tech, Party in Promega Appeal | pdg@THPartners.NET |
| Pacific Biosciences | | | | | | |
| | 45 | Hunkapiller, Mike | President & CEO | 3/5/2014 | Former Employee of Life-tech; Inventor of the Patent at Issue in the Promega Appeal | mhunkapiller@pacificbiosciences.com |
| 3M | | | | | | |
| | 46 | Rhodes, Kevin | Chief IP Counsel | 3/9/2014 | Prospective Client | krhodes@mmm.com |
| Arachnid | | | | | | |
| | 47 | Delafield, Carrie | Principal (lawyer) | 4/10/2014 | Prospective Client | cdelafield@aol.com |
| | 47 | Keelty, Julia | Principal | 4/10/2014 | Prospective Client | keelty@me.com |
| Netgear | | | | | | |
| | 48 | Busse, Brian | VP of IP and Litigation | 3/5/2014 | Prospective Client | bbusse@netgear.com |
| | 48 | Kim, Andrew | SVP and General Counsel | 3/5/2014 | Prospective Client | akim@netgear.com |
| Riverbed Technology | | | | | | |
| | 49 | Damon, Ryan | Deputy General Counsel | 4/1/2014 | Prospective Client | Ryan.Damon@riverbed.com |
| | 49 | Nissenberg, Brett | General Counsel | 4/1/2014 | Prospective Client | brett.nissenberg@riverbed.com |
| New York Times Company | | | | | | |
| | 50 | Richieri, Kenneth | General Counsel | 4/9/2014 | Co-defendant non-client in a common interest group (Waltman's email relates to a common interest group question) | richierk@nytimes.com |

**EDWARD R. REINES PRIVILEGE LOG**

**July 7, 2014**

| EXHIBIT | DATE | DOC TYPE | AUTHOR | RECIPIENT | CC | DESCRIPTION | PRIVILEGE |
|---------|------|----------|--------|-----------|-----|-------------|-----------|
| 4 | 3/5/2014 | Email Chain | 1. Jennifer Lum, Esq. 2. Edward Reines. | 1. Edward Reines, Adam Cochran, Chantal D'Apuzzo 2.  Victoria Stratman, Jennifer Lum, Adam Cochran, D'Apuzzo Chantal | | Email to current client discussing pending litigation | Attorney-Client Privilege Attorney Work Product |
| 5 | 6/15/2014 | Email Chain | 1. Edward Reines 2. Rip Finst 3. Edward Reines | 1. Michael Sundermeyer, William Burke 2. Edward Reines 3. Rip Finist | | Email from client to counsel | Attorney-Client Privilege |
| 7 | 3/7/2014 | Email Chain | 1. Edward Reines 2. Hugh Pasika, Esq. | 1. Hugh Pasika, Esq. 2. Edward Reines | 1.  Peter Y. Lee, Esq. 2. Peter Y. Lee, Esq. | E-mail to client discussing unrelated case | Attorney-Client Privilege Attorney Work Product |
| 12 | 3/5/2014 | Email Chain | 1. Edward Reines 2. Naomi Waltman | 1. Naomi Waltman, Daniel Wan; 2. Edward Reines, Daniel Wan. | | Email to current client discussing pending litigation | Attorney-Client Privilege Attorney Work Product |
| 14 | 6/15/2014 | Email Chain | 1. Edward Reines 2. Neal Rubin 3. Edward Reines | 1. Michael Sundermeyer, William Burke 2. Neal Rubin | | Email from client to counsel | Attorney-Client Privilege |
| 31 | 6/15/2014 | Email Chain | 1. Edward Reines 2. Kevin Hamel 3. Patently-O | 1. Michael Sundermeyer, William Burke 2. Edward Reines 3. Kevin Hamel | | Email from client to counsel | Attorney-Client Privilege |
| 37 | 6/15/2014 | Email Chain | 1. Edward Reines 2. Kevin Kramer 3. Edward Reines | 1. Michael Sundermeyer, William Burke 2. Edward Reines 3. Kevin Kramer | | Email from client to counsel | Attorney-Client Privilege |
| 41 | 3/10/2014 | Email Chain | 1. Michael Ritter, Esq.  2. Edward Reines | 1.  Edward Reines  2. Michael Ritter, Esq. | | E-mail to potential client discussing unrelated case | Attorney-Client Privilege Attorney Work Product |
| 45 | 3/5/2014 | Email Chain | Edward Reines | Mike Hunkapiller | | Email to former representative of current client discussing pending litigation | Attorney Work Product |
| 49 | 6/15/2014 | Email Chain | 1. Reines 2. Keith Flaum 3. Brett Nissenberg, Ryan Damon | 1. Michael Sundermeyer, William Burke 2.Edward Reines 3. Keith Flaum | | Email from client to counsel | Attorney-Client Privilege |

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

<table>
<tr><td>)</td><td></td></tr>
<tr><td>In re EDWARD R. REINES,</td><td>)</td><td>No: 14-MA004</td></tr>
<tr><td>        *Respondent.*</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>(Filed Under Seal)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## DECLARATION OF PROFESSOR THOMAS D. MORGAN

I, Thomas D. Morgan, declare under penalty of perjury that:

1.       I am a 1965 graduate of the University of Chicago Law School and a member of the Bar of Illinois.  I am the S. Chesterfield Oppenheim Professor of Antitrust and Trade Regulation Law, Emeritus, at The George Washington University Law School where I was on the faculty from 1989 to 1998 and from 2000 to 2013.  From 1998 to 2000, I was the first Rex E. Lee Professor of Law at J. Reuben Clark Law School, Brigham Young University.  From 1980 to 1985, I was Dean, and from 1985 to 1989, Distinguished Professor at Emory University School of Law.  From 1966 to 1980, less time for military service, I was a professor at the University of Illinois College of Law.

2.       The subject of most of my teaching and scholarly research has been professional responsibility and ethics, i.e., the professional obligations of lawyers and judges.  I have taught courses in that subject one or more times each year since 1974.  I have authored or co-authored numerous publications, including a widely-used law school casebook in the subject, *Professional Responsibility: Problems and Materials* (12th Edition 2014), published by Foundation Press.  I served as one of two Associate Reporters for the American Law Institute's *Restatement of the Law (Third): The Law Governing Lawyers*, published in 2000, and as one of two Associate

1

Reporters for the American Bar Association's Commission on Revision of the Model Rules of Professional Conduct, the Ethics 2000 Commission, whose work led to extensive revision of the ABA Model Rules in 2002. I serve on the Editorial Board of the ABA/BNA Lawyers' Manual of Professional Conduct. I have received two awards for lifetime contributions to legal ethics scholarship – the American Bar Foundation Keck Award in 2000 and the New York State Bar Association Sanford D. Levy Award in 2008. My curriculum vitae listing my publications, presentations and other professional activities and awards is attached to this declaration.

3.      The law firm of Williams & Connolly has retained me as an expert in this matter on behalf of its client Edward R. Reines, the respondent herein. I have rendered expert opinions on questions concerning lawyers' professional conduct, standards of care, and fiduciary duties in affidavits, depositions and testimony in over 85 litigated cases, and my declarations, affidavits and testimony as an expert in those fields have been admitted in state and federal courts all over the country. I have known Judge Rader for several years in his role as an adjunct member of the George Washington Law School faculty; I do not know the respondent, Edward R. Reines. I have had no contact with either one in connection with my work on this matter. I am being compensated at my current regular rate for time expended in preparing this declaration.

4.      I have reviewed the following documents prior to preparation of this declaration:

a.      Email message from Chief Judge Randall R. Rader to Edward R. Reines, dated March 5, 2014.

b.      Email messages from Edward R. Reines, or sent on his behalf, and the recipients' responses thereto, dated on or shortly after March 5, 2014, forwarding Judge Rader's message to persons that I understand to be representatives of clients, former clients and potential clients. (Exhibits 4 – 49 to Mr. Reines' Response to the Order to Show Cause). I understand that Exhibit

2

50 was sent by Mr. Reines' client to a non-client member of a common interest group.

  c.  Email messages sent to Mr. Reines' family and to retired U.S. District Judge Joseph Farnan that also attached Judge Rader's email message of March 5, 2014.

  d.  News article at wsj.com, dated May 22, 2014.

  e.  Letter from Chief Judge Rader to the Judges of this Court, dated May 23, 2014.

  f.  Text of address given by Chief Judge Rader before the Federal Circuit Bar Association, also dated May 23, 2014.

  g.  Various news stories and blog posts, dated on or shortly after May 23, 2014.

  h.  Order of this Court, dated June 5, 2014, that Edward R. Reines show cause why he should not be disciplined for conduct unbecoming a member of the bar of this Court.

  i.  Declaration of Mr. Reines attached to his Response to the Order to Show Cause as Attachment A.

  5.  In my professional opinion, Edward R. Reines has not engaged in "conduct unbecoming a member of the bar" of this Court, the standard used in Federal Rule of Appellate Procedure 46(b)(1)(B) and in the Order to Show Cause to Mr. Reines. Indeed, I respectfully suggest that for this Court to impose discipline on Mr. Reines would be legally unjustified and even raise constitutional questions.

  a.  In its Order to Show Cause, the Court has correctly identified *In re Snyder*, 472 U.S. 634 (1985), as the leading case on the authority of a federal Court of Appeals to impose discipline on a member of its bar. But perhaps the most important aspect of *In re Snyder* was the Supreme Court's *refusal* to let the Court of Appeals for the Eighth Circuit impose discipline.

  b.  In the course of seeking reimbursement under the Criminal Justice Act, lawyer Snyder wrote an intemperate letter to the District Court condemning the kinds of documentation

the court required him to supply and asking to be removed from the list of those who would

accept indigent criminal defense work. The Chief Judge of the Eighth Circuit believed the tone

of the lawyer's letter reflected "a total lack of respect for the legal process and the courts" and he

issued an Order to Show Cause why the lawyer should not be suspended from practice before the

Court. The Court of Appeals, *en banc*, gave the lawyer several chances to apologize for the tone

of his letter, but he refused to do so, saying that the content of the letter was protected by the

First Amendment and that he did not view his letter as "one of disrespect for the Court." The

Court of Appeals disagreed and imposed a six month suspension. *Matter of Snyder*, 734 F.2d 334

(8th Cir. 1984).

 c. The Supreme Court avoided Mr. Snyder's constitutional free speech claim and

focused instead on how serious misconduct must be to warrant suspension from practice before a

U.S. Court of Appeals. Chief Justice Burger wrote for a unanimous Supreme Court:

> "Read in light of the traditional duties imposed on an attorney, it is clear that 'conduct unbecoming a member of the bar' is *conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice*. More specific guidance is provided by case law, applicable court rules, and 'the lore of the profession,' as embodied in codes of professional conduct." 472 U.S. at 645 (emphasis added).

The Court concluded that, "even assuming that the letter exhibited an unlawyerlike rudeness," it

did not "rise to the level of 'conduct unbecoming a member of the bar' warranting suspension

from practice." 472 U.S. at 647.

 d. In the matter before this Court, the Order to Show Cause asks about a number of

emails sent by or on behalf of Mr. Reines (Exhibits 4 – 49 referenced above) to representatives

of current, former, and prospective clients. Those emails forwarded a copy of an unsolicited,

highly-complimentary email message that Judge Rader sent to Mr. Reines earlier this year.

Whatever one's judgment of the wisdom of forwarding the email might be, I respectfully suggest

4

that it in no sense "shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice."

6.      Paragraph 3 of the Order to Show Cause suggests that a principal concern of the Court in issuing the Order might be that Mr. Reines' conduct in forwarding Judge Rader's email could have violated ABA Model Rule 8.4(e). I respectfully suggest, however, what Mr. Reines did does not violate either the letter or the spirit of that rule.

a.      Rule 8.4(e) says that it is professional misconduct for a lawyer to "state or imply an ability to influence *improperly* a government agency or official or to achieve results by *means that violate the Rules of Professional Conduct or other law*" (emphasis added). The way the Model Rules are drafted, adjectives and adverbs like those I have highlighted turn out to be the key concepts in the rule. In Rule 8.5(e), the prohibition is of "improper" influence or means that violate legal standards. When one reflects on the rule, it is obvious that nothing in the text or spirit of Rule 8.4(e) prohibits a lawyer from suggesting that he or she is a persuasive advocate who can achieve results for clients by knowledge of the record, clear rhetorical images and other lawful means that enhance the administration of justice, not diminish it.

b.      Prior to ABA adoption of the current ABA Model Rules of Professional Conduct (1983), as amended, principal ethical guidance was provided by the ABA Model Code of Professional Responsibility (1970). Its provision that corresponded to Model Rule 8.4(e) was Disciplinary Rule 9-101(C): "A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official." The corresponding Ethical Consideration 9-4 explained:

> "Because the very essence of the legal system is to provide procedures by which matters can be presented in an impartial manner so that they may be decided solely upon the merits, any statement or suggestion by a lawyer that he can or would attempt to circumvent those procedures is detrimental to the legal system and tends to undermine

5

public confidence in it."

Once again, the rule did not prohibit good lawyering; what it prohibited was crossing the line from claiming effective advocacy into proposing or tolerating illegal conduct.

c.    The case that I believe best illustrates what Rule 8.4(e) prohibits is *In re Sears*, 364 A.2d 777 (N.J. 1976). Harry L. Sears was a prominent New Jersey lawyer and state senator who was hired by Robert Vesco, a financier then under S.E.C. investigation. Vesco's concern at the time was preventing the S.E.C. from getting access to his company records. Vesco asked Sears to approach a federal district judge *ex parte* to allay suspicion that Vesco was trying to cover up impropriety, and Sears agreed to do so. Apparently, Sears did *not* contact the judge but he told a Vesco associate that he had. Imposing a three year suspension, the New Jersey Supreme Court held: "In order to find a violation of Disciplinary Rule DR 9-101(C), it is sufficient that the attorney merely state or imply that he could influence the judicial tribunal improperly. It is irrelevant whether he actually makes the attempt or accomplishes the objective." 364 A.2d at 785.

d.    The *Sears* case captures what current Rule 8.5(e) is about. Sears agreed to do something for his client that was clearly improper. The proposed ex parte contact would have violated both the Federal District Court's own rules and the Rules of Professional Conduct.  And although the summary sentence from ABA/BNA Lawyers' Manual on Professional Conduct at 101:703, cited in this Court's Order to Show Cause, could be read more broadly, the cases cited in support of the summary are clearly based on statements of *improper* influence. They are like the facts in *Rey v. State*, 512 S.W.2d 40 (Tex.App. 1974), where the lawyer was suspended for asking client's father for $500 with which to buy a present for the judge.  In short, the conduct of lawyers found to have violated Model Rule 8.4(e) or its Model Code predecessor went far

6

beyond anything Mr. Reines did with Judge Rader's email.

7.    The Order to Show Cause suggests that, in forwarding the email, Mr. Reines may have been improperly "implying a special relationship with [Judge Rader]," presumably because Judge Rader's email calls Mr. Reines his "friend," indeed his "friend for life." Once again, however, friendship between a judge and a lawyer traditionally has not constituted a prohibited "special relationship" that itself suggests a possibility of exercising improper influence.

a.    It is beyond argument that there have been friendships between lawyers and judges as long as we have had an Anglo-American legal system. Indeed, the Inns of Court in London and bar associations in the United States were created in large part to further good personal and professional relationships between judges and lawyers.

b.    Of course, some friendships are closer than others, and for many years, if the relationship between a judge and a lawyer is so close that the judge has a personal "bias" in the matter, 28 U.S.C. § 144, or the judge's "impartiality might reasonably be questioned," 28 U.S.C. § 455, the judge must recuse himself or herself from hearing a case in which that lawyer is involved.

c.    The U.S. Judicial Conference Committee on Codes of Conduct examined when friendship requires disqualification in its Advisory Opinion No. 11. The question posed was whether the fact that one of the attorneys "is a friend of long-standing and is also a godfather of one of the judge's children" could be said to "convey the impression that [the lawyer] is in a special position to influence the judge" or cause the judge's "impartiality reasonably [to] be questioned." The Opinion answered that it could not if "the relationship were simply one of historical significance, the godfather being merely within the wide circle of the judge's friends, and the obligation having been perfunctorily assumed." But if a lawyer-judge relationship "is

7

like that of a close relative," the opinion said, the judge's impartiality could be in doubt.

      d.      Professor Charles Geyh addresses a judge's "prior relationship with an attorney"

in his book for the Federal Judicial Center, *Judicial Disqualification: An Analysis of Federal*

*Law* (2nd ed. 2010). He cites *United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985), as a good

illustration of the relatively unusual case in which friendship made disclosure and possible

disqualification appropriate. In *Murphy*, the Judge and the U.S. Attorney became close friends

when they served together as Assistant U.S. Attorneys. Their families now vacationed together,

and indeed did so immediately after the trial in question in which the U.S. Attorney personally

tried the case. On appeal, the defendant argued that he was entitled to a new trial before a

different judge, so the Seventh Circuit expressly explored the implications of such a close judge-

attorney friendship.

> "When a question arises about friendship between a judge and a lawyer, "[t]he twofold test is whether the judge feels capable of disregarding the relationship and whether others can reasonably be expected to believe that the relationship is disregarded." Advisory Opinion No. 11, Interim Advisory Committee on Judicial Activities (1970).

> "The statutory standard puts to the judge a question about the objective state of the legal and lay culture. The court must consider whether an astute observer in either culture would conclude that the relation between judge and lawyer (a) is very much out of the usual course, and (b) presents a potential for actual impropriety if the worst implications are realized. The inquiry is entirely objective, see *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460-61 (7th Cir. 1985), and is divorced from questions about actual impropriety.

>     \* \* \*

> "In today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. A judge need not cut himself off from the rest of the legal community. Social as well as official communications among judges and lawyers may improve the quality of legal decisions. Social interactions also make service on the bench, quite isolated as a rule, more tolerable to judges." 768 F.2d at 1537.

The Court approved the view of "many courts" that "a judge need not disqualify himself

just because a friend—even a close friend—appears as a lawyer," but it found the fact that the

judge and prosecutor were as close friends as these were should have been disclosed. At the end of the day, however, it found the objection was waived and the defendant had received a fair trial.

e.      As I suggested earlier in this declaration, I do not know Mr. Reines at all or Judge Rader well enough to have independent knowledge of the nature of their friendship. I can say, however, that in my professional opinion, nothing in Judge Rader's email message to Mr. Reines or Mr. Reines' messages to the client groups suggests anything like the degree of personal relationship that would ordinarily require disclosure or Judge Rader's recusal in cases involving Mr. Reines.

8.      What may be happening with respect to the view of lawyer-judge friendships seems to represent a change in what the Seventh Circuit in *Murphy* called "the objective state of the legal and lay culture." 768 F.2d at 1537. I suggest that because the question of judges and lawyers being "friends" has come up most recently in connection with the use of social media, particularly Facebook. The specific issue has been whether the social media status of "friend" implies a prohibited special relationship.

a.      There are many state opinions; the most complete current list seems to be the one appended to Arizona Supreme Court Judicial Ethics Advisory Committee Opinion 14-01 (May 5, 2014). It is clear to all that being social media friends does not prove any *actual* ability to influence a judge improperly, and most states conclude that there is no absolute prohibition of judges and lawyers being social media friends, but each opinion cites *perception* concerns, many of which derive from the fact that the lay public has extensive access to social media. Florida Supreme Court Judicial Ethics Advisory Committee Opinion 2009-20 (Nov. 17, 2009), for example, was especially worried that social media is frequently viewed by people who do not

understand how the judicial system works and thus who might get a false sense that a social

media "friend" would have special access to the judge.

    b.    Mr. Reines' own state of California provided the one of the most complete and

persuasive analyses of the issues presented in California Judges Association Judicial Ethics

Committee Opinion 66 (Nov. 23, 2010):

> "The same rules that govern a judge's ability to socialize and communicate in
> person, on paper and over the telephone apply to the Internet.

<div align="center">* * *</div>

> "There is no ethical rule prohibiting judges from interacting with lawyers who
> appear before them. The commentary to Canon 4A [of the state Code of Judicial
> Conduct] points out that a judge should not be separated from the community in which
> the judge lives. Judges are not only allowed, but are encouraged to participate in bar
> association and other groups dedicated to the improvement of the law. Judges are
> permitted to participate in organizations such as the American Inns of Court where judges
> and lawyers interact socially in an effort to foster civility and professionalism. While bar
> associations are open to all lawyers, Inn of Court chapters limit their membership.
> Judges are permitted to join social and civic organizations that include attorneys who
> may appear before them."

    c.    The California opinion is detailed and examines factors to consider in evaluating

how a public online "friendship" might reasonably appear to others. Thus, being a "friend" who

exchanges sensitive personal information with a judge or lawyer is more likely to raise red flags

than being a friend who discusses bar association or other professional work, and the more often

the lawyer appears before the judge, the more limited a personal relationship should be. Indeed,

an Internet relationship could become so close as to require disclosure to parties and possibly

recusal in some cases. See, e.g., ABA Formal Opinion 462 (Feb. 21, 2013). But as discussed

above, the question of required disqualification is quite different from whether a judge may

properly identify a lawyer as a friend and whether the lawyer may do the same.

    d.    Ordinarily, of course, the public does not have access to email communication

<div align="center">10</div>

between a lawyer and a judge in the way it has access to their Facebook postings. That might

make perception concerns go away. But it might increase other concerns, and apparently shortly

after Judge Rader's and Mr. Reines sent their respective email messages, the U.S. Judicial

Conference Committee on Codes of Conduct issued Advisory Opinion No. 112 (March 2014).

Page 112-3 of the opinion says that:

> "In the Committee's view, * * * any frequent interaction between a judge or
> judicial employee and a lawyer who appears before the court may 'put into question the
> propriety of the judicial employee's conduct in carrying out the duties of the office."
> Employee's Code, Canon 2. With respect to judges, communication of this nature may
> "convey or permit others to convey the impression that they are in a special position to
> influence the judge." Judge's Code, Canon 2B. A similar concern arises where a judge or
> judicial employee uses social media to comment – favorably or unfavorably – about the
> competence of a particular law firm or attorney."

e.      That statement about judicial responsibilities is pointed and seems to establish a

rule for judges that implicitly addresses the changing state of the culture as the Committee

understands it. Giving advice to *judges* about what *judges* may and may not do in a changing

world is central to the Codes of Conduct Committee's work, but while U.S. Judicial Conference

Advisory Opinions regulate judges, they do not themselves regulate lawyer conduct. Mr. Reines

is a California lawyer whose conduct was consistent with the standards that govern him and the

judges in his state, and up until Advisory Opinion No. 112, the principal focus of the Federal

Judicial Center had been issues relevant to judicial disqualification, not the permissible content

of individual email messages. I respectfully suggest that there is no legal basis for obliging Mr.

Reines to have anticipated Advisory Opinion No. 112, and no legal basis for finding Mr. Reines

conduct to be professionally improper.

f.      There can be absolutely no dispute that if Mr. Reines had promised to – or

claimed the ability to – exercise improper influence with one or more judges of this Court, his

actions would have been improper. But in my professional opinion, fairly read, Judge Rader's

11

email – and Mr. Reines' notes forwarding that email – do not suggest any basis for improper influence. The message that Mr. Reines received and passed on to clients is that Mr. Reines had done an excellent job of oral advocacy and represented his clients very well. Nothing in that message is inconsistent in any way with either the text or the spirit of Model Rule 8.4(e) or Federal Rule of Appellate Procedure 46(b)(1)(B).

9.       What I suggest that this case illustrates instead is one form professional marketing takes in the modern practice of law. In my professional opinion, Mr. Reines' conduct in calling attention to a positive development in his career was entirely consistent with the standards applicable to such marketing. His conduct was a kind that is constitutionally-protected and ultimately seen as in the public interest.

a.       Prior to 1977, legal ethics standards around the country might have discouraged Mr. Reines from circulating Judge Rader's message. See, e.g., ABA Code of Professional Responsibility (1970), Disciplinary Rule 2-101(A): "A lawyer shall not * * * participate in the use of any form of public communication that contains professionally self-laudatory statements calculated to attract lay clients." Because Judge Rader's message praised Mr. Reines, passing it along would have been considered a "self-laudatory" act, although even before 1977, lawyers could communicate with one another and individually-addressed correspondence to lawyers and other friends would not have constituted a prohibited "public communication."

b.       But whatever professional standards once required, they dramatically changed after the Supreme Court decision in *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977). *Bates* involved a state's attempt to impose discipline on two lawyers who ran a newspaper ad for a "legal clinic" offering low fees for defined legal services. The state said that prohibiting lawyer advertising raised no constitutional issue because it was "commercial speech," which *Valentine*

12

*v. Chrestensen*, 316 U.S. 52 (1942), had said may be subject to regulation. In *Bates*, the Supreme

Court rejected the view that lawyer advertising may be subject to "blanket suppression." There is

a public interest, the Court said, in allowing lawyers to disseminate accurate information about

themselves. The availability of reliable information serves important needs of clients, and

lawyers have a constitutional right to circulate such information.

    c.    Professional limitations on lawyer marketing since 1977 can be traced directly to

the following caveat in *Bates:*

> "Advertising that is false, deceptive, or misleading, of course is subject to restraint. * * * For example, advertising claims as to the quality of services * * * are not susceptible to measurement or verification; accordingly, such claims may be so likely to be misleading as to warrant restriction." 433 U.S. at 383-84.

Thus, ABA Model Rule of Professional Conduct 7.1 now provides:

> "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading."

Comment 2 to Model Rule 7.1 explains:

> "A truthful statement is also misleading if there is a substantial likelihood that it will lead a reasonable person to formulate a specific conclusion about the lawyer or the lawyer's services for which there is no reasonable factual foundation."

And Comment 3 to Model Rule 7.1 continues:

> "Similarly, an unsubstantiated comparison of the lawyer's services or fees with the services or fees of other lawyers may be misleading if presented with such specificity as would lead a reasonable person to conclude that the comparison can be substantiated."

    d.    The very next year, in *Ohralik v. Ohio State Bar Association*, 436 U.S. 477

(1978), and *In re Primus*, 436 U.S. 412 (1978), the Court established professional standards for a

lawyer's direct personal contact with potential clients, i.e., other than through broad advertising.

ABA Model Rule of Professional Conduct 7.3 reflects those cases, makes the accuracy of the

13

communications subject to Rule 7.1, and further provides:

> "(a)    A lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain, unless the person contacted: (1) is a lawyer, or (2) has a family, close personal, or prior professional relationship with the lawyer."

e.    Further, the Supreme Court has made clear in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), that a judge's subjective sense that communication between a lawyer and prospective clients is "undignified" is not a sufficient basis for imposing discipline.

> "[A]lthough the State undoubtedly has a substantial interest in ensuring that its attorneys behave with dignity and decorum in the courtroom, we are unsure that the State's desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgment of their First Amendment rights."  471 U.S. at 647-48.

f.    Mr. Reines' forwarding of Judge Rader's email was clearly consistent with the professional standards I have outlined.  First, Mr. Reines emails do not even constitute "real-time electronic contact" of the kind prohibited by Model Rule 7.3.  Rather, they are written electronic communications analogous to letters or print ads that a recipient may take time to consider, or even ignore entirely.  Second, even if Mr. Reines had engaged in in-person communication, where the courts have suggested the need for regulation is greatest, Mr. Reines would have satisfied Model Rule 7.3(a) in that all the communications were with other lawyers or people with whom he had a close personal or prior professional relationship.  Third, even if one believed passing along Judge Rader's email was undignified or unwise, professional standards did not require Mr. Reines to act other than he did, nor would constitutional standards likely have permitted limiting his actions.

g.    Most important to see, Model Rule 7.1 does not permit Mr. Reines to say simply that "I'm a top-flight oral advocate" or "Federal Circuit watchers think I argue cases very well."  The *Bates* case makes clear that such information is constitutionally-protected and providing it is

14

in the public interest, but consistent with the caveat from *Bates* quoted earlier, Comments 2 & 3 to Model Rule 7.1 permit the statements only if the lawyer has a "reasonable factual foundation" and can provide "substantiation" for the claims. Judge Rader's email provided the "reasonable factual foundation" and the "substantiation" for the message any lawyer in Mr. Reines situation would hope to convey about his or her ability. And the best way to tell the story accurately and completely was to attach the email itself to Mr. Reines' own communication. In short, in my professional opinion, far from violating today's lawyer professional standards, Mr. Reines' actions were consistent with both the letter and the spirit of those standards.

10.    The consequences of Judge Rader's email have been understandably unsettling, and in retrospect, all might wish that Mr. Reines had kept Judge Rader's email to himself. In my professional opinion, however, imposing professional discipline on Mr. Reines would be both unjustified and unjust.

a.    Mr. Reines' communications with representatives of current, former, and prospective clients, almost all of whom were lawyers, were professional in tone and free of any claim of special influence with Judge Rader or other members of this Court. The responses that Mr. Reines received likewise reflect an understanding that Mr. Reines had been congratulated for his professional distinction, not for any improper or special influence.

b.    The relevant cases and ethics opinions that Mr. Reines had before him at the time he acted did not reasonably suggest that his conduct was improper. Even if one assumes that Mr. Reines would or should act differently in the future, I respectfully submit that nothing about forwarding Judge Rader's email to these client groups constituted "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice," the standard used by the

15

Supreme Court in *In re Snyder*, 472 U.S. 634 (1985), to define the basis upon which a United

States Court of Appeals may impose disciplinary sanctions upon a member of its Bar.

_July 7, 2014_
_____
Date

_____
Thomas D. Morgan

**Attachment**

**Curriculum Vitae**
**THOMAS D. MORGAN**

**Personal Data:**

Born:  February 8, 1942, in Peoria, Illinois

Home Office: 4251 Gulf Shore Blvd. N., Apt. 11D, Naples, FL 34103    (239) 263-7353

E-mail: tmorgan@law.gwu.edu

**Undergraduate Education:**

Northwestern University, Evanston, Illinois, 1959-62
B.A. degree, highest distinction    Member, Phi Beta Kappa

**Legal Education:**

University of Chicago Law School, Chicago, Illinois, 1962-65
      J.D. degree with honors; Member, Order of the Coif
      Comment Editor, Volume 32, University of Chicago Law Review

**Professional Experience:**

Oppenheim Professor of Antitrust and Trade Regulation Law, Emeritus, since 2014

Oppenheim Professor of Antitrust and Trade Regulation Law, George Washington
      University, 1989-1998; 2000-2013

Rex E. Lee Professor of Law, Brigham Young University, 1998-2000

Dean, Emory University School of Law, 1980-85
      Distinguished Professor of Law 1985-89

Professor of Law, University of Illinois, 1974-80
      Associate Professor, Illinois, 1970-74; Assistant Professor, Illinois, 1966-67

Visiting Professor, Brigham Young University, Fall 1994
      Monash University (Australia), Spring 1988
      Cornell University, Winter 1974

Special Assistant to Assistant Secretary of Defense, 1969-70
      Attorney, Office of Air Force General Counsel, 1967-69

Bigelow Teaching Fellow, University of Chicago Law School, 1965-66

17

**Publications:**

**A.     In the Field of Professional Responsibility**

THE VANISHING AMERICAN LAWYER (Oxford University Press 2010)

PROFESSIONAL RESPONSIBILITY: PROBLEMS AND MATERIALS (Foundation
Press 1976); 2nd Edition 1981; 3rd Edition 1984; 4th Edition 1987; 5th Edition
1991; 6th Edition 1995, 7th Edition 2000, 8th Edition 2003, 9th Edition 2006, 10th
Edition 2008 (co-authored with R. Rotunda); 11th Edition 2011; 12th Edition 2014
(co-authored with R. Rotunda and J. Dzienkowski); all with Teachers' Manuals.

SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (published
annually since 1981) (co-authored with R. Rotunda)

AMERICAN LAW INSTITUTE, RESTATEMENT OF THE LAW (THIRD): THE
LAW GOVERNING LAWYERS (2000) (with C. Wolfram & J. Leubsdorf)

LAWYER LAW: COMPARING THE ABA MODEL RULES OF PROFESSIONAL
CONDUCT WITH THE ALI RESTATEMENT (THIRD) OF THE LAW
GOVERNING LAWYERS (2005)

LEGAL ETHICS (Gilbert Law Summaries) (8th Edition 2005)

"Where Do We Go From Here with Fee Schedules?," 59 A.B.A.J. 1403 (1973)

"The Evolving Concept of Professional Responsibility," 90 Harvard L. Rev. 702 (1977)

"Appropriate Limits on Participation by a Former Agency Official in Matters Before an
Agency," 1980 Duke L.J. 1

"Conflicts of Interest and the Former Client in the Model Rules of Professional Conduct,"
1980 American Bar Foundation Res. J. 993

"The Fall and Rise of Professionalism," 19 U. Richmond L. Rev. 451 (1985)

"Screening the Disqualified Lawyer: The Wrong Solution to the Wrong Problem," 10
Univ. Arkansas (Little Rock) L. J. 37 (1987-88)

"An Introduction to the Debate over Fee Forfeitures," 36 Emory L. J. 755 (1987)

"Public Financial Disclosure by Federal Officials: A Functional Approach," 3
Georgetown J. Legal Ethics 217 (1989).

18

"The Quest for Equality in Regulating the Behavior of Government Officials:  The Case
of Extrajudicial Compensation," 58 George Washington L. Rev. 490 (1990)

"Thinking About Lawyers as Counselors," 42 Florida L. Rev. 439 (1990)

"Vintage Freedman in a New Bottle," Review of Freedman, Understanding Lawyers'
Ethics, 4 Georgetown J. Legal Ethics 847 (1991)

"Heroes for Our Time: Going Beyond Ethical Codes," Clark Memorandum (Brigham
Young University), Fall 1992, p. 23

"Economic Reality Facing 21st Century Lawyers," 69 Washington L. Rev. 625 (1994)

"Sanctions and Remedies for Attorney Misconduct," 19 S. Illinois U. L. Rev. 343 (1995)

"Legal Representation in a Pluralist Society," 63 George Washington L. Rev. 984 (1995)
(co-authored with Robert W. Tuttle)

"American Perspectives on the Duty of Loyalty: Conflicts of Interest and Other Issues of
Particular Concern to the International Practitioner," in Mary C. Daly & Roger J.
Goebel, Eds., Rights, Liability, and Ethics in International Law Practice (1995)

"Law Faculty as Role Models," in ABA Section of Legal Education, Teaching and
Learning Professionalism: Symposium Proceedings (1996)

"Suing a Present Client," 9 Georgetown J. Legal Ethics 1157 (1996), reprinted in 1
Journal of Institute for Study of Legal Ethics 87 (1996)

"Conflicts of Interest in the *Restatement*: Comments on Professor Moore's paper," 10
Georgetown J. Legal Ethics 575 (1997)

"Whose Lawyer Are You Anyway?," 23 William Mitchell L. Rev. 11 (1997)

"Use of the Problem Method for Teaching Legal Ethics," 39 William & Mary L. Rev.
409 (1998)

"Conflicts of Interest and the New Forms of Professional Associations," 39 S. Texas L.
Rev. 215 (1998)

"What Insurance Scholars Should Know About Professional Responsibility," 4 Conn.
Insurance L. J. 1 (1997-98)

"Interview with Professor Thomas Morgan on Professional Responsibility," 13 Antitrust
4 (Fall 1998).

"The Impact of Antitrust Law on the Legal Profession," 67 Fordham L. Rev. 415 (1998)

19

"Toward a New Perspective on Legal Ethics," Am Bar Foun, Researching the Law (2000)

"Real World Pressures on Professionalism," 23 U. Ark. (Little Rock) L. J. 409 (2001)

"Practicing Law in the Interests of Justice in the Twenty-First Century," 70 Fordham L. Rev. 1793 (2002)

"Toward Abandoning Organized Professionalism," 30 Hofstra L. Rev. 947 (2002)

"Creating a Life as a Lawyer," 38 Valparaiso L. Rev. 37 (2003)

"Sarbanes-Oxley: A Complication, Not a Contribution in the Effort to Improve Corporate Lawyers' Professional Conduct," 17 Georgetown J. Legal Ethics 1 (2003)

"The Client(s) of a Corporate Lawyer," 33 Capital U. L. Rev. 17 (2004)

"Educating Lawyers for the Future Legal Profession," 30 Okla City U. L. Rev. 537 (2005)

"The Corporate Lawyer and the Perjury Trilemma," 34 Hofstra L. Rev. 965 (2006)

"It's Not Perfect, But the ABA Does a Key Job in State-Based Regulation of Lawyers," 11 Tex. Rev. of L. & Politics 381 (2007)

"Comment on Lawyers as Gatekeepers," 57 Case Western Res. L. Rev. 375 (2007)

"Professional Malpractice in a World of Amateurs," 40 St. Mary's L. J. 892 (2009).

"It's Not Your Parents' Profession Anymore: The Changing Course of Legal Careers," GW Law School Alumni Magazine, Summer 2010, p. 18.

"Should the Public Be Able to Buy Stock in Law Firms?" 11 Engage 111 (Sept. 2010).

"Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in Aggregate Settlements," 79 George Washington L. Rev. 734 (2011).

"Realistic Questions About Modern Lawyer Regulation," part of an on-line symposium at http://truthonthemarket.com/2011/09/19/thomas-morgan-on-realistic-questions-about-modern-lawyer-regulation.

"Calling Law a 'Profession' Only Confuses Thinking about the Challenges Lawyers Face," 9 U. St. Thomas L.J. 542 (2011).

"On the Declining Importance of Legal Institutions," 2012 Mich. St. L. Rev. 255.

"The Rise of Institutional Law Practice," 40 Hofstra L. Rev. 1005 (2012).

B.   **In the Fields of Economic Regulation and Administrative Law**

MODERN ANTITRUST LAW AND ITS ORIGINS: CASES AND MATERIALS
(West Publishing Co. 1994; 2nd Ed. 2001; 3rd Ed. 2005; 4th Ed. 2009; 5th Ed. 2014)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (West
Publishing Co. 1976)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (2nd
Edition 1985) (co-authored with J. Harrison & P. Verkuil)

REGULATION AND DEREGULATION: CASES AND MATERIALS (West
Publishing Co. 1997; 2nd Edition 2004) (co-authored with Harrison and Verkuil)

"The General Accounting Office: One Hope for Congress to Regain Parity of Power with
the President," 51 N. Carolina L. Rev. 1279 (1973)

Review of "Inner City Housing and Private Enterprise," 1972 U Ill. L Forum 833 (1973)

"Achieving National Goals Through Federal Contracts: Giving Form to an Unconstrained
Administrative Process," 1974 Wisconsin L. Rev. 301

"Toward a Revised Strategy for Ratemaking," 1978 U. Illinois L. Forum 21

"Procedural Impediments to Optimal Rate Making," in W. Sichel, Ed., Public Utility
Rate Making in an Energy-Conscious Environment (Westview Press 1979)

"Federal Chartering of Corporations" and "Shareholder Remedies in Corporations" in
M.B. Johnson, Ed., The Attack on Corporate America: The Corporate Issues
Sourcebook (McGraw-Hill 1978)

Review of "Economic Analysis and Antitrust Law," 33 Vanderbilt L. Rev. 1523 (1980)

"The Deregulation Bandwagon: Too Far, Too Fast?," 2 J. Law & Commerce 1 (1982)

Review of "Antitrust Stories," Antitrust Source, www.antitrustsource.com (Aug 2008)

"Antitrust Implications of Accreditation Standards That Limit Law School Enrollment,"
101 Antitrust & Trade Regulation Report 2508 (BNA, July 15, 2011).

C.   **In the Field of Legal Education**

"Computer-Based Legal Education at the University of Illinois:  A Report of Two Years'
Experience," 27 J. Legal Education 138 (1975) (with P. Maggs)

"Teaching Students for the 21st Century," 36 J. Legal Education 285 (1986)

"Thinking About Bar Examining: The Challenge of Protecting the Public," 55 Bar
    Examiner 27 (Nov.1986)

"President's Address", 90-1 AALS Newsletter 1 (Feb. 1990)

"Should We Oppose Ranking of Law Schools?, 90-2 AALS Newsletter 1 (Apr. 1990)

"Legal Education Organizations in Business," 90-3 AALS Newsletter 1 (Aug. 1990)

"The Challenge to Maintain Diversity in Legal Education," 90-4 AALS Newsletter 1
    (Nov. 1990)

"A Defense of Legal Education in the 1990s," 48 Wash. & Lee L. Rev. 1 (1991)

"Admission of George Mason to Membership in the Association of American Law
    Schools," 50 Case Western Reserve L. Rev. 445 (1999)

"Training Law Students For the Future: On Train Wrecks, Leadership and Choices," 6 St.
    Thomas L. Rev. 297 (2009).

"The Changing Face of Legal Education: Its Impact on What it Means to Be a Lawyer,"
    45 Akron L. Rev. 811 (2012).

**Participation in Public Programs:**

**A.  Endowed Lectures Given**
    Mellon Lecture, University of Pittsburgh - 1981
    Altheimer Lecture, University of Arkansas (Little Rock) - 1987
    Dunwody Lecture, University of Florida - 1990
    Lane Foundation Lecture, Creighton University - 1990 & 2010
    Tucker Lecture, Washington & Lee University - 1990
    Pirsig Lecture, Wm. Mitchell Law School - 1996
    Van Arsdell Lecture, University of Illinois - 1997
    Keck Award Lecture, American Bar Foundation - 2000
    Tabor Lecture, Valparaiso University - 2003
    Sullivan Lecture, Capital University - 2004
    Miller-Becker Lecture, University of Akron - 2011
    Lichtenstein Lecture, Hofstra Law School - 2012
    Payne Lecture, Mississippi College – 2012

B. **Representative Programs on Which Served as Speaker or Panelist**

Let's Make a Deal (the Ethics of Negotiation) - ABA Conference on Professional Responsibility (Palm Beach) - June 1992

Reporting a Client's Continuing Crime or Fraud - ABA Conference on Professional Responsibility (Chicago) - May 1993

Ethical Issues in Representing Older Clients - Fordham University School of Law (New York) - December 1993

Problem of Representing a Regulated Client, Eleventh Circuit Judicial Conference (Orlando) - May 1994

Ethical Issues in Products Liability Cases - Products Liability Committee of the ABA Litigation Section (Tucson) - February 1995

Ethical Issues Arising in the O.J. Simpson Case - University of Washington School of Law (Seattle) - May 1995

Competition Policy for the New South Africa (Pretoria) - November 1995

Ethical Issues in Representing Children - Fordham University School of Law (New York) - December 1995

Are We a Cartel? The ABA/DOJ Consent Decree - AALS Annual Meeting (San Antonio) - January 1996

Professional Responsibilities of the Law Teacher - AALS (Washington) - July 1996

Ethical Issues for Mediators and Advocates - ABA Annual Meeting (Orlando) - August 1996

Legal Issues in Cyberspace - ABA Annual Meeting (Orlando) - August 1996

Teaching Legal Ethics by the Problem Method - College of William & Mary--Keck Foundation Conference (Williamsburg) - March 1997

Litigators Under Fire: Handling Professional Dilemmas In and Out of Litigation - televised ALI/ABA CLE program (Washington) - April 1997

Conflicts of Interest in the New Forms of Law Practice - South Texas Law School Symposium (Houston) - September 1997

Fiduciary Obligations in Dismissal of a Law Firm Partner - Washington & Lee Law
School Symposium (Lexington, VA) - April 1998

Impact of Disciplinary Action on Lawyer's Status as Certified Specialist - ABA
Committee on Specialization National Roundtable (Washington) - May 1998

Conflicts of Interest in the Restatement of the Law Governing Lawyers - National
Organization of Bar Counsel (Toronto) - July 1998

The Ethics of Teaching Legal Ethics - Association of American Law Schools
(Washington) - October 1998

The New Restatement of the Law Governing Lawyers: What Is It & How Does It Affect
Your Practice? - Assn of Bar of City of New York (New York) - November 1998

Imputation, Screens & Personal Conflicts - ABA Conference on Professional
Responsibility (La Jolla) - June 1999

The Future of Legal Education - Dedication of Sullivan Hall, the new Seattle University
Law Building (Seattle) - October 1999

Legal Ethics in the New Millennium - J. Reuben Clark Soc. (Dallas) - November 1999

Unauthorized Practice of Law and Ethical Risks to Lawyers from Multistate Practice -
ALAS Telephone Seminar (Chicago) - December 1999

Ethics 2000: Rewriting the Standards for Lawyer Conduct - American Intellectual
Property Law Association (La Quinta, CA) - January 2000

Real World Pressures on Professionalism - University of Arkansas at Little Rock Law
School (Little Rock, AR) - February 2000

Professional Responsibility Issues Arising Out of Electronic Commerce - ABA Section
of Public Contract Law (Annapolis, MD) - March 2000

Multidisciplinary Practice: Curse, Cure or Tempest in a Teapot - American Intellectual
Property Law Association (Pittsburgh, PA) - May 2000

Ethics 2000: Proposed Changes in the Law Governing Lawyers - Conference of Chief
Justices (Rapid City, SD) - July 2000

Attorney Standards in Federal Courts and Developments in the Multidisciplinary Practice
Controversy - Conference of Chief Justices (Baltimore) - January 2001

Multijurisdictional Practice - Turner Seminar (Memphis) - February 2001

Ethical Issues in Large Firms – Ass'n of Legal Administrators (Baltimore) - May 2001

Law Firm Ancillary Services - ALAS Annual Meeting (Bermuda) - June 2001

New Rule 1.6 on Disclosure of Confidential Client Information - ABA Civil Justice
    Roundtable (Washington) - March 2002

Ethics for Corporate In-House Counsel - American College of Investment Counsel
    (Chicago) - April 2002

Treading Water: A Young Lawyer's Guide to Ethics in Varying Practice Environments -
    ABA Tax Section Young Lawyers Committee (Washington) - May 2002

Shifting Ethical Sands: Ethics 2000 and Beyond - Federal Communications Bar Ass=n
    (Washington) - June 2002

Multijurisdictional Practice - ABA Forum on Franchising (Phoenix) - October 2002

The Sarbanes-Oxley Act of 2002 and the ABA Task Force on Corporate Responsibility
    Report (ALAS Telephone Seminar) - October 2002

At the Bar and in the Boardroom: The Ethics of Corporate Lawyering - Federalist Society
    (Washington) - Nov. 2002

Law Firm Risk Management: Post-Enron Challenges - Hildebrandt Conference (New
    York) - Nov. 2002

Future Regulation of Securities Lawyers - ABA Section of Business Law, Committee on
    Federal Securities Regulation (Washington) - Nov. 2002

What Lawyers Need to Know to Comply with the New SEC Professional Conduct Rules
    - ABA Section of Business Law Televised Forum (Washington) - Feb 2003

Ethics in Representing Organizational Clients After Sarbanes-Oxley - ABA Section of
    Business Law Spring Meeting (Los Angeles) - April 2003

Corruption in the Executive Suite: The Nation Responds - National Teleconference from
    ABA Public Utility Section Spring Meeting (Washington) - April 2003

Sarbanes-Oxley Revolution in Disclosure and Corporate Governance: Complying with
    the New Requirements - ABA National Institute (Washington) - May 2003

Client Confidentiality, Corporate Representation and Sarbanes-Oxley - ABA National
    Conference on Professional Responsibility (Chicago) - May 2003

25

Friend or Foe: The Restatement of Law Governing Lawyers - ABA National Legal Malpractice Conference (La Jolla) - September 2003

Where Were the Lawyers in Enron? - Cato Institute (Washington) - October 2003

Testified before the House Subcommittee on Capital Markets' Hearing on the Role of Attorneys in Corporate Governance (Washington) - February 2004

The Lawyer-Lobbyist "on the Frontier": What Legal and Ethical Rules Apply? - ABA Mid-Year Meeting (San Antonio) - February 2004

The Client(s) of a Corporate Lawyer - Capital U. Law School (Columbus) - March 2004

Ethical Issues Facing Public Interest Law Firms - Heritage Foundation (Washington) - October 2004

Drafting an Ethical Code for a Diverse Legal Profession - Univ. of Memphis Law School (Memphis) - October 2004

Ethical Issues in International Trade Cases - International Trade Trial Lawyers Association (Washington) - November 2004

Professional Regulation of Business Lawyers Isn't Going to Get Any Easier - ABA Section of Business Law (Washington) - November 2004

Problems for Corporate Lawyers in Complying with the Sarbanes-Oxley Act - New Jersey Corporate Counsel Association (Livingston, NJ) - January 2005

Avoiding Conflicts in Business Law Practice: Seven Deadly Sins - ABA Section of Business Law (Nashville) - April 2005

Fireside Chat on Legal and Accounting Ethics - SEC Historical Society (Washington) - November 2005

When Good Clients Go Bad - ALAS Annual Meeting (Toronto) - June 2006

Lawyers Face the Future - St. Thomas Univ. Law School (Minneapolis) - August 2006

Regulating Corporate Morality - George Washington Corporate & Business Law Society (Washington) - September 2006

Comments on Noisy Withdrawal - Case Law School Leet Symposium (Cleveland) - October 2006

The ABA Role in Law School Accreditation - Federalist Society Lawyers' Convention (Washington) - November 2006

Investigative Techniques: Legal, Ethical and Other Limits - ABA Section of Antitrust Law (National) - December 2006

Ethics Issues in Corporate Internal Investigations - Georgia Bar (Atlanta) - March 2007

Are Regulatory Lawyers' Ethical Obligations Changing? - ABA Section of Public Utility Law (Washington) - April 2007

Antitrust Litigation Ethics From Soup to Nuts - ABA Section of Antitrust Law (Washington) - April 2007

How to Survive in Today's Competitive Environment and Comply With the Rules of Professional Conduct - Wisconsin State Bar (Milwaukee) - May 2007

Audit Response Letters: Will There Be Peace Under the Treaty? - ABA National Conference on Professional Responsibility (Chicago) - May 2007

The Buried Bodies Case: Alive and Well After Thirty Years - ABA National Conference on Professional Responsibility (Chicago) - May 2007

Organization and Discipline for an Independent Legal Profession - Visit of Leaders of the Iraqi and Kurdistan Bar Associations (Washington) - November 2007

Feeling Conflicted? The Experts Opine and Prescribe - Tennessee Bar Foundation (Nashville) - January 2008

Ethics Issues in Qui Tam Litigation - ABA National Institute on Civil False Claims (Washington) - June 2008.

Ethics and the Lawyer-Lobbyist - ABA Administrative Law Conference (Washington) - October 2008

Ethics in the Early Going - ABA Tort & Insurance Practice Section, Aviation & Space Law Committee Litigation National Program (Washington) - October 2008

Professional Malpractice in a World of Amateurs - St. Mary's Law School Symposium on Legal Malpractice (San Antonio) - February 2009

The World Economic Crisis and the Legal Profession - Order of Advocates of Brazil (Brazilian counterpart of the ABA) - (Rio de Janeiro) - May 2009

Principles of United States Antitrust Law - Commissioners and Staff of the CADE
(Brazilian counterpart of the FTC) - (Brazilia) - May 2009

The World Economic Crisis, Antitrust Law and the Lawyer - Institute of Advocates of
Brazil (Brazilian counterpart of the ALI) - (Rio de Janeiro) - May 2009

The World Economic Crisis and Antitrust Law - American Chamber of Commerce -
(Bela Horizonte, Brazil) - May 2009

Antitrust Law: The Real U.S. Policies - Seminar celebrating the retirement of Prof. Joao
Bosco Leopoldino da Fonseca of the Federal University of Minas Gerais (Bela
Horizonte) - May 2009

Where Does It End? Duties to Former Clients - American Bar Association Center for
Professional Responsibility (Chicago) - May 2009

The Last Days of the American Lawyer - Creighton Law School (Omaha) - Oct. 2009

Ethics Challenges for National Security Lawyers In and Out of Government - ABA
Standing Committee on Law and National Security (Washington) - Nov. 2009

The Transformative Effect of International Initiatives on Lawyer Practice and Regulation:
The Financial Action Task Force Guidelines - Association of American Law
Schools Annual Meeting (New Orleans) - Jan. 2010

Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in
Aggregate Settlements - Humphreys Complex Litigation Center Conference on
Aggregate Litigation: Critical Perspectives (Washington) - March 2010

Abandoning Homogeneity in Legal Education - Georgetown Center for Study of
the Legal Profession Program on Law Firm Evolution: Brave New World or
Business as Usual? (Washington) - March 2010

Ethics Issues in Housing - ABA Forum on Affordable Housing (Washington) - May 2010

The Vanishing American Lawyer - Conference on Regulating and Deregulating Lawyers
- Institute for Advanced Legal Studies (London) - June 2010

The Vanishing American Lawyer - Federalist Society Podcast - Sept. 2010.

Developments in Ethics 2010 - ABA Teleconference - Jan. 2011

A Transforming Legal Profession: The Challenges for Bar Associations - National
Conference of Bar Presidents (Atlanta) - Feb. 2011

A Transforming Profession: The Challenges for Lawyers Starting Out - ABA Law
Student Division (Washington) - Feb. 2011

A Transforming Profession: A Look Back Forty Years and the Challenges Ahead -
Alabama Bar Annual Meeting (Point Clear) B July 2011
Florida Bar Board of Governors (Palm Beach) B July 2011

On the Declining Importance of Legal Institutions B Conference at Michigan State Law
School (East Lansing) - Sept. 2011

Calling Law a Profession Only Confuses Thinking About Challenges Lawyers Face -
Conference at University of St. Thomas Law School (Minneapolis) - Sept. 2011

The Changing Face of Legal Education: Its Impact on What It Means to be a Lawyer -
Miller-Becker Lecture at University of Akron Law School (Akron) - Oct. 2011

Law School Accreditation - Federalist Society (Washington) - Nov. 2011

Aggregate Litigation: Don't Let Your End Game Blow-Up - ALM Litigation Summit
(Washington) - Nov. 2011

So Someone Objects to Your New Client - ABA Administrative Law & Regulatory
Practice Section Fall Conference (Washington) - Nov. 2011

Ethical Dilemmas Facing Lawyers Practicing National Security Law - ABA Standing
Committee on Law and National Security (Washington) - Dec. 2011

Needed Law Schools' Response to Changes in the Legal Profession - AALS Annual
Meeting (Washington) - Jan. 2012

The Rise of Institutional Law Practice - Lichtenstein Lecture at Hofstra Law School
(Hempstead, NY) - Feb. 2012

Blazing New Pathways Through the Legal World - Washington Area Legal Recruitment
Administrators Association (Washington) - Mar. 2012

Ethics in Privacy and Social Media - ABA Antitrust Section (Washington) - Mar. 2012

Ethical Issues in Alternative Litigation Funding – Humphries Center at GW Law
(Washington) – May 2012

The Vanishing American Lawyer: The Road Ahead -- Utah Bar (Sun Valley, ID) -- July
2012

The Vanishing American Lawyer: The Changing Legal Profession -- Federal Bar Ass'n (Memphis, TN) -- Oct. 2012

The Professional World Facing New American Lawyers – 2012 Georgia Convocation on Professionalism (Atlanta) -- Nov. 2012

Testimony -- ABA Task Force on the Future of Legal Education (Dallas) -- Feb. 2013

Public Ownership of Stock in Law Firms -- Federalist Society Teleforum -- Apr. 2013

The ABA's 2012 Changes in Ethics Rules -- ABA Antitrust Section Spring Meeting (Washington) -- Apr. 2013

Proposals for Training Required for Bar Admission – AALS Annual Meeting (New York) – Jan. 2014

Law Professors of the Future: A New Balance of Teaching, Scholarship and Service? – AALS Annual Meeting (New York) – Jan. 2014

Are Lawyers Vanishing? – Transportation Lawyers' Ass'n (St. Petersburg, FL) – May 2014

## Major Civic and Professional Activities:

### A. In the Field of Professional Responsibility

Associate Reporter, American Law Institute Restatement of the Law (Third), The Law Governing Lawyers, 1986-2000

Associate Reporter, American Bar Association Ethics 2000 Commission, 1998-99

Reporter, American Bar Association Commission on Professionalism, 1985-86

Member, Advisory Board, ABA/BNA Lawyers' Manual on Professional Conduct, since 1984; Chair 1986-87 & 1992-93

Member, Advisory Council, Project on a Digital Archive of the Birth of the Dot Com Era: The Brobeck Papers, Library of Congress and Univ. of Maryland, 2005-2009

Chair, Federalist Society Practice Group on Professional Responsibility and Legal Education 2005-2007

Member, Drafting Committee, Multistate Professional Responsibility Examination, National Conference of Bar Examiners, 1986-89

Member, Committee on Professional Ethics, Illinois State Bar Association, 1974-1980; Vice Chair 1979-80

**B.    In the Fields of Economic Regulation and Administrative Law**

Vice Chair, ABA Section of Administrative Law & Regulatory Practice, 2001-2002

Consultant, Administrative Conference of the U.S., 1975-1979 & 1985-1989

Council Member, ABA Section of Administrative Law, 1983-1986

Chair, Section on Law and Economics, Ass'n of American Law Schools, 1979-1980

**C.    In the Field of Legal Education**

President, Association of American Law Schools, 1990

Member, AALS Executive Committee, 1986-1991

Chair, AALS Special Committee on ABA Accreditation Standards, 2010

Chair, AALS Nominating Committee for President-Elect and Members of the Executive Committee, 2010 (Member 2008 & 2011)

AALS Delegate to the ABA House of Delegates, 2011-2013

Chair, AALS Long Range Planning Committee, 1988-1989

Member, Planning Committee for Workshop on Tomorrow's Law Schools: Economics, Governance and Justice, 2013

Member, AALS Special Committee on Faculty Recruitment Practices, 2005-2007

Member, AALS Committee on the Ethical and Professional Responsibilities of Law Professors, 1988-1989

**Special Honors Received:**

Illinois State Bar Foundation, Honorary Fellow (1988) (for contributions to study of lawyer professionalism)

American Bar Foundation, Keck Foundation Award (2000) (for distinguished scholarship in legal ethics and professional responsibility)

New York State Bar Association, Sanford D. Levy Professional Ethics Award (2008) (for lifetime contributions to legal ethics scholarship)

**Legal Consulting:**

Testified in twenty-five contested trials or hearings involving issues such as lawyer discipline, disqualification, right to fees and malpractice.

Gave depositions in twenty-nine cases resolved prior to trial.

Submitted declarations or affidavits in thirty-four other cases, typically in connection with motions for summary judgment or to disqualify.

**Organization Memberships:**

American Bar Association
American Law Institute (Life Member)
American Bar Foundation (Fellow)
Illinois State Bar Association
Illinois Bar Foundation (Honorary Fellow)
ABA Center for Professional Responsibility
Association of Professional Responsibility Lawyers
American Judicature Society

**Current as of July 2014**



STATE OF CALIFORNIA

**Court of Appeal**

SECOND APPELLATE DISTRICT
DIVISION FOUR

J. GARY HASTINGS
ASSOCIATE JUSTICE (RETIRED)

July 6, 2014

Michael S. Sundermeyer
Williams & Connolly LLP
725 12th Street, N.W.
Washington D.C 20005

Re: In Re Edward R. Reines

Dear Mr. Sundermeyer:

I have had a chance to review the Order to Show Cause in this matter and the numerous emails you have forwarded to me. You have requested that I review the current, former and prospective client emails and California authorities in connection with the Order To Show Cause and provide an opinion whether I believe Mr. Reines violated Rule 1-400, as suggested in the OSC.

Attached is my biography to provide background on my experience, which includes service for thirteen years as an Associate Justice on the California Court of Appeal, Second District, and eight years as a judge on the Los Angeles County Superior Court. In addition, I was a founding member of the Benjamin Aranda III Inn of Court here in the South Bay in 1994 and I have remained a member since then. About three years ago my pupilage group decided to do a program on use of social media by attorneys and judges. We researched and developed hypotheticals involving numerous issues including communications, solicitation and advertising contained within California Rules of Professional Conduct, rule 1-400, various Business & Professions Code statues and the American Bar Association Model Rules of Professional Conduct. I have since presented a number of lectures on the subject during the Seminar I teach at Southwestern Law School and to law firms. I am happy to provide you with this opinion.

I understand that attorney Edward Reines is a California practitioner who specializes in intellectual property, a member of the California Bar Association and the United States Court of Appeals, Federal Circuit. On March 5, Chief Judge Randall R. Rader of the Federal Circuit Court sent an unsolicited email to Mr. Reines passing on praise from the Chief Judge's colleagues

1

Not printed at public expense

about Mr. Reines' advocacy in recent appearances before them in two cases, cases in which Judge Rader was apparently not a member of the panel. He concluded as follows:

> "In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!
> "And actually I not only do not mind, but encourage you to let others see this message.
> "Your friend for life."

Mr. Reines did take Chief Judge Rader's suggestion and sent out a number of emails incorporating a copy of Judge Rader's email. Regarding present, former and prospective clients, I understand that all of the emails were sent to lawyers. Some of the recipients appear to be lawyers together with principals of the clients he was representing in the two argued cases. Save two, the rest went to other current, former or prospective clients, and in some instances also included non-lawyers as recipients. The only email that did not go to a lawyer, I understand, was sent to a former employee of one of the clients in the argued cases, and another email was sent by Mr. Reines' client to a lawyer representative of a non-client member of a common interest group. In addition, two of Mr. Reines' partners each forwarded the Judge's email to a prospective client, in one case to two lawyers and in the second case to a lawyer and a non-lawyer.

The ethical proscriptions involving communications, solicitation and advertising by attorneys are contained within California Rules of Professional Conduct, Rule 1-400 and Standards adopted in aid of enforcing those provisions, a copy of which I append hereto. Where the ABA Model Rules do not conflict with California policy, those rules may also be considered. (*Kennedy v. Elderidge* (2011) 201 Cal.App.4[th] 1197, 1210.)

First, I do not believe the emails constitute "advertisements" under either the California or ABA rules. They were not sent "to the general public or any substantial portion thereof." (Rule 1-400, subdivision (A)(3).) The comment to ABA Rule 7.2 states that advertising is allowed "[t]o assist the public in learning about and obtaining legal services . . . ." Here, the emails were apparently directed only to selected lawyers and executives of current, former or prospective clients. I understand Mr. Reines knew all of the persons to whom he sent the emails.

Second, the emails do not constitute "solicitations" within the meaning of Rule 1-400 or ABA Model Rule 7.3. Pursuant to subdivision (B)(2)(a) a solicitation is a

2

communication which is "delivered in person or by telephone." Formal Opinion 2012-186 dated 12/21/2012 of the California State Bar, issued by the Standing Committee on Professional Responsibility and Conduct, confirmed Formal Opinion 2001-155 which concluded that a "communication" sent by email cannot be considered a "solicitation" within the meaning of Rule 1-400. The latter Opinion explains the reason as follows: "Although email communication as part of website technology permits faster responses and more interaction than is possible with other forms of communication, it does not create the risk that the attorney might be able to use her persuasive ability and experience to influence unduly the potential client's thoughtful decision to hire her." (Formal Opinion No. 2001-155, p. 2.) While Model Rule 7.3 contemplates solicitation by "real-time electronic contact," such as chat rooms, such contact has been interpreted not to include emails because they do not present the kind of immediate, personal interaction with an attorney that risks overreaching. (*See, e.g.,* Utah State Bar Ethics Advisory Opinion 97-10 ["Because (a) email is in writing (similar to facsimile transmission), (b) it does not represent a 'live' communication (unlike the chat-room discussions), and (c) the recipient can ignore the message or respond at leisure and after due reflection, we find that e-mail is not an 'in person' communication under Rule 7.3(a)."])

I do believe some of the emails qualify as "communications" under Rule 1-400 and ABA Model Rules, Rule 7.1. Rule 1-400 defines "communication" as "any message or offer made by or on behalf of a member concerning the availability for professional employment of a member or a law firm directed to any former, present or prospective client . . . ." Rule 7.1 is similar in nature. I refer to those emails where Mr. Reines requests that he and his firm be considered in the future for Federal Circuit needs. One example is the email dated March 10, 2014, to Kevin Rhodes, Chief Intellectual Property Counsel at 3M (Exhibit 46): "Kevin, as you may consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful. . . ." Both rules basically prohibit an attorney from issuing communications that are untrue, false or misleading.

Both the ABA Rules and the California Rules recognize exceptions to proscriptions described where the communication is between lawyers and others with whom the lawyer has a close personal or professional relationship. As noted above, the problem being addressed is an attorney's ability to "unduly" influence a potential client. Rule 7.3(a) contains an exception where the person contacted "(1) is a lawyer; or (2) has a family, close personal, or prior professional relationship with the lawyer." Thus, it recognizes the threat of undue influence in those circumstances to be de minimus. The

vast majority of Mr. Reines' emails were sent to current or former clients. The only emails not covered by this exception would be Exhibits 46, 47, 48, 49 and perhaps 50.

California ethics opinions also recognize an exception where advertisements or communications within the scope of Rule 1-400 are between lawyers, which again would not involve the general public. Formal Opinion 1981-61 addressed the predecessor to Rule 1-400, Rule 2-101, and answered two questions. First: "A. May Attorney A recommend himself or herself for professional employment to Attorney B by means of an in-person or any other communication, when the purpose of the recommendation is to obtain B's client as the client of A?" It concluded in the affirmative, stating in part:

> "First, if A's communication is considered an advertisement, there appears to be no substantial interest in prohibiting such a communication. A's communication to B concerning his or her availability to perform legal services is not inherently likely to deceive B or involve intrusion, coercion, duress, compulsion, intimidation, threats or vexatious conduct. (See rule 2-101(A) (1)-(3), (6), Rules Prof. Conduct.) If A's communications are false, misleading, or deceptive, they may subject A to discipline. (See rule 2-1-1(A)(1)-(3), Rules Prof. Conduct.)

> "An attorney is presumed to have superior knowledge and informed access to written authorities and to other members of the bar to evaluate recommendations of employment of other attorneys. Accordingly, it is difficult to find a demonstrated harm which would allow curtailment of the right, which a lawyer shares with all other citizens, to disseminate purely commercial information, subject to the limitations of rule 2-101(A) of the Rules of Professional Conduct."

Second, it asked: "B. May attorney A seek professional employment for pecuniary gain my means of an in-person solicitation or other direct communication of attorney B where B is the potential client?" Again, it answered in the affirmative:

> "We conclude that members of the State Bar are permitted to communicate freely with each other regarding their availability to provide legal services, subject to applicable law and the provisions of rule 2-101 of the Rules of Professional Conduct which govern the manner in which communications may be made. Those who object to such commercial behavior on the part of the members of the State Bar are referred to the six principal arguments against

such commercial activity which were overruled in the opinion in *Bates v. State Bar of Arizona* [(1977)] 433 U.S. [350], commencing at page 368."

More recently, Formal Opinion 2004-165 addressed advertising by an independent group of lawyers calling themselves Court Appearance Service to other lawyers promoting contract hiring of its members when the lawyer needed someone to cover for court appearances, attending depositions etc. It concluded that as long as the advertising was directed at lawyers it was not governed by rule 1-400:

"The Committee previously opined in California State Bar Formal Opn. No. 1981-61, however, that lawyer-to-lawyer communications do not come within the scope of the predecessor to rule 1-400 if the communications seek professional employment *through* the assistance or recommendations of the recipient attorney, or even if the communication seeks professional employment *by* the recipient attorney. The Committee reasoned that the predecessor of rule 1-400 is intended to prevent fraud, undue influence, and other abuses to which lay persons might be subject. Consequently, the rule should not apply to lawyer-to-lawyer communications because lawyers are unlikely to be affected by such vexatious conduct." (Formal Opinion 2004-165, p. 8, italics in original.)

In sum, in this case all of the current, former and prospective client emails are covered by one or more of the exceptions applicable to Rule 1-400. They were sent either to current clients, former clients or to lawyers or some combination thereof, not to the general public. Consequently, pursuant to ABA Rule 7.1 and California Rule 1-400 communication about legal services is permitted unless it is untrue, false or deceptive. I don't believe incorporating Judge Rader's email made the communications such.

Turning to the specific charge in the Order To Show Cause, it references Judge Rader's email "implying a special relationship with the judge," and suggests that Standard 6 of Rule 1-400 in connection with ABA Rule 8.4(e) creates "a presumption" of professional misconduct. As just noted, I don't believe Rule 1-400 applies in this situation because the emails were not sent to the public; because the emails were sent to either current clients, former clients or lawyers representing prospective clients; and because none of the emails contained an untrue or false statement. But assuming Rule 1-400 applies, I believe the panel is misreading Standard 6.

Standard 6 along with Standards (7) through (10) must be read in connection with the proscriptions within items (1) through (3) of subdivision (D) which are meant to

5

preclude: "any *untrue statements*" or which "[c]ontain any matter, or present or arrange any matter in a manner or format which is *false, deceptive, or which tends to confuse, deceive, or mislead the public*" or which "[o]mits to state any fact necessary to make the statements made, in the light of the circumstances under which they are made, *not misleading to the public . . .*" In other words, unless it is true, pursuant to Standard (6) an attorney should not state, suggest or imply that he or she is in a professional relationship with "a government agency or instrumentality or a public or non-profit legal services organization." To do so may confuse or mislead the public into believing they are hiring someone who is employed by or has a professional relationship with one of those entities. Standards (7) through (10) address similar situations.

These standards are not meant to address an issue of "friendship" between a lawyer and a judge or truthful communications to lawyers and other sophisticated persons, and not the public, about "friendship." That issue is addressed elsewhere within judicial ethics and recusal statutes. And the onus is on the judge to either disclose the relationship or recuse himself. For example, California Code of Civil Procedure section 170.1 lists a number of circumstances when a judge "shall be disqualified" from hearing a case. The list includes financial interests in a party or the case, personal knowledge of facts of the case, being a lawyer within a firm appearing before the judge within two years preceding the matter etc. As pertinent here, the following would apply:

"(6)(A) For any reason:

"(i) The judge believes his or her recusal would further the interests of justice.
"(ii) The judge believes there is a substantial doubt as to his or her capacity to be impartial.
"(iii) A person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial.
"(B) Bias or prejudice toward a lawyer in the proceeding may be grounds for disqualification."

Judge David Rothman, in his "California Judicial Conduct Handbook" discusses relationships between lawyers and judges. He distinguishes between professional relationships and personal relationships. Regarding professional relationships, he states: "The fact that a judge and an attorney serve together in a professional legal organization or the judge has only a professional relationship with the attorney, does not normally require the judge to either recuse or disclose when the attorney appears before him. (*Id.* at pg. 328, citing to Cal. Judges Assoc. Judicial Ethics Update (2003) p. 2.)

6

Regarding social friendships, Judge Rothman writes: "The test for disclosure and disqualification in social friendships is similar to that which one might employ with respect to a dating relationship: is the relationship that of a mere 'acquaintance,' in which case even disclosure is questionable, or is the person within the inner circle of the judge's intimate friends, such that disqualification is required? Between these extremes are the variable, where the relationship gradation moves closer to clear disclosure than to clear disqualification. The circumstances might also be such that whereas the judge might not even consider disclosure of an acquaintanceship with an attorney appearing in court to represent a client, the judge might recuse where the attorney is personally a party in the case." (*Id.* at 356-357, footnote omitted.)

If a situation arose in California where Mr. Reines would be appearing before Judge Rader, and assuming that the friendship referenced in the email was an extremely close personal friendship, rather than a professional friendship, between Mr. Reines and Judge Rader, the impetus would be on the Judge, not the lawyer, to decide whether to disclose the friendship or recuse himself from the case.

Finally, referring to the language of Rule 8.4(e) I cannot conclude the emails from Mr. Reines are either stating or implying that he has "an ability to influence *improperly* a government agency or official or to achieve results by *means that violate the Rules of Professional Conduct or other law . . .*" In his emails, Mr. Reines says nothing to suggest such improper influence. Nor does he call any attention to Judge Rader's remarks about their friendship. Similarly, the responses from the recipients of the emails provide no evidence that they perceived any suggesting of improper influence. The email from Judge Rader basically states that Mr. Reines was an excellent advocate in two cases in which he appeared before the Federal Circuit. If that is so, and I have no reason to believe that statement was false, it would stand to reason Mr. Reines may have a better ability to make a case before that court than one who does not have those skills. But that is what lawyers are supposed to do and it does not mean his eloquence will improperly sway the members of the court and result in a victory.

I think the foregoing addresses the issues of California law raised in the Order to Show Cause. If you or the Court have any other issues you would like me to address I will be happy to do so.

Sincerely,

Justice (Ret.) J. Gary Hastings

7

# Justice J. Gary Hastings (Ret.)



## FORMAL EDUCATION

J.D., Southwestern University School of Law, May, 1972, Magna Cum Laude; Notes and Comments Editor and Editor-in-Chief of the Southwestern Law Review.

B.S., University of Southern California, 1968, Business Administration.

## JUDICIAL EXPERIENCE

**Associate Justice,** California Court of Appeal, Second Appellate District, Division 4 September 21, 1993 – February 19, 2006; on assignment through August 2006.

**Judge,** Los Angeles Superior Court October 1, 1985 – September 21, 1993; civil and criminal trials, family law matters, probate calendar, law and motion calendars, civil master calendar, Supervising Judge of the Southwest branch 1989-1990.

## LEGAL PRACTICE

State Bar Admission:  December 14, 1972

Associate and then shareholder at Belcher, Henzie & Biegenzahn, 1972 – 1985.  Represented: The Firestone Tire & Rubber Company in product liability suits; State Farm Fire and Casualty Company in bad faith and coverage cases and insureds of State Farm in various cases; Glacier General Assurance Company insureds in medical malpractice cases; business, probate and family law matters for individual clients.

**TEACHING EXPERIENCE**

Adjunct Professor of law at Southwestern Law School 1973-1977 (Legal Research and Writing and Civil Law and Procedure); August 2006 to the present (Trial Advocacy and Trial Advocacy Seminar).

Faculty for the National Institute for Trial Advocacy, Southern California Regional Trial Program, 1994 to present.

Lecturer and organizer for California Judicial Education and Research, 1986-2006.

Lecturer for various local bar associations and law firms, 1996 to present on various subjects:

- The Tripartite Relationship and Legal Ethics
- Litigation Ethics
- Civility and Professionalism: Why it Counts
- Ethical and Legal Issues Involving Use of Social Media
- Best Practices to Avoid Malpractice and State Bar Complaints
- Appellate Advocacy

**RECOGNITION**

Adjunct Professor "Excellence in Teaching Award," 2007, Southwestern Law School.

Roger J. Traynor Memorial Award "Appellate Justice of the Year," 2004, Consumer Attorneys Association of Los Angeles.

William B. Enright Ethics and Civility Award, 2001, California Council of the American Inns of Court.

Honorable William E. MacFadden Award "For Dedicated Service to the Bench and Bar," 1999, South Bay Bar Association.

Alfred J. McCourtney Memorial Award "Trial Judge of the Year," 1993, Los Angeles Trial Lawyers Association.

**PERSONAL INFORMATION:**

Born February 19, 1943 in Los Angeles, California.
Married with two adult children.

**Hastings, J 1/2/2013**
**For Educational Use Only**

Rule 1-400. Advertising and Solicitation, CA ST RPC Rule 1-400

West's Annotated California Codes
   **Rules** of the State Bar of California (Refs & Annos)
     California **Rules** of Professional **Conduct** (Refs & Annos)
       Chapter 1. Professional Integrity in General

Prof.Conduct, **Rule 1-400**

**Rule 1-400**. Advertising and Solicitation

Currentness

**(A)** For purposes of this **rule**, "communication" means any message or offer made by or on behalf of a member concerning the availability for professional employment of a member or a law firm directed to any former, present, or prospective client, including but not limited to the following:

(1) Any use of firm name, trade name, fictitious name, or other professional designation of such member or law firm; or

(2) Any stationery, letterhead, business card, sign, brochure, or other comparable written material describing such member, law firm, or lawyers; or

(3) Any advertisement (regardless of medium) of such member or law firm directed to the general public or any substantial portion thereof; or

(4) Any unsolicited correspondence from a member or law firm directed to any person or entity.

**(B)** For purposes of this **rule**, a "solicitation" means any communication:

(1) Concerning the availability for professional employment of a member or a law firm in which a significant motive is pecuniary gain; and

(2) Which is:

  (a) delivered in person or by telephone, or

  (b) directed by any means to a person known to the sender to be represented by counsel in a matter which is a subject of the communication.

**Hastings, J 1/2/2013**
**For Educational Use Only**

Rule 1-400. Advertising and Solicitation, CA ST RPC Rule 1-400

**(C)** A solicitation shall not be made by or on behalf of a member or law firm to a prospective client with whom the member or law firm has no family or prior professional relationship, unless the solicitation is protected from abridgment by the Constitution of the United States or by the Constitution of the State of California. A solicitation to a former or present client in the discharge of a member's or law firm's professional duties is not prohibited.

**(D)** A communication or a solicitation (as defined herein) shall not:

(1) Contain any untrue statement; or

(2) Contain any matter, or present or arrange any matter in a manner or format which is false, deceptive, or which tends to confuse, deceive, or mislead the public; or

(3) Omit to state any fact necessary to make the statements made, in the light of circumstances under which they are made, not misleading to the public; or

(4) Fail to indicate clearly, expressly, or by context, that it is a communication or solicitation, as the case may be; or

(5) Be transmitted in any manner which involves intrusion, coercion, duress, compulsion, intimidation, threats, or vexatious or harassing **conduct**.

(6) State that a member is a "certified specialist" unless the member holds a current certificate as a specialist issued by the Board of Legal Specialization, or any other entity accredited by the State Bar to designate specialists pursuant to standards adopted by the Board of Governors, and states the complete name of the entity which granted certification.

**(E)** The Board of Governors of the State Bar shall formulate and adopt standards as to communications which will be presumed to violate this **rule 1-400**. The standards shall only be used as presumptions affecting the burden of proof in disciplinary proceedings involving alleged violations of these **rules**. "Presumption affecting the burden of proof" means that presumption defined in Evidence Code sections 605 and 606. Such standards formulated and adopted by the Board, as from time to time amended, shall be effective and binding on all members.

**(F)** A member shall retain for two years a true and correct copy or recording of any communication made by written or electronic media. Upon written request, the member shall make any such copy or recording available to the State Bar, and, if requested, shall provide to the State Bar evidence to support any factual or objective claim contained in the communication.

[*Publisher's Note: Former* **rule 1-400** *(D)(6) repealed by order of the Supreme Court effective November 30, 1992. New* **rule 1-400** *(D)(6) added by order of the Supreme Court effective June 1, 1997.*]

**STANDARDS**

**Hastings, J 1/2/2013**
**For Educational Use Only**

Rule 1-400. Advertising and Solicitation, CA ST RPC Rule 1-400

Pursuant to **rule 1-400**(E) the Board of Governors of the State Bar has adopted the following standards, effective May 27, 1989, unless noted otherwise, as forms of "communication" defined in **rule 1-400**(A) which are presumed to be in violation of **rule 1-400**:

(1) A "communication" which contains guarantees, warranties, or predictions regarding the result of the representation.

(2) A "communication" which contains testimonials about or endorsements of a member unless such communication also contains an express disclaimer such as "this testimonial or endorsement does not constitute a guarantee, warranty, or prediction regarding the outcome of your legal matter."

(3) A "communication" which is delivered to a potential client whom the member knows or should reasonably know is in such a physical, emotional, or mental state that he or she would not be expected to exercise reasonable judgment as to the retention of counsel.

(4) A "communication" which is transmitted at the scene of an accident or at or en route to a hospital, emergency care center, or other health care facility.

(5) A "communication," except professional announcements, seeking professional employment for pecuniary gain, which is transmitted by mail or equivalent means which does not bear the word "Advertisement," "Newsletter" or words of similar import in 12 point print on the first page. If such communication, including firm brochures, newsletters, recent legal development advisories, and similar materials, is transmitted in an envelope, the envelope shall bear the word "Advertisement," "Newsletter" or words of similar import on the outside thereof.

(6) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies a relationship between any member in private practice and a government agency or instrumentality or a public or non-profit legal services organization.

(7) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies that a member has a relationship to any other lawyer or a law firm as a partner or associate, or officer or shareholder pursuant to Business and Professions Code sections 6160-6172 unless such relationship in fact exists.

(8) A "communication" which states or implies that a member or law firm is "of counsel" to another lawyer or a law firm unless the former has a relationship with the latter (other than as a partner or associate, or officer or shareholder pursuant to Business and Professions Code sections 6160-6172) which is close, personal, continuous, and regular.

(9) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation used by a member or law firm in private practice which differs materially from any other such designation used by such member or law firm at the same time in the same community.

(10) A "communication" which implies that the member or law firm is participating in a lawyer referral service which has been certified by the State Bar of California or as having satisfied the Minimum Standards for Lawyer Referral Services in California, when that is not the case.

(11) [Repealed eff. June 1, 1997]

Hastings, J 1/2/2013
For Educational Use Only

Rule 1-400. Advertising and Solicitation, CA ST RPC Rule 1-400

(Publisher's Note: Repealed. See rule 1-400(D) (6) for the operative language on this subject.)

(12) A "communication," except professional announcements, in the form of an advertisement primarily directed to seeking professional employment primarily for pecuniary gain transmitted to the general public or any substantial portion thereof by mail or equivalent means or by means of television, radio, newspaper, magazine or other form of commercial mass media which does not state the name of the member responsible for the communication. When the communication is made on behalf of a law firm, the communication shall state the name of at least one member responsible for it.

(13) A "communication" which contains a dramatization unless such communication contains a disclaimer which states "this is a dramatization" or words of similar import.

(14) A "communication" which states or implies "no fee without recovery" unless such communication also expressly discloses whether or not the client will be liable for costs.

(15) A "communication" which states or implies that a member is able to provide legal services in a language other than English unless the member can actually provide legal services in such language or the communication also states in the language of the communication (a) the employment title of the person who speaks such language and (b) that the person is not a member of the State Bar of California, if that is the case.

(16) An unsolicited "communication" transmitted to the general public or any substantial portion thereof primarily directed to seeking professional employment primarily for pecuniary gain which sets forth a specific fee or range of fees for a particular service where, in fact, the member charges a greater fee than advertised in such communication within a period of 90 days following dissemination of such communication, unless such communication expressly specifies a shorter period of time regarding the advertised fee. Where the communication is published in the classified or "yellow pages" section of telephone, business or legal directories or in other media not published more frequently than once a year, the member shall conform to the advertised fee for a period of one year from initial publication, unless such communication expressly specifies a shorter period of time regarding the advertised fee.

**Credits**
(Adopted Nov. 28, 1988, eff. May 27, 1989. As amended, eff. Aug. 13, 1992; Oct. 29, 1992; April 9, 1994; June 1, 1997.)

## DECLARATION OF HON. MARGARET M. GRIGNON (RET.)

1.     **Introduction**.  I, the undersigned Hon. Margaret M. Grignon (Ret.), submit the following declaration as an expert on California law in the matter of In Re Edward R. Reines, United States Court of Appeals for the Federal Circuit (No.14-MA004).  I have personal knowledge of the facts set forth herein and if called and sworn as a witness, I could and would testify competently thereto.


I have no personal relationship with Edward R. Reines, Weil, Gotshal & Manges LLP, or their counsel of record and this declaration is my independent opinion based on my knowledge of and experience with the practice of law in California.  The declaration consists of my professional background and qualifications; the documents I reviewed in the preparation of the declaration; a summary of the relevant facts and proceedings; and my opinion.


2.     **Professional Background and Qualifications**.  I am an attorney at law duly licensed to practice in all of the courts of the State of California and various federal courts.  I was admitted to the California Bar on December 21, 1977.  In 1984, I was appointed to the Municipal Court of the Antelope Judicial District, Los Angeles County, California, where I served for three years presiding over civil and criminal matters.  In 1987, I was elevated to the Superior Court of Los Angeles County, California, where I also served for three years, presiding over civil and criminal matters.  In 1990, I was elevated to the California Court of Appeal, Second Appellate District, Division Five, where I served for 14 years until my retirement from the bench on December 31, 2004.  During this period, I also sat as a justice pro tem of the California Supreme Court.  In the course of my tenure as an appellate justice, I heard appeals from a wide variety of civil and criminal matters.  As a result of my 20 years as a California judicial officer, I am familiar with the practice of law in California.

In 2005, I joined the international law firm of Reed Smith, where I practice appellate law in the firm's Los Angeles, California office. I am a partner of Reed Smith and the head of the firm's appellate practice in Los Angeles. In this role as well, I am familiar with the practice of law in California. I attach as Exhibit A to this Declaration a copy of my current Curriculum Vitae.

3.    **Documents Reviewed**. I have reviewed the following documents in the preparation of this declaration: (a) the Order to Show Cause in this matter dated June 5, 2014; (b) a March 5, 2014 e-mail from then-Chief Judge Randall Rader to Attorney Edward Reines; (c) 50 e-mails involving the e-mail from then-Chief Judge Rader, attached as Exhibits 1-50 to the Response to the Show Cause Order; and (d) the declaration of Edward R. Reines, attached as Attachment A to the Response to the Show Cause Order.

4.    **Relevant Facts And Proceedings Upon Which My Opinions Are Based.** My opinion is based on my review of the foregoing documents and materials. In brief, on March 5, 2014, Judge Rader sent Attorney Reines an e-mail praising Attorney Reines' appellate advocacy skills and expressly encouraging Attorney Reines to let others see the e-mail (the "Rader E-mail"). In the days following receipt of the Rader E-mail, Attorney Reines or his partners forwarded it in 46 e-mails to clients, former clients and prospective clients. [Attachment B; Exhibits 4-49] All but one of the 46 e-mails [Exhibit 45] was sent to a lawyer (including in-house counsel). [Attachment B] Non-lawyers, one of whom had solicited information concerning Weil Gotshal's availability for professional employment, were copied on two of the e-mails that were sent to lawyers. [Exhibits 8, 47] In all, only three of the recipients of the 46 e-mails were non-lawyers. Illustrative of the e-mails is the following sent to in-house counsel: "As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful. Regardless of his comment, please do not circulate this outside," your company. [Exhibit 46]

In its Order to Show Cause as to why Attorney Reines "should not be disciplined for conduct unbecoming a member of the bar," the Court indicated that it would be guided by the California Rules of Professional Conduct. The Court stated: "It has been alleged that you disseminated the attached email [from Judge Rader] to clients and to potential clients in soliciting their business, implying a special relationship with the judge."

5.    **Opinions.** Based on my review of the foregoing documents and materials, it does not appear that Attorney Reines violated the California Rules of Professional Conduct.

To begin, the e-mails to clients, former clients and prospective clients [Exhibits 4-50] do not appear to be directed to the public, such that they would be considered advertisements under the State Bar Act, Cal. Bus. & Prof. Code §§ 6000, et seq. Cal. Bus. & Prof. Code §6157(c). Instead, they are directed to specific persons and thus do not come within the definition of "advertisement." *Id.*

Rule 1-400 of the California Rules of Professional of Conduct provides detailed requirements with which attorney advertising must comply. Rule 1-400 also regulates certain communications that are not advertisements. "For purposes of [Rule 1-400], 'communication' means any message . . . made by or on behalf of a member concerning the availability for professional employment of a member or a law firm directed to any former, present, or prospective client, including . . . [a]ny unsolicited correspondence from a member or law firm directed to any person or entity." Cal. R. Prof'l Conduct 1-400(A)(4) ("Advertising and Solicitation"). Except for the e-mail to the inventor of the patent at issue in the Promega appeal [Exhibit 45], the solicited email [Exhibit 47], and an email from one of Attorney Reines' clients to a co-defendant regarding whether Mr. Reines would argue an issue on behalf of a joint defense group [Exhibit 50], the e-mails [Exhibits 4-44, 46, 48-49] appear to be "communications" under Rule 1-400(A)(4), because they are messages concerning Attorney Reines' availability for professional

employment.[1]  Solicited messages concerning the availability of Attorney Reines for professional employment do not come within the definition of "communications."  *Id.*

As is relevant here, communications are not permitted to "(1) [c]ontain any untrue statement"; or "(2) [c]ontain any matter . . . which is false, deceptive, or which tends to confuse, deceive, or mislead *the public*"; or "(3) [o]mit to state any fact necessary to make the statements made, in the light of [the] circumstances under which they are made, not misleading to *the public*"; or "(4) [f]ail to indicate clearly, expressly, or by context, that it is a communication" . . . ."  Rule 1-400(D)(1)-(4) (emphasis added).

A communication is presumed to violate Rule 1-400 if it violates a Standard adopted by the Board of Governors of the State Bar.  The presumption is one affecting the burden of proof.  Rule 1-400(E).  The only relevant standard in this situation appears to be Standard 2:  "A 'communication' which contains testimonials about or endorsements of a member unless such communication also contains an express disclaimer such as 'this testimonial or endorsement does not constitute a guarantee, warranty, or prediction regarding the outcome of your legal matter.'"

The State Bar of California Standing Committee On Professional Responsibility And Conduct has stated in two formal opinions that Rule 1-400 and its predecessor do not apply to lawyer-to-lawyer communications.  California State Bar Formal Opn. Nos. 1981-61, 2004-165.  "The Committee previously opined in California State Bar Formal Opn. No. 1981-61 . . . that lawyer-to-lawyer communications do not come within the scope of the predecessor to rule 1-400 if the communications seek professional employment *through* the assistance or recommendations of the recipient attorney, or even if the communication seeks professional employment *by* the recipient attorney.  The Committee reasoned that the predecessor of rule 1-400 is intended to prevent fraud, undue influence, and other abuses to which lay persons might be subject.  Consequently,

---

[1] The e-mails do not appear to be "solicitations" because they do not meet the requirements of Rule 1-400(B)(2).

the rule should not apply to lawyer-to-lawyer communications because lawyers are unlikely to be affected by such vexatious conduct." California State Bar Formal Opn. No. 2004-165 at 8. The Committee specifically opined that the predecessor of rule 1-400 does not apply to lawyer-to-lawyer communications even when the recipient is in-house counsel for a business and the purpose of the communication is to secure that business as a client. California State Bar Formal Opn. No. 1981-61 at 1. Thus, to the extent the e-mails were sent to other lawyers [Exhibits 4-44, 46-50], including in-house counsel, the e-mails are not prohibited by Rule 1-400.

As to the one e-mail that was not sent to an attorney [Exhibit 45], the e-mail does not appear to be a communication concerning Attorney Reines' availability for professional employment. The recipient is the inventor of the patent at issue in the Promega appeal. [Reines Declaration at ¶ 22] Attorney Reines sent the e-mail to him to report about the Promega oral argument. *Id.* In the e-mail, Attorney Reines did not ask the recipient to consider him for future employment. [Exhibit 45] Accordingly, the e-mail does not "concern[ ] the availability for professional employment of a member or a law firm" and is not a "communication" covered by Rule 1-400(A). In any event, the e-mail that was not sent to an attorney [Exhibit 45] does not contain any "untrue statements" in violation of Rule 1-400(D)(1) and is not misleading "to the public" in violation of Rule 1-400(D)(2) or (D)(3) because it was not sent to the public. The recipient was a single, highly sophisticated business executive with prior knowledge of the patent involved in the Promega appeal [Reines Declaration ¶ 22]. The recipient can be expected to take a more sophisticated approach to reviewing the endorsements contained in the e-mail and to regard the endorsement as a statement of the quality of Attorney Reines' legal work. There is no reason that this recipient should be presumed to have been at any significant risk of being misled into believing that Attorney Reines had improper influence over any judge of this Court in any legal proceedings before him or her. Rather, it seems highly likely that such a sophisticated recipient would have taken such an informal e-mail at face value—that Attorney Reines had performed well in the eyes of some judges of this Court, had a good reputation with the Court as an appellate advocate, and maintained a friendly professional relationship with Judge Rader. Such a

- 5 -

construction is particularly reasonable in light of Judge Rader's express encouragement to let others see Judge Rader's e-mail. It is highly unlikely that the express disclaimer required by Standard 2 would have been required to protect the recipient from any misunderstanding.

Of note, in its Order to Show Cause, the Court identified—in addition to Rule 1-400—Rule 8.4(e) of the Model Rules of Professional Conduct and Standard 6 of Rule 1-400. Neither appears to apply here, as a matter of the California rules. California has not adopted Rule 8.4(e). And the text of Standard 6 of Rule 1-400 suggests that it does not apply either. Under Standard 6, a communication is presumed to violate Rule 1-400 if it is made "in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies a relationship between any member in private practice and a government agency or instrumentality or a public or non-profit legal services organization." By its language, the presumption appears to apply only to an organizational name used by the communicator, such that, for example, the trade name "Department of Labor Alumni, LLP" would be presumed to violate Rule 1-400. The e-mails do not include any such name or designation.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 7 July 2014 in Los Angeles, California.

_____
Hon. Margaret M. Grignon (Ret.)

- 6 -

# ReedSmith



## Margaret M. Grignon
Partner
magrignon@reedsmith.com

Los Angeles

T: +1 213 457 8056
F: +1 213 457 8080

**Education**

Loyola Law School, 1977, J.D., summa cum laude

University of Zurich, International and Swiss Law

University of California, Los Angeles, 1972, B.A., cum laude, Political Science

**Professional Admissions / Qualifications**

California

**Court Admissions**

U.S. Court of Appeals - Ninth Circuit

U.S. Court of Claims

U.S. Tax Court

U.S. District Court - Southern District of California

U.S. District Court - Central District of California

U.S. Court of Appeals - Fifth Circuit

State Supreme Court - California

U.S. Court of Appeals - Eighth Circuit

U.S. Court of Appeals - Tenth Circuit

U.S. Court of Appeals - Eleventh Circuit

## Overview

Justice Margaret M. Grignon (Ret.) is a partner in the firm's Appellate Group. She is retired from the California Court of Appeal, Second District, Division Five, where she spent 14 years and authored in excess of 2,230 opinions, more than 160 of which have been published. She has considerable experience in business/commercial, employment, family, insurance coverage and bad faith, intellectual property, legal and medical malpractice, personal injury, and premises liability law. Her appellate cases in these areas have produced multiple precedential opinions from the state and federal courts, and resulted in her being named one of the Top Women Lawyers in California for 2013.

Justice Grignon is a member of the California Academy of Appellate Lawyers, the American Academy of Appellate Lawyers, the California Women Lawyers Association, the National Association of Women Judges, and on the Board of the Association of Business Trial Lawyers. She has authored numerous articles on tax, business and appellate law, and is a frequent lecturer at education programs for judges and attorneys. Justice Grignon continues to be active in the administration of the judicial system, and regularly serves as a judge of various law school moot court competitions; and is a consultant for continuing legal education publications.

## Representative Published Cases

- *Cutler v. Franchise Tax Board*, 146 Cal. Rptr. 3d 244 (2012).  The Court of Appeal held a state tax provision providing tax benefits for sale of stocks in a qualified California small business was unconstitional under dormant Commerce Clause.

- *Perez v. Torres*, 206 Cal. App. 4th 418 (2012).  Code of Civil Procedure section 998 offer to compromise is invalid where it fails to include a statutorily required acceptance provision.

- *Landeros v. Torres*, 206 Cal. App. 4th 398 (2012).  Civil Code section 3333.4 does not preclude recovery of noneconomic damages against a drunk driver where plaintiff is an unlicensed permissive user of an insured vehicle.

- *Quarry v. Doe 1*, 53 Cal. 4th 945 (2012).  Reversed Court of Appeal and held that statute of limitations precluded plaintiffs' claims against defendants.

- *Rose v. Bank of America*, 200 Cal.App.4th 1441 (2011). Affirmed dismissal of putative class action for violation of Unfair Competition Law based on alleged failures to adequately disclose changes in account fees.

- *Parmar v. State Board of Equalization*, 196 Cal.App.4th 705 (2011). Affirmed order invalidating state tax practice and upholding entitlement to substantial attorney fees under private attorney general statute.

- *Arnall v. Superior Court*, 190 Cal.App.4th 360 (2010). Obtained writ ordering trial court to grant former client's summary adjudication motion of attorney's causes of action for fees based on a void contingent fee agreement, leaving only the quantum meruit cause of action to be tried.

# ReedSmith

- *Whitmire v. Ingersoll-Rand Company*, 184 Cal.App.4th 1078 (2010). Obtained affirmance of summary judgment in favor of defendant contractor in mesothelioma action on ground that plaintiff had no substantial evidence that he had been exposed to asbestos attributable to the defendant.

- *Clark v. Superior Court*, 50 Cal.4th 605 (2010). Argued on behalf of Amici and obtained unanimous reversal of Court of Appeal judgment. The Supreme Court held that a statute providing for the trebling of penalties as to senior citizens and the disabled could not be used to treble restitution under the Unfair Competition Law.

- *United States Life Ins. v. Superior National Ins. Co.*, 591 F.3d 1167 (9th Cir. 2010). Obtained affirmance of judgment confirming a $450 million arbitration award in a dispute over reinsurance coverage for workers' compensation insurance claims.

- *Daghlian v. DeVry University, Inc.*, 574 F.3d 1212 (9th Cir. 2009). Obtained dismissal on an appeal from a summary judgment in a consumer class action on the ground that repeal of the statutory basis for the action resulted in abatement.

- *Dunn Yeager v. Blue Cross*, 175 Cal. App. 4th 1098 (2009). Obtained affirmance in Court of Appeal of summary judgment for health insurer in action alleging that insurer's offer of infertility coverage did not comply with statute.

- *Hernandez v. Vitamin Shoppe Industries Inc.*, 174 Cal. App. 4th 1441 (2009). Affirming the final approval of a settlement in a wage and hour class action, and further affirming orders barring counsel for plaintiffs in a competing class action from communicating with members of the conditionally certified class and issuing a notice to class members to correct a prior improper communication to class members from that counsel.

- *321 Henderson Receivables Origination LLC v. Sioteco, et al.*, 173 Cal. App. 4th 1059 (2009). Reversed consolidated superior court order denying 11 petitions for approval of the transfer of structured settlement payments rights. The Fifth District Court of Appeal held that contractual anti-assignment provisions are generally ineffective in barring transfers of structured settlement payment rights; the transfers are not subject to the usury law; and the evidence was insufficient to support the superior court's findings that the factoring company systematically violated the independent professional advice requirement of the Structured Settlement Transfer Act.

- *Mintz v. Blue Cross*, 172 Cal. App. 4th 1594 (2009). Dismissal of claims for intentional interference with contractual relations, negligent interference with contractual relations, and intentional infliction of emotional distresses arising out of alleged wrongful denial of health insurance benefits.

- *Watkins v. Wachovia Corp.*, 172 Cal. App. 4th 1576 (2009). In putative class action alleging violation of California wage and hour laws, obtained dismissal, of appeal from order denying class certification on ground that class representative's settlement of individual claims following denial of certification deprived the class representative of standing to pursue the appeal. In same decision, also obtained affirmance of summary judgment as to another class representative on the ground that, upon termination of employment, she signed a release of disputed wage claims in exchange for enhanced severance benefits.

- *321 Henderson Receivables Origination LLC v. Judith Red Tomahawk*, 172 Cal. App. 4th 290 (2009). Reversed order denying petition under the Structured Settlement Transfer Act; trial court's failure to dismiss petition without prejudice upon transferee's request for dismissal rendered order denying petition void.

- *321 Henderson Receivables Origination LLC v. Lisa Ramos*, 172 Cal. App. 4th 305 (2009). Reversed order voiding prior transfer of structured settlement payments; final court-approved transfers cannot be attacked as void under the Structured Settlement Transfer Act absent direct and affirmative evidence of fraud.

ReedSmith

- *Cable Connection, Inc. v. DIRECTV, Inc.,* 44 Cal. 4th 1334 (2008). California Supreme Court affirmed trial court order vacating an arbitration award. In a case of first impression, the Supreme Court held that parties to an arbitration agreement may agree to expanded judicial review of an award.

- *Jogani v. Superior Court*, 165 Cal. App. 4th 901 (2008). Petition for writ of mandate granted; trial court committed error per se by denying plaintiff his jury trial right on legal claim for quantum meruit.

- *Ball v. FleetBoston Financial Corp.*, 164 Cal. App. 4th 794 (2008). Affirmance of dismissal following an order denying permission to file an amended complaint in a Consumer Legal Remedies Act action on the ground that extension of credit is not a good or service and unconscionability allegations were encompassed in the CLRA cause of action.

- *Monroy v. City of Los Angeles*, 164 Cal. App. 4th 248 (2008). Reversed jury verdict; trial court erred in instructing jury on a theory contrary to unambiguous party admissions; trial court also abused its discretion in limiting expert witness testimony; and trial court erred in excluding deposition testimony where deponent resided more than 150 miles from trial.

- *Trujillo v. First American Registry Inc.,* 157 Cal. App. 4th 628 (2007). Affirmed summary judgment in consumer credit reporting and unfair competition action.

- *Fitz-Gerald v. Skywest Airlines, Inc.*, 155 Cal. App. 4th 411 (2007). Affirmed summary judgment in action brought by flight attendants against airline for minimum wages, meal and rest breaks, overtime and penalties.

- *Sea Foods Co., Ltd. v. O.M. Foods Co., Ltd.*, 150 Cal. App. 4th 769 (2007). Reversed third party liability judgment for foreign corporation and against California sea food importer; also reversed personal jurisdiction dismissal of fraud action brought by same sea food importer against same foreign corporation.

- *Camacho v. Automobile Club of Southern California, et al.*, 142 Cal. App. 4th 1394 (2006). Affirmed judgment on the pleadings for insurer in unfair competition class action brought by uninsured motorist in connection with insurer's efforts to collect subrogation claim.

**Opinions Authored as Court of Appeals Justice - Business**

- Zink v. Gourley, 77 Cal. App. 4th 774 (2000). Suspension of a commercial driver's license for a refusal to submit to chemical testing is not subject to mitigation to a restricted license.

- Truitt v. Superior Court (Atchison, Topeka & Sante Fe Railway Company), 59 Cal. App. 4th 1183 (1997). Under Cal. Rules Prof. Conduct 2-100, an attorney with no actual knowledge of representation may interview a covered employee of corporation.

- United Med. Mgmt. Ltd. v. Gatto, 49 Cal. App. 4th 1732 (1996). A foreign corporation which qualifies to transact intrastate business after transacting business but before commencing an action need not prove payment of state taxes.

- Myers Building Industries, Ltd. v. Interfare Technology, Inc., 13 Cal. App. 4th 949 (1993). Punitive damages may not be awarded for breach of contract. Attorney fee award may not be based on third party indemnity provision.

- G.E. Hetrick & Associates, Inc. v. Summit Construction & Maintenance Co., Inc., 11 Cal. App. 4th 318 (1991). Cal. Bus. & Prof. Code § 7031, abrogating the substantial compliance rule for actions brought by unlicensed contractors had no retroactive application.

- Art Movers, Inc. v. Ni West, Inc., 3 Cal. App. 4th 640 (1992). In this action involving toxic waste liability between current lessee and former lessee, summary adjudication of

# ReedSmith

cause of action seeking permanent injunctive relief was not appealable.

- Tutor-Saliba-Perini Joint Venture v. Superior Court, 233 Cal. App.3d 736 (1991). Venue in contract action was proper where brought, and was not required to be transferred to local agency's county under Cal. Code Civ. Proc. § 394.

- Lundeen Coatings Corp. v. Department of Water & Power, 232 Cal. App. 3d 816 (1991). Subcontractor's contract claims against governmental entity were barred by the statute of limitations.

- Nicolle-Wagner v. Deukmejian, 230 Cal. App. 3d 652 (1991). Upheld regulation requiring naturally occurring chemicals in food to be listed pursuant to Proposition 65.

### Opinions Authored as Court of Appeals Justice - Employment

- Vasquez v. Superior Court (L.A. County Fair Assn.), 80 Cal. App. 4th 430 (2000). Arbitration provision of collective bargaining agreement is not enforceable as to ADA and FEHA claims unless agreement contains a clear and unmistakable waiver of statutory rights.

- Downs v. Dept. of Water & Power, 58 Cal. App. 4th 1093 (1997). One year statute of limitations for FEHA action was equitably tolled while plaintiff pursued federal remedies under EEOC.

- Brundage v. Hahn, 57 Cal. App. 4th 228 (1997). There was no disability discrimination where employer terminated employee and failed to reinstate her because of job abandonment and not mental disability.

- Fiol v. Doellstedt, 50 Cal. App. 4th 1318 (1996). Second tier supervisor is not personally liable under FEHA as an aider and abettor for failure to take action to prevent sexual harassment of plaintiff by subordinate.

### Opinions Authored as Court of Appeals Justice - Financial Institutions

- Canadian Commercial Bank v. Ascher Findley Co., 229 Cal. App. 3d 1139 (1991). Noncompliance with Cal. U. Com. Code § 9504 is an absolute bar to a bank's deficiency judgment.

### Opinions Authored as Court of Appeals Justice - Government/Municipal

- Laraway v. Sutro & Co., Inc., 96 Cal. App. 4th 266 (2002). Plaintiff's False Claims Act cause of action properly dismissed upon request of governmental entity where good cause for the dismissal established.

- Pomona Police Officers' Association v. City of Pomona, 58 Cal. App. 4th 578 (1997). Retirement conversion option in collective bargaining agreement was unenforceable as in violation of the Public Employees' Retirement Law.

- Grenier v. City of Irwindale, 57 Cal. App. 4th 931 (1997). A public entity defendant establishes design immunity when it presents substantial evidence of the design's reasonableness, even if there is conflicting evidence.

- Los Angeles Police Protective League v. City of Los Angeles, 27 Cal. App.4th 168 (1994). Public entities are not required to provide for the defense of criminal actions brought against their employees.

- White v. Southern California Edison Co., 25 Cal. App. 4th 442 (1994). Public utility that owns and maintains inoperable streetlight owes no duty to pedestrian injured in a motor vehicle collision near the streetlight.

- Rogers v. Superior Court, 19 Cal. App. 4th 469 (1993). Telephone records of city council members, sought under the Freedom of Information Act, were exempt from disclosure under deliberative process privilege.

ReedSmith

- Carlino v. Los Angeles County Flood Control District, 10 Cal. App. 4th 1526 (1992). Upheld a government tort claim action concluding claim had been timely filed with proper public entity.

- Domjanovic v. Ambrose, 3 Cal. App. 4th 503 (1992). Cal. Govt. Code § 945.3, which prevents commencement of civil action against police officers while criminal action is pending, does not toll time within which to serve defendants if an action is filed.

- Bellflower Education Assn. v. Bellflower Unified School Dist., 228 Cal. App. 3d 805 (1991). Vacated collective bargaining arbitration award ordering reinstatement of a probationary teacher.

**Opinions Authored as Court of Appeals Justice - Health Care**

- Shewry v. Arnold, 125 Cal. App. 4th 186 (2004). Trust assets distributed solely to adult disabled child of beneficiary are exempt from Medi-Cal reimbursement claim.

- Westside Hospital v. Belshé, 69 Cal. App. 4th 672 (1999). Statute of limitations for hospital's petition for writ of administrative mandate commenced on date decision adopted, not on date of mailing.

- Keneally v. Medical Board, 27 Cal. App. 4th 489 (1994). Physician is not entitled to pre-hearing disposition in disciplinary action by Medical Board.

- Mission Community Hospital v. Kizer, 13 Cal. App. 4th 1683 (1993). Hospital's amended cost report for Medi-Cal reimbursement was not timely filed.

**Opinions Authored as Court of Appeals Justice - Insurance**

- Cabral v. Los Angeles County Metropolitan Transportation Authority, 66 Cal. App. 4th 907 (1998). An uninsured motorist's recovery in a negligence action was limited to economic damages under Cal. Civ. Proc. Code § 3333.4, where uninsured motorist was injured by a passing bus as he was exiting his parked car ("action arising out of operation or use of motor vehicle").

- Standun, Inc. v. Fireman's Fund Ins. Co., 62 Cal. App. 4th 882 (1998). Coverage under a machine shop operator's CGL insurance policy was barred under the pollution exclusion, where property damage arose out of purposeful, long-term, and regular discharge of waste materials into a landfill.

- Travelers Indemnity Co. of Ill. v. Maryland Casualty Co., 41 Cal. App. 4th 1538 (1996). Conclusive presumption of Ins. Code § 11580.9(d) that policy in which vehicle is described as "owned" is primary, is applicable only where insured is engaged in the business of renting or leasing motor vehicles.

- Smith v. Premier Alliance Ins. Co., 41 Cal. App. 4th 691 (1995). Decedent's two children were not entitled to share in settlement of wrongful death action by insurer with decedent's wife, but could pursue their own action.

- Grand Rent A Car v. 20th Century Ins. Co., et al., 25 Cal. App. 4th 1242 (1994). Car rental agreement and agency's certificate of self-insurance constitute primary liability insurance.

- People ex rel Garamendi v. American Autoplan, Inc., 20 Cal. App. 4th 760 (1993). Doctrine of exclusive concurrent jurisdiction did not prevent trial court from issuing preliminary injunction in an action by the insurance commissioner to enforce a cease and desist order.

- Abifadel v. Cigna Ins. Co., 8 Cal. App. 4th 145 (1992). Under a claims-made directors and officers liability policy, no claim had been made against the directors.

**Opinions Authored as Court of Appeals Justice - Intellectual Property**

- Kabehie v. Zoland, 102 Cal. App. 4th 513 (2002). State law causes of action are

ReedSmith

preempted by federal copyright law to the extent they assert rights equivalent to the exclusive right protected by federal copyright law.

### Opinions Authored as Court of Appeals Justice - Land Use

- Sounhein v City of San Dimas, 47 Cal. App. 4th 1181 (1996). City's conditional use permit properly limited second residential unit on property to owner-occupant as a condition running with the land.

- County Sanitation District v. Watson Land Co., 17 Cal. App.4th 1268 (1993). Valuation opinion of expert in eminent domain proceedings may be excluded if it employs a methodology unsanctioned by law.

- Long Beach Community Redevelopment Agency v. Morgan, 14 Cal. App. 4th 1047 (1993). Resolution of necessity adopted by redevelopment agency empowers agency to take property by eminent domain.

- Miller v. City of Hermosa Beach, 13 Cal. App. 4th 1118 (1993). Request for a hearing on temporary restraining order or preliminary injunction does not constitute request for hearing on mandamus petition to enforce CEQA against hotel development and thus the petition was untimely and properly dismissed.

### Opinions Authored as Court of Appeals Justice - Post-Trial

- Gil v. Mansono, 121 Cal. App. 4th 739 (2004). Attorney fee provision in release asserted as an affirmative defense did not authorize attorney fees.

- Quintana v. Gibson, et al., 113 Cal. App. 4th 89 (2003). The sole method of obtaining an order for entry of satisfaction of judgment is the noticed motion procedure of Cal. Code Civ. Proc. § 724.050.

- Mix v. Tumanjan Development Corporation, 102 Cal. App. 4th 1318 (2002). Attorney fees are recoverable for legal services of attorneys who assisted pro per attorney.

- Sanabria v. Embry, 92 Cal. App. 4th 422 (2001). Costs and attorney fees may not be awarded where memorandum of costs and motion for attorney fees were not timely filed.

- General Electric Capital Auto Financial Services, Inc. v. Appellate Division, 88 Cal. App.4th 136 (2001). A post judgment order in a small claims case is appealable to the appellate division of the superior court.

- Argaman v. Ratan, 73 Cal. App. 4th 1173 (1999). A monetary sanction for misuse of discovery process may not include compensation for time spent by pro per attorney.

- Malovec v. Hamrell, 70 Cal. App. 4th 434 (1999). A trial court may not impose sanctions on its own motion under Cal. Code Civ. Proc. § 128.7 following a dispositive ruling on an improper pleading and may not award monetary sanctions in favor of a party.

- Heritage Engineering Construction, Inc. v. City of Industry, 65 Cal. App. 4th 1435 (1998). For purposes of Cal. Civ. Proc. Code § 998, a plaintiff obtains a more favorable judgment than pre-trial settlement offer where plaintiff's judgment including pre-offer costs and attorney fees, exceeds defendant's offer, including costs.

- Steele v. Jensen Instrument Co., 59 Cal. App. 4th 326 (1997). Discussed the interplay among three attorney fee and cost shifting statutes: Cal. Gov't. Code § 12965(b); Cal. Civ. Proc. Code § 1033(a); Cal. Civ. Proc. Code § 998(c).

- Great Western v. Converse Consultants, Inc., 58 Cal. App. 4th 609 (1997). A cross-defendant is the prevailing party on the cross-complaint and entitled to costs when cross-complaint is dismissed by virtue of a good faith settlement.

- Bitters v. Network Electronics, 54 Cal. App. 4th 246 (1997). Party to litigation who pays court reporter directly rather than depositing fees with the clerk assumes risk of loss if

ReedSmith

reporter absconds with the fees and fails to prepare the transcript.

- Kane v. Hurley, 30 Cal. App. 4th 859 (1994). Cal. Code Civ. Proc. § 128.5 sanctions may not be ordered payable to the court.

- Walton v. Magno, 25 Cal. App. 4th 1237 (1994). An order granting a judgment notwithstanding the verdict as to the liability phase of a bifurcated trial is not appealable.

- Real Property Services Corp. v. City of Pasadena, 25 Cal. App. 4th 375 (1994). Nonsignatory of lease with attorney fee provision may be entitled to attorney fees as third party beneficiary.

- Mid-Wilshire Associates v. O'Leary, 7 Cal. App. 4th 1450 (1992). Order denying vacation or correction of an arbitration award is not appealable.

- Shipp v. Superior Court, 5 Cal. App. 4th 147 (1992). Assignment to family law court was an all-purpose assignment and disqualification motion under Cal. Code Civ. Proc. § 170.6 was untimely.

- McConnel v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 176 Cal. App. 3d 480 (1985). Imposed sanctions for filing a frivolous appeal.

### Opinions Authored as Court of Appeals Justice - Product Liability and Pharmaceutical

- Smith v. Wyeth (Cal. App. 2004). Upheld the dismissal of all plaintiff's personal injury claims brought against a pharmaceutical company on statute of limitation grounds.

- National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc., 107 Cal. App. 4th 1336 (2003). In actions under Cal. Bus. & Prof. Code §§ 17200 et seq. and 17500 et seq. a private plaintiff bears both the burden of production of evidence and the burden of proof.

### Opinions Authored as Court of Appeals Justice - Professional Responsibility

- Sanchez v. Bay Shores Medical Group, 75 Cal. App. 4th 946 (1999). In a medical malpractice action, party may not recover fees of their expert witnesses as costs under Cal. Civ. Proc. Code § 1033.5.

- Powers v. Dickson, Carlson & Campillo, 54 Cal. App. 4th 1102 (1997). In legal malpractice action, arbitration provisions of retainer agreement were enforceable ("any dispute arising out of or related to professional services").

- Sisco v. Cosgrove, Michelizzi, Schwabacher, Ward & Bianchi, 51 Cal. App. 4th 1302 (1996). Legal malpractice action could not be sustained where settlement agreement desired by client could not have been legally drafted by attorneys to reach desired result.

- Campanano v. California Medical Center, 38 Cal. App. 4th 1322 (1995). Cause of action for "bystander" negligent infliction of emotional distress accrues at the time plaintiff observes the injury producing event.

- Wantuch v. Davis, 32 Cal. App. 4th 786 (1995). A prison inmate who brings a pro se civil action against his former attorney is entitled to meaningful access to the courts.

- Jacoves v. United Merchandising Corp., 9 Cal. App. 4th 88 (1992). Hospital may be liable to parents of psychiatric patient who committed suicide after being prematurely released by staff physician.

- Pierce v. Lyman, 1 Cal. App. 4th 1093 (1991). Nonfiduciaries (attorneys) may be liable for conspiracy to breach another's fiduciary duty only if they actively participated for own personal gain.

### Opinions Authored as Court of Appeals Justice - Real Estate

ReedSmith

- Yeung v. Soos, 119 Cal. App. 4th 576 (2004). Default judgment in quiet title action rendered without evidentiary hearing is not void.

- Herrera v. Department of Real Estate, 88 Cal. App. 4th 776 (2001). Statute of limitations for disciplinary accusation against real estate broker commences on date broker's law license was suspended, not date of underlying conduct.

- Moeller v. Lien, 25 Cal. App. 4th 822 (1994). Sale to bona fide purchaser for value at nonjudicial foreclosure sale may not be set aside on the grounds of a grossly inadequate sales price.

- Andrisani v. Saugus Colony Limited, 8 Cal. App. 4th 517 (1992). Upheld the dismissal of a vexatious litigant's quiet title action for failure to post a bond.

- Nicholson v. Barab, 233 Cal. App. 3d 1671 (1991). Settlement agreement in real property action is not enforceable under Cal. Code Civ. Proc. § 664.6 unless signed by the parties or placed on the record before the court.

- Machado v. Southern Pacific Transportation Co., 233 Cal. App. 3d 347 (1991). Construed deed conveying a railroad right of way as a fee simple and not an easement.

- Vaill v. Edmonds, 4 Cal.App.4th 247 (1991). Real estate broker was not negligent in connection with geological hazards associated with real property.

- Napue v. Gor-Mey West, Inc., 175 Cal. App. 3d 608 (1985). Three-month reinstatement period of Cal. Code Civ. Proc. § 2924 is not tolled by injunction (Cal. Code Civ. Proc. § 356) or bankruptcy.

### Opinions Authored as Court of Appeals Justice - Tax

- City of Los Angeles v. Furman Selz Capital Management, L.L.C., 121 Cal. App. 4th 505 (2004). A city may not impose a business tax on a limited liability company wholly-owned by a financial corporation and whose separate existence for tax purposes has been disregarded.

- Gray v. Franchise Tax Board, 235 Cal. App. 3d 36 (1991). Nonresident taxpayers were entitled to a credit against California income taxes for taxes paid to Connecticut on California source capital gains arising out of real estate partnerships.

### Opinions Authored as Court of Appeals Justice - Tort

- Benedek v. PLC Santa Monica, 104 Cal. App. 4th 1351 (2002). Upheld release of health club in an action by member for personal injuries arising out of use of the facilities.

- Seo v. All-Makes Overhead Doors, 97 Cal. App. 4th 1493 (2002). Gate repair company owed no duty of care to subtenant of commercial premises for design defect in electronic sliding gate.

- American Golf v. Superior Court (Becker), 79 Cal. App. 4th 30 (2000). Action against golf course for negligent design and placement of yardage marker was barred by the primary assumption of the risk doctrine.

- Robbins v. Blecher, 52 Cal. App. 4th 886 (1997). Voluntary dismissal of alter ego action does not constitute a favorable termination on the merits for purposes of malicious prosecution.

- Eels v. Rosenblum, 36 Cal. App. 4th 1848 (1995). Voluntary dismissal of a complaint without prejudice on a technical defect is not a favorable termination on the merits.

- Jacoves v. United Merchandising Corp., 9 Cal. App. 4th 88 (1992). Store at which son purchased firearm by which he committed suicide was not liable.

Honors & Awards

ReedSmith

- Listed in the *Daily Journal* as one of its 2013 Top Women Lawyers (8 May 2013)
- Listed in the *Daily Journal* as one of the Top Women Litigators (12 May 2010)
- Listed, *Chambers USA: America's Leading Lawyers for Business*, "Band 1" (6 bands with 1 being the highest) rating for Appellate Litigation (California) (2009-2014)
- Listed, *California Super Lawyers*, Appellate (2007-2014)
- Listed, *California Super Lawyers*, Corporate Counsel Edition, Appellate (2010)

Publications

- "Oral Argument: Facing the Challenge and Embracing the Opportunity," *American Bar Association Litigation Section*, 26 March 2014
- "Just How Mandatory Are Those Statutory Writ Deadlines," *Los Angeles Daily Journal*, 08 February 2012
  Co-Author(s): Kasey J. Curtis
- "What a Difference a Day Makes," *Los Angeles Daily Journal*, 14 March 2011
- "Can Denial of Summary Judgment Based on Qualified Immunity Be Reviewed," *Los Angeles Daily Journal*, 25 February 2011
- "Saving Face," *San Francisco Daily Journal*, 3 February 2009
- "When Time's Not on Your Side," *San Francisco Daily Journal*, 20 May 2008
  Co-Author(s): Wendy S. Albers, Co-author
- "Ditching Class," *Los Angeles Daily Journal*, 30 January 2008
- "Objections to Evidence," *Los Angeles Daily Journal*, 29 November 2007
- "Strict Compliance," 1 May 2007
  Co-Author(s): Zareh Jaltorossian
- "The Dynamics of Appellate Oral Argument," *Certworthy*, Summer 2006
  Co-Author(s): Zareh Jaltorossian
- "Three Reasons for Thinking Twice Before Filing a Frivolous Appeal," April 2006
  Co-Author(s): Zareh Jaltorossian
- "In Tricky Dance of Appeals, Timing of Filing Is Everything," *Los Angeles Daily Journal*, 1 November 2005

Speaking Engagements

- "Why You Should Learn To Stop Worrying And Love The California Supreme Court," 2014 MCLE Day, Los Angeles, California, 14 January 2014
- Reed Smith's MCLE DAY 2011, 12 January 2011
- Reed Smith's "Consumer Litigation: Ripple Effect or Tsunami in the Consumer Finance Industry?" Teleseminar, 5 March 2008

Employment History

- 2005 - Reed Smith
- 1990 - Court of Appeal, Second District, Division Five
- 1987 - Los Angeles Superior Court
- 1984 - Antelope Municipal court
- 1981 - Gray, Cary Ames & Fyre
- 1978 - O'Melveny & Meyers

ReedSmith

Professional Affiliations

- American Academy of Appellate Lawyers - Member
- California Academy of Appellate Lawyers - Member
- Certified as a Specialist in Taxation Law, 1984

Interests

She has two adult children. When she is not working, she spends time with her family, waterskiing, running, reading, and traveling.

Justice Fred K. Morrison (Ret.)
JAMS
2520 Venture Oaks Way, Suite 400
Sacramento, California 95833

July 6, 2014

Michael S. Sundermeyer
Williams & Connolly LLP
725 12th Street, N.W.
Washington D.C 20005

Re: In Re Edward R. Reines

Dear Mr. Sundermeyer:

This letter is in response to your request that I review the Order to Show
Cause issued by the United States Court of Appeals for the Federal Circuit and
evaluate the actions of attorney Edward Reines in sending e-mail messages to cur-
rent, former, and prospective clients ("the E-mails") conveying an extremely com-
plimentary message sent to Mr. Reines by the then Chief Judge Randall Rader of
the Federal Circuit (attached as Exhibits 4-50 to Mr. Reines's Response to the Or-
der to Show Cause). The OSC directs Mr. Reines to show cause why his actions
should not warrant disbarment, suspension, sanction, or other attorney discipline
for "conduct unbecoming a member of the bar."

I have been a lawyer since 1971, was a California trial judge for nine years
and an associate justice on the California Court of Appeal for 14 years. Since 2009,
I have worked as an ADR neutral.

Judge Rader's message to Mr. Reines relays the compliments of other judges
on the Federal Circuit regarding his performance in two recent oral arguments and
states in part:

> . . . , one of my female colleagues interrupted and addressed herself to me.
> She said that she was vastly impressed with the advocacy of 'my friend,
> Ed.'She said that you had handled two very complex cases, back to back.. . .
> In both cases, you knew the record cold and handled every question with
> confidence and grace. She said that she was really impressed with your per-
> formance. Two of my other colleagues immediately echoed her enthusiasm

over your performance . . . . In sum, I was really proud to be your friend to-
day! Your bring great credit on yourself and all associated with you!

    And actually I not only do not mind, but encourage you to let others
see this message.

    Your friend for life, rrr

Of the E-mails, this excerpt from a message sent to an individual working at
Samsung is typical:

Anthony, as you consider us for your Federal Circuit and other needs, I
thought the below email from Chief Judge Rader might be helpful. Regard-
less of his comment, please do not circulate this outside Samsung, but feel
free to do so within Samsung to the relevant folks. All The Best, Ed

I have read retired California Court of Appeal Justice Gary Hastings's letter
dealing with Mr. Reines's conduct. I fully concur with Justice Hastings's analysis
of California Rules of Professional Conduct, Rule 1-400. He concludes that the
E-mails do not constitute "advertisements" or "solicitations" within the meaning of
Rule 1-400, but do qualify as "communications" under the rule.

I also agree that these E-mail communications are neither, "untrue, false or
misleading statements" nor do they suggest or imply that the author is in a profes-
sional relationship with a government agency. Thus, there is no violation under the
language of Rule 1-400 or the Standards used to interpret the Rule.

However, I believe the central issue in the evaluation of Mr. Reines's action
in disseminating the Chief Judge's e-mails is whether the rule against implying an
ability to improperly influence a court was violated. If the ABA Model Rules do
not conflict with California policy those rules serve as a collateral source for guid-
ance on proper professional conduct in California. (Kennedy v. Elderidge (2011)
201 Cal. App. 4th 1197, 1210.) The prohibition mentioned above in contained in
ABA Rule 8.4(e), which states that it is professional misconduct for a lawyer to:

. . . .
(e) state or imply an ability to influence improperly a government agency or
official or to achieve results by means that violate the Rules of Professional
Conduct or other law; . . . .

Informing clients and potential clients about compliments received that reflect on one's ability as a lawyer, be it a "Super-lawyer" designation, a news article or favorable mention in a judicial opinion does not violate the rule against implying an ability to exert improper influence over a court. But this case is somewhat unusual because of Chief Judge Rader's warm and effusive expression of lifelong friendship which is also contained in the messages.

Mr. Reines's messages accompanying copies of the judge's e-mail do not imply a special relationship. The primary focus of both the notes accompanying the judge's message and the judge's message itself is on Mr. Reines's skill as an appellate advocate, and the judge's expression of friendship does not imply that Mr. Reines is in a position to exert improper influence over the court or the judge.

If Mr. Reines had attempted to edit or truncate the judge's words, it might have even been considered deceptive by some. His choice was to disseminate the judge's praise as he did or not send the messages. Aside from the wisdom of sending out so many e-mails containing Chief Judge Radar's extremely complimentary message and expression of friendship, I do not believe his conduct was intended to or implied that he had the ability to improperly influence Chief Judge Rader or the other judges on the Federal Circuit.

In my opinion, because I did not see any evidence that Mr. Reines either expressly or by implication attempted to convey the impression that his relationship with Chief Judge Rader gave him the ability exert improper influence, I do not believe he violated his ethical obligations under California law or ABA Rule 8.4(e).

Thank you for considering my opinion on this matter.

Sincerely,

*Fred K Morrison*

Fred K. Morrison

U.S. COURT OF APPEALS CASE NO. 14-MA004

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**Filed Under Seal**

———————

In Re Edward R. Reines

*Respondent.*

———————

## DECLARATION OF MARK L. TUFT

———————

I, MARK L. TUFT, declare as follows:

1.     I am an attorney at law, licensed to practice before the courts of California and am a partner with the law firm of Cooper White & Cooper, LLP. My office address is 201 California Street, 17th Floor, San Francisco, California 94111.

2.     This declaration is submitted in support of Respondent Edward R. Reine's response to the show cause order issued by the United States Court of Appeals for the Federal Circuit on June 5, 2014 in the above-captioned matter.

3.     I have been asked by Williams & Connolly LLP, counsel for Mr. Reines, to analyze in response to the show cause order whether Mr. Reines' emails forwarding a March 5, 2014 email he received from former Chief Judge Randall R. Rader to current, former and potential clients violate Rule 1-400 of the California Rules of Professional Conduct and Standard 6. I do not express an opinion on the application of Model Rule 8.4(e) of the American Bar Association Model Rules of Professional Conduct because California has not adopted Model Rule 8.4(e) and I understand another expert will be providing an opinion on this Rule.

4.     The opinions expressed in this declaration are based on my review of Mr. Reines' emails (Exhibits 1-49) and the chart summarizing the emails by exhibit number, organization, name, title/relationship, date of dissemination, client status and email address, submitted in response to the show cause order. Based on my

review of these materials, Mr. Reines' emails do not violate California Rule 1-400. Nor do the emails create a presumptive violation of Rule 1-400 under Standard 6.

## Qualifications

5.     I have been licensed to practice law in the State of California since 1969 and have been actively engaged in litigation in state and federal courts since joining Cooper, White & Cooper LLP in 1973. I received my J.D. degree with honors from Hastings College of the Law in 1968. I received an LL.M degree with highest honors from George Washington University in 1972.

6.     I specialize in the field of professional responsibility of lawyers and am certified as a Legal Malpractice Specialist by the State Bar of California. My practice involves counseling and representing lawyers, law firms and other clients on professional responsibility and professional liability matters. I serve as outside ethics counsel for a number of law firms, corporate legal departments, government and public interest entities on all aspects of the law governing lawyers. My practice includes consulting with lawyers and rendering opinions in regard to lawyer advertising issues. I have also served for many years as an expert witness and consultant on issues relating to the practice of law and the professional responsibilities of lawyers and have testified as an expert in various courts and arbitrations.

7.     I am a vice chair of the State Bar of California Commission for the Revision of the Rules of Professional Conduct.  The Commission is charged with the responsibility of revising the Rules of Professional Conduct promulgated by the State Bar of California and approved by the California Supreme Court.  The Commission's charge includes analyzing the ABA Model Rules, the Restatement (Third) Law Governing Lawyers and the lawyer codes of other jurisdictions.  The work of the Commission has resulted in 68 proposed rules which are currently pending review by the California Supreme Court.

8.     I am a past chair and special adviser to the State Bar of California Committee on Professional Responsibility and Conduct.  The Committee is responsible for issuing advisory ethics opinions on the rules and statutes regulating lawyer conduct in California and assisting the State Bar Board of Trustees on such matters.  I have also served on several State Bar task forces charged with studying issues of legal ethics, including legal advertising, and drafting rules of professional conduct.

9.     I am a co-author of the California Practice Guide on Professional Responsibility, published by the Rutter Group, a division of West, a Thomson Reuters business.  The publication covers the law governing lawyers in California and is updated annually.  Chapter 2 of the Practice Guide covers the regulation of lawyer advertising and solicitation in California and includes an expansive

discussion of California Rule 1-400 and the advertising standards. I have been an adjunct professor at the University of San Francisco School of Law where I taught legal ethics for 12 years. I received the law school's adjunct professor of the year award in 2008. I am also a former chair and current member of the Bar Association of San Francisco Legal Ethics Committee and a former member of the Board of Directors of the Bar Association of San Francisco. I received that Bar Association's Award of Merit for my work in legal ethics in 1991.

10.    I have written articles for various state and national publications and lecture frequently on the regulation of lawyers and legal ethics issues for a variety of continuing legal education providers, including the American Bar Association, the State Bar of California, the Practicing Law Institute, Continuing Education of the Bar, The Rutter Group, and a number of law schools, voluntary bar associations and national organizations. In 2005, I received CEB's Certificate of Merit for legal education.

11.    I am a member of the ABA Center on Professional Responsibility and currently serve on the ABA Center's Publication Board and Policy Implementation Committee. I am the immediate past President of the Association of Professional Responsibility Lawyers ("APRL"), a national organization of lawyers who practice in the field of legal ethics. The work of both the ABA Center and its Policy Implementation Committee and APRL frequently involve issues relating to lawyer

advertising and solicitation.  A copy of my curriculum vitae is attached hereto as Exhibit A.

## Analysis

12.    California Rule 1-400 is intended to protect the public against false, deceptive and misleading communications by lawyers seeking professional employment for pecuniary gain.  Cal. State Bar Formal Opns. 2004-165; *see also* 1986-90 and 1981-61 (discussing predecessor Rule 2-101).  The State Bar has confirmed on several occasions that the primary purpose of the rule is to protect the public from harm caused by communications involving fraud, undue influence, overreaching and similar abusive practices.  Cal. State Bar Formal Opns. 2004-165 and 1981-61.  The California Supreme Court has found that regulating false, deceptive and misleading advertising does not conflict with the First Amendment protection afforded to commercial speech.  *Leoni v. State Bar of California*, 39 Cal.3d 609, 624-628 (1985).

13.    Since Rule 1-400 is intended to protect unsophisticated laypersons from abusive lawyer advertising practices, Rule 1-400 does not apply with equal force to lawyer-to-lawyer communications because lawyers are unlikely to be deceived by such practices.  Cal. State Bar Formal Opn. 2004-165—"[T]he Rule should not apply to lawyer-to-lawyer communications because lawyers are unlikely to be affected by such vexatious conduct."  Lawyer-to-lawyer

communications do not come within the scope of the Rule even if the communications seek professional employment through the assistance or recommendation of the recipient lawyer, or even if the communications seek professional employment by the recipient lawyer.  Cal. State Bar Formal Opn. 2004-165; Cal. State Bar Formal Opn. 1981-61 (discussing predecessor Rule 2-101).  Based on the materials I reviewed, the majority of Mr. Reines' emails were sent to other lawyers and in-house counsel.  These emails do not violate Rule 1-400.

14.     Many of Mr. Reines' emails constitute "communications" under Rule 1-400(A) because they concern the availability of Mr. Reines for professional employment and are directed to present, former and prospective clients.  I note, however, that most of the emails that he sent to his current clients in the *Promega* litigation, Thermo Fisher/Life Technologies, would not likely be considered communications under the Rule since these emails reported information he received regarding oral argument in the client's matter and do not solicit future employment.

15.     Mr. Reines' emails include the March 5, 2014 email he received from former Chief Judge Rader and reference the compliment he received, noting that the recipient may find Judge Rader's email helpful in evaluating their future legal needs.  The content of these emails does not violate the provisions of Rule 1-

400(D)(1)-(6). The emails do not contain any untrue or misleading statements. Rule 1-400(D)(1)-(2). Nor do they omit information that is necessary to make the statements not misleading to the public. Rule 1-400(D)(3). The emails were not directed to the general public or laypersons, but rather were sent to lawyers and sophisticated business executives and managers, many of whom are current or former clients of Mr. Reines or his firm. The emails are not sent in a manner that would be considered intrusive, threatening or harassing under Rule 1-400(D)(5). The emails do not violate the remaining restrictions of Rule 1-400(D).

16.    Standard 6 is one of 15 advertising standards the Board of Trustees has adopted regarding certain types of communications that are presumed to violate Rule 1-400. The standards are used only as a presumption affecting the burden of proof involving violations of the Rule and may be rebutted by evidence that the communication is not misleading or deceptive. Rule 1-400(E).

17.    Under Standard 6, a communication "in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies a relationship between any member in private practice and a government agency or instrumentality or a public or non-profit legal services organization" is considered a presumptive violation of the Rule. Standard 6 was included to clarify areas of concern which are frequently raised with respect to the use of a firm or trade name and the use of the term "of counsel." *Request that the Supreme Court of California*

*Approve Amendments to the Rules of Professional Conduct of the State Bar of California, and Memorandum and Supporting Documents in Explanation*, Office of Professional Standards of the State Bar of California (Dec. 1987), Memorandum at 22; *see also* Los Angeles Bar Ass'n Formal Opn. 516 (2006). Standard 6 is limited and only applies to "firm name[s], trade name[s], fictitious name[s] and professional designation[s]." Cal. State Bar Formal Opn. 2004-167. For example, Standard 6 would apply to the firm name "Workers' Compensation Relief Center" because prospective clients may be misled and believe that the firm is connected with state agencies, such as the Workers' Compensation Appeals Board. Potential clients may also believe that the firm has authority to grant relief, an authority generally limited to governmental entities. *Id.* Similarly, the use of a governmental title on letterhead next to the lawyer's name, the use of a governmental title as part of a firm name, or the use of the "Great Seal of the State of California" would be considered presumptive violations of Standard 6 because these uses imply a relationship with the governmental or state entity. *Id.*; *Matter of Respondent V*, 3 Cal. State Bar Ct. Rptr. 442 (2005).

18.    None of Mr. Reines' emails that I have reviewed violate Standard 6. They are not in the form of a firm or trade name or other professional designation that indicates any relationship to a governmental agency, including the Federal Circuit Court of Appeals. The emails simply convey compliments Mr. Reines

received from former Chief Judge Rader and do not imply that he has any relationship with the Federal Circuit Court of Appeals.

19.    For the foregoing reasons, none of the emails violate Rule 1-400 or Standard 6.

I declare under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed at Moraga, California on July 5, 2014.

_____
Mark L. Tuft

# MARK L. TUFT

201 CALIFORNIA STREET, 17TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 433-1900
DIRECT: (415) 765-6215
FACSIMILE (415) 433-5530
E-Mail: mtuft@cwclaw.com

## LEGAL PRACTICE

Partner with Cooper, White & Cooper LLP; principally engaged in professional liability, media law, civil and criminal litigation in federal and state courts. State-wide practice as ethics counsel to lawyers and law firms on professional responsibility, professional liability, law firm mergers and dissolutions and lawyer discipline. Arbitrator, Special Master and mediator on lawyer-client and law firm disputes.

## LEGAL EDUCATION

LL.M., George Washington University, June 1972. Graduated with highest honors.

J.D., Hastings College of the Law, June 1968. Order of the Coif, Thurston Law Society, *Hastings Law Journal*.

## PROFESSIONAL ASSOCIATIONS AND AWARDS

- Certified Specialist in Legal Malpractice Law
- Member, American Bar Association, Center for Professional Responsibility, Policy Implementation Committee and Editorial Board
- American Law Institute
- Vice Chair, State Bar of California Commission for the Revision of the Rules of Professional Conduct
- Former Chair, State Bar Committee on Professional Responsibility and Conduct
- Former Member, Board of Directors, Bar Association of San Francisco
- Former Chair, Bar Association of San Francisco Legal Ethics Committee
- President, Association of Professional Responsibility Lawyers
- Bar Association of San Francisco Certificate of Merit Award
- Spirit of the CEB Award

## PUBLICATIONS AND TEACHING

- Co-Author, California Practice Guide on Professional Responsibility (The Rutter Group, a division of West, a Thomson Reuters business)
- Adjunct Professor, University of San Francisco School of Law



PANSKY MARKLE HAM LLP

T 213.626.7300  F 213.626.7330
1010 Sycamore Avenue, Suite 308
South Pasadena, California 91030

panskymarkle.com

July 7, 2014

**VIA EMAIL**

Michael S. Sundermeyer, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington DC  20005-5901

  *Re:*  *Legal Ethics Opinion Regarding In Re Edward R. Reines*

Dear Mr. Sundermeyer:

  You have requested this opinion letter to confirm my analysis of the facts underlying the pending disciplinary proceeding entitled *In re Edward R. Reines,* 14-MA004 (Fed. Cir.).  The opinions set forth herein are based on the facts set forth in the Declaration of Edward Reines, which I have assumed to be true, and the chart of email recipients, which is set forth on the attached Appendix A.  I reserve the right to change my opinion if I learn that these facts are not accurate or if I learn other material facts. This opinion does not address and does not resolve any legal issues other than legal ethics.

## PROFESSIONAL QUALIFICATIONS

  My professional qualifications which are set forward at greater length in my curriculum vitae, a copy of which is appended hereto as Appendix B, include the following:

  From 1978 through 1983, I was employed as a prosecutor by the State Bar of California, during which time I handled thousands of investigations and trial-level prosecutions based on attorney misconduct.  During this time I also provided advice to members of the bar seeking informal ethics advice, and acted as a supervisor of other attorneys in the State Bar's Office of Trials.

  From 1983 through October 1985, I became an Assistant General Counsel for the State Bar of California, briefing and arguing cases before the California Supreme Court, serving as counsel for various subcommittees of the State Bar's Board of Governors, and representing the State Bar in outside litigation.

  Between 1985 and 1988, I was an associate in Clinnin, Siracuse & Belcher, an insurance defense litigation firm located in downtown Los Angeles.  In 2006, I was Of Counsel to the law offices of Robie & Matthai.

  Since October 1988, I have defended numerous attorneys in malpractice and disciplinary matters, and have personally represented attorneys in both disciplinary proceedings and civil disputes.  I have represented plaintiffs in legal malpractice actions.  Additionally, I regularly participate in the presentation of many continuing legal education programs, including those sponsored by the Los Angeles County Bar Association, Consumer Attorneys Association of Los Angeles, Association of Southern California Defense Counsel, American Bar Association Center for Professional Responsibility, Association of Professional Responsibility Lawyers, and the State Bar of California, which covered

Michael S. Sundermeyer, Esq.
Williams & Connolly LLP
July 7, 2014
Page 2

legal ethics issues including but not limited to conflicts of interest, fiduciary duties, fee and billing issues, First Amendment commercial free speech issues, duties of officers of the court, disqualification, the extent to which ethical walls may be constructed, and many other ethics issues.

I have been designated and have been qualified as an expert witness in numerous legal malpractice actions. I have published numerous articles in the area of attorney ethics and attorney standard of care. I am a member and past-president of the Association of Professional Responsibility Lawyers (APRL). I have for many years served on the Los Angeles County Bar Association's Committee on Professional Responsibility and Ethics, of which I am a former chair.

I have represented scores of lawyers and law firms in the drafting, construction and dissemination of legal advertising and legal service marketing campaigns.

## SUMMARY OF UNDERLYING FACTS

On Wednesday, March 5, 2014, Edward Reines received an email from Hon. Randall R. Rader, who was then serving as the Chief Judge of the U.S. Court of Appeals for the Federal Circuit. In brief summary, Chief Judge Rader's email passed along a compliment from another judge regarding Mr. Reines's performance in recent appellate court arguments, referred to his feelings of friendship for Mr. Reines, and invited Mr. Reines to share the email with others. Following receipt of this email, Mr. Reines forwarded it via email to a select group of recipients.

As set forth in greater detail in the Declaration of Edward Reines, I am informed of the following facts: (1) In disseminating Chief Judge Rader's email, Mr. Reines did not intend to suggest that he had any improper influence over any member of the judiciary; (2) Reines disseminated the Rader e-mail because he was proud of the compliment he had received about his performance during oral argument and he wanted his network of professional contacts and members of his family (such as his mother and siblings) to know that he was well-regarded in his profession; (3) in forwarding the email to a number of current, former, and prospective clients, he expressed his wish to be considered when they were seeking representation in Federal Circuit matters in the future; (4) all but three of the recipients of those emails — Julia Feelty (who was copied on an email that was also addressed to Carrie Delafield, J.D.), Mark Stevenson (who was copied on an email that was also addressed to Gennoffir MacLeod, General Counsel of Life Tech) and Mike Hunkapiller — were lawyers; (5) none of the recipients expressed any concerns or objection to having received a copy of Chief Judge Rader's email, and none of them told Mr. Reines that they believed it was improper of him to have forwarded the email; (6) it was widely known in the patent litigation community that Mr. Reines, as Chair of the Federal Circuit Advisory Council, had long worked extensively on bench/bar matters in close consultation with the Chief Judge and was thus a professional friend of the Chief Judge; and (7) none of the recipients of the copy of Chief Judge Rader's email indicated that they construed Chief Judge Rader's statements as suggesting that Mr. Reines enjoyed any sort of special favor with individual federal judges or the federal judiciary as an entity .

Michael S. Sundermeyer, Esq.
Williams & Connolly LLP
July 7, 2014
Page 3

## APPLICABLE AUTHORITIES

In reaching the opinions set forth in this letter, I have considered, among other material, the following:

*Bates v. State Bar of Arizona,* 433 U.S. 350, 555 P.2d 640 (1977) (internal quotations and citations omitted)

> Our analysis began with the observation that our cases long have protected speech even though it is in the form of a paid advertisement; in a form that is sold for profit; or in the form of a solicitation to pay or contribute money. If commercial speech is to be distinguished, it must be distinguished by its content. But a consideration of competing interests reinforced our view that such speech should not be withdrawn from protection merely because it proposed a mundane commercial transaction. Even though the speaker's interest is largely economic, the Court has protected such speech in certain contexts. The listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. Moreover, significant societal interests are served by such speech. Advertising, though entirely commercial, may often carry information of import to significant issues of the day. And commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system. In short, such speech serves individual and societal interests in assuring informed and reliable decision-making.

*Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 465 *(1978),* which struck down a prohibition against targeted solicitation of a civil rights case, where no pecuniary gain was sought by the lawyer. The purpose of regulations upon attorney advertising is the "protect the members of the general public in need of legal services."

*Leone v. State Bar of California* (1985) 39 Cal. 3rd 609, 626 and *Jacoby v. State Bar of California* (1977) 19 Cal.3d 359, each of which noted that the enforceability of the rules governing attorney advertising and communications are governed by "the policy of consumer protection," i.e., whether the communication is misleading to the public.

California Rules of Professional Conduct, Rule 1-400

> (C) A solicitation shall not be made by or on behalf of a member or law firm to a prospective client with whom the member or law firm has no family or prior professional relationship, unless the solicitation is protected from abridgment by the Constitution of the United States or by the Constitution of the State of California. A solicitation to a

Michael S. Sundermeyer, Esq.
Williams & Connolly LLP
July 7, 2014
Page 4

former or present client in the discharge of a member's or law firm's professional duties is not prohibited.

(D) A communication or a solicitation (as defined herein) shall not: (3) Omit to state any fact necessary to make the statements made, in the light of circumstances under which they are made, not misleading **to the public** (Emphasis added)...

California Business and Professionals Code 6157(c):

"Advertise" or "advertisement" means any communication, disseminated by television or radio, by any print medium, including, but not limited to, newspapers and billboards, or by means of a mailing directed generally to members of the public and not to a specific person, that solicits employment of legal services provided by a member, **and is directed to the general public and is paid for by, or on the behalf of, an attorney** (Emphasis added).

California Code of Judicial Ethics, 2(B)(2)(e):

A judge may serve as a reference or provide a letter of recommendation only if based on the judge's personal knowledge* of the individual. These written communications may include the judge's title and may be written on stationery that uses the judicial title. (Eff. 1-1-13)

ABA Model Rule 7.1

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading.

*California Judicial Conduct Handbook*, Judge David M. Rothman (1991) §8.24, Serving as a Reference or Making a Recommendation (confirming that a judicial officer is free to provide a written recommendation of a person and to write a reference letter for a lawyer whom is personally known to the author)

U.S. Judicial Conference Committee on Codes of Conduct Advisory Opinion No. 11 - Disqualification Where Long-Time Friend or Friend's Law Firm Is Counsel:

The question regarding members or associates of the firm of the friend and godfather poses no problem. We do not believe that judges must recuse from all cases handled by a law firm simply because judges have law firm members for friends. **Although there may be special circumstances dictating disqualification, a friendly relationship is not sufficient reason in itself** (Emphasis added).

Michael S. Sundermeyer, Esq.
Williams & Connolly LLP
July 7, 2014
Page 5

State Bar of California Standing Committee on Professional Responsibility and Conduct Formal
Opinion 1981-61, which interpreted the scope of the predecessor rule to current CRPC 1-400 as
follows: "Rule 2-101-(B) of the Rules of Professional Conduct does not prohibit a
recommendation of employment by one attorney to another attorney. **An attorney may ethically
recommend his or her employment to another attorney, even when the latter is employed
as legal counsel to a business and the purpose of the solicitation is to secure that business as
a client."** (Emphasis added.)

## OPINIONS

Based on my experience, knowledge of the standard of care among California attorneys, my
training and education in the area of legal ethics, and having considered various applicable authorities
including but not limited to those summarized above, I have reached the following opinions:

1.      As applied in disciplinary proceedings in California, the rules regulating attorney
communications which offer legal services for monetary compensation are primarily intended to protect
relatively unsophisticated or inexperienced consumers of legal services from confusing, misleading
and/or harassing methods of communication. The regulations on attorney advertising to the public must
be balanced against the constitutional protection for commercial free speech, as made clear by the
United States Supreme Court, and cannot be based on speculative harm. In my experience, the current
rules governing attorney advertising are not applied by the California bar regulators in an ultra-technical
manner, and harm to the public is required before attorney discipline will be imposed. Even unsavory or
distasteful attorney advertising is entitled to constitutional protection, where no false or misleading
content has been included in the communication.

2.      In California, a judicial officer is not prohibited from providing recommendations and
reference letters for lawyers. Inherent in the concept of permitting judicial officers to create reference
letters and recommendation letters is the resultant use of such letters by the attorney who is the subject
of the letter. This being the case, it cannot constitute a disciplinary violation for a lawyer to disseminate
such a recommendation or reference. Indeed, the publication of endorsements of lawyers by judges is
prevalent, and easily found by a simple Internet search. Therefore, in my opinion, Mr. Reines did not
violate any ethical or professional duties when he disseminated the laudatory email to his family,
friends, colleagues, clients, former clients, and prospective clients.

3.      Mr. Reines did not disseminate the email he received from Chief Judge Rader to the
public, nor did he initiate dissemination of the email to prospective clients who were non-lawyers and
thus might be susceptible to being misled by the email. To the contrary, Mr. Reines only permitted
Judge Rader's email to be forwarded to a relatively small number of persons – overwhelmingly
lawyers—who already knew him. In one instance information was provided in response to an inquiry
from a prospective client, who, *through an independent lawyer,* requested information about the Weil

Michael S. Sundermeyer, Esq.
Williams & Connolly LLP
July 7, 2014
Page 6

firm's professional qualifications. Therefore, in my opinion, Mr. Reines did not violate any California rules restricting false, confusing and misleading advertisements disseminated to the public. Nor am I aware of any other California ethics rules or principles that Mr. Reines might have violated by disseminating the email as he did.

4.     In connection with the allegation in the Show Cause Order that Mr. Reines's conduct violated Standard 6 of Rule 1-400, regarding firm names and designations that are misleading, Standard 6 explicitly refers to the use of a "firm name, trade name, fictitious name or other professional designation." Mr. Reines did not use a false or misleading firm name or trade name. Standard 6 has no application to Mr. Reines's conduct. Additionally, Mr. Reines did not imply that he was related to a governmental agency or instrumentality or a public or non-profit legal services organization. Standard 6 applies when a lawyer or law firm uses a trade name such "Governmental Claims Attorneys," or "Public Service Benefit Law Firm," or some other fictitious name that connoted that the law firm is something other than a private, for-profit law firm. Standard 6 is completely inapplicable to Mr. Reines's conduct.

5.     Mr. Reines is well-known for his longstanding work with the Federal Circuit. He is a specialty practitioner who is experienced and well-known by the Federal Circuit Judges. In my judgment, nothing in the email drafted by Chief Judge Rader, or in Mr. Reines's forwarding emails, can reasonably be interpreted as an improper or misleading suggestion that Mr. Reines held special influence over Judge Rader or any other Judge on the Federal Circuit. To the contrary, the focus of Judge Rader's email was a description of the exceptional quality of Mr. Reines' skill in providing legal services during recent oral arguments and an expression of Chief Judge Rader's approval and appreciation of that high degree of skill, which, under California ethics standards, Mr. Reines was free to disseminate as he did. Chief Judge Rader also referred twice to his friendship with Mr. Reines, which does not change my analysis.

6.     None of the recipients of the letters expressed any confusion or misunderstanding about the purpose behind Mr. Reines having forwarded Chief Judge Rader's email to them. To the contrary, the recipients who responded to Mr. Reines seemed to understand that the purpose of forwarding the email was to share the compliment Mr. Reines had received regarding the high quality of his professional services, his skill as an appellate lawyer, and his proficiency in Intellectual Property Law issues.

7.     Friendship between judges and lawyers is not ethically impermissible. Professional friendship is encouraged through Bar association activities, Bench and Bar conferences, and other professional activities. It simply is not improper for either a judge or a lawyer to refer to one another as "friends." There is no evidence to support an inference that Mr. Reines and Chief Judge Rader had a relationship that was anything other than close professional colleagues. In my opinion, Mr. Reines was not ethically precluded from sharing with his colleagues, clients, former clients, and prospective clients, as well as his friends and family, a writing that included an expression of friendship from a judge whose opinions were clearly based on personal knowledge, and were limited to expressions of admiration and praise for a professional accomplishment.

Michael S. Sundermeyer, Esq.
Williams & Connolly LLP
July 7, 2014
Page 7

8.    More than 3 decades ago, the State Bar of California Standing Committee on professional Responsibility and Ethics unequivocally concluded that the rules regulating attorney advertising do not affect lawyer-to-lawyer communications regarding the availability to provide legal services. The 1981 formal ethics opinion is consistent with the overarching, fundamental principle that restrictions on commercial legal advertising exist to safeguard the general public. In my opinion, a lawyer should not face disciplinary charges for the dissemination of truthful, non-misleading commercial speech directed to another lawyer.

9.    With respect to the emails that were directed to non-lawyers, in my opinion, this did not violate the applicable advertising/communication rules. Mike Hunkapiller, as the inventor, was interested in the outcome of the Promega appeal, in which Mr. Reines's client was a party, and the emails consisted of pure, non-commercial speech. Since the Hunkapiller email did not offer employment, it is outside of the scope of any of the advertising rules. Regarding the email sent to Feelty and Delafield, each of the recipients were trained as lawyers. Moreover, the email sent to Feelty and Delafield does not fall within Rule 1-400's restrictions upon unsolicited communications regarding the offer of legal services because it was solicited. In responding to the request for information relating to the Weil firm, Mr. Reines's partner did not initiate an unsolicited communication, either directly or indirectly, and the transmission of information in response to the request of Feelty and Delafield did not violate any ethical duty.

Please do not hesitate to contact me in the event you require any additional opinions or advice from me in connection with this matter.  It has been a pleasure working with you.

Very truly yours,

Ellen A. Pansky

EAP/vm

Enclosures

# ELLEN A. PANSKY
# CURRICULUM VITAE

Ellen A. Pansky specializes in the defense of attorneys, bar applicants and other professionals in regulatory and licensure proceedings and represents both plaintiffs and defendants in civil actions. She consults with and advises lawyers in legal ethics and risk management. She frequently serves as an expert witness in legal malpractice proceedings.

Ms. Pansky is a California State Bar Certified Specialist in the area of Legal Malpractice Law.

Ms. Pansky is a member and past-president (1995-1996) of the Association of Professional Responsibility Lawyers, "APRL."  She has long been active with the Los Angeles County Bar Association, and served as a member of the Board of Trustees and Assistant Vice President  (2005-2012), and has served on several of its committees including: Professional Responsibility and Ethics Committee (chair 1996-1997, and current member); Ethics 2000 Liaison Committee; Judicial Appointments Committee and on the Shattuck-Price Award Committee.  She has also served as a member of the Los Angeles County Bar Association Senior Lawyers Division Executive Committee (2010-2013), and has been appointed to the Ad Hoc Committee on State Bar Admissions Regulation Reform Proposals (2013-2014) as well as the Ad Hoc President's Advisory Committee on Women in the Legal Profession (2013-2014). She is a longstanding member of the American Bar Association and has been a member of its Practice Management Section and the ABA Women Rainmakers Committee. She also served as a member of Editorial Board of the ABA/BNA Lawyers' Manual on Professional Conduct (2004-2007).  Ms. Pansky served as a liaison member to the ABA Standing Committee on Ethics and Professional Responsibility, representing APRL (2006-2008) and is a current member of the SCEPR.  She is also a charter member of the ABA Center for Professional Responsibility.  Additionally, she previously served as a member of the California State Bar's Pilot Program Interaction Advisory Committee, addressing the effect of the Lawyer Assistance Program on the State Bar disciplinary system. She served by appointment of the then presiding judge of the State Bar Court as a member of an Advisory Rules Revision Committee of the Executive Committee of the State Bar Court.

Ms. Pansky is a member and section chair of the United States District Court, Central District, Standing Committee on Discipline (2008-2014).

Ms. Pansky is a member of the Association of Southern California Defense Counsel. She is a member of the Steering Committee of the Breakfast Club. Ms. Pansky is a prior chair of the State Bar of California Committee on Women in the Law (2000-2001); and is a lifetime member and previously served on the Board of Governors of California Women Lawyers, (co-chair of Bias in the Law Committee and chair of its Judicial Evaluations Committee). Ms. Pansky is also a lifetime member of the Women Lawyers' Association of Los Angeles.  She is a member and past president (2002-2003) of the National Association of Women Lawyers.

As a California State Bar certified MCLE provider, Ms. Pansky is a frequent lecturer on legal ethics and professional responsibility. She has presented well over 100 continuing legal education courses. She was selected as one of the Inaugural Fellows of the National Institute for Teaching Ethics and Professionalism (NIFTEP), and she also was an invited participant in Harvard University Law School's 2001 focus group on law firm ethics advisors.  Ms. Pansky is a contributor to Legal Malpractice Law Review at legalmalpractice.com.

Ms. Pansky has published extensively in the area of legal ethics, including: as a contributing author (Conflicts of Interest Chapter) of California Civil Procedure Before Trial; CEB, a contributing editor to "Attorney Ethics," *California Practice Handbook*, (Matthew Bender 1993); and has authored a number of articles including: "Attorney Discipline: Are We on the Wrong Path?" *Los Angeles Lawyer*, July/August 2012; "Playing the Percentages" *Los Angeles County Bar Update*, Vol. 30, No. 9, October 2010; "A Flat Fee Future" *Los Angeles County Bar Update,* January 2010; "Wearing Many Hats" *State Bar of California Big Meeting Magazine, 2009 Annual Meeting Issue,* Fall 2009; "To Err Is Human – Or Is It Moral Turpitude?" *Los Angeles County Bar Update*, Vol. 29, No. 3, March 2009; "Application of California's Modified Substantial Relationship Test to International Law Firm Conflict of Interest:  Creative Solution or Can of Worms?"  *Penn State Law Review,* October 2008; "The Connection Between Ethical Advocacy and a Lawyer's Integrity" *Los Angeles County Bar Update,* November 2007; "California Ethical Rules Governing Restriction on Law Practice" *ABA/CPR Conference* June 2007,  "Breaking Up Is Hard To Do: Terminating the Attorney/Client Relationship," *County Bar Update*, January 2007, Vol. 27, No.1, "Lien Provisions in Contingent Fee Contracts: Are You Violating the California Rules of Professional Conduct?" - *Forum* April 2006, "Belated Fee Complaints: What to Do?" Los Angeles County Bar publication - *County Bar Update* January 2004, "Communication and Diligence," *Emory Law Journal*, August 2003, "Don't Fight Your Substitution Out of a Client's Matter" *County Bar Update*, January 2002, Vol. 22, No. 1, "Construction Project: Authorizing Ethical Walls in California" *County Bar Update*, April 2000, Vol. 20, No. 4, "Fair Share?" *Los Angeles Daily Journal* (California Law Business Supplement) October 2000; "Bonus Points," *Los Angeles Lawyer*, September 2000; "One Easy Way to Become the Target of a State Bar Complaint: Fail to Regularly Communicate with Clients,"  *Los Angeles Daily Journal*, August 1999; "Balance Client Trust Account to Avoid Bar Discipline," *Los Angeles Daily Journal*, June 1999; "When Representing Multiple Parties, Don't Waver on Waivers," *Los Angeles Daily Journal*, September 1999; "Conduct Becoming," *Los Angeles Lawyer*, September 1997; "Between an Ethical Rock and a Hard Place: Balancing Duties to the Organizational Client and Its Constituents," *South Texas Law Review*, October 1996; "Gender Bias in the Legal Profession," *Women Lawyers Journal*, April 1996; "Mitigation of Disciplinary Sanctions: Justice and Fairness Require Analysis of Each Individual Attorney," *The Professional Lawyer*, American Bar Association 21st Ethics Symposium, June 1995; "Barred for Life? Permanent Sanction for Ethics Abuses Won't Cure Profession's Ills," *Los Angeles Daily Journal*, May 1995; California Women Lawyers' Glass Ceiling Surveys Reports (1993-94 and 1995); "Client Trust Account Procedures: How to Ensure Proper Compliance," *Los Angeles Lawyer*, December 1992; and "An Attorney's Expanding Fiduciary Duties to Opposing Parties and Non-Clients," *State Bar General Practice Section Newsletter*, Fall 1992.

Between 1978 and 1983, Ms. Pansky served as a prosecutor in the Office of Trial Counsel for the State Bar of California. In that capacity, she handled approximately 100 formal disciplinary proceedings and thousands of investigations of California attorneys. A number of the prosecutions conducted by Ms. Pansky resulted in California Supreme Court opinions, including *Rimel v. State Bar* (1983) 34 Cal. 3d 128 and *Ballard v. State Bar* (1983) 35 Cal.3d 274. In 1983, Ms. Pansky became an Assistant General Counsel for the State Bar of California, involved primarily in briefing and arguing disciplinary cases before the California Supreme Court, and other courts. A partial list of those cases include: *Greene v. Zank* (1984) 158 Cal.App.3d 497; *Palomo v. State Bar* (1984) 36 Cal.3d 785; *Tarver v. State Bar* (1984) 37 Cal. 3d 122; *Leoni v. State Bar* (1985) 39 Cal.3d 609; *Ritter v. State Bar* (1985) 40 Cal.3d 595; and *Trousil v. State Bar* (1985) 38 Cal.3d 337.

Between 1985 and 1988, Ms. Pansky was associated with a downtown Los Angeles litigation firm, practicing primarily in the areas of insurance defense litigation and physician peer review proceedings.   In 2006, Ms. Pansky was "of counsel" to the law offices of Robie & Matthai.

In 1989, Ms. Pansky and her late husband, R. Gerald Markle, opened the law offices of Pansky & Markle, emphasizing professional liability defense and, to a limited extent, prosecution of legal malpractice actions; State Bar disciplinary defense and admissions; ethics consultations; and expert testimony.  Since that time, Ms. Pansky has defended attorneys in numerous cases before both the California Supreme Court and the State Bar Court, as reflected in reported decisions, including *Lister v. State Bar* (1990) 51 Cal.3d 1117; *Sternlieb v. State Bar* (1990) 52 Cal.3d 317; *Lybbert v. State Bar* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 297; *In Re Paguirigan* (2001) 25 Cal.4th 1, and *In Re Lesansky* (2001) 25 Cal.4th 11.  Additionally, she has briefed and argued many legal malpractice cases before the California courts of appeal with favorable results.

Ms. Pansky was admitted to the California Bar in 1977, and is also admitted to practice before the United States District Courts for the Northern, Central and Southern Districts of California, as well as the Ninth Circuit Court of Appeals.  She is a native Southern Californian, having graduated from Hawthorne High School in 1971 with honors. She graduated summa cum laude with a B.A. from the University of California at Los Angeles in 1974. She is a lifetime member of the UCLA Alumni Association. She received her J.D. degree from Loyola University School of Law in Los Angeles in 1977. Ms. Pansky twice has been awarded the Wiley W. Manuel Pro Bono Services Award. In 2006, Ms. Pansky has served as a moot court judge in the National Civil Trial Competition sponsored by Loyola Law School.  Martindale Hubbell has awarded Ms. Pansky an AV Preeminent rating, and has listed the law firm in its Bar Register of Preeminent Lawyers. Additionally, Ms. Pansky has for years been recognized by her peers and ranked as a top litigator in several lawyer surveys, including the Los Angeles Daily Journal, Los Angeles Times Best Lawyers, and Super Lawyers. Ms. Pansky has repeatedly been selected as one of the top 50 Women Lawyers in Southern California and one of the top 100 Southern California Lawyers, Super Lawyers 2010 through 2012.

In January, 2009, Pansky Markle Ham LLP was formed with James I. Ham and Ellen A. Pansky as partners. The firm continues to consult with, advise and represent clients in litigation, with a strong emphasis on legal ethics, professional responsibility, legal malpractice and State Bar regulatory matters, as well as in other administration proceedings and litigation proceedings in state and federal court.

# DECLARATION OF PETER J. ANTHONY

I, Peter J. Anthony, declare under penalty of perjury that I have personal knowledge of the facts contained in this Declaration and that they are true and correct.

     1.     Attached as Exhibits 51–69 to the Response of Edward R. Reines to the Order to Show Cause are true and correct screenshots of attorney websites.

     2.     Attached as Exhibits 70–71 to the Response of Edward R. Reines to the Order to Show Cause are true and correct copies of speeches given by Judge Rader.

* * * * * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 7, 2014

Peter J. Anthony, Esq.

# EXHIBIT 1

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 12:38 PM
**To:** 'mreines@nyc.rr.com'
**Subject:** Fw: Congratulations
Here is a high compliment from the Chief Judge of the Federal Circuit. Seth Waxman is considered perhaps the leading oral advocate in the country.

---

**From**: Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent**: Wednesday, March 05, 2014 03:24 PM Eastern Standard Time
**To**: Reines, Edward
**Cc**: Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com)
<kbagrowski@brinkshofer.com>; Kang, Jennifer <kangj@cafc.uscourts.gov>
**Subject**: Congratulations

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 2

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Friday, March 07, 2014 10:01 AM
**To:** 'Larry Reines'; 'Sarah Reines'; Daniel Reines (dreines@emory.edu); Mike Reines
(mreines@mac.com)
**Cc:** Miriam Reines (mreines@nyc.rr.com)
**Subject:** A nice note
I normally limit my spamming of kvell-material to Mom, but this one goes pretty far so I
figured I'd send it along to the whole crew. Pretty unusual. Ed

Begin forwarded message:

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 3

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Sunday, March 09, 2014 4:41 PM
**To:** farnan@farnanlaw.com
**Subject:** Re: A nice note

It is always awkward to share something like that so thank you for the kind thoughts. Best, Ed

---

**From:** Joseph J. Farnan, Jr. [mailto:farnan@farnanlaw.com]
**Sent:** Sunday, March 09, 2014 08:37 PM Eastern Standard Time
**To:** Reines, Edward
**Subject:** Re: A nice note

Ed,

Congratulations on such well deserved recognition. I will certainly keep it in mind. And thank you for sharing - I appreciate it very much.

Best regards
Joe

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Sunday, March 09, 2014 08:25 PM
**To:** Joseph J. Farnan, Jr.
**Subject:** A nice note

Judge Farnan, I share the below email with you because I thought it might be a helpful reference given that your cases often go to the Federal Circuit. If I can ever be of service, just let me know. Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She

said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 4

**From:** Lum, Jennifer T. [Jennifer.Lum@caltech.edu]
**Sent:** Wednesday, March 05, 2014 6:14 PM
**To:** Reines, Edward; victoria.stratman@caltech.edu; adam.cochran@caltech.edu; chantal@caltech.edu
**Subject:** RE: Federal Circuit Appeal: Your Hood Patent

Ed,

Thank you for sharing the email and your thoughts on the argument, as well as the link.  It sounds like you did an outstanding job. I also appreciate you reaching out to me last week.  We enjoy working with you and look forward to working with you in the future.

Best regards,
Jennifer

*This message and any attached documents contain information from the California Institute of Technology Office of General Counsel that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 5:27 PM
**To:** Stratman, Victoria D.; Lum, Jennifer T.; Cochran, Adam; Chantal Morgan D'Apuzzo Ph. D (chantal@caltech.edu)
**Subject:** Federal Circuit Appeal: Your Hood Patent

Folks, I write you because I have some unusual feedback for you from the Chief Judge of the Federal Circuit regarding a Federal Circuit appeal involving one of your patents that I argued for you yesterday. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Below is an email with the feedback from Chief Judge Rader.  This is quite unusual.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

If the spirit moves you, the link below will bring you to a recording of the argument.  You can easily listen.

It is always a pleasure to serve you and your fine institution.   Ever since I worked with Vicci back on the Huang case, I have had only positive experiences.  In that regard, I would be delighted to work with you again should that fit your needs.

All The Best,

Ed

http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1454.mp3

Begin forwarded message:

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Cc:** "Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com)"
<kbagrowski@brinkshofer.com>, "Kang, Jennifer" <kangj@cafc.uscourts.gov>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email,

postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 5

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Sunday, June 15, 2014 4:43 PM
**To:** Sundermeyer, Michael; Burke, William
**Subject:** FW: Congratulations

███████████████████████████████████████████████████

**From:** Finst, Rip [mailto:Rip.Finst@thermofisher.com]
**Sent:** Wednesday, March 05, 2014 8:49 PM
**To:** Reines, Edward
**Subject:** RE: Congratulations

Congrats, Ed.  I listened to your WI oral argument – powerful non-enablement advocacy.  Let's hope the panel agrees.

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 7:52 PM
**To:** Finst, Rip
**Subject:** FW: Congratulations

FYI

**From:** Reines, Edward
**Sent:** Wednesday, March 05, 2014 12:44 PM
**To:** Lee, Peter Y. (peter.lee@thermofisher.com); Pasika, Hugh (Hugh.Pasika@thermofisher.com)
**Subject:** FW: Congratulations

Peter and Hugh, please see below.  Notwithstanding Chief Judge Rader's comment, please keep it within TF.  Your support was critical to making this impression.  Best, Ed

**From:** Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent:** Wednesday, March 05, 2014 12:24 PM
**To:** Reines, Edward
**Cc:** Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com); Kang, Jennifer
**Subject:** Congratulations

Ed,

       On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really

impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 6

**From:** Alan Hammond [ahammondfamily@gmail.com]
**Sent:** Wednesday, March 05, 2014 5:45 PM
**To:** Reines, Edward
**Subject:** Re: Promega

Hi Ed, thanks for the note. FYI, I had already listened to the oral arguments in both cases this morning. Could not stay away even though I no longer work for the company. I guess that is what happens when you put your heart and sole into something. That's an impressive note from Rader and I would agree you did a really great job with the oral arguments (btw, I think Waxman was taking liberties with the record and I think that will hurt him). Thanks for all your help with these cases (and especially jumping in at the 11th hour on the Caltech case). I will anxiously be awaiting the decisions. I hope you have the opportunity to do many more projects for Thermo! They would be smart to give you more stuff. Alan.


On Wed, Mar 5, 2014 at 2:53 PM, Reines, Edward <edward.reines@weil.com> wrote:
I hope you are enjoying some well-earned R&R. The Promega hearings went well. I thought you would be interested. Below are the links if you'd like to listen to the hearings. I'd like to discuss with you at some convenient point. Below is a very complementary email from Chief Judge Rader about the argument, that provides some feedback. Notwithstanding his comment, please do not circulate this broadly. Much of this positive feedback springs from your major efforts.

Most importantly, thank you for trusting me to help with these important matters. I've done my best to reward that trust. Time will tell on the result.

Best,

Ed


http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1011.mp3

http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1454.mp3

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Cc:** "Bagrowski, Kori Anne (kbagrowski@brinkshofer.com)
> (kbagrowski@brinkshofer.com)" <kbagrowski@brinkshofer.com>, "Kang, Jennifer"
> <kangj@cafc.uscourts.gov>
> **Subject: Congratulations**

Ed,

  On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very

complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 7

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Friday, March 07, 2014 10:27 AM
**To:** 'Pasika, Hugh'
**Cc:** 'Lee, Peter Y.'
**Subject:** RE: Congratulations + Tronzo + "Made in UK"

**Attachments:** Transcript.docx; Tronzo v. Biomet, Inc., 236 F. 3d 1342 (Fed Cir 2001).pdf



Ed

---

**From:** Pasika, Hugh [mailto:Hugh.Pasika@thermofisher.com]
**Sent:** Wednesday, March 05, 2014 2:28 PM
**To:** Reines, Edward
**Cc:** Lee, Peter Y.
**Subject:** RE: Congratulations + Tronzo + "Made in UK"

Ed,

Thanks for sharing.  That's really, well, neat and high praise indeed.



**Hugh Pasika**
**Business Unit Lead IP Counsel**
**Life Sciences Solutions**

Thermo Fisher Scientific
850 Lincoln Center Drive • Foster City • California • 94404 • USA
Direct:    650 554 2257
Fax:       650 638 6071
Mobile:   650 274 1498
hugh.pasika@thermofisher.com

http://www.lifetechnologies.com

This email and its attachments are confidential. If you received this email in error, please notify the sender and delete.

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 12:44 PM
**To:** Lee, Peter Y.; Pasika, Hugh (Hugh.Pasika@thermofisher.com)
**Subject:** FW: Congratulations

Peter and Hugh, please see below.  Notwithstanding Chief Judge Rader's comment, please keep it within TF.  Your support was critical to making this impression.  Best, Ed

---

**From:** Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent:** Wednesday, March 05, 2014 12:24 PM
**To:** Reines, Edward
**Cc:** Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com); Kang, Jennifer
**Subject:** Congratulations

Ed,
    On Wednesday, as you know, the judges meet for a strictly social

lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

Transcription of File 2013-1011 for Time Stamps:  40-45& 1:00-1:05

[40:00]

Speaker 1:    …And judge says, look didn't allow them to put this in.  And, now you want to put it in.  Please explain why.  And they then say, well the reason is we think they can only claim under 270… you know…in essence under 271(a) not 271(f).  And, it's their burden to quantify those sales.  And the judge then says, well there has been, obviously a miscommunication in this case, quote "…and that includes me."  So, now that we've precluded them from putting it on their direct case, we're going to have to allow them to do that in the rebuttal case.  Which is exactly what we did with the exact same witness, and that testimony, that evidence, comprises virtually all of volume 4 of the joint appendix in this case.  And our evidence of U.S. sales also included testimony from I think 3 or 4 other life witnesses who testified about their own sales of infringing kits to U.S. customers and qualified it.  So, this wasn't a situation in which we were in any way not trying not to do it.  We tried to quantify both U.S. sales and were world-wide sales, and, indeed, for the world-wide sales of the identifiler kits, as to which both the cap polymer rates and the primers were exported from the United States for combination.  We quantified it at $311,000,000.  And, therefore, even if you were to agree with the court's ruling as to whether or not one component…The court's ruling that one component can never be a substantial portion.  We would still be entitled to a new trial on 271(f)(1) for the $311,000,000 in foreign sales of kits that were comprised of multiple components sent from the United States.

Judge:    OK.  I think we'll leave it at that.

Speaker 1:     OK. **I'll do my other two points if it comes up in my rebuttal.**

Judge:         Well you've exhausted your rebuttal, but we restore you the five minutes to your rebuttal and then we'll add five minutes…ten minutes to Mr. Reines to keep it sort of even.  You…Don't feel compelled to use that time.

Speaker 2:     Let me first reply on the enablement.  There's really two undisputed points right now that I think are determinative in terms of the outcome.  One is Promega argued and acknowledged that even as it relates to the '660 patent, which I now have in front of me if you want to look at that, in claim 1.  It had the same coamplifying the low side in the multiplex amplification in the action language.  And, I think it was stated rather proudly that no one is disputing that that's open and encompasses all the low sides.  So, it's not an unrecited.  Multiplex amplification reaction includes all low side and primers that are in the multiplex amplification reaction, which is any infinite number of low side and any infinite number of primes.  So, it's open claim at the point of novelty. See, that's not disputed.  I think their saying… So the point about whether it's consistent or comprising in the set of low side doesn't matter.  That's the point.  So, I think we're all together on the claim language.

Judge:         Do you think that's the right construction of that claim?

Speaker 2:     I think  we took the other position of the law itself.

Judge:         All right.

Speaker 2:     You know.  It really doesn't matter so much if it's closed.  We don't infringe. Because we don't use their primers or their low side.  We don't use their inventions.  So, we don't do that.  So, if it's close, we don't infringe.  If it's open,

their covering stuff they haven't invented. That they haven't given anything to us. Which goes to the second point: what else is conceded? I made the argument to you, and I think I was pretty specific, and perhaps even repetitive, that if you add a new primer, a new low side to the pre-existing set of low sides, you might have to start from scratch. Your project's beginning. Oh oh, we have a conflict. It's all so unpredictable and rare that it works and so hard. It's so trial-and-error. We have to start over again. We have to go pick all new primers. There was not an effort whatsoever to refute that point. Because it can't be refuted. We're not talking about pencils and erasers. We talking about inter-related systems where a new low side brings in new primers that can disrupt everything that happened before. It's inter-related. And, so it's now undisputed…I don't think…I don't see…They didn't disputed it in their brief. They didn't dispute it oral argument that if you add one new locus you maybe start from scratch. That was the language we used in our brief. That's the fact. There's no way someone should be encompassing this kind of arrangement…

[45:09]

3

Time Stamp:  1:00-1:05

[59:50:00]

Speaker 2:    …So I don't agree at all that that there's a new trial right in these circumstances. And, that would be for me, really something for the district judge who's already stated what he's going to do on that.  Which is no:  They made conscious choice to shoot for the moon with respect to 271(f) with respect to numerosity with everything knowing full well what the risk of that would was.  And to ask the process to start over again is totally inappropriate and disrespectful to the district judge.

Judge:    I think we have your argument.

Speaker 2:    Thank you.

Judge:    [some unintelligible, overlapping background talking]…And we're going to hold you to it.

Speaker 1:    OK.  I'm going to stick to it.  The point here…A lot of this discussion has gone to the supposed inequity or impropriety in a new trial in this case.  Nothing could be further from the truth.  The judge denied us our motion for a new trial because she found that it had been waived because we hadn't asked for it in the alternative in response to their Rule 50(b) motion.  We pointed out to her that under Rule 50(d) which is absolutely [lucid]? about this, a verdict winner has until 28 days after an adverse [J mall]? to move for a new trial.  She didn't recite that or acknowledge it here denial of a new trial motion.  Life doesn't even cite Rule 50(d).  That is clear error.  And we are entitled to a new trial.  Now, I do want to get into, I hope that I'll have a few seconds to get into the 50…the 271(f) damages on the identifiler

4

kits.  Because, it's not as if we want to have the right to go back and show that

both the polymer rates and primers were supplied for $311,000,000 of sales.  The

judge found that.  She acknowledged that in her J-Mall ruling.  That's an accepted

fact.  But, more to…directly to the point: two things.  First of all, they moved for

J-Mall not on non-infringement.  How could they?  They stood up and told the

jury that wasn't infringement and we were entitled to be compensated for it.

Their 50(b) motion was on damages.  They'd claimed that we had this all-or-

nothing theory and since we didn't prove all we had to be stuck with nothing.

The notion that in ruling on a damages motion, the court could enter a judgment

of no infringement on the record in this case is completely indefensible.  And,

**even if there had been a flaw in the damages award in light of the judge's J-**

**Mall ruling on 271(f), there is no question under the law of the Supreme**

**Court, the law of this circuit and the law of every other court that the proper**

**remedy would be remitter, an offer of remitter or a new trial.**  That is the rule

when one of multiple theories is subsequently determined to be invalid.  It is the

rule that the Supreme Court in *Hetzel* and this court I think in…I'm forgetting the

name of it now.  Has held the 7th Amendment required when there is proof of at

least some damages, a new trial is required.  A court is not allowed to say, you

didn't prove all if it, therefore you get not of it.  And, here, the evidence on 271(a)

is nothing short of overwhelming.  I've already mentioned everything that's in

volume 4 of the joint appendix here.  If you just pages 14 thru 18 of our opening

brief in this case, you will see as a concise a resuscitation as we could provide for

the extensive evidence of quantified, acknowledged U.S. sales of infringing goods

here. And, that included multiple life witnesses own testimony. And, the notion that Mr. Reines is suggesting here, that all we did was try lay a bunch of spreadsheets in the record, you know, so that the jury could somehow figure this out is, as we pointed out in read brief, more than ironic because, they raised the issue before trial with the judge. They did not want testimony about what was in those spreadsheets on the record in the case because they considered it confidential. And, as a result, the judge provided that we would have their witness on the stand who would describe what the spreadsheets were and explain to the jury how it could in fact sum up damages

Judge:    Why didn't you supply all of that evidence that U.S. sales you have to us to the district court judge in opposition to the J-Mall motion?

Speaker 1:    We…That's exactly what happened. That's exactly what happened. What happened was, and I actually do have the pages for your honor the page cites for what exactly happened when. On day 4 of the trial, we had this witness, Mr. [Sanduly]? on the stand asking them about the spreadsheets showing Life sales, including U.S. sales. They objected because the evidence was not relevant to any issue before the jury. That's at page 5572. Two days, they had Mr. [Sanduly]? on the stand. They asked him to quantify U.S. sales. That at 6126 and 6127. We had a sidebar where we said, they wouldn't let us do this exact same thing with them…

[1:05:25]

236 F.3d 1342 (2001)

# Dr. Raymond G. TRONZO, Plaintiff-Appellant,

## v.

# BIOMET, INC., Defendant-Appellee.

No. 00-1007.

**United States Court of Appeals, Federal Circuit.**

DECIDED January 17, 2001.

1344  *1343 *1344 *James F. Davis,* Howrey Simon Arnold & White, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were *Jeffrey I. Auerbach,* Of counsel on the brief were *Robert S. Hackleman, Connis O. Brown, III,* and *George S. LeMieux,* Gunster, Yoakley Valdes Fauli & Stewart, P.A., of Fort Lauderdale, Florida.

*Donald R. Dunner,* Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for defendant-appellee. With him on the brief were *Don O. Burley,* and *Robert L. Burns.* Of counsel on the brief was *L. Martin Reeder, Jr.,* Greenberg Traurig, P.A., of West Palm Beach, Florida. Of counsel was *Edwin G. Torres,* Steel Hector & Davis LLP, of Miami, Florida.

Before NEWMAN, *Circuit Judge,* ARCHER, *Senior Circuit Judge,* and LOURIE, *Circuit Judge.*

ARCHER, *Senior Circuit Judge.*

# DECISION

Dr. Raymond G. **Tronzo** ("Dr. **Tronzo**") appeals the judgment of the United States District Court for the Southern District of Florida. *Tronzo v. Biomet, Inc.,* No. 91-8175-CIV-HURLEY (S.D.Fla. Aug.27, 1999), and underlying orders. Specifically, Dr. **Tronzo** appeals the reduction in an award of compensatory damages from $7,134,000 to $520, the reduction of punitive damages from $20,000,000 to $52,000, and the rejection of Dr. **Tronzo's** request for a new trial in light of the court's reduction of the jury's award of compensatory and punitive damages. Concluding that the district court erred only in revisiting the issue of the proper amount of punitive damages, we affirm-in-part and reverse-in-part.

# BACKGROUND

This case returns to this court following remand from an earlier appeal, *Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 47 USPQ2d 1829 (Fed.Cir.1998) ("*Tronzo I*"), from the judgment of the Southern District of Florida, *Tronzo v. Biomet, Inc.,* 950 F.Supp. 1149, 41 USPQ2d 1403 (S.D.Fla.1996).

The underlying dispute between Dr. **Tronzo** and Biomet concerns a medical device, called an "acetabular cup," that forms the upper portion of a hip implant. Dr. **Tronzo** alleged that he had established a confidential relationship with Biomet for the purpose of bringing his acetabular cup design to market. According to Dr. **Tronzo**, Biomet was to pay him for his invention if he could successfully obtain a patent on his invention. Dr. **Tronzo** claims that Biomet failed to compensate him and, instead, took his ideas and incorporated them into its highly successful Mallory/Head cup design (named after Drs. Thomas Mallory and William Head). Dr. **Tronzo** brought suit in the Southern District of Florida for infringement of United States Patent No. 4,743,262 ("the '262 patent"), issued May 10, 1988, and, under Florida law, for breach of a confidential relationship, fraud, and unjust enrichment.

A jury found in favor of Dr. **Tronzo** on all counts, finding, by special verdict, that the '262 patent was valid and willfully infringed by Biomet and that Biomet was liable under state law for breach of a confidential relationship, fraud, and

unjust enrichment. The jury awarded Dr. **Tronzo** $3,805,000 for patent infringement, $4,757,000 in compensatory plus $15,000,000 in punitive damages for the breach of a confidential relationship, $7,134,000 in compensatory plus $20,000,000 in punitive damages for fraud, and $4,750,000 in compensatory damages for unjust enrichment. The district court then enhanced the jury's patent infringement award by 50% (pursuant to 35 U.S.C. *1345 § 284), dismissed the unjust enrichment count, and capped the total recovery at $7,134,000 in compensatory damages plus $20,000,000 in punitive damages to avoid double recovery.

1345

On appeal of the district court's decision, Biomet argued that some of the claims of the '262 patent were invalid and that the other claims asserted were not infringed. Biomet further contested liability with respect to the state law claims and the compensatory damages associated with those claims. Biomet did not appeal the punitive damage award.

In reviewing Biomet's appeal in *Tronzo I*, we reversed the district court's findings of patent infringement, holding that some of the asserted claims were invalid and the other claims were not infringed. In addition, we upheld the district court's finding of liability on the state law counts, but reversed its judgment with respect to the amount of compensatory damages, holding that Dr. **Tronzo** had failed to establish the necessary nexus between the damages claimed and the injury sustained. The damages award granted by the district court had been computed based on Biomet's profits. We concluded that this was an incorrect measure of Dr. **Tronzo's** damages under controlling state law. *See Tronzo I*, 156 F.3d at 1161, 47 USPQ2d at 1835.

Because the compensatory damages were computed incorrectly, we remanded to the district court to determine if there was evidence on the record to "prove any of the costs and injuries incurred by [Dr.] **Tronzo**, such as the costs of prosecuting the patent and lost business opportunities." *Id.* If no such evidence existed on the record, we left it to the district court to decide, at its discretion, whether it would be appropriate to take new evidence.

On remand, the district court reviewed the evidence on the record concerning damages and concluded that, aside from $520 in patent prosecution costs, there was a "complete absence of competent substantial evidence to support the vacated portion of the award." The district court considered Dr. **Tronzo's** arguments that his lost business opportunities could be measured by looking to the value of Biomet's Mallory/Head system, which allegedly incorporated Dr. **Tronzo's** misappropriated ideas. The district court, however, rejected this argument, reasoning that such a measure of damages was foreclosed by our decision on appeal. Then, exercising its discretion, the district court declined to reopen the record to take new evidence concerning compensatory damages. In making this decision, the court reasoned that both parties had been represented by competent counsel and had made strategic decisions in this protracted litigation. Accordingly, the court set the compensatory damages at $520, the maximum amount supported by the evidence in the record.

In response to the district court's reduction of the compensatory damages award, Dr. **Tronzo** asserted that this order constituted a remittitur, advised the court that he rejected this remittitur, and moved for a new trial on the issue of compensatory damages. The court rejected Dr. **Tronzo's** motion.

Biomet then moved for a reduction in the amount of punitive damages, arguing that, given the reduction in the compensatory damages award, the disparity between the amounts of compensatory and punitive damages now rendered the punitive damages amount unconstitutional. The court considered Biomet's argument, applying the Supreme Court's criteria in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), to determine whether the punitive damages award violated due process. Noting that the disparity in the awards was greater than 38,000 to 1, the court granted Biomet's motion, and reduced the punitive damages award to $52,000, the maximum amount of punitive damages it considered permissible: 100 times the compensatory damages.

On August 27, 1999, the district court entered its Third Amended Final Judgment, implementing the terms of its several *1346 orders and setting compensatory damages at $520, punitive damages at $52,000, and awarding prejudgment interest on the compensatory damages award. *Tronzo v. Biomet, Inc.*, No. 91-8175-CIV-HURLEY (S.D.Fla. Aug.27, 1999).

1346

In response to the court's reduction in the punitive damages award, Dr. **Tronzo** again argued this constituted a

remittitur, and moved for a new trial on punitive and compensatory damages. The district court denied this motion.

This appeal followed. Dr. **Tronzo** asserts legal error in the district court's reduction in the jury's awards of compensatory and punitive damages and, in light of these reductions, in the district court's denial of its motions for a new trial on damages.

# DISCUSSION

## I. *Jurisdiction and Standard of Review*

This appeal follows the remand of an earlier appeal of a matter arising, in part, under the patent laws. Since the jurisdiction of the district court was based, in part, on 28 U.S.C. § 1338 (1994), we have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1) (1994).

We review issues not unique to patent law according to the law of the regional circuit where appeals from the district court would normally lie. _Novamedix v. NDM Acquisition Corp., 166 F.3d 1177, 1180, 49 USPQ2d 1613, 1615 (Fed. Cir.1999); Rodime PLC v. Seagate Tech., Inc., 174 F.3d 1294, 1301, 50 USPQ2d 1429, 1434 (Fed.Cir.1999)_ (holding district court's evidentiary decisions are reviewed under the law of the regional circuit). Accordingly, under controlling Eleventh Circuit law, we review the district court's conclusions of law de novo. _Elston v. Talladega County Bd. of Educ., 997 F.2d 1394, 1405 (11th Cir.1993)_.

We also review *de novo* the interpretation of our own mandate in *Tronzo I*. See _Engel Indus. v. Lockformer Co., 166 F.3d 1379, 1382, 49 USPQ2d 1618, 1621 (Fed.Cir.1999)_.

## II. *Compensatory Damages*

Dr. **Tronzo** claims legal error in the district court's reduction of the jury's award of compensatory damages from $7,134,000 to $520. Dr. **Tronzo** first argues that, under Florida law, a court may broadly consider any evidence of record that logically establishes the correct value of property taken by fraud. Dr. **Tronzo** contends that the district court should have considered as a proper measure of the value of the "property" taken from him either (1) payments by Biomet to Drs. Mallory and Head for their hip implant allegedly incorporating Dr. **Tronzo's** ideas or (2) Biomet's profits from its sales of the Mallory/Head device. Since this evidence amply supports the jury award, Dr. **Tronzo** asserts that the district court should have upheld the entire jury award of compensatory damages. Dr. **Tronzo's** arguments, however, are foreclosed by our decision in *Tronzo I*.

In *Tronzo I*, we held that the award of lost profits as damages for the torts asserted was inappropriate because it did not reflect the actual injury sustained by Dr. **Tronzo**. _Tronzo I, 156 F.3d at 1161, 47 USPQ2d at 1835_. Dr. **Tronzo** cannot now circumvent this holding by simply recasting his claim for damages measured by Biomet's profits as a claim for "out-of-pocket" losses. No matter how Dr. **Tronzo** frames this claim, he cannot establish the necessary nexus between his tort injuries and Biomet's profits from sales of the Mallory/Head device. Similarly, we cannot accept Dr. **Tronzo's** arguments that payments to Drs. Mallory and Head can provide a proper measure of his losses. Those payments were based on royalty payments for the Mallory/Head device as well as other related products, and also reflect compensation for various services provided by the two doctors. As such, they are simply too remote and inconclusive to reflect the actual injury to Dr. **Tronzo** or to measure the amount of his damages. Rather, as we instructed in *Tronzo I*, Dr. **Tronzo's** injuries were to be *1347 measured by any record evidence properly establishing his losses, including evidence of his costs in prosecuting his patent and his lost business opportunities. *Id*.

1347

On remand, the district court followed our instruction and reviewed the record for any such evidence. The court found that the only costs of patent prosecution supported in the record were $520. On appeal, neither party disputes this figure. As for "lost business opportunities," the district court found no evidence in support of Dr. **Tronzo's** claim of damages. *Id*. Dr. **Tronzo** confined his arguments to lost business opportunities measured by reference to either

payments to Drs. Mallory and Head or Biomet's profits. The district court properly rejected such evidence. Thus, we see no error in the district court's computation of compensatory damages on remand.

In the alternative, Dr. **Tronzo** asserts that the district court should have applied the "wrongdoer rule" to support the full compensatory damages award. The wrongdoer rule is a principle explained in _Bigelow v. R.K.O. Radio Pictures_, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), whereby a "wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable." _Id._ at 265, 66 S.Ct. 574. Noting that Dr. **Tronzo** raised this argument for the first time on remand, the district court refused to entertain this argument. Dr. **Tronzo** claims legal error in the district court's refusal.

We reject this argument as well. As the district court explained, Dr. **Tronzo** made strategic decisions in the initial trial concerning what evidence and arguments to advance in support of his theory of damages. We see no error, therefore, in the district court's refusal to address a new theory presented for the first time on remand. Moreover, even if the district court had chosen to address this theory, it would have been obliged to reject it. The wrongdoer rule does not obviate the requirement for a nexus between an injury and the claimed damages. _Bigelow_, 327 U.S. at 264, 66 S.Ct. 574 (noting that in applying the wrongdoer rule, the verdict must be based on a just and reasonable estimate of the damages, not speculation or guesswork.) Thus, this rule cannot be applied to justify Dr. **Tronzo's** reliance on either Biomet's profits or payments to Drs. Mallory and Head as a measure of its damages.

## III. _Punitive Damages_

Dr. **Tronzo** argues legal error in the district court's reduction of the punitive damages award from $20,000,000 to $52,000. Dr. **Tronzo** asserts that, because Biomet never challenged the punitive damages award on appeal in _Tronzo I_, it necessarily waived any right to challenge this award on remand, and the initial punitive damages award became the "law of the case." Alternatively, Dr. **Tronzo** argues that the district court's reduction of the punitive damages award was outside the scope of our remand in _Tronzo I_ and, therefore, revisiting this issue was prohibited by the mandate rule.

In response, Biomet asserts that it did not waive its constitutional challenge to the punitive damages and that neither the law of the case nor the mandate rule prevented the district court from revisiting this issue. By appealing the liability for the compensatory damages, Biomet argues, it implicitly challenged its liability for punitive damages as well. Biomet further argues that the doctrine of law of the case and the mandate rule do not preclude Biomet from asserting issues that only became ripe on remand. Because the disparity in compensatory and punitive damages first arose on remand when the district court reduced the compensatory damages, Biomet argues this issue was never waived.

1348    We agree that by failing to appeal the award of punitive damages in _Tronzo I_, Biomet waived this issue and was barred from raising it on remand. As an initial \*1348 matter, Biomet's assertion that it challenged the punitive damages award indirectly in its initial appeal is not persuasive. It is uncontroverted that Biomet never appealed, nor questioned in any way, the _amount_ of the punitive damages on appeal to this court in _Tronzo I_. Now, we need only consider whether Biomet's failure to raise this challenge in its first appeal waived its right to contest the amount of punitive damages in subsequent proceedings.

As noted above, Dr. **Tronzo** presents the issue of waiver in terms of either application of the doctrine of law of the case or an application of the mandate rule. In considering this question of waiver, we are guided by the approach of our recent decision in _Engel Industries, Inc. v. Lockformer Co._, 166 F.3d 1379, 49 USPQ2d 1618 (Fed.Cir.1999). In that case, the alleged waiver concerned an issue that was within the scope of the initial judgment of the district court and was not appealed. We concluded that the issue was disposed of by the initial decision on appeal. While Dr. **Tronzo** argues waiver under law of the case, as well as the mandate rule, we confine our analysis to the determination of the scope of our mandate in _Tronzo I_. In other words, we consider whether the amount of punitive damages was an issue within the scope of the initial judgment of the district court. If so, it was necessarily incorporated within the scope of our mandate in _Tronzo I_ and foreclosed from further review on remand.[1]

As described above, Biomet's main challenge to Dr. **Tronzo's** arguments of waiver is its contention that the constitutional issue was not ripe until remand and, therefore, could not have been appealed initially, and could not properly be considered within the scope of the initial judgment. Under these circumstances, Biomet argues, it is inappropriate to consider this issue waived or foreclosed by our mandate following the initial appeal in **Tronzo I**. And in further support of its contentions, Biomet points to our decisions in *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 42 USPQ2d 1897 (Fed.Cir.1997), and *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 45 USPQ2d 1865 (Fed.Cir.1998), where we held that issues not reached by the district court were not waived by a failure to raise these issues on a first appeal.

We are unpersuaded by Biomet's arguments. The present case is not comparable to *Laitram* or *Exxon*. In each of those cases, the trial court had not addressed the contested issue and, therefore, the issue was not deemed within the scope of the judgment initially appealed. *Laitram*, 115 F.3d at 951-52; *Exxon*, 137 F.3d at 1478-79. In the present case, however, the district court *did* consider the contested issue because it granted an award of punitive damages based on the jury verdict.[2] Despite Biomet's arguments to the contrary, the appropriateness of the amount of punitive damages was then ripe for legal challenge. And indeed, Biomet *1349 did challenge the amount of punitive damages at that time, arguing that the amount of punitive damages was excessive and not supported by the weight of the evidence. In its motion for judgment as a matter of law and for a new trial, Biomet argued:

> Even though at best the only damages that Dr. **Tronzo** could have suffered in this case would have been a few thousand dollars in patent costs, the jury awarded a $7.1 million compensatory award coupled with a $20 million punitive award.

Thus, Biomet's ripeness argument is misplaced. The district court had ruled on the issue of punitive damages in its initial decision and had further responded to Biomet's challenge to the appropriateness of the amount of punitive damages. Then, while disputing various rulings of the district court on appeal, Biomet chose not to contest the amount of punitive damages. Because Biomet failed to raise this issue, clearly implicated in the initial decision of the district court, our mandate in **Tronzo I** acted to prevent Biomet from raising this issue on remand or in any future proceedings in this litigation. See *Engel*, 166 F.3d at 1383, 49 USPQ2d at 1621.

Finally, while Biomet did not initially challenge the amount of punitive damages on constitutional grounds, it could have done so. The unconstitutionality of a large punitive damages award is not predicated on any specific ratio of punitive damages to compensatory damages. Rather, it is judged according to the three guideposts outlined by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, namely, the reprehensibility of the conduct, the ratio of punitive damages to actual harm inflicted on the plaintiff, and the comparison of punitive damages to the civil or criminal penalties imposed for comparable conduct. *Id.* at 574-584, 116 S.Ct. 1589. Applying these guideposts, Biomet could have raised a constitutional challenge in **Tronzo I** if it considered the punitive damages, which the jury awarded based on its finding of wanton or willful conduct, to be excessive. Biomet could have asserted that, if the compensatory damages award is lowered, constitutional requirements mandate that the punitive award be commensurately adjusted; see *BMW*, 517 U.S. 559, 116 S.Ct. 1589. Biomet did not make any such challenge.

Thus, we conclude that Biomet's belated attack on the punitive damages award was foreclosed by our mandate in **Tronzo I**. This, however, does not entirely end our inquiry. Law of the case and the mandate rule are not always considered an unassailable limit on an appellate court's jurisdiction. Rather, these doctrines are better viewed as prudential doctrines that direct a court's discretion, but do not necessarily limit a court's power. *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739-40 (D.C.Cir.1995); *Heathcoat v. Potts*, 905 F.2d 367 (11th Cir.1990); *Eli Lilly and Co. v. Home Ins. Co.*, 794 F.2d 710, 717 (D.C.Cir.1986); *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). Accordingly, it may be appropriate in some circumstances for a court to revisit an issue that would otherwise be deemed waived and beyond the scope of an appellate mandate. Such circumstances, however, must be exceptional. See *id.* Otherwise, the underlying rationales for the doctrines of law of the case and the mandate rule would be thwarted.[3] However, courts have considered revisiting issues otherwise foreclosed in circumstances where there has been a substantial change in the evidence. See *id.*

Here, with the reduction in the award of compensatory damages from $7,134,000 to $520, Biomet argues, the ratio of the punitive *1350 damages award ($20,000,000) to compensatory damages went from 2.8 to 1 to 38,000 to 1. According to Biomet, its challenge to the punitive damages on remand was a "totally different challenge" than it might have raised when the ratio was only 2.8 to 1.

We cannot, however, accept Biomet's contention. True, 38,000 to 1 is a high ratio, and such a particularly high ratio will certainly "raise a suspicious judicial eyebrow." *Id.* at 583, 116 S.Ct. 1589 (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 481, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting)). But the constitutionality of a punitive damages award is not simply a matter of numbers or ratios. *BMW*, 517 U.S. at 582, 116 S.Ct. 1589 ("We have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula...."). Rather, as noted above, Biomet's challenge to the amount of punitive damages, viewed under Supreme Court law in *BMW*, involves a consideration of three "guideposts," only one of which is the ratio of compensatory to punitive damages. The court must also consider the reprehensibility of the conduct and any civil or criminal penalties for similar conduct. And of these three guideposts, it was not the ratio of punitive to compensatory damages, but the reprehensibility of the conduct that was deemed by the Supreme Court to be "the most important indicium of the punitive damages award." *Id.* at 575, 116 S.Ct. 1589. With respect to this most important guidepost, we note that Biomet never challenged on appeal the jury's finding of wanton or willful conduct in support of the punitive damages liability.

Moreover, Biomet's focus on the ratio of damages presents even this limited issue too simplistically. The guidepost articulated by the Supreme Court was the ratio of punitive damages to "actual and *potential* damages." *BMW*, 517 U.S. at 582, 116 S.Ct. 1589 (emphasis added). In discussing this guidepost, the Court elaborated:

> [L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id.* In the present case, in discussing the reprehensibility of Biomet's conduct, the district court pointed to record evidence in support of Dr. **Tronzo's** claim that Biomet misappropriated his ideas and commented that "Biomet misled Dr. **Tronzo** and substantially profited thereby." The court then went on to note that the compensatory damages "[did] not adequately reflect the actual harm caused." In addition, in regard to the limited record evidence of compensatory damages, the court further commented that the parties were represented by "competent counsel who made strategic decisions throughout the course of protracted litigation," indicating competent evidence of damages may have existed, but was never introduced. Thus, there is a strong suggestion in the record that the potential compensatory damages may have been much higher than what was actually awarded.

Overall, therefore, we cannot conclude that the reduction of the amount of compensatory damages on remand created such a substantial change in the facts to allow the district court to revisit the punitive damage award. Accordingly, we conclude that the district court erred in reducing the amount of punitive damages and that such action was foreclosed by our mandate in *Tronzo I*. We reverse the district court's judgment on this matter and reinstate the original $20,000,000 award of punitive damages.

# IV. *Remittitur*

Finally, Dr. **Tronzo** claims legal error in the district court's rejection of his claim that the reduction in the compensatory and punitive damages awards was a remittitur, and in its failure to order a new *1351 trial on these issues. Because we have reversed the court's reduction of punitive damages, Dr. **Tronzo's** claim with respect to these damages is now moot. Thus, we only consider Dr. **Tronzo's** claim with respect to the compensatory damages.

Dr. **Tronzo** argues that under the rule announced in *Hetzel v. Prince William County*, 523 U.S. 208, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998), when a court determines that the evidence does not support a damages award, and the damages must be recalculated, the court is imposing a remittitur. If the court then imposes a lesser amount of damages than the

jury awarded, and the plaintiff does not accept this reduction, the Seventh Amendment to the United States Constitution requires that the plaintiff be granted the option of a new trial. Dr. **Tronzo** argues that he rejected the district court's remittitur on the compensatory damages award and moved for a new trial. He contends that the district court's denial of his request for a new trial was therefore in error.

In response, Biomet points to Eleventh Circuit law distinguishing the *Hetzel* decision. _Johansen v. Combustion Eng'g,_ _170 F.3d 1320, 1330-31 (11th Cir.1999)_. Biomet argues that the analysis in *Johansen* should guide this court in considering whether the reduction in compensatory damages in this case constituted a remittitur. According to the *Johansen* court, "the Seventh Amendment is not offended" when the reduction in a damages award is necessitated by legal error. _Johansen, 170 F.3d at 1330._ The *Johansen* court further noted that *Hetzel* considered a classic remittitur situation, where the judge had exercised his discretion to reduce a damages award that he felt was not adequately supported by the evidence. *Id.* In contrast, the verdict in the case before the *Johansen* court was reduced as legally impermissible under the Constitution. Similarly, Biomet argues that the reduction in compensatory damages in the present case was a purely legal issue. As a matter of law, there was no support for the compensatory damages award beyond that awarded by the district court. Thus, there was no issue for the jury to reconsider.

We agree with Biomet that the reduction in compensatory damages did not constitute a remittitur entitling Dr. **Tronzo** to a new trial. While Supreme Court law, to the extent articulated in *Hetzel,* applies to remittitur situations, we adopt for purposes of this case the controlling Eleventh Circuit's conclusion that *Hetzel* did not consider the case of the reduction in a damages award on purely legal grounds.

In *Hetzel,* a jury had found for the plaintiff on her civil rights claim under title VII of the Civil Rights Act and awarded $500,000 in damages. Considering this award excessive in light of the limited evidence of harm, the court reduced this award to $50,000. This discretionary decision necessarily involved a reweighing of the evidence and reassessment of the appropriate amount of damages warranted by the facts decisions traditionally left to a jury.

In contrast, in the present case, the district court did not reweigh any evidence, nor did it exercise its discretion in computing the damages award. Instead, the court awarded the maximum damages possible given the lack of competent evidence in the record. The award of $520 in compensatory damages was based on the total costs for prosecuting the '780 patent, as evidenced by the record. The parties do not dispute this figure. The only true dispute here is over the proper amount of compensatory damages for Dr. **Tronzo's** "lost business opportunities." But, as the district court explained, Dr. **Tronzo** never introduced any legally competent evidence to support any such damages award. The evidence in the record that Dr. **Tronzo** attempted to rely on was too remote and inconclusive to reflect the actual injury incurred by Dr. **Tronzo** or to measure his damages. Thus, re-presenting this issue to the jury would have been pointless because, as a matter of law, the compensatory damages award could not exceed the $520 already awarded. *Cf.* _Johansen, 170_ *1352 _F.3d at 1332 n. 19_ (commenting that giving the plaintiff the option of a new trial would be of no value because the award was already the maximum permissible under the Constitution).

In conclusion, we see no error in the district court's refusal to grant Dr. **Tronzo** a new trial in light of its reduction in the compensatory damages award.

## CONCLUSION

For the reasons stated above, we affirm the district court's judgment as to the award of compensatory damages and its rejection of Dr. **Tronzo's** motion for a new trial as to these damages, and we reverse the court's reduction in the punitive damages award, reinstating the original punitive damage award of $20,000,000.

Each party shall bear its own costs.

*AFFIRMED-IN-PART* AND *REVERSED-IN-PART*

[1] Other courts have attached different labels to the issue before this court. *See, e.g.,* Wright, Miller & Cooper, Federal Practice & Procedure § 4478 (1981); _Engel, 166 F.3d at 1383, 49 USPQ2d at 1621_ (citing cases discussing "waiver" and "law of the case" in

support of its application of the mandate rule); _United States v. Polland, 56 F.3d 776, 779 (7th Cir.1995)_ (explaining that law of the case doctrine is a corollary to the mandate rule). Many courts, however, have addressed this issue as we do, as an application of the mandate rule. _See Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 167-68, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Biggins v. Hazen Paper Co., 111 F.3d 205, 209 (1st Cir.1997); Mason_, 182 F.3d at 1214; _Eason v. Thaler, 73 F.3d 1322, 1329 (5th Cir.1996)_. We conclude that the present issue is best labeled and treated as an application of the mandate rule.

[2] Moreover, unlike the present case, in _Laitram_, the alleged waiver was due to the _appellee's_ failure to raise an issue in the initial appeal. In concluding that the issue was not waived in that case, we noted that appellees do not select the issues to be appealed, and, therefore, the policies of waiver are less implicated by an appellee's failure to raise an issue. _Laitram, 115 F.3d at 954, 42 USPQ2d at 1902-03._

[3] Such rationales include the need for (and the litigant's right to) finality, judicial economy, the consistency of judicial decisions, the discouragement of piecemeal adjudication, and the prevention of the perverse result of allowing a litigant to be in a better position by failing to raise an issue in an initial appeal. _See, e.g., Arizona, 460 U.S. at 619, 103 S.Ct. 1382; Northwestern Indiana Tel. Co., Inc. v. Fed. Communications Comm'n, 872 F.2d 465, 470 (D.C.Cir.1989); Heathcoat, 905 F.2d at 370; Crocker, 49 F.3d at 735 (D.C.Cir.1995)._

Save trees - read court opinions online on Google Scholar.

# EXHIBIT 8

**From:** Stevenson, Mark [mark.stevenson@thermofisher.com]
**Sent:** Thursday, March 06, 2014 4:49 PM
**To:** Reines, Edward; 'Genoffir.MacLeod@thermofisher.com'
**Cc:** Lee, Peter Y.
**Subject:** Re: Promega
Hi Ed

Great note. We appreciate working with you as a winner!

All the best

Mark

---

**From:** <Reines>, Edward <edward.reines@weil.com>
**Date:** Wednesday, March 5, 2014 at 7:52 PM
**To:** "Stevenson, Mark (mark.stevenson@thermofisher.com)"
<mark.stevenson@thermofisher.com>, "'Genoffir.MacLeod@thermofisher.com'"
<Genoffir.MacLeod@thermofisher.com>
**Cc:** "Lee, Peter Y." <peter.lee@thermofisher.com>
**Subject:** Promega

Regarding the Promega appeals, please see the below.   I sent this to Peter (who has done a wonderful job getting up to speed on these matters) and gave him a full report on the details, but this email from the Chief Judge right after a hearing is so unusual I thought I would share it directly with you.  Thank you for your support.   With these appeals completed, I'm hopeful that we will continue to work with TF and the Life unit, notwithstanding the exciting changes.  Your support in that regard would of course also be appreciated.  Best, Ed

**From:** Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent:** Wednesday, March 05, 2014 12:24 PM
**To:** Reines, Edward
**Cc:** Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com); Kang, Jennifer
**Subject:** Congratulations

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little

enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 9

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 2:52 PM
**To:** Bradford Paul Schmidt
**Subject:** Fwd: Congratulations

Bradford, I hope you are enjoying some well-earned R&R (rest and relaxation, but perhaps a little rock'n'roll too). The Promega hearings went well. I thought you would be interested. Below are the links if you'd like to listen to them. I'd like to discuss with you at some convenient point. Below is a very complementary email from Chief Judge Rader about the argument, that provides some feedback. Notwithstanding his comment, please do not circulate this broadly. Much of this positive feedback springs from your wonderful efforts.

Most importantly, thank you for trusting me to help with these important matters. I've done my best to reward that trust. Time will tell on the result.

Best,

Ed

http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1011.mp3

http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1454.mp3

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Cc:** "Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com)" <kbagrowski@brinkshofer.com>, "Kang, Jennifer" <kangj@cafc.uscourts.gov>
> **Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 10

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 6:59 PM
**To:** karobins@adobe.com
**Subject:** Federal Circuit

Karen, as you continue to consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this widely outside of Adobe absent a specific need.  All The Best, Ed

Begin forwarded message:

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 11

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:29 PM
**To:** Noreen Krall; melaugh@apple.com; jrisher@apple.com; Jackie Harlow
**Subject:** Federal Circuit
As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief
Judge Rader might be helpful.   Regardless of his comment, please do not circulate this outside of
Apple.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>         On Wednesday, as you know, the judges meet for a strictly
> social lunch.  We usually discuss politics and pay raises.
> Today, in the midst of the general banter, one of my female
> colleagues interrupted and addressed herself to me.  She said
> that she was vastly impressed with the advocacy of "my friend,
> Ed."  She said that you had handled two very complex cases,
> back to back.  In one case, you were opposed by Seth Waxman.
> She said Seth had a whole battery of assistants passing him
> notes and keeping him on track.  You were alone and
> IMPRESSIVE in every way.  In both cases, you knew the record
> cold and handled every question with confidence and grace.  She
> said that she was really impressed with your performance.  Two
> of my other colleagues immediately echoed her enthusiasm over
> your performance.
>         I, of course, pointed out that I had taught you everything
> you know in our recent class at Berkeley together . . . NOT!  I
> added the little enhancement that you can do the same thing
> with almost any topic of policy: mastering the facts and law
> without the slightest hesitation or pause!
>         In sum, I was really proud to be your friend today!  You
> bring great credit on yourself and all associated with you!
>         And actually I not only do not mind, but encourage you to
> let others see this message.
>         Your friend for life, rrr

# EXHIBIT 12

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 6:56 PM
**To:** naomi.waltman@cbs.com; daniel.wan@cbsinteractive.com
**Subject:** RE: Federal Circuit

Yes, please forward the decision.   And, yes, please do share with Ken and others as needed for HPL. ███████████████████████████████████████

███████████████████████████████████████████████████████

---

**From:** Waltman, Naomi [mailto:naomi.waltman@cbs.com]
**Sent:** Wednesday, March 05, 2014 6:49 PM
**To:** Reines, Edward; daniel.wan@cbsinteractive.com
**Subject:** RE: Federal Circuit

Wow...pretty darn impressive!(although totally well deserved)...if you don't mind, I would like to share it with Ken Richieri at the NY Times, apropos of HPL oral argument ████████████████████████████

I████████████████████████████████████████   We can forward you the decision if you don't have it).

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 9:38 PM
**To:** Waltman, Naomi; Wan, Daniel
**Subject:** Federal Circuit

Naomi and Dan, I thought you might be interested in this feedback from Chief Judge Rader.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
>      On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over

your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 13

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 6:15 PM
**To:** nrubin@cisco.com
**Subject:** RE: Congratulations

Thanks.   That aspect of my practice is really thriving; it's really fulfilling.   Best, Ed

---

**From:** Neal Rubin (nrubin) [mailto:nrubin@cisco.com]
**Sent:** Wednesday, March 05, 2014 5:33 PM
**To:** Reines, Edward
**Subject:** RE: Congratulations

Nice!

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:27 PM
**To:** Mark Chandler (machandl); Neal Rubin (nrubin); Marta Beckwith (mabeckwi); Kathleen Zylan (zylank); Leah Poynter (lepoynte)
**Subject:** Fwd: Congratulations

Team Cisco, as you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful regarding my arguments yesterday.   Notwithstanding his comment, please do not circulate this widely.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject:** Congratulations
>
> Ed,
>
>    On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
>    I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I

added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 14

| | |
|---|---|
| **From:** | Reines, Edward [edward.reines@weil.com] |
| **Sent:** | Sunday, June 15, 2014 5:43 PM |
| **To:** | Sundermeyer, Michael; Burke, William |
| **Subject:** | FW: Support from Cisco |

-----Original Message-----
From: Neal Rubin (nrubin) [mailto:nrubin@cisco.com]
Sent: Saturday, May 24, 2014 8:22 AM
To: Reines, Edward
Subject: Support from Cisco

Hi Ed:  just a short note to say I am thinking of you, and how sorry I am that you have
been dragged into these recent articles about Judge Rader. Hope you are doing OK. You're a
terrific lawyer and friend.  Hope all of this passes soon.

Best,

Neal

Sent from my iPhone. Please excuse typos.

_____

The information contained in this email message is intended only for use of the individual
or entity named above. If the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please immediately notify us
by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 15

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Thursday, March 06, 2014 8:01 AM
**To:** 'Sherman, Howard'
**Cc:** 'Ward, Emily'; 'Bens, Rory'; atikku@ebay.com
**Subject:** RE: Federal Circuit

You folks are very generous.   Thank you all for your support over the years.   Whenever you think I can support you, let me know.

---

**From:** Sherman, Howard [mailto:hsherman@ebay.com]
**Sent:** Thursday, March 06, 2014 6:58 AM
**To:** Reines, Edward
**Cc:** Ward, Emily; Bens, Rory; atikku@ebay.com
**Subject:** RE: Federal Circuit

I echo Anup's comments.  I haven't yet seen you in action in the courtroom, but it was completely evident in the event in your offices last month that the judges had an enormous amount of respect for you.

Congratulations!

Regards,
Howard

Howard I. Sherman
Patent Counsel
eBay Enterprise
935 First Avenue
King of Prussia, PA 19406
(610) 491-4254
hsherman@ebay.com

---

**From:** Tikku, Anup
**Sent:** Wednesday, March 05, 2014 10:00 PM
**To:** Reines, Edward
**Cc:** Ward, Emily; Bens, Rory; Sherman, Howard
**Subject:** Re: Federal Circuit

That's a wonderful email Ed!  I've seen you around judges a few times, and it's clear they hold you in high regard - you easily engage in discussions with them and they often hang on your words and are eager to gain insights from you.   Congrats!


On Mar 5, 2014, at 6:42 PM, "Reines, Edward" <edward.reines@weil.com> wrote:

> Folks, as you continue to consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful. Regardless of his comment, please do not circulate this widely outside of eBay absent a specific need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>
> In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!
>
> And actually I not only do not mind, but encourage you to let others see this message.
>
> Your friend for life, rrr

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 16

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 11:13 PM
**To:** 'Ward, Emily'; atikku@ebay.com
**Cc:** 'Bens, Rory'; 'Sherman, Howard'
**Subject:** RE: Federal Circuit

Emily, thank you for your kind thoughts. You've been a wonderful friend and partner. One area where we might be a new resource is IPR appeals. Arguing those at the Federal Circuit could be tricky and will not be very expensive. Best, Ed

---

**From:** Ward, Emily [mailto:eward@ebay.com]
**Sent:** Wednesday, March 05, 2014 10:30 PM
**To:** atikku@ebay.com
**Cc:** Reines, Edward; Bens, Rory; Sherman, Howard
**Subject:** Re: Federal Circuit

That's terrific praise and so thoughtful of Chief Judge Rader to write to you which speaks of the high regard he and others have for you. Congratulations!

On Mar 5, 2014, at 6:59 PM, "Tikku, Anup" <atikku@ebay.com> wrote:

> That's a wonderful email Ed! I've seen you around judges a few times, and it's clear they hold you in high regard - you easily engage in discussions with them and they often hang on your words and are eager to gain insights from you. Congrats!

On Mar 5, 2014, at 6:42 PM, "Reines, Edward" <edward.reines@weil.com> wrote:

> Folks, as you continue to consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful. Regardless of his comment, please do not circulate this widely outside of eBay absent a specific need. All The Best, Ed
>
> Begin forwarded message:
>
> > **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> > **Date:** March 5, 2014 at 3:24:12 PM EST
> > **To:** Edward Reines <edward.reines@weil.com>
> > **Subject: Congratulations**
> >
> > Ed,
> >         On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself

to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 17

**From:** Christen Dubois [cdubois@fb.com]
**Sent:** Wednesday, March 05, 2014 10:30 PM
**To:** Reines, Edward
**Subject:** Re: Federal Circuit
Impressive :)

Christen Dubois | Facebook | Associate General Counsel, IP
NOTICE: This email (including any attachments) may contain information that is private, confidential, or protected by
attorney-client or other privilege.  Unless you are the intended recipient, you may not use, copy, or retransmit the
email or its contents.

---

**From:** <Reines>, Edward <edward.reines@weil.com>
**Date:** Wednesday, March 5, 2014 at 6:27 PM
**To:** Christen Dubois <cdubois@fb.com>, Sam O'Rourke <sam@fb.com>
**Subject:** Federal Circuit

Christen and Sam, as you continue to consider us for your Federal Circuit needs, I
thought the below email from Chief Judge Rader might be helpful.   Regardless of his
comment, please do not circulate this widely outside of Facebook absent a specific
need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly
> social lunch.  We usually discuss politics and pay raises.
> Today, in the midst of the general banter, one of my female
> colleagues interrupted and addressed herself to me.  She said
> that she was vastly impressed with the advocacy of "my friend,
> Ed."  She said that you had handled two very complex cases,
> back to back.  In one case, you were opposed by Seth Waxman.
> She said Seth had a whole battery of assistants passing him
> notes and keeping him on track.  You were alone and
> IMPRESSIVE in every way.  In both cases, you knew the record
> cold and handled every question with confidence and grace.
> She said that she was really impressed with your performance.
> Two of my other colleagues immediately echoed her enthusiasm
> over your performance.
>
> I, of course, pointed out that I had taught you everything
> you know in our recent class at Berkeley together . . . NOT!  I
> added the little enhancement that you can do the same thing

with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 18

**From:**          Reines, Edward [edward.reines@weil.com]
**Sent:**          Wednesday, March 05, 2014 7:35 PM
**To:**            'Rainey, Richard (GE Corporate)'
**Subject:**       RE: Federal Circuit


You are kind.

-----Original Message-----
From: Rainey, Richard (GE Corporate) [mailto:richard.rainey1@ge.com]
Sent: Wednesday, March 05, 2014 7:19 PM
To: Reines, Edward
Subject: Re: Federal Circuit

Knowing you as I do, I am not surprised. Great words for a star advocate!!

Richard L. Rainey
GE Corporate
Mobile: +1-203-260-9774

On Mar 5, 2014, at 9:30 PM, "Reines, Edward"
<edward.reines@weil.com<mailto:edward.reines@weil.com>> wrote:

Rich, please keep the below to yourself, regardless of Judge Rader's comment.  All The
Best, Ed

Begin forwarded message:
From: "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov<mailto:RR@cafc.uscourts.gov>>
Date: March 5, 2014 at 3:24:12 PM EST
To: Edward Reines <edward.reines@weil.com<mailto:edward.reines@weil.com>>
Subject: Congratulations
Ed,
        On Wednesday, as you know, the judges meet for a strictly social lunch.  We
usually discuss politics and pay raises.  Today, in the midst of the general banter, one
of my female colleagues interrupted and addressed herself to me.  She said that she was
vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two
very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said
Seth had a whole battery of assistants passing him notes and keeping him on track.  You
were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and
handled every question with confidence and grace.  She said that she was really impressed
with your performance.  Two of my other colleagues immediately echoed her enthusiasm over
your performance.
        I, of course, pointed out that I had taught you everything you know in our recent
class at Berkeley together . . . NOT!  I added the little enhancement that you can do the
same thing with almost any topic of policy: mastering the facts and law without the
slightest hesitation or pause!
        In sum, I was really proud to be your friend today!  You bring great credit on
yourself and all associated with you!
        And actually I not only do not mind, but encourage you to let others see this
message.
        Your friend for life, rrr


_____

The information contained in this email message is intended only for use of the individual
or entity named above. If the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please immediately notify us
by email, postmaster@weil.com<mailto:postmaster@weil.com>, and destroy the original
message. Thank you.

# EXHIBIT 19

**From:** Roeder, Paul [paul.roeder@hp.com]
**Sent:** Wednesday, March 05, 2014 4:13 PM
**To:** Reines, Edward; Bright, Cynthia
**Subject:** RE: Federal Circuit
Will keep it here. Very useful. Thanks.

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:51 PM
**To:** Bright, Cynthia; Roeder, Paul
**Subject:** Federal Circuit

As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this widely outside of HP absent a specific need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>
> In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!
>
> And actually I not only do not mind, but encourage you to let others see this message.
>
> Your friend for life, rrr

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 20

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 4:49 PM
**To:** 'Bright, Cynthia'; 'Roeder, Paul'
**Subject:** RE: Federal Circuit

Thank you both. And thank you for all your support.

---

**From:** Bright, Cynthia [mailto:cynthia.bright@hp.com]
**Sent:** Wednesday, March 05, 2014 4:17 PM
**To:** Reines, Edward; Roeder, Paul
**Subject:** RE: Federal Circuit

What a lovely message. Well deserved. Will keep it safe.

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:51 PM
**To:** Bright, Cynthia; Roeder, Paul
**Subject:** Federal Circuit

As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful. Regardless of his comment, please do not circulate this widely outside of HP absent a specific need. All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing

with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 1

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 12:38 PM
**To:** 'mreines@nyc.rr.com'
**Subject:** Fw: Congratulations

Here is a high compliment from the Chief Judge of the Federal Circuit. Seth Waxman is considered perhaps the leading oral advocate in the country.

---

**From:** Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent:** Wednesday, March 05, 2014 03:24 PM Eastern Standard Time
**To:** Reines, Edward
**Cc:** Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com) <kbagrowski@brinkshofer.com>; Kang, Jennifer <kangj@cafc.uscourts.gov>
**Subject:** Congratulations

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 2

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Friday, March 07, 2014 10:01 AM
**To:** 'Larry Reines'; 'Sarah Reines'; Daniel Reines (dreines@emory.edu); Mike Reines
(mreines@mac.com)
**Cc:** Miriam Reines (mreines@nyc.rr.com)
**Subject:** A nice note
I normally limit my spamming of kvell-material to Mom, but this one goes pretty far so I
figured I'd send it along to the whole crew.  Pretty unusual.  Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 3

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Sunday, March 09, 2014 4:41 PM
**To:** farnan@farnanlaw.com
**Subject:** Re: A nice note

It is always awkward to share something like that so thank you for the kind thoughts. Best, Ed

---

**From:** Joseph J. Farnan, Jr. [mailto:farnan@farnanlaw.com]
**Sent:** Sunday, March 09, 2014 08:37 PM Eastern Standard Time
**To:** Reines, Edward
**Subject:** Re: A nice note

Ed,

Congratulations on such well deserved recognition. I will certainly keep it in mind. And thank you for sharing - I appreciate it very much.

Best regards
Joe

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Sunday, March 09, 2014 08:25 PM
**To:** Joseph J. Farnan, Jr.
**Subject:** A nice note

Judge Farnan, I share the below email with you because I thought it might be a helpful reference given that your cases often go to the Federal Circuit. If I can ever be of service, just let me know. Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She

said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 4

**From:** Lum, Jennifer T. [Jennifer.Lum@caltech.edu]
**Sent:** Wednesday, March 05, 2014 6:14 PM
**To:** Reines, Edward; victoria.stratman@caltech.edu; adam.cochran@caltech.edu; chantal@caltech.edu
**Subject:** RE: Federal Circuit Appeal: Your Hood Patent

Ed,

Thank you for sharing the email and your thoughts on the argument, as well as the link.  It sounds like you did an outstanding job. I also appreciate you reaching out to me last week.  We enjoy working with you and look forward to working with you in the future.

Best regards,
Jennifer

*This message and any attached documents contain information from the California Institute of Technology Office of General Counsel that may be confidential and/or privileged.  If you are not the intended recipient, you may not read, copy, distribute, or use this information.  If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 5:27 PM
**To:** Stratman, Victoria D.; Lum, Jennifer T.; Cochran, Adam; Chantal Morgan D'Apuzzo Ph. D (chantal@caltech.edu)
**Subject:** Federal Circuit Appeal: Your Hood Patent

Folks, I write you because I have some unusual feedback for you from the Chief Judge of the Federal Circuit regarding a Federal Circuit appeal involving one of your patents that I argued for you yesterday. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Below is an email with the feedback from Chief Judge Rader.  This is quite unusual.

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

If the spirit moves you, the link below will bring you to a recording of the argument.  You can easily listen.

It is always a pleasure to serve you and your fine institution.   Ever since I worked with Vicci back on the Huang case, I have had only positive experiences.  In that regard, I would be delighted to work with you again should that fit your needs.

All The Best,

Ed

http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1454.mp3

Begin forwarded message:

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Cc:** "Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com)"
<kbagrowski@brinkshofer.com>, "Kang, Jennifer" <kangj@cafc.uscourts.gov>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email,

postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 5

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Sunday, June 15, 2014 4:43 PM
**To:** Sundermeyer, Michael; Burke, William
**Subject:** FW: Congratulations

███████████████████████████████████████████

**From:** Finst, Rip [mailto:Rip.Finst@thermofisher.com]
**Sent:** Wednesday, March 05, 2014 8:49 PM
**To:** Reines, Edward
**Subject:** RE: Congratulations

Congrats, Ed.  I listened to your WI oral argument – powerful non-enablement advocacy.  Let's hope the panel agrees.

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 7:52 PM
**To:** Finst, Rip
**Subject:** FW: Congratulations

FYI

---

**From:** Reines, Edward
**Sent:** Wednesday, March 05, 2014 12:44 PM
**To:** Lee, Peter Y. (peter.lee@thermofisher.com); Pasika, Hugh (Hugh.Pasika@thermofisher.com)
**Subject:** FW: Congratulations

Peter and Hugh, please see below.  Notwithstanding Chief Judge Rader's comment, please keep it within TF.  Your support was critical to making this impression.  Best, Ed

---

**From:** Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent:** Wednesday, March 05, 2014 12:24 PM
**To:** Reines, Edward
**Cc:** Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com); Kang, Jennifer
**Subject:** Congratulations

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really

impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 6

**From:** Alan Hammond [ahammondfamily@gmail.com]
**Sent:** Wednesday, March 05, 2014 5:45 PM
**To:** Reines, Edward
**Subject:** Re: Promega

Hi Ed, thanks for the note. FYI, I had already listened to the oral arguments in both cases this morning. Could not stay away even though I no longer work for the company. I guess that is what happens when you put your heart and sole into something. That's an impressive note from Rader and I would agree you did a really great job with the oral arguments (btw, I think Waxman was taking liberties with the record and I think that will hurt him). Thanks for all your help with these cases (and especially jumping in at the 11th hour on the Caltech case). I will anxiously be awaiting the decisions. I hope you have the opportunity to do many more projects for Thermo! They would be smart to give you more stuff. Alan.


On Wed, Mar 5, 2014 at 2:53 PM, Reines, Edward <edward.reines@weil.com> wrote:
I hope you are enjoying some well-earned R&R. The Promega hearings went well. I thought you would be interested. Below are the links if you'd like to listen to the hearings. I'd like to discuss with you at some convenient point. Below is a very complementary email from Chief Judge Rader about the argument, that provides some feedback. Notwithstanding his comment, please do not circulate this broadly. Much of this positive feedback springs from your major efforts.

Most importantly, thank you for trusting me to help with these important matters. I've done my best to reward that trust. Time will tell on the result.

Best,

Ed


http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1011.mp3

http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1454.mp3

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Cc:** "Bagrowski, Kori Anne (kbagrowski@brinkshofer.com)
> (kbagrowski@brinkshofer.com)" <kbagrowski@brinkshofer.com>, "Kang, Jennifer"
> <kangj@cafc.uscourts.gov>
> **Subject: Congratulations**
>
> Ed,
>      On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very

complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 7

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Friday, March 07, 2014 10:27 AM
**To:** 'Pasika, Hugh'
**Cc:** 'Lee, Peter Y.'
**Subject:** RE: Congratulations + Tronzo + "Made in UK"

**Attachments:** Transcript.docx; Tronzo v. Biomet, Inc., 236 F. 3d 1342 (Fed Cir 2001).pdf



Ed

---

**From:** Pasika, Hugh [mailto:Hugh.Pasika@thermofisher.com]
**Sent:** Wednesday, March 05, 2014 2:28 PM
**To:** Reines, Edward
**Cc:** Lee, Peter Y.
**Subject:** RE: Congratulations + Tronzo + "Made in UK"

Ed,

Thanks for sharing.  That's really, well, neat and high praise indeed.



**Hugh Pasika**
**Business Unit Lead IP Counsel**
**Life Sciences Solutions**

Thermo Fisher Scientific
850 Lincoln Center Drive • Foster City • California • 94404 • USA
Direct:    650 554 2257
Fax:       650 638 6071
Mobile:   650 274 1498
hugh.pasika@thermofisher.com

http://www.lifetechnologies.com

This email and its attachments are confidential. If you received this email in error, please notify the sender and delete.

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 12:44 PM
**To:** Lee, Peter Y.; Pasika, Hugh (Hugh.Pasika@thermofisher.com)
**Subject:** FW: Congratulations

Peter and Hugh, please see below.  Notwithstanding Chief Judge Rader's comment, please keep it within TF.  Your support was critical to making this impression.  Best, Ed

---

**From:** Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent:** Wednesday, March 05, 2014 12:24 PM
**To:** Reines, Edward
**Cc:** Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com); Kang, Jennifer
**Subject:** Congratulations

Ed,

On Wednesday, as you know, the judges meet for a strictly social

lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

Transcription of File 2013-1011 for Time Stamps:  40-45& 1:00-1:05

[40:00]

Speaker 1:     …And judge says, look didn't allow them to put this in.  And, now you want to

put it in.  Please explain why.  And they then say, well the reason is we think they

can only claim under 270… you know…in essence under 271(a) not 271(f).  And,

it's their burden to quantify those sales.  And the judge then says, well there has

been, obviously a miscommunication in this case, quote "…and that includes me."

So, now that we've precluded them from putting it on their direct case, we're

going to have to allow them to do that in the rebuttal case.  Which is exactly what

we did with the exact same witness, and that testimony, that evidence, comprises

virtually all of volume 4 of the joint appendix in this case.  And our evidence of

U.S. sales also included testimony from I think 3 or 4 other life witnesses who

testified about their own sales of infringing kits to U.S. customers and qualified it.

So, this wasn't a situation in which we were in any way not trying not to do it.

We tried to quantify both U.S. sales and were world-wide sales, and, indeed, for

the world-wide sales of the identifiler kits, as to which both the cap polymer rates

and the primers were exported from the United States for combination.  We

quantified it at $311,000,000.  And, therefore, even if you were to agree with the

court's ruling as to whether or not one component…The court's ruling that one

component can never be a substantial portion.  We would still be entitled to a new

trial on 271(f)(1) for the $311,000,000 in foreign sales of kits that were comprised

of multiple components sent from the United States.

Judge:          OK.  I think we'll leave it at that.

Speaker 1:     OK. **I'll do my other two points if it comes up in my rebuttal.**

Judge:     Well you've exhausted your rebuttal, but we restore you the five minutes to your rebuttal and then we'll add five minutes…ten minutes to Mr. Reines to keep it sort of even.  You…Don't feel compelled to use that time.

Speaker 2:     Let me first reply on the enablement.  There's really two undisputed points right now that I think are determinative in terms of the outcome.  One is Promega argued and acknowledged that even as it relates to the '660 patent, which I now have in front of me if you want to look at that, in claim 1.  It had the same coamplifying the low side in the multiplex amplification in the action language. And, I think it was stated rather proudly that no one is disputing that that's open and encompasses all the low sides.  So, it's not an unrecited.  Multiplex amplification reaction includes all low side and primers that are in the multiplex amplification reaction, which is any infinite number of low side and any infinite number of primes.  So, it's open claim at the point of novelty. See, that's not disputed.  I think their saying… So the point about whether it's consistent or comprising in the set of low side doesn't matter.  That's the point.  So, I think we're all together on the claim language.

Judge:     Do you think that's the right construction of that claim?

Speaker 2:     I think  we took the other position of the law itself.

Judge:     All right.

Speaker 2:     You know.  It really doesn't matter so much if it's closed.  We don't infringe. Because we don't use their primers or their low side.  We don't use their inventions.  So, we don't do that.  So, if it's close, we don't infringe.  If it's open,

their covering stuff they haven't invented. That they haven't given anything to us. Which goes to the second point: what else is conceded? I made the argument to you, and I think I was pretty specific, and perhaps even repetitive, that if you add a new primer, a new low side to the pre-existing set of low sides, you might have to start from scratch. Your project's beginning. Oh oh, we have a conflict. It's all so unpredictable and rare that it works and so hard. It's so trial-and-error. We have to start over again. We have to go pick all new primers. There was not an effort whatsoever to refute that point. Because it can't be refuted. We're not talking about pencils and erasers. We talking about inter-related systems where a new low side brings in new primers that can disrupt everything that happened before. It's inter-related. And, so it's now undisputed…I don't think…I don't see…They didn't disputed it in their brief. They didn't dispute it oral argument that if you add one new locus you maybe start from scratch. That was the language we used in our brief. That's the fact. There's no way someone should be encompassing this kind of arrangement…

[45:09]

3

Time Stamp:  1:00-1:05

[59:50:00]

Speaker 2:    …So I don't agree at all that that there's a new trial right in these circumstances. And, that would be for me, really something for the district judge who's already stated what he's going to do on that.  Which is no:  They made conscious choice to shoot for the moon with respect to 271(f) with respect to numerosity with everything knowing full well what the risk of that would was.  And to ask the process to start over again is totally inappropriate and disrespectful to the district judge.

Judge:    I think we have your argument.

Speaker 2:    Thank you.

Judge:    [some unintelligible, overlapping background talking]…And we're going to hold you to it.

Speaker 1:    OK.  I'm going to stick to it.  The point here…A lot of this discussion has gone to the supposed inequity or impropriety in a new trial in this case.  Nothing could be further from the truth.  The judge denied us our motion for a new trial because she found that it had been waived because we hadn't asked for it in the alternative in response to their Rule 50(b) motion.  We pointed out to her that under Rule 50(d) which is absolutely [lucid]? about this, a verdict winner has until 28 days after an adverse [J mall]? to move for a new trial.  She didn't recite that or acknowledge it here denial of a new trial motion.  Life doesn't even cite Rule 50(d).  That is clear error.  And we are entitled to a new trial.  Now, I do want to get into, I hope that I'll have a few seconds to get into the 50…the 271(f) damages on the identifiler

4

kits. Because, it's not as if we want to have the right to go back and show that both the polymer rates and primers were supplied for $311,000,000 of sales. The judge found that. She acknowledged that in her J-Mall ruling. That's an accepted fact. But, more to…directly to the point: two things. First of all, they moved for J-Mall not on non-infringement. How could they? They stood up and told the jury that wasn't infringement and we were entitled to be compensated for it. Their 50(b) motion was on damages. They'd claimed that we had this all-or-nothing theory and since we didn't prove all we had to be stuck with nothing. The notion that in ruling on a damages motion, the court could enter a judgment of no infringement on the record in this case is completely indefensible. And, **even if there had been a flaw in the damages award in light of the judge's J-Mall ruling on 271(f), there is no question under the law of the Supreme Court, the law of this circuit and the law of every other court that the proper remedy would be remitter, an offer of remitter or a new trial.** That is the rule when one of multiple theories is subsequently determined to be invalid. It is the rule that the Supreme Court in *Hetzel* and this court I think in…I'm forgetting the name of it now. Has held the 7th Amendment required when there is proof of at least some damages, a new trial is required. A court is not allowed to say, you didn't prove all if it, therefore you get not of it. And, here, the evidence on 271(a) is nothing short of overwhelming. I've already mentioned everything that's in volume 4 of the joint appendix here. If you just pages 14 thru 18 of our opening brief in this case, you will see as a concise a resuscitation as we could provide for the extensive evidence of quantified, acknowledged U.S. sales of infringing goods

5

here.  And, that included multiple life witnesses own testimony.  And, the notion that Mr. Reines is suggesting here, that all we did was try lay a bunch of spreadsheets in the record, you know, so that the jury could somehow figure this out is, as we pointed out in read brief, more than ironic because, they raised the issue before trial with the judge.  They did not want testimony about what was in those spreadsheets on the record in the case because they considered it confidential.  And, as a result, the judge provided that we would have their witness on the stand who would describe what the spreadsheets were and explain to the jury how it could in fact sum up damages

Judge:          Why didn't you supply all of that evidence that U.S. sales you have to us to the district court judge in opposition to the J-Mall motion?

Speaker 1:     We…That's exactly what happened.  That's exactly what happened.  What happened was, and I actually do have the pages for your honor the page cites for what exactly happened when.  On day 4 of the trial, we had this witness, Mr. [Sanduly]? on the stand asking them about the spreadsheets showing Life sales, including U.S. sales.  They objected because the evidence was not relevant to any issue before the jury.  That's at page 5572.  Two days, they had Mr. [Sanduly]? on the stand.  They asked him to quantify U.S. sales.  That at 6126 and 6127.  We had a sidebar where we said, they wouldn't let us do this exact same thing with them…

[1:05:25]

6

236 F.3d 1342 (2001)

## Dr. Raymond G. TRONZO, Plaintiff-Appellant,

### v.

## BIOMET, INC., Defendant-Appellee.

No. 00-1007.

**United States Court of Appeals, Federal Circuit.**

DECIDED January 17, 2001.

1344 *1343 *1344 *James F. Davis,* Howrey Simon Arnold & White, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were *Jeffrey I. Auerbach,* Of counsel on the brief were *Robert S. Hackleman, Connis O. Brown, III,* and *George S. LeMieux,* Gunster, Yoakley Valdes Fauli & Stewart, P.A., of Fort Lauderdale, Florida.

*Donald R. Dunner,* Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for defendant-appellee. With him on the brief were *Don O. Burley,* and *Robert L. Burns.* Of counsel on the brief was *L. Martin Reeder, Jr.,* Greenberg Traurig, P.A., of West Palm Beach, Florida. Of counsel was *Edwin G. Torres,* Steel Hector & Davis LLP, of Miami, Florida.

Before NEWMAN, *Circuit Judge,* ARCHER, *Senior Circuit Judge,* and LOURIE, *Circuit Judge.*

ARCHER, *Senior Circuit Judge.*

## DECISION

Dr. Raymond G. **Tronzo** ("Dr.**Tronzo**") appeals the judgment of the United States District Court for the Southern District of Florida. *Tronzo v. Biomet, Inc.,* No. 91-8175-CIV-HURLEY (S.D.Fla. Aug.27, 1999), and underlying orders. Specifically, Dr. **Tronzo** appeals the reduction in an award of compensatory damages from $7,134,000 to $520, the reduction of punitive damages from $20,000,000 to $52,000, and the rejection of Dr. **Tronzo's** request for a new trial in light of the court's reduction of the jury's award of compensatory and punitive damages. Concluding that the district court erred only in revisiting the issue of the proper amount of punitive damages, we affirm-in-part and reverse-in-part.

## BACKGROUND

This case returns to this court following remand from an earlier appeal, *Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 47 USPQ2d 1829 (Fed.Cir.1998) ("*Tronzo I*"), from the judgment of the Southern District of Florida, *Tronzo v. Biomet, Inc.,* 950 F.Supp. 1149, 41 USPQ2d 1403 (S.D.Fla.1996).

The underlying dispute between Dr. **Tronzo** and Biomet concerns a medical device, called an "acetabular cup," that forms the upper portion of a hip implant. Dr. **Tronzo** alleged that he had established a confidential relationship with Biomet for the purpose of bringing his acetabular cup design to market. According to Dr. **Tronzo**, Biomet was to pay him for his invention if he could successfully obtain a patent on his invention. Dr. **Tronzo** claims that Biomet failed to compensate him and, instead, took his ideas and incorporated them into its highly successful Mallory/Head cup design (named after Drs. Thomas Mallory and William Head). Dr. **Tronzo** brought suit in the Southern District of Florida for infringement of United States Patent No. 4,743,262 ("the '262 patent"), issued May 10, 1988, and, under Florida law, for breach of a confidential relationship, fraud, and unjust enrichment.

A jury found in favor of Dr. **Tronzo** on all counts, finding, by special verdict, that the '262 patent was valid and willfully infringed by Biomet and that Biomet was liable under state law for breach of a confidential relationship, fraud, and

unjust enrichment. The jury awarded Dr. **Tronzo** $3,805,000 for patent infringement, $4,757,000 in compensatory plus $15,000,000 in punitive damages for the breach of a confidential relationship, $7,134,000 in compensatory plus $20,000,000 in punitive damages for fraud, and $4,750,000 in compensatory damages for unjust enrichment. The

1345    district court then enhanced the jury's patent infringement award by 50% (pursuant to 35 U.S.C. *1345 § 284), dismissed the unjust enrichment count, and capped the total recovery at $7,134,000 in compensatory damages plus $20,000,000 in punitive damages to avoid double recovery.

On appeal of the district court's decision, Biomet argued that some of the claims of the '262 patent were invalid and that the other claims asserted were not infringed. Biomet further contested liability with respect to the state law claims and the compensatory damages associated with those claims. Biomet did not appeal the punitive damage award.

In reviewing Biomet's appeal in **Tronzo I**, we reversed the district court's findings of patent infringement, holding that some of the asserted claims were invalid and the other claims were not infringed. In addition, we upheld the district court's finding of liability on the state law counts, but reversed its judgment with respect to the amount of compensatory damages, holding that Dr. **Tronzo** had failed to establish the necessary nexus between the damages claimed and the injury sustained. The damages award granted by the district court had been computed based on Biomet's profits. We concluded that this was an incorrect measure of Dr. **Tronzo's** damages under controlling state law. See _Tronzo I_, 156 _F.3d at 1161, 47 USPQ2d at 1835_.

Because the compensatory damages were computed incorrectly, we remanded to the district court to determine if there was evidence on the record to "prove any of the costs and injuries incurred by [Dr.] **Tronzo**, such as the costs of prosecuting the patent and lost business opportunities." _Id._ If no such evidence existed on the record, we left it to the district court to decide, at its discretion, whether it would be appropriate to take new evidence.

On remand, the district court reviewed the evidence on the record concerning damages and concluded that, aside from $520 in patent prosecution costs, there was a "complete absence of competent substantial evidence to support the vacated portion of the award." The district court considered Dr. **Tronzo's** arguments that his lost business opportunities could be measured by looking to the value of Biomet's Mallory/Head system, which allegedly incorporated Dr. **Tronzo's** misappropriated ideas. The district court, however, rejected this argument, reasoning that such a measure of damages was foreclosed by our decision on appeal. Then, exercising its discretion, the district court declined to reopen the record to take new evidence concerning compensatory damages. In making this decision, the court reasoned that both parties had been represented by competent counsel and had made strategic decisions in this protracted litigation. Accordingly, the court set the compensatory damages at $520, the maximum amount supported by the evidence in the record.

In response to the district court's reduction of the compensatory damages award, Dr. **Tronzo** asserted that this order constituted a remittitur, advised the court that he rejected this remittitur, and moved for a new trial on the issue of compensatory damages. The court rejected Dr. **Tronzo's** motion.

Biomet then moved for a reduction in the amount of punitive damages, arguing that, given the reduction in the compensatory damages award, the disparity between the amounts of compensatory and punitive damages now rendered the punitive damages amount unconstitutional. The court considered Biomet's argument, applying the Supreme Court's criteria in _BMW of North America, Inc. v. Gore_, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), to determine whether the punitive damages award violated due process. Noting that the disparity in the awards was greater than 38,000 to 1, the court granted Biomet's motion, and reduced the punitive damages award to $52,000, the maximum amount of punitive damages it considered permissible: 100 times the compensatory damages.

On August 27, 1999, the district court entered its Third Amended Final Judgment, implementing the terms of its several

1346    *1346 orders and setting compensatory damages at $520, punitive damages at $52,000, and awarding prejudgment interest on the compensatory damages award. _Tronzo v. Biomet, Inc._, No. 91-8175-CIV-HURLEY (S.D.Fla. Aug.27, 1999).

In response to the court's reduction in the punitive damages award, Dr. **Tronzo** again argued this constituted a

remittitur, and moved for a new trial on punitive and compensatory damages. The district court denied this motion.

This appeal followed. Dr. **Tronzo** asserts legal error in the district court's reduction in the jury's awards of compensatory and punitive damages and, in light of these reductions, in the district court's denial of its motions for a new trial on damages.

# DISCUSSION

## I. *Jurisdiction and Standard of Review*

This appeal follows the remand of an earlier appeal of a matter arising, in part, under the patent laws. Since the jurisdiction of the district court was based, in part, on 28 U.S.C. § 1338 (1994), we have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1) (1994).

We review issues not unique to patent law according to the law of the regional circuit where appeals from the district court would normally lie. *Novamedix v. NDM Acquisition Corp.*, 166 F.3d 1177, 1180, 49 USPQ2d 1613, 1615 (Fed. Cir.1999); *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1301, 50 USPQ2d 1429, 1434 (Fed.Cir.1999) (holding district court's evidentiary decisions are reviewed under the law of the regional circuit). Accordingly, under controlling Eleventh Circuit law, we review the district court's conclusions of law *de novo*. *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1405 (11th Cir.1993).

We also review *de novo* the interpretation of our own mandate in *Tronzo I. See Engel Indus. v. Lockformer Co.*, 166 F.3d 1379, 1382, 49 USPQ2d 1618, 1621 (Fed.Cir.1999).

## II. *Compensatory Damages*

Dr. **Tronzo** claims legal error in the district court's reduction of the jury's award of compensatory damages from $7,134,000 to $520. Dr. **Tronzo** first argues that, under Florida law, a court may broadly consider any evidence of record that logically establishes the correct value of property taken by fraud. Dr. **Tronzo** contends that the district court should have considered as a proper measure of the value of the "property" taken from him either (1) payments by Biomet to Drs. Mallory and Head for their hip implant allegedly incorporating Dr. **Tronzo's** ideas or (2) Biomet's profits from its sales of the Mallory/Head device. Since this evidence amply supports the jury award, Dr. **Tronzo** asserts that the district court should have upheld the entire jury award of compensatory damages. Dr. **Tronzo's** arguments, however, are foreclosed by our decision in *Tronzo I*.

In *Tronzo I*, we held that the award of lost profits as damages for the torts asserted was inappropriate because it did not reflect the actual injury sustained by Dr. **Tronzo**. *Tronzo I*, 156 F.3d at 1161, 47 USPQ2d at 1835. Dr. **Tronzo** cannot now circumvent this holding by simply recasting his claim for damages measured by Biomet's profits as a claim for "out-of-pocket" losses. No matter how Dr. **Tronzo** frames this claim, he cannot establish the necessary nexus between his tort injuries and Biomet's profits from sales of the Mallory/Head device. Similarly, we cannot accept Dr. **Tronzo's** arguments that payments to Drs. Mallory and Head can provide a proper measure of his losses. Those payments were based on royalty payments for the Mallory/Head device as well as other related products, and also reflect compensation for various services provided by the two doctors. As such, they are simply too remote and inconclusive to reflect the actual injury to Dr. **Tronzo** or to measure the amount of his damages. Rather, as we instructed in *Tronzo I*, Dr. **Tronzo's** 1347 injuries were to be *1347 measured by any record evidence properly establishing his losses, including evidence of his costs in prosecuting his patent and his lost business opportunities. *Id.*

On remand, the district court followed our instruction and reviewed the record for any such evidence. The court found that the only costs of patent prosecution supported in the record were $520. On appeal, neither party disputes this figure. As for "lost business opportunities," the district court found no evidence in support of Dr. **Tronzo's** claim of damages. *Id.* Dr. **Tronzo** confined his arguments to lost business opportunities measured by reference to either

payments to Drs. Mallory and Head or Biomet's profits. The district court properly rejected such evidence. Thus, we see no error in the district court's computation of compensatory damages on remand.

In the alternative, Dr. **Tronzo** asserts that the district court should have applied the "wrongdoer rule" to support the full compensatory damages award. The wrongdoer rule is a principle explained in _Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946),_ whereby a "wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable." _Id._ at 265, 66 S.Ct. 574. Noting that Dr. **Tronzo** raised this argument for the first time on remand, the district court refused to entertain this argument. Dr. **Tronzo** claims legal error in the district court's refusal.

We reject this argument as well. As the district court explained, Dr. **Tronzo** made strategic decisions in the initial trial concerning what evidence and arguments to advance in support of his theory of damages. We see no error, therefore, in the district court's refusal to address a new theory presented for the first time on remand. Moreover, even if the district court had chosen to address this theory, it would have been obliged to reject it. The wrongdoer rule does not obviate the requirement for a nexus between an injury and the claimed damages. _Bigelow,_ 327 U.S. at 264, 66 S.Ct. 574 (noting that in applying the wrongdoer rule, the verdict must be based on a just and reasonable estimate of the damages, not speculation or guesswork.) Thus, this rule cannot be applied to justify Dr. **Tronzo's** reliance on either Biomet's profits or payments to Drs. Mallory and Head as a measure of its damages.

## III. _Punitive Damages_

Dr. **Tronzo** argues legal error in the district court's reduction of the punitive damages award from $20,000,000 to $52,000. Dr. **Tronzo** asserts that, because Biomet never challenged the punitive damages award on appeal in _Tronzo I_, it necessarily waived any right to challenge this award on remand, and the initial punitive damages award became the "law of the case." Alternatively, Dr. **Tronzo** argues that the district court's reduction of the punitive damages award was outside the scope of our remand in _Tronzo I_ and, therefore, revisiting this issue was prohibited by the mandate rule.

In response, Biomet asserts that it did not waive its constitutional challenge to the punitive damages and that neither the law of the case nor the mandate rule prevented the district court from revisiting this issue. By appealing the liability for the compensatory damages, Biomet argues, it implicitly challenged its liability for punitive damages as well. Biomet further argues that the doctrine of law of the case and the mandate rule do not preclude Biomet from asserting issues that only became ripe on remand. Because the disparity in compensatory and punitive damages first arose on remand when the district court reduced the compensatory damages, Biomet argues this issue was never waived.

1348 We agree that by failing to appeal the award of punitive damages in _Tronzo I,_ Biomet waived this issue and was barred from raising it on remand. As an initial *1348 matter, Biomet's assertion that it challenged the punitive damages award indirectly in its initial appeal is not persuasive. It is uncontroverted that Biomet never appealed, nor questioned in any way, the _amount_ of the punitive damages on appeal to this court in _Tronzo I._ Now, we need only consider whether Biomet's failure to raise this challenge in its first appeal waived its right to contest the amount of punitive damages in subsequent proceedings.

As noted above, Dr. **Tronzo** presents the issue of waiver in terms of either application of the doctrine of law of the case or an application of the mandate rule. In considering this question of waiver, we are guided by the approach of our recent decision in _Engel Industries, Inc. v. Lockformer Co.,_ 166 F.3d 1379, 49 USPQ2d 1618 (Fed.Cir.1999). In that case, the alleged waiver concerned an issue that was within the scope of the initial judgment of the district court and was not appealed. We concluded that the issue was disposed of by the initial decision on appeal. While Dr. **Tronzo** argues waiver under law of the case, as well as the mandate rule, we confine our analysis to the determination of the scope of our mandate in _Tronzo I._ In other words, we consider whether the amount of punitive damages was an issue within the scope of the initial judgment of the district court. If so, it was necessarily incorporated within the scope of our mandate in _Tronzo I_ and foreclosed from further review on remand.[1]

As described above, Biomet's main challenge to Dr. **Tronzo's** arguments of waiver is its contention that the constitutional issue was not ripe until remand and, therefore, could not have been appealed initially, and could not properly be considered within the scope of the initial judgment. Under these circumstances, Biomet argues, it is inappropriate to consider this issue waived or foreclosed by our mandate following the initial appeal in **Tronzo I**. And in further support of its contentions, Biomet points to our decisions in Laitram Corp. v. NEC Corp., 115 F.3d 947, 42 USPQ2d 1897 (Fed.Cir.1997), and Exxon Chemical Patents, Inc. v. Lubrizol Corp., 137 F.3d 1475, 45 USPQ2d 1865 (Fed.Cir.1998), where we held that issues not reached by the district court were not waived by a failure to raise these issues on a first appeal.

We are unpersuaded by Biomet's arguments. The present case is not comparable to Laitram or Exxon. In each of those cases, the trial court had not addressed the contested issue and, therefore, the issue was not deemed within the scope of the judgment initially appealed. Laitram, 115 F.3d at 951-52; Exxon, 137 F.3d at 1478-79. In the present case, however, the district court *did* consider the contested issue because it granted an award of punitive damages based on the jury verdict.[2] Despite Biomet's arguments to the contrary, the appropriateness of the amount of punitive damages

1349   was then ripe for legal challenge. And indeed, Biomet *1349 did challenge the amount of punitive damages at that time, arguing that the amount of punitive damages was excessive and not supported by the weight of the evidence. In its motion for judgment as a matter of law and for a new trial, Biomet argued:

> Even though at best the only damages that Dr. **Tronzo** could have suffered in this case would have been a few thousand dollars in patent costs, the jury awarded a $7.1 million compensatory award coupled with a $20 million punitive award.

Thus, Biomet's ripeness argument is misplaced. The district court had ruled on the issue of punitive damages in its initial decision and had further responded to Biomet's challenge to the appropriateness of the amount of punitive damages. Then, while disputing various rulings of the district court on appeal, Biomet chose not to contest the amount of punitive damages. Because Biomet failed to raise this issue, clearly implicated in the initial decision of the district court, our mandate in **Tronzo I** acted to prevent Biomet from raising this issue on remand or in any future proceedings in this litigation. See Engel, 166 F.3d at 1383, 49 USPQ2d at 1621.

Finally, while Biomet did not initially challenge the amount of punitive damages on constitutional grounds, it could have done so. The unconstitutionality of a large punitive damages award is not predicated on any specific ratio of punitive damages to compensatory damages. Rather, it is judged according to the three guideposts outlined by the Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, namely, the reprehensibility of the conduct, the ratio of punitive damages to actual harm inflicted on the plaintiff, and the comparison of punitive damages to the civil or criminal penalties imposed for comparable conduct. *Id.* at 574-584, 116 S.Ct. 1589. Applying these guideposts, Biomet could have raised a constitutional challenge in **Tronzo I** if it considered the punitive damages, which the jury awarded based on its finding of wanton or willful conduct, to be excessive. Biomet could have asserted that, if the compensatory damages award is lowered, constitutional requirements mandate that the punitive award be commensurately adjusted; see BMW, 517 U.S. 559, 116 S.Ct. 1589. Biomet did not make any such challenge.

Thus, we conclude that Biomet's belated attack on the punitive damages award was foreclosed by our mandate in **Tronzo I**. This, however, does not entirely end our inquiry. Law of the case and the mandate rule are not always considered an unassailable limit on an appellate court's jurisdiction. Rather, these doctrines are better viewed as prudential doctrines that direct a court's discretion, but do not necessarily limit a court's power. Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 739-40 (D.C.Cir.1995); Heathcoat v. Potts, 905 F.2d 367 (11th Cir.1990); Eli Lilly and Co. v. Home Ins. Co., 794 F.2d 710, 717 (D.C.Cir.1986); Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). Accordingly, it may be appropriate in some circumstances for a court to revisit an issue that would otherwise be deemed waived and beyond the scope of an appellate mandate. Such circumstances, however, must be exceptional. See id. Otherwise, the underlying rationales for the doctrines of law of the case and the mandate rule would be thwarted.[3] However, courts have considered revisiting issues otherwise foreclosed in circumstances where there has been a substantial change in the evidence. See id.

Here, with the reduction in the award of compensatory damages from $7,134,000 to $520, Biomet argues, the ratio of the punitive *1350 damages award ($20,000,000) to compensatory damages went from 2.8 to 1 to 38,000 to 1. According to Biomet, its challenge to the punitive damages on remand was a "totally different challenge" than it might have raised when the ratio was only 2.8 to 1.

We cannot, however, accept Biomet's contention. True, 38,000 to 1 is a high ratio, and such a particularly high ratio will certainly "raise a suspicious judicial eyebrow." *Id.* at 583, 116 S.Ct. 1589 (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 481, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting)). But the constitutionality of a punitive damages award is not simply a matter of numbers or ratios. *BMW*, 517 U.S. at 582, 116 S.Ct. 1589 ("We have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula...."). Rather, as noted above, Biomet's challenge to the amount of punitive damages, viewed under Supreme Court law in *BMW*, involves a consideration of three "guideposts," only one of which is the ratio of compensatory to punitive damages. The court must also consider the reprehensibility of the conduct and any civil or criminal penalties for similar conduct. And of these three guideposts, it was not the ratio of punitive to compensatory damages, but the reprehensibility of the conduct that was deemed by the Supreme Court to be "the most important indicium of the punitive damages award." *Id.* at 575, 116 S.Ct. 1589. With respect to this most important guidepost, we note that Biomet never challenged on appeal the jury's finding of wanton or willful conduct in support of the punitive damages liability.

Moreover, Biomet's focus on the ratio of damages presents even this limited issue too simplistically. The guidepost articulated by the Supreme Court was the ratio of punitive damages to "actual and *potential* damages." *BMW*, 517 U.S. at 582, 116 S.Ct. 1589 (emphasis added). In discussing this guidepost, the Court elaborated:

> [L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id.* In the present case, in discussing the reprehensibility of Biomet's conduct, the district court pointed to record evidence in support of Dr. **Tronzo's** claim that Biomet misappropriated his ideas and commented that "Biomet misled Dr. **Tronzo** and substantially profited thereby." The court then went on to note that the compensatory damages "[did] not adequately reflect the actual harm caused." In addition, in regard to the limited record evidence of compensatory damages, the court further commented that the parties were represented by "competent counsel who made strategic decisions throughout the course of protracted litigation," indicating competent evidence of damages may have existed, but was never introduced. Thus, there is a strong suggestion in the record that the potential compensatory damages may have been much higher than what was actually awarded.

Overall, therefore, we cannot conclude that the reduction of the amount of compensatory damages on remand created such a substantial change in the facts to allow the district court to revisit the punitive damage award. Accordingly, we conclude that the district court erred in reducing the amount of punitive damages and that such action was foreclosed by our mandate in *Tronzo I*. We reverse the district court's judgment on this matter and reinstate the original $20,000,000 award of punitive damages.

# IV. *Remittitur*

Finally, Dr. **Tronzo** claims legal error in the district court's rejection of his claim that the reduction in the compensatory and punitive damages awards was a remittitur, and in its failure to order a new *1351 trial on these issues. Because we have reversed the court's reduction of punitive damages, Dr. **Tronzo's** claim with respect to these damages is now moot. Thus, we only consider Dr. **Tronzo's** claim with respect to the compensatory damages.

Dr. **Tronzo** argues that under the rule announced in *Hetzel v. Prince William County*, 523 U.S. 208, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998), when a court determines that the evidence does not support a damages award, and the damages must be recalculated, the court is imposing a remittitur. If the court then imposes a lesser amount of damages than the

jury awarded, and the plaintiff does not accept this reduction, the Seventh Amendment to the United States Constitution requires that the plaintiff be granted the option of a new trial. Dr. **Tronzo** argues that he rejected the district court's remittitur on the compensatory damages award and moved for a new trial. He contends that the district court's denial of his request for a new trial was therefore in error.

In response, Biomet points to Eleventh Circuit law distinguishing the *Hetzel* decision. *Johansen v. Combustion Eng'g,* 170 F.3d 1320, 1330-31 (11th Cir.1999). Biomet argues that the analysis in *Johansen* should guide this court in considering whether the reduction in compensatory damages in this case constituted a remittitur. According to the *Johansen* court, "the Seventh Amendment is not offended" when the reduction in a damages award is necessitated by legal error. *Johansen,* 170 F.3d at 1330. The *Johansen* court further noted that *Hetzel* considered a classic remittitur situation, where the judge had exercised his discretion to reduce a damages award that he felt was not adequately supported by the evidence. *Id.* In contrast, the verdict in the case before the *Johansen* court was reduced as legally impermissible under the Constitution. Similarly, Biomet argues that the reduction in compensatory damages in the present case was a purely legal issue. As a matter of law, there was no support for the compensatory damages award beyond that awarded by the district court. Thus, there was no issue for the jury to reconsider.

We agree with Biomet that the reduction in compensatory damages did not constitute a remittitur entitling Dr. **Tronzo** to a new trial. While Supreme Court law, to the extent articulated in *Hetzel,* applies to remittitur situations, we adopt for purposes of this case the controlling Eleventh Circuit's conclusion that *Hetzel* did not consider the case of the reduction in a damages award on purely legal grounds.

In *Hetzel,* a jury had found for the plaintiff on her civil rights claim under title VII of the Civil Rights Act and awarded $500,000 in damages. Considering this award excessive in light of the limited evidence of harm, the court reduced this award to $50,000. This discretionary decision necessarily involved a reweighing of the evidence and reassessment of the appropriate amount of damages warranted by the facts decisions traditionally left to a jury.

In contrast, in the present case, the district court did not reweigh any evidence, nor did it exercise its discretion in computing the damages award. Instead, the court awarded the maximum damages possible given the lack of competent evidence in the record. The award of $520 in compensatory damages was based on the total costs for prosecuting the '780 patent, as evidenced by the record. The parties do not dispute this figure. The only true dispute here is over the proper amount of compensatory damages for Dr. **Tronzo's** "lost business opportunities." But, as the district court explained, Dr. **Tronzo** never introduced any legally competent evidence to support any such damages award. The evidence in the record that Dr. **Tronzo** attempted to rely on was too remote and inconclusive to reflect the actual injury incurred by Dr. **Tronzo** or to measure his damages. Thus, re-presenting this issue to the jury would have been pointless because, as a matter of law, the compensatory damages award could not exceed the $520 already 1352 awarded. *Cf. Johansen,* 170 *1352 F.3d at 1332 n. 19* (commenting that giving the plaintiff the option of a new trial would be of no value because the award was already the maximum permissible under the Constitution).

In conclusion, we see no error in the district court's refusal to grant Dr. **Tronzo** a new trial in light of its reduction in the compensatory damages award.

# CONCLUSION

For the reasons stated above, we affirm the district court's judgment as to the award of compensatory damages and its rejection of Dr. **Tronzo's** motion for a new trial as to these damages, and we reverse the court's reduction in the punitive damages award, reinstating the original punitive damage award of $20,000,000.

Each party shall bear its own costs.

*AFFIRMED-IN-PART* AND *REVERSED-IN-PART*

[1] Other courts have attached different labels to the issue before this court. *See, e.g.,* Wright, Miller & Cooper, Federal Practice & Procedure § 4478 (1981); *Engel, 166 F.3d at 1383, 49 USPQ2d at 1621* (citing cases discussing "waiver" and "law of the case" in

support of its application of the mandate rule); _United States v. Polland, 56 F.3d 776, 779 (7th Cir.1995)_ (explaining that law of the case doctrine is a corollary to the mandate rule). Many courts, however, have addressed this issue as we do, as an application of the mandate rule. _See Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 167-68, 59 S.Ct. 777, 83 L.Ed. 1184 (1939)_; _Biggins v. Hazen Paper Co., 111 F.3d 205, 209 (1st Cir.1997)_; _Mason_, 182 F.3d at 1214; _Eason v. Thaler, 73 F.3d 1322, 1329 (5th Cir.1996)_. We conclude that the present issue is best labeled and treated as an application of the mandate rule.

[2] Moreover, unlike the present case, in _Laitram_, the alleged waiver was due to the _appellee's_ failure to raise an issue in the initial appeal. In concluding that the issue was not waived in that case, we noted that appellees do not select the issues to be appealed, and, therefore, the policies of waiver are less implicated by an appellee's failure to raise an issue. _Laitram, 115 F.3d at 954, 42 USPQ2d at 1902-03_.

[3] Such rationales include the need for (and the litigant's right to) finality, judicial economy, the consistency of judicial decisions, the discouragement of piecemeal adjudication, and the prevention of the perverse result of allowing a litigant to be in a better position by failing to raise an issue in an initial appeal. _See, e.g., Arizona, 460 U.S. at 619, 103 S.Ct. 1382_; _Northwestern Indiana Tel. Co., Inc. v. Fed. Communications Comm'n, 872 F.2d 465, 470 (D.C.Cir.1989)_; _Heathcoat, 905 F.2d at 370_; _Crocker, 49 F.3d at 735 (D.C.Cir.1995)_.

Save trees - read court opinions online on Google Scholar.

# EXHIBIT 8

**From:** Stevenson, Mark [mark.stevenson@thermofisher.com]
**Sent:** Thursday, March 06, 2014 4:49 PM
**To:** Reines, Edward; 'Genoffir.MacLeod@thermofisher.com'
**Cc:** Lee, Peter Y.
**Subject:** Re: Promega
Hi Ed

Great note. We appreciate working with you as a winner!

All the best

Mark

---

**From:** <Reines>, Edward <edward.reines@weil.com>
**Date:** Wednesday, March 5, 2014 at 7:52 PM
**To:** "Stevenson, Mark (mark.stevenson@thermofisher.com)"
<mark.stevenson@thermofisher.com>, "'Genoffir.MacLeod@thermofisher.com'"
<Genoffir.MacLeod@thermofisher.com>
**Cc:** "Lee, Peter Y." <peter.lee@thermofisher.com>
**Subject:** Promega

Regarding the Promega appeals, please see the below.   I sent this to Peter (who has done a wonderful job getting up to speed on these matters) and gave him a full report on the details, but this email from the Chief Judge right after a hearing is so unusual I thought I would share it directly with you.  Thank you for your support.   With these appeals completed, I'm hopeful that we will continue to work with TF and the Life unit, notwithstanding the exciting changes.  Your support in that regard would of course also be appreciated.  Best, Ed

**From:** Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent:** Wednesday, March 05, 2014 12:24 PM
**To:** Reines, Edward
**Cc:** Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com); Kang, Jennifer
**Subject:** Congratulations

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little

enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 9

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 2:52 PM
**To:** Bradford Paul Schmidt
**Subject:** Fwd: Congratulations

Bradford, I hope you are enjoying some well-earned R&R (rest and relaxation, but perhaps a little rock'n'roll too).   The Promega hearings went well.  I thought you would be interested. Below are the links if you'd like to listen to them.   I'd like to discuss with you at some convenient point.   Below is a very complementary email from Chief Judge Rader about the argument, that provides some feedback.  Notwithstanding his comment, please do not circulate this broadly.   Much of this positive feedback springs from your wonderful efforts.

Most importantly, thank you for trusting me to help with these important matters.  I've done my best to reward that trust.   Time will tell on the result.

Best,

Ed


http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1011.mp3

http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1454.mp3

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Cc:** "Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com)" <kbagrowski@brinkshofer.com>, "Kang, Jennifer" <kangj@cafc.uscourts.gov>
> **Subject: Congratulations**
>
> Ed,
>
>     On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 10

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 6:59 PM
**To:** karobins@adobe.com
**Subject:** Federal Circuit

Karen, as you continue to consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this widely outside of Adobe absent a specific need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>
> In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!
>
> And actually I not only do not mind, but encourage you to let others see this message.
>
> Your friend for life, rrr

# EXHIBIT 11

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:29 PM
**To:** Noreen Krall; melaugh@apple.com; jrisher@apple.com; Jackie Harlow
**Subject:** Federal Circuit

As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this outside of Apple.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>
> In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!
>
> And actually I not only do not mind, but encourage you to let others see this message.
>
> Your friend for life, rrr

# EXHIBIT 12

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 6:56 PM
**To:** naomi.waltman@cbs.com; daniel.wan@cbsinteractive.com
**Subject:** RE: Federal Circuit

Yes, please forward the decision.   And, yes, please do share with Ken and others as needed for HPL. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

**From:** Waltman, Naomi [mailto:naomi.waltman@cbs.com]
**Sent:** Wednesday, March 05, 2014 6:49 PM
**To:** Reines, Edward; daniel.wan@cbsinteractive.com
**Subject:** RE: Federal Circuit

Wow...pretty darn impressive!(although totally well deserved)...if you don't mind, I would like to share it with Ken Richieri at the NY Times, apropos of HPL oral argument ████████████████████████████████████
I ████████████████████████████████████████  We can forward you the decision if you don't have it).

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 9:38 PM
**To:** Waltman, Naomi; Wan, Daniel
**Subject:** Federal Circuit

Naomi and Dan, I thought you might be interested in this feedback from Chief Judge Rader.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
>     On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over

your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 13

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 6:15 PM
**To:** nrubin@cisco.com
**Subject:** RE: Congratulations

Thanks.   That aspect of my practice is really thriving; it's really fulfilling.   Best, Ed

---

**From:** Neal Rubin (nrubin) [mailto:nrubin@cisco.com]
**Sent:** Wednesday, March 05, 2014 5:33 PM
**To:** Reines, Edward
**Subject:** RE: Congratulations

Nice!

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:27 PM
**To:** Mark Chandler (machandl); Neal Rubin (nrubin); Marta Beckwith (mabeckwi); Kathleen Zylan (zylank); Leah Poynter (lepoynte)
**Subject:** Fwd: Congratulations

Team Cisco, as you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful regarding my arguments yesterday.   Notwithstanding his comment, please do not circulate this widely.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject:** Congratulations
>
> Ed,
>        On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>        I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I

added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 14

| | |
|---|---|
| **From:** | Reines, Edward [edward.reines@weil.com] |
| **Sent:** | Sunday, June 15, 2014 5:43 PM |
| **To:** | Sundermeyer, Michael; Burke, William |
| **Subject:** | FW: Support from Cisco |

-----Original Message-----
From: Neal Rubin (nrubin) [mailto:nrubin@cisco.com]
Sent: Saturday, May 24, 2014 8:22 AM
To: Reines, Edward
Subject: Support from Cisco

Hi Ed:  just a short note to say I am thinking of you, and how sorry I am that you have
been dragged into these recent articles about Judge Rader. Hope you are doing OK. You're a
terrific lawyer and friend.  Hope all of this passes soon.

Best,

Neal

Sent from my iPhone. Please excuse typos.

_____

The information contained in this email message is intended only for use of the individual
or entity named above. If the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please immediately notify us
by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 15

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Thursday, March 06, 2014 8:01 AM
**To:** 'Sherman, Howard'
**Cc:** 'Ward, Emily'; 'Bens, Rory'; atikku@ebay.com
**Subject:** RE: Federal Circuit

You folks are very generous.   Thank you all for your support over the years.   Whenever you think I can support you, let me know.

---

**From:** Sherman, Howard [mailto:hsherman@ebay.com]
**Sent:** Thursday, March 06, 2014 6:58 AM
**To:** Reines, Edward
**Cc:** Ward, Emily; Bens, Rory; atikku@ebay.com
**Subject:** RE: Federal Circuit

I echo Anup's comments.  I haven't yet seen you in action in the courtroom, but it was completely evident in the event in your offices last month that the judges had an enormous amount of respect for you.

Congratulations!

Regards,
Howard

Howard I. Sherman
Patent Counsel
eBay Enterprise
935 First Avenue
King of Prussia, PA 19406
(610) 491-4254
hsherman@ebay.com

---

**From:** Tikku, Anup
**Sent:** Wednesday, March 05, 2014 10:00 PM
**To:** Reines, Edward
**Cc:** Ward, Emily; Bens, Rory; Sherman, Howard
**Subject:** Re: Federal Circuit

That's a wonderful email Ed!  I've seen you around judges a few times, and it's clear they hold you in high regard - you easily engage in discussions with them and they often hang on your words and are eager to gain insights from you.   Congrats!


On Mar 5, 2014, at 6:42 PM, "Reines, Edward" <edward.reines@weil.com> wrote:

> Folks, as you continue to consider us for your Federal Circuit and other needs,
> I thought the below email from Chief Judge Rader might be helpful.
> Regardless of his comment, please do not circulate this widely outside of eBay
> absent a specific need.  All The Best, Ed

Begin forwarded message:

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 16

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 11:13 PM
**To:** 'Ward, Emily'; atikku@ebay.com
**Cc:** 'Bens, Rory'; 'Sherman, Howard'
**Subject:** RE: Federal Circuit

Emily, thank you for your kind thoughts.  You've been a wonderful friend and partner.  One area where we might be a new resource is IPR appeals.  Arguing those at the Federal Circuit could be tricky and will not be very expensive.  Best, Ed

---

**From:** Ward, Emily [mailto:eward@ebay.com]
**Sent:** Wednesday, March 05, 2014 10:30 PM
**To:** atikku@ebay.com
**Cc:** Reines, Edward; Bens, Rory; Sherman, Howard
**Subject:** Re: Federal Circuit

That's terrific praise and so thoughtful of Chief Judge Rader to write to you which speaks of the high regard he and others have for you.  Congratulations!


On Mar 5, 2014, at 6:59 PM, "Tikku, Anup" <atikku@ebay.com> wrote:

> That's a wonderful email Ed!  I've seen you around judges a few times, and it's clear they hold you in high regard - you easily engage in discussions with them and they often hang on your words and are eager to gain insights from you.   Congrats!



On Mar 5, 2014, at 6:42 PM, "Reines, Edward" <edward.reines@weil.com> wrote:

> Folks, as you continue to consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this widely outside of eBay absent a specific need.  All The Best, Ed
>
> Begin forwarded message:
>
> > **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> > **Date:** March 5, 2014 at 3:24:12 PM EST
> > **To:** Edward Reines <edward.reines@weil.com>
> > **Subject: Congratulations**
> >
> > Ed,
> >     On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself

to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 17

**From:** Christen Dubois [cdubois@fb.com]
**Sent:** Wednesday, March 05, 2014 10:30 PM
**To:** Reines, Edward
**Subject:** Re: Federal Circuit

Impressive :)

Christen Dubois | Facebook | Associate General Counsel, IP
NOTICE: This email (including any attachments) may contain information that is private, confidential, or protected by
attorney-client or other privilege.  Unless you are the intended recipient, you may not use, copy, or retransmit the
email or its contents.

---

**From:** <Reines>, Edward <edward.reines@weil.com>
**Date:** Wednesday, March 5, 2014 at 6:27 PM
**To:** Christen Dubois <cdubois@fb.com>, Sam O'Rourke <sam@fb.com>
**Subject:** Federal Circuit

Christen and Sam, as you continue to consider us for your Federal Circuit needs, I
thought the below email from Chief Judge Rader might be helpful.   Regardless of his
comment, please do not circulate this widely outside of Facebook absent a specific
need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
>        On Wednesday, as you know, the judges meet for a strictly
> social lunch.  We usually discuss politics and pay raises.
> Today, in the midst of the general banter, one of my female
> colleagues interrupted and addressed herself to me.  She said
> that she was vastly impressed with the advocacy of "my friend,
> Ed."  She said that you had handled two very complex cases,
> back to back.  In one case, you were opposed by Seth Waxman.
> She said Seth had a whole battery of assistants passing him
> notes and keeping him on track.  You were alone and
> IMPRESSIVE in every way.  In both cases, you knew the record
> cold and handled every question with confidence and grace.
> She said that she was really impressed with your performance.
> Two of my other colleagues immediately echoed her enthusiasm
> over your performance.
>
>        I, of course, pointed out that I had taught you everything
> you know in our recent class at Berkeley together . . . NOT!  I
> added the little enhancement that you can do the same thing

with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 18

**From:**       Reines, Edward [edward.reines@weil.com]
**Sent:**       Wednesday, March 05, 2014 7:35 PM
**To:**         'Rainey, Richard (GE Corporate)'
**Subject:**    RE: Federal Circuit

You are kind.

-----Original Message-----
From: Rainey, Richard (GE Corporate) [mailto:richard.rainey1@ge.com]
Sent: Wednesday, March 05, 2014 7:19 PM
To: Reines, Edward
Subject: Re: Federal Circuit

Knowing you as I do, I am not surprised. Great words for a star advocate!!

Richard L. Rainey
GE Corporate
Mobile: +1-203-260-9774

On Mar 5, 2014, at 9:30 PM, "Reines, Edward"
<edward.reines@weil.com<mailto:edward.reines@weil.com>> wrote:

Rich, please keep the below to yourself, regardless of Judge Rader's comment.  All The
Best, Ed

Begin forwarded message:
From: "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov<mailto:RR@cafc.uscourts.gov>>
Date: March 5, 2014 at 3:24:12 PM EST
To: Edward Reines <edward.reines@weil.com<mailto:edward.reines@weil.com>>
Subject: Congratulations
Ed,
        On Wednesday, as you know, the judges meet for a strictly social lunch.  We
usually discuss politics and pay raises.  Today, in the midst of the general banter, one
of my female colleagues interrupted and addressed herself to me.  She said that she was
vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two
very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said
Seth had a whole battery of assistants passing him notes and keeping him on track.  You
were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and
handled every question with confidence and grace.  She said that she was really impressed
with your performance.  Two of my other colleagues immediately echoed her enthusiasm over
your performance.
        I, of course, pointed out that I had taught you everything you know in our recent
class at Berkeley together . . . NOT!  I added the little enhancement that you can do the
same thing with almost any topic of policy: mastering the facts and law without the
slightest hesitation or pause!
        In sum, I was really proud to be your friend today!  You bring great credit on
yourself and all associated with you!
        And actually I not only do not mind, but encourage you to let others see this
message.
        Your friend for life, rrr

_____

The information contained in this email message is intended only for use of the individual
or entity named above. If the reader of this message is not the intended recipient, or the
employee or agent responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please immediately notify us
by email, postmaster@weil.com<mailto:postmaster@weil.com>, and destroy the original
message. Thank you.

# EXHIBIT 19

**From:** Roeder, Paul [paul.roeder@hp.com]
**Sent:** Wednesday, March 05, 2014 4:13 PM
**To:** Reines, Edward; Bright, Cynthia
**Subject:** RE: Federal Circuit
Will keep it here.  Very useful.  Thanks.

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:51 PM
**To:** Bright, Cynthia; Roeder, Paul
**Subject:** Federal Circuit

As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this widely outside of HP absent a specific need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
>      On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
>      I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>
>      In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!
>
>      And actually I not only do not mind, but encourage you to let others see this message.
>
>      Your friend for life, rrr

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 20

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 4:49 PM
**To:** 'Bright, Cynthia'; 'Roeder, Paul'
**Subject:** RE: Federal Circuit

Thank you both.  And thank you for all your support.

---

**From:** Bright, Cynthia [mailto:cynthia.bright@hp.com]
**Sent:** Wednesday, March 05, 2014 4:17 PM
**To:** Reines, Edward; Roeder, Paul
**Subject:** RE: Federal Circuit

What a lovely message.  Well deserved.  Will keep it safe.

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:51 PM
**To:** Bright, Cynthia; Roeder, Paul
**Subject:** Federal Circuit

As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this widely outside of HP absent a specific need.  All The Best, Ed

Begin forwarded message:

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing

with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 21

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:52 PM
**To:** Dadswell, Charles
**Subject:** Re: Federal Circuit
Of course.  646-248-4331. I'm about to go wheels up.  I'll be around after 9:30 pm tonight or tomorrow.  Yes, please share with Roland and the team.   Best, Ed

On Mar 5, 2014, at 6:51 PM, "Dadswell, Charles" <cdadswell@illumina.com> wrote:

> Ed:
>
> I appreciate the e-mail.  I won't circulate, but will let Roland give it a read.
>
> Do you have a cell phone number you would be comfortable giving me?
>
> cd

---

**From:** <Reines>, Edward Reines <edward.reines@weil.com>
**Date:** Wednesday, March 5, 2014 at 3:32 PM
**To:** ". ." <cdadswell@illumina.com>
**Subject:** Federal Circuit

Chuck, as you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this widely.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>      On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really

impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 22

**From:** Stabinsky, Allon [allon.stabinsky@intel.com]
**Sent:** Friday, March 07, 2014 1:53 PM
**To:** Reines, Edward
**Subject:** RE: Federal Circuit

Ed:

I'm definitely interested in learning more about Weil's appellate practice.   In fact, I have been talking to Garland about expanding the relationship, and he has the AR to plan a meeting with the litigation and transactional folks.   Please coordinate with Garland to ensure that you're involved too.

Thanks,

Allon

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 7:01 PM
**To:** Stabinsky, Allon
**Subject:** Federal Circuit

Allon, as you continue to consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this widely outside of Intel absent a specific need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything

you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 23

**From:** Mary Fuller [Mary.Fuller@maximintegrated.com]
**Sent:** Sunday, March 09, 2014 8:34 PM
**To:** Reines, Edward; Ed Medlin; Jason Cheng
**Subject:** RE: Federal Circuit

Ed,

Congratulations.  What a great honor to be honored by Judge Rader.

Thank you for sharing.

Best wishes,
Mary

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Sunday, March 09, 2014 5:33 PM
**To:** Ed Medlin; Mary Fuller; Jason Cheng
**Subject:** Federal Circuit

Folks, as you may have Federal Circuit and other needs for counsel, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this outside of Maxim absent a need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing

with almost any topic of policy: mastering the facts and law
without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You
bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to
let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 24

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:39 PM
**To:** Isabella.Fu@microsoft.com
**Subject:** Re: Federal Circuit
I did.  Thank you so much!

On Mar 5, 2014, at 6:33 PM, "Isabella Fu (LCA)" <Isabella.Fu@microsoft.com> wrote:

> That's great, Ed.  Nice to see you today.  I saw you at the street corner and asked the taxi driver to open the window/door immediately.  Hope you made it to your flight.
>
> **From:** Reines, Edward [mailto:edward.reines@weil.com]
> **Sent:** Wednesday, March 05, 2014 3:30 PM
> **To:** Andy Culbert (LCA); Isabella Fu (LCA); David Killough (LCA)
> **Subject:** Federal Circuit
> As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this outside of Microsoft.  All The Best, Ed
>
> Begin forwarded message:
>
> > **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> > **Date:** March 5, 2014 at 3:24:12 PM EST
> > **To:** Edward Reines <edward.reines@weil.com>
> > **Subject: Congratulations**
> >
> > Ed,
> >
> > On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
> >
> > I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest

hesitation or pause!

     In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

     And actually I not only do not mind, but encourage you to let others see this message.

     Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 25

**From:** Ian.Slotin@nbcuni.com
**Sent:** Wednesday, March 05, 2014 6:38 PM
**To:** Reines, Edward
**Subject:** RE: Federal Circuit
Congratulations!  Quite a compliment!

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 6:36 PM
**To:** Lane, Hilary (NBCUniversal); Slotin, Ian (NBCUniversal)
**Subject:** Federal Circuit

Hilary and Ian, I thought you might be interested in this feedback from Chief Judge Rader.  Please keep to yourself unless a need arises.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>
> In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!
>
> And actually I not only do not mind, but encourage you to let others see this message.
>
> Your friend for life, rrr

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 26

**From:** Luftman, Douglas [Douglas.Luftman@netapp.com]
**Sent:** Wednesday, March 05, 2014 9:00 PM
**To:** Reines, Edward
**Subject:** Re: Federal Circuit
Awesome man.  Congrats on the kudos.
Doug

**Douglas Luftman**
Vice President, Innovation Services & Chief Intellectual Property Counsel
**NetApp**
495 East Java Drive
Sunnyvale, CA 94089
408.205.3500 Mobile Phone
douglas.luftman@netapp.com
www.netapp.com/us/

On Mar 5, 2014, at 3:32 PM, "Reines, Edward" <edward.reines@weil.com> wrote:

> Doug, I thought the below email from Chief Judge Rader might be interesting given you attended the hearings.  All The Best, Ed

> Begin forwarded message:

>> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
>> **Date:** March 5, 2014 at 3:24:12 PM EST
>> **To:** Edward Reines <edward.reines@weil.com>
>> **Subject: Congratulations**

>> Ed,
>> On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley

together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 27

**From:** Kent E. Baldauf Jr. [KBaldaufJr@webblaw.com]
**Sent:** Wednesday, March 05, 2014 4:59 PM
**To:** Reines, Edward; Lee Cheng
**Cc:** Kevin M. Fong
**Subject:** Re: Federal Circuit
I always knew the chicks dug Ed, I'm just surprised about the other stuff.

Congratulations bud. It is well deserved. You are the best at what you do and I'm glad you are on our side.

From: Reines, Edward
Sent: Wednesday, March 5, 2014 6:43 PM
To: Lee Cheng
Cc: Kent E. Baldauf Jr.; Kevin M. Fong
Subject: Federal Circuit


Lee, I thought the below email from Chief Judge Rader might be of interest. Regardless of his comment, please do not circulate this outside of Newegg without a specific need and then not broadly. All The Best, Ed

Begin forwarded message:

From: "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov<mailto:RR@cafc.uscourts.gov>>
Date: March 5, 2014 at 3:24:12 PM EST
To: Edward Reines <edward.reines@weil.com<mailto:edward.reines@weil.com>>
Subject: Congratulations

Ed,
On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance. I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!
And actually I not only do not mind, but encourage you to let others see this message.
Your friend for life, rrr

_____

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this

communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

---

# EXHIBIT 28

**From:** Lee.C.Cheng (svp.usca00.Newegg) 22015 [Lee.C.Cheng@newegg.com]
**Sent:** Wednesday, March 05, 2014 3:59 PM
**To:** Reines, Edward
**Cc:** Kent E. Baldauf; Kevin M. Fong
**Subject:** RE: Federal Circuit

Congrats, Ed.

I share with Judge Rader great admiration for your legal acumen, as well as the honor of your friendship.

I'm so not surprised that you impressed the ladies...

Kick Waxman's ass!

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:43 PM
**To:** Lee.C.Cheng (svp.usca00.Newegg) 22015
**Cc:** Kent E. Baldauf; Kevin M. Fong
**Subject:** Federal Circuit

Lee, I thought the below email from Chief Judge Rader might be of interest.   Regardless of his comment, please do not circulate this outside of Newegg without a specific need and then not broadly.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
>         On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
>         I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing

with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 29

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 7:30 PM
**To:** anthony.k@samsung.com
**Subject:** Federal Circuit

Anthony, as you consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful.  Regardless of his comment, please do not circulate this outside Samsung, but feel free to do so within Samsung to the relevant folks.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
>      On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
>      I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>
>      In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!
>
>      And actually I not only do not mind, but encourage you to let others see this message.
>
>      Your friend for life, rrr

# EXHIBIT 30

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Thursday, March 06, 2014 6:23 AM
**To:** Hamel, Kevin
**Subject:** Re: Federal Circuit

Thank you kindly for your support. But only time will tell whether he actually listens to you and the Federal Circuit judges! ;-). It would be wonderful to connect soon. Let me know if your ever out this way. Best, Ed

On Mar 6, 2014, at 4:32 AM, "Hamel, Kevin" <kevin.hamel@sap.com> wrote:

> Good to know he listens to me!
>
> On Mar 5, 2014, at 8:26 PM, "Reines, Edward" <edward.reines@weil.com> wrote:
>
>> You are very kind. You guys are first-class and I would delight in serving you again. I would reward your trust. Best, Ed
>>
>> **From:** DiBartolomeo, Anthony [mailto:anthony.dibartolomeo@sap.com]
>> **Sent:** Wednesday, March 05, 2014 4:52 PM
>> **To:** Reines, Edward
>> **Cc:** Hamel, Kevin; Lisa Buccino
>> **Subject:** Re: Federal Circuit
>>
>> I'm not surprised. Kevin was just saying the same thing recently and suggested we find a way to get you more involved with our appeal strategies and Fed Cir activities. Thanks for being a good friend to us. Best, Tony
>>
>> On Mar 5, 2014, at 6:34 PM, "Reines, Edward" <edward.reines@weil.com> wrote:
>>
>>> As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful. Regardless of his comment, please do not circulate this outside of SAP absent a specific need. All The Best, Ed
>>>
>>> Begin forwarded message:
>>>
>>>> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
>>>> **Date:** March 5, 2014 at 3:24:12 PM EST
>>>> **To:** Edward Reines <edward.reines@weil.com>
>>>> **Subject: Congratulations**
>>>>
>>>> Ed,
>>>>        On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases,

back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 31

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Sunday, June 15, 2014 5:44 PM
**To:** Sundermeyer, Michael; Burke, William
**Subject:** FW: Dennis Crouch's Patently-O: A Warm Welcome to Chief Judge Prost

███████████████████████████████████████████████████████████████

**From:** Hamel, Kevin [mailto:kevin.hamel@sap.com]
**Sent:** Saturday, May 24, 2014 5:16 AM
**To:** Reines, Edward
**Subject:** Fwd: Dennis Crouch's Patently-O: A Warm Welcome to Chief Judge Prost

The last line is priceless.


Begin forwarded message:

> **From:** Patently-O » Patent <patent@gmail.com>
> **Date:** May 24, 2014 at 6:29:13 AM EDT
> **To:** <kevin.hamel@sap.com>
> **Subject: Dennis Crouch's Patently-O: A Warm Welcome to Chief Judge Prost**

# Dennis Crouch's Patently-O: A Warm Welcome to Chief Judge Prost

 Link to Patentl...

## A Warm Welcome to Chief Judge Prost

Posted: 23 May 2014 07:40 AM PDT

*By Dennis Crouch*

Chief Judge Randall Rader has announced that he is stepping down from his position as Chief Judge – effective May 30, 2014. According to the Federal Circuit's rules of succession, Judge Sharon Prost will succeed Judge Rader as the next Chief.

Judge Rader is a longtime member of the court and has been a gregarious Chief Judge. His willingness to have frank and open discussions on a variety of patent law issues has been welcomed by the bar as has his work to build ties with patent law authorities from around the globe. Those connections will continue to serve the court well into the future. However, this outgoing approach has also been criticized as contrary to the traditions of judicial detachment and seclusion. Judge Rader is eligible to take senior status (and thus retain his full salary of approximately $170k). However, he has indicated that he will remain in active service for now. Although it is unclear whether related, Judge Rader's transition comes amidst a potential brewing mini-scandal involving a public endorsement for veteran Federal Circuit litigator Ed Reines. There were three years remaining in his seven-year term as Chief.

Judge Prost has been on the court since 2001. During that time she has authored

hundreds of patent law opinions, including the recent en banc decision in *Bosch v. Pylon* and a dissent in *Apple v. Motorola*. Prior to joining the court, she worked as the Senate Judiciary Chief Counsel under Orrin Hatch and has worked in the Federal Government since her graduation from Cornell in 1973. She was appointed to the court by President George W. Bush. Judge Prost is also known as a litigant – her early 1990′s custody battle resulted in a D.C. Court of Appeals opinion that continues to be taught in law schools. Link.

Moving forward, Chief Judge Prost's history in government will be instrumental in considering the new administrative-law battles arising from the USPTO's Patent Trial & Appeal Board.

= = = =

**Succession**: According to the rules of succession, the next Chief Judge is designated as the most senior judge on the court who is in regular active service but who is also not yet aged 65 and who has not previously served as Chief Judge.

= = = =

**Update:** Judge Rader has distributed an open letter that provides an explanation and appears to fully confirm the story that regarding his recent recusals and vacatur of his position as Chief Judge.

In particular, Judge Rader confirms that he previously emailed noted attorney Ed Reines of the Weil firm praising his advocacy and suggesting that the email could be used as a client development tool.  The letter then became public as Reines was arguing before the court.  Judge Rader now writes:

> I have come to realize that I have engaged in conduct that crossed lines established for the purpose of maintaining the judicial process whose integrity must be beyond question. It is important to emphasize that I did not and would never compromise my impartiality in judging any case before me. But avoiding even teh appearance of partiality is a vital interest of our court, and I compromised that interest by transgressing limits on judges' interaction with attorneys who appear before the court. I was inexcusably careless, and I sincerely apologize.

5-23-14_RRR_Letter

As I highlighted above, Judge Rader's demeanor is gregarious and he is open with his praise. I have seen him publicly praise many different attorneys. In fact, I remember a couple of times where he praised my work — suggesting to me that his praises should generally be taken with a grain of salt.  I also don't believe that this activity warrants him stepping down from his position as chief, but it appears he is going the extra mile to ensure that the court's integrity is above question.

I should also add that I also believe Ed Reines is a great appellate advocate. (Yes, you may show this to your potential clients.)

---

You are subscribed to email updates from Patently-O » Patent                                    Email delivery powere
To stop receiving these emails, you may unsubscribe now.
Google Inc., 20 West Kinzie, Chicago IL USA 60610

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 32

**From:** Andrea.Townsend@turner.com
**Sent:** Thursday, March 06, 2014 2:31 AM
**To:** Reines, Edward
**Subject:** Re: Federal Circuit
Thanks Ed! This is a keeper.

---

**From:** Reines, Edward
**Sent:** Wednesday, March 5, 2014 10:00 PM
**To:** Townsend, Andrea
**Subject:** Federal Circuit

Andrea, as you continue to consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this widely outside of the Turner companies absent a specific need but feel free to do so within as you see fit.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>
> In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!
>
> And actually I not only do not mind, but encourage you to

let others see this message.
Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 33

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 7:05 PM
**To:** Coyne, Mary L (mary.coyne@verizon.com); Holden, Michael (michael.holden@verizon.com); 'Levine, Gail'
**Subject:** Federal Circuit

Folks, as you consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful. Regardless of his comment, please do not circulate this widely outside of Verizon absent a specific need. I trust you are well and looking forward to Spring. All The Best, Ed P.S.. Gail, wonderful to see you are the White House event. It's been too long. Let's connect next time schedules click.

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>
> On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.
>
> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>
> In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!
>
> And actually I not only do not mind, but encourage you to let others see this message.
>
> Your friend for life, rrr

# EXHIBIT 34

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:55 PM
**To:** Justin Liu; Scott Hoover Smoot
**Subject:** Federal Circuit

Justin and Scott, As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful. Regardless of his comment, please do not circulate this widely outside of Xilinx absent a specific need. All The Best, Ed

Begin forwarded message:

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 35

**From:** hphan@yahoo-inc.com
**Sent:** Wednesday, March 05, 2014 4:02 PM
**To:** Reines, Edward; kramer@yahoo-inc.com; dbright@yahoo-inc.com
**Subject:** RE: Federal Circuit
Very nice, Ed.

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 3:49 PM
**To:** Kevin Kramer; David Brightman; Hieu Phan
**Subject:** Federal Circuit

As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this broadly absent a specific need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>       On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.
>       I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!
>       In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!
>       And actually I not only do not mind, but encourage you to let others see this message.
>       Your friend for life, rrr

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 36

**From:** kramer@yahoo-inc.com
**Sent:** Wednesday, March 05, 2014 3:53 PM
**To:** Reines, Edward
**Cc:** dbright@yahoo-inc.com; hphan@yahoo-inc.com
**Subject:** Re: Federal Circuit

That's great, Ed!

Nice praise from the court.

Thanks for sharing.

Sent from my iPhone

On Mar 5, 2014, at 3:49 PM, "Reines, Edward" <edward.reines@weil.com> wrote:

> As you continue to consider us for your Federal Circuit needs, I thought the below email from Chief Judge Rader might be helpful. Regardless of his comment, please do not circulate this broadly absent a specific need. All The Best, Ed

> Begin forwarded message:

>> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
>> **Date:** March 5, 2014 at 3:24:12 PM EST
>> **To:** Edward Reines <edward.reines@weil.com>
>> **Subject: Congratulations**

>> Ed,

>> On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

>> I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of

policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 37

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Sunday, June 15, 2014 5:42 PM
**To:** Sundermeyer, Michael; Burke, William
**Subject:** FW: Stuff

███████████████████████████████████████████████████

**From:** Kevin Kramer [mailto:kramer@yahoo-inc.com]
**Sent:** Friday, June 06, 2014 8:51 AM
**To:** Reines, Edward
**Subject:** Re: Stuff

Good.

It will all blow over at some point.


On Friday, June 6, 2014 8:31 AM, "Reines, Edward" <edward.reines@weil.com> wrote:

**Thanks much.   Doing the best I can.**

---

**From:** Kevin Kramer [mailto:kramer@yahoo-inc.com]
**Sent:** Friday, June 06, 2014 8:29 AM
**To:** Reines, Edward
**Subject:** Stuff

Ed,

Just checking in and making sure all is good.

I've seen all the drama.   Seems quite overblown to me, but wanted to make sure you're doing well.

Kevin

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 38

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Thursday, March 06, 2014 9:25 AM
**To:** 'paul.delva@fairchildsemi.com'
**Subject:** Power Integrations

Paul, I saw the unfortunate verdict in ND Cal in the Power Integrations case.  I call to offer assistance in two ways.   I can help in the district court.  No one knows this court better or has a better relationship with the bench.  I have chaired the ND Cal Patent Rules committee for many years and am viewed as an authority on all-things-patent by this bench.   You will have maximum credibility.  Second, I am a leading Federal Circuit advocate.  Just yesterday Chief Judge Rader sent me an email reporting how impressed the Federal Circuit judges were in appeals I argued Tuesday.  In one of those cases I helped flip a $52 million verdict.   I would love to help you do the same.  Yesterday's email is below.  Please keep it to Fairchild.   I have served the Federal Circuit as Chair of its Advisory Council for many years.   That obviously speaks to my stature at that court.

I can help in any role from mere fresh eyes to complete handling.  I pride myself on working well with trial counsel – often the loss is not their fault but, in all events, looking backwards that way is not my role or interest.

Please let me know if you would like to discuss.   I'm happy to direct you to references.

Best,

Ed

*****************

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every

question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 39

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Monday, March 10, 2014 12:34 PM
**To:** 'Gupta, Anirma'
**Cc:** 'Faye, Chris'
**Subject:** RE: Weil

Got it.  Maybe some of the patent reform efforts are working!   Best, Ed

---

**From:** Gupta, Anirma [mailto:Anirma_Gupta@intuit.com]
**Sent:** Monday, March 10, 2014 1:32 PM
**To:** Reines, Edward
**Cc:** Faye, Chris
**Subject:** Re: Weil

Thanks for sharing.  We are in the fortunate position to not have an overwhelming docket at the moment.  However, we will keep your firm in mind going forward.


Regards, Anirma

**Anirma R. Gupta**
**Vice President & Deputy General Counsel**
**Intuit Inc.**
2675 Coast Avenue, Mountain View, CA 94043
(650) 944-5754

---

**From:** <Reines>, Edward <edward.reines@weil.com>
**Date:** Sunday, March 9, 2014 10:23 PM
**To:** Anirma Gupta <Anirma_Gupta@intuit.com>
**Subject:** Weil

Anirma, as you may have Federal Circuit and other needs for counsel, and as we would like to work with you (Sonal, speaks VERY highly) I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this outside of Intuit absent a need.  All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**
>
> Ed,
>       On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases, back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your

performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 40

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Thursday, March 06, 2014 1:16 PM
**To:** 'Hilary Ware'
**Cc:** 'Isaac Peterson (ipeterson@netflix.com)'
**Subject:** RE: Federal Circuit

Thanks, Hilary. For immediate purposes, I was more thankful for the indirect, but good vibes from the three panelists!

**From:** Hilary Ware [mailto:hware@netflix.com]
**Sent:** Thursday, March 06, 2014 1:06 PM
**To:** Reines, Edward
**Cc:** Isaac Peterson (ipeterson@netflix.com)
**Subject:** Re: Federal Circuit

Thanks so much for passing on such great feedback, Ed! It's clear he's an enormous fan.

Hilary

On Wed, Mar 5, 2014 at 7:14 PM, Reines, Edward <edward.reines@weil.com> wrote:

Hilary and Isaac, as you consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful. Regardless of his comment, please do not circulate this widely outside of Netflix absent a specific need. All The Best, Ed

Begin forwarded message:

> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> **Date:** March 5, 2014 at 3:24:12 PM EST
> **To:** Edward Reines <edward.reines@weil.com>
> **Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

--
Hilary E. Ware
Associate General Counsel, Litigation & Regulatory Affairs
Netflix Inc.

# EXHIBIT 41

**From:** Michael Ritter [mritter@paloaltonetworks.com]
**Sent:** Monday, March 10, 2014 10:15 AM
**To:** Reines, Edward
**Subject:** RE: Federal Circuit

Hello Ed, ███████████████████████████████████████████████████████████
█████████████████████████ That's a very nice note from CJ Rader and we will definitely keep
you in mind.

Michael

---

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Friday, March 07, 2014 3:14 PM
**To:** Michael Ritter
**Subject:** Federal Circuit

████████████████████████████████████████ Let me know if you think some
additional Federal Circuit expertise may be of use. The below note from Chief Judge
Rader may be helpful in considering us. Best, Ed

Begin forwarded message:

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social
lunch. We usually discuss politics and pay raises. Today, in the midst
of the general banter, one of my female colleagues interrupted and
addressed herself to me. She said that she was vastly impressed with
the advocacy of "my friend, Ed." She said that you had handled two very
complex cases, back to back. In one case, you were opposed by Seth
Waxman. She said Seth had a whole battery of assistants passing him
notes and keeping him on track. You were alone and IMPRESSIVE in
every way. In both cases, you knew the record cold and handled every
question with confidence and grace. She said that she was really
impressed with your performance. Two of my other colleagues
immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know
in our recent class at Berkeley together . . . NOT! I added the little
enhancement that you can do the same thing with almost any topic of
policy: mastering the facts and law without the slightest hesitation or
pause!

In sum, I was really proud to be your friend today! You bring great
credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others
see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 42

**From:** Joe FitzGerald [fitz@purestorage.com]
**Sent:** Wednesday, March 05, 2014 9:37 PM
**To:** Reines, Edward
**Subject:** Re: Federal Circuit
Well done! Did you go to the event at the rosewood tonight?

Sent from my iPhone

On Mar 5, 2014, at 9:18 PM, "Reines, Edward" <edward.reines@weil.com> wrote:

> Joe, I thought the below email from Chief Judge Rader might be helpful if you
> consider us as counsel.   Regardless of his comment, please do not circulate
> this widely absent a specific need.  All The Best, Ed
>
> Begin forwarded message:
>
> > **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
> > **Date:** March 5, 2014 at 3:24:12 PM EST
> > **To:** Edward Reines <edward.reines@weil.com>
> > **Subject: Congratulations**
> >
> > Ed,
> >        On Wednesday, as you know, the judges meet for
> > a strictly social lunch.  We usually discuss politics and
> > pay raises.  Today, in the midst of the general banter,
> > one of my female colleagues interrupted and addressed
> > herself to me.  She said that she was vastly impressed
> > with the advocacy of "my friend, Ed."  She said that you
> > had handled two very complex cases, back to back.  In
> > one case, you were opposed by Seth Waxman.  She said
> > Seth had a whole battery of assistants passing him
> > notes and keeping him on track.  You were alone and
> > IMPRESSIVE in every way.  In both cases, you knew
> > the record cold and handled every question with
> > confidence and grace.  She said that she was really
> > impressed with your performance.  Two of my other
> > colleagues immediately echoed her enthusiasm over
> > your performance.
> >        I, of course, pointed out that I had taught you
> > everything you know in our recent class at Berkeley
> > together . . . NOT!  I added the little enhancement that
> > you can do the same thing with almost any topic of
> > policy: mastering the facts and law without the slightest
> > hesitation or pause!
> >        In sum, I was really proud to be your friend
> > today!  You bring great credit on yourself and all

associated with you!
    And actually I not only do not mind, but
encourage you to let others see this message.
    Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 43

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Thursday, March 13, 2014 12:29 PM
**To:** rtiller@redhat.com
**Cc:** 'David Perry'
**Subject:** RE: Qualiqode

Rob, thanks for your kind note. It would fun to have the opportunity to work together again. In terms of recent *bona fides*, this email last week from Chief Judge Rader may be relevant to you. Best, Ed

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

**From:** Robert Tiller [mailto:rtiller@redhat.com]
**Sent:** Thursday, March 13, 2014 12:04 PM

**To:** Reines, Edward
**Cc:** David Perry
**Subject:** Re: Qualiqode

Hi Ed --

    Thanks for letting us know of your interest.  We recently heard news of your good work from the GC at Newegg.  We're just starting to look at this one, and may want to talk more.
Cheers,
Rob
On 3/13/2014 2:11 PM, Reines, Edward wrote:

> Rob and David, please let us know whether you would like to consider us to defend you in the Qualiqode litigation.  We would be happy to prepare an analysis and proposal for you.
> Best, Ed

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

--
Robert H. Tiller
Vice President & Assistant General Counsel
Red Hat, Inc.
100 E. Davie St.
Raleigh, N.C. 27601
(919) 754-4232
rtiller@redhat.com

# EXHIBIT 44

**From:** Paul Grossman [pdg@thpartners.net]
**Sent:** Thursday, March 06, 2014 4:01 PM
**To:** Reines, Edward
**Subject:** Re: Update
Ed,

Thanks for the kind words, and congratulations on the Radar comments; very well deserved, I'm sure.

Best,
Paul

Paul Grossman
Telegraph Hill Partners
2223 Avenida de la Playa, Suite 305A
La Jolla, CA 92037
T: 858-410-1048
C: 760-216-3269
E: PDG@THPartners.NET

Assistant: Kate Cilio
T: 415-765-6980
C: 917-602-2910
F: 415-765-6983
E: KCC@THPartners.NET

---

**From:** <Reines>, Edward Reines <edward.reines@weil.com>
**Date:** Wednesday, March 5, 2014 at 11:08 PM
**To:** Paul Grossman <pdg@thpartners.net>
**Subject:** Update

> Paul, congrats again on another major success with the merger.  You are impressive.  Thank you for your friendship and support over the years.   You've shown trust and provided opportunity.
> We had the hearing on our appeals from the Promega decisions: (1) invalidating the Caltech patent on SJ and (2) JMOL overturning the $52 million verdict against us.
> As you'll see below, we have already received some unusual feedback from the Chief Judge of the Federal Circuit, Randall Rader, about the argument.   I'm proud to share it with you.
> I hope to see you and Bonnie soon.

All The Best,
Ed

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 45

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Wednesday, March 05, 2014 5:36 PM
**To:** Mike Hunkapiller (mhunkapiller@pacificbiosciences.com)
**Subject:** Your '096 Patent On Fluorescent Tagging Of DNA

Mike, █████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████ As you read
below, you'll see that we have already received some unusual feedback from the Chief
Judge of the Federal Circuit, Randall Rader, about the argument.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

As mentioned earlier, below is an email with the feedback from Chief Judge Rader.  Such
feedback is quite unusual.

If the spirit moves you, this link will bring you to a recording of the argument:
http://oralarguments.cafc.uscourts.gov/Audiomp3/2013-1454.mp3

You can easily listen.  I think you might be interested.

Mike, you have been one of the best partners and supporters I have had in my career and
I never will forget that or take it for granted. █████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Feel free to circulate this to your co-inventors or others who you think might appreciate it.

I'd be happy to discuss.

All The Best,

Ed

**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Cc:** "Bagrowski, Kori Anne (kbagrowski@brinkshofer.com) (kbagrowski@brinkshofer.com)"
<kbagrowski@brinkshofer.com>, "Kang, Jennifer" <kangj@cafc.uscourts.gov>
**Subject: Congratulations**

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

# EXHIBIT 46

**From:** krhodes@mmm.com
**Sent:** Sunday, March 09, 2014 5:01 PM
**To:** Reines, Edward
**Subject:** Re: Federal Circuit

Congratulations, Ed.  You should be rightly proud of such high praise.  We will keep you in mind, for sure, in our trips to the Federal Circuit.


Best regards,
Kevin

_____



Kevin H. Rhodes
Chief Intellectual Property Counsel  |  President, 3M Innovative Properties Company
3M Center, Building 220-9E-01 | Office Location:  220-10W/11
Mailing Address:  P.O. Box 33428 | St. Paul, Minnesota 55133-3428
Office: 651 736 4533 | Fax: 651 733 9155
Blackberry: 651 497 8705 | Mobile:  651 470 6458
krhodes@mmm.com | www.3M.com

Assistant:  Shelley Cordes | 651 733 1524
scordes@mmm.com

This communication contains confidential information intended only for the addressee(s) named above.
*************************************************************************



| | |
|---|---|
| From: | "Reines, Edward" <edward.reines@weil.com> |
| To: | "krhodes@mmm.com" <krhodes@mmm.com> |
| Date: | 03/09/2014 07:37 PM |
| Subject: | Federal Circuit |

_____


Kevin, as you may consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful.   Regardless of his comment, please do not circulate this outside of your company absent a specific need.  All The Best, Ed

Begin forwarded message:
**From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
**Date:** March 5, 2014 at 3:24:12 PM EST
**To:** Edward Reines <edward.reines@weil.com>
**Subject: Congratulations**
Ed,
        On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me.  She said that she was vastly impressed with the advocacy of "my friend, Ed."  She said that you had handled two very complex cases,

back to back.  In one case, you were opposed by Seth Waxman.  She said Seth had a whole battery of assistants passing him notes and keeping him on track.  You were alone and IMPRESSIVE in every way.  In both cases, you knew the record cold and handled every question with confidence and grace.  She said that she was really impressed with your performance.  Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT!  I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today!  You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 47

Message

| | |
|---|---|
| **From**: | Pappas, Nicholas [nicholas.pappas@weil.com] |
| **Sent**: | 4/10/2014 3:17:45 PM |
| **To**: | 'Julia Keelty' [keelty@me.com] |
| **CC**: | 'Carrie Delafield' [cdelafield@aol.com] |
| **Subject**: | RE: law firms |
| **Attachments**: | 963 SAP Shuffles Legal Lineup to Defend First-of-its-Kind PTO Ruling.pdf |

Dear Julia:

Serendipity strikes!   Federal Circuit appeals are right in our sweet spot.   I'm delighted that we are so well-positioned to assist you.  Let me briefly explain.

There is no better Federal Circuit expert than my partner Ed Reines.   Here is a link to his bio (http://www.weil.com/edwardreines/), but let me highlight a few of his credentials to help you determine whether you would like to pursue this further.

- Ed serves the Federal Circuit as the Chair of its Advisory Council.  There is no higher honor the Federal Circuit can bestow on a member of the bar.   They rely on him and the Council for advice on practice and policy and have done so for many years.
- Below is an email Chief Judge Rader of the Federal Circuit recently sent to Ed that described his recent Federal Circuit performance there as "impressive in every way."  In all my years of litigation, I have never seen an appellate judge send such glowing feedback to an advocate.
- Ed was retained a few days ago for an incredibly high profile set of Federal Circuit appeals.  The AmLaw story this week on Ed and that retention is attached.

We are confident that Weil would be a potentially good match.  Please let us know if you would like more information or to meet Ed.

Best regards,

Nick

**From:** Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent:** Wednesday, March 05, 2014 12:24 PM
**To:** Reines, Edward
**Subject:** Congratulations

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr


**From:** Julia Keelty [mailto:keelty@me.com]
**Sent:** Thursday, April 10, 2014 2:35 AM
**To:** Pappas, Nicholas
**Cc:** Carrie Delafield
**Subject:** Re: law firms

Hi Nick,

Thanks for getting in touch. Our situation has been a bit mercurial, which is why I din't reply sooner. First, since I spoke with Jon, I learned that though Judge Sweet in NYC ruled on the case initially, this matter is appealable to the U.S. Federal Court of Appeals for the Federal Circuit, which sits in DC, not New York.

I see that your firm had an office in DC, and as I understand it, litigators from all over the US come to this court for parent related issues, so you firm may still be a possibility, however there are some new complexities that make matters slightly murky.

I'll be in Chicago all day Thursday and Friday, but will try and give you a call to very briefly acquaint you with our needs and the status of the case. Then we can determine if any further discussion make sense or not.

Thank you for your prompt attention to my inquiry and I look forward to speaking with you soon.

Best,

Julia Keelty
Keelty@me.com
410-404-1477


On Apr 8, 2014, at 3:47 PM, Pappas, Nicholas wrote:

Dear Julia,

As per your email to Jon Newman and some further email exchanges I had with Jon, I understand that you may be looking for new counsel in connection with the Touchtunes v. Arachnid matter in the U.S. District Court for the Southern District of New York before Judge Sweet.  I believe Jon has let you know that we have run a conflicts check based on the names you provided to Jon in your email below.  Subject to learning about any new facts, we do not see any conflict, and would be very pleased to discuss with you the possibility that Weil may be of service to Arachnid in this case.

Weil has a deep bench of patent litigators here in New York, including capabilities both at the district court and appellate levels. My colleagues here in the New York patent group, Liz Weiswasser and Tim DeMasi, have extensive experience litigating patent matters, and our partner Ed Reines in our Silicon Valley office is a nationally recognized lawyer who specializes in appeals to the Federal Circuit.  We believe we could propose a strong team that would be an excellent fit for this case.

We would be pleased to discuss further the Arachnid matter and Weil's capabilities at your convenience.   If you let us know some times that work for you, we will set up a conference call.

Best regards,

Nick




**Nicholas J. Pappas**
**Weil, Gotshal & Manges LLP**
**767 Fifth Avenue**
**New York, NY 10153**
nicholas.pappas@weil.com

**+1 212 310 8669 Direct**

**+1 201 259 4440 Mobile**
**+1 212 310 8007 Fax**
http://www.weil.com/nicholaspappas/

**From:** Jonathan Newman [mailto:JNewman@nfllp.com]
**Sent:** Thursday, April 03, 2014 5:47 PM
**To:** Pappas, Nicholas
**Cc:** Jonathan Newman
**Subject:** FW: law firms

Nick – please see my email below and Julia Keelty's reply.

Once you have had a chance to run a conflict check, please advise.

Thanks.

Jonathan H. Newman, Esq. | Newman Ferrara LLP
1250 Broadway, 27th Floor | New York, NY 10001
P: 212-619-5400 | F: 212-619-3090
jnewman@nfllp.com | www.nfllp.com

CONFIDENTIALITY NOTICE: The accompanying e-mail transmission is protected by the attorney-client privilege and is intended to be read by the designated individual/entity.  If you are not the recipient so named, or the employee or authorized agent responsible for delivery of this transmission to the intended recipient, you are prohibited from reading, disseminating, distributing, or copying this transmission.  If you have received this communication in error, please notify the sender immediately and delete any copy of the original transmission from your computer system.  Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free.

**From:** Julia Keelty <keelty@me.com>
**Date:** Thursday, April 3, 2014 4:46 PM
**To:** Jonathan Newman <jnewman@nfllp.com>
**Subject:** Re: law firms

Hi Jon,

Thanks for the speedy reply - We'll need to pass on Kaye Schoeler, LLP because they represent the Plaintiff in our case - so I *know* they have a conflict. Kind of funny that's one of your contacts on the list.

For your friend at Weil Gotshal,

The case was tried in front of Judge Sweet.
I think this is the case # 07 Civ. 11450

the parties involved are:

Touchtunes Music Corp., Plaintiff
- against -
Rowe International Corp., Arachnid Inc., AMI Entertainment, Inc and Merit Industries, Inc. , Defendant

My contact info is:

Julia Keelty
Keelty@me.com
410-404-1477

On Apr 3, 2014, at 3:22 PM, Jonathan Newman wrote:

Julia – I just spoke to my friend Nick Pappas, at Weil Gotshal who said that his firm could definitely help.

He did warn that his firm (like many on your list below) is not the cheapest in NYC.

He also requested before having you speak to one of his patent partners in his firm, if you could email me the name of the case, the case #, and your contact information so that he can run an appropriate conflict search.

I also have the name of a partner at the law firm Kaye Scholer LLP. This fellow was a classmate at Cornell of one of the attorneys here in my office.  I will be reaching out to him shortly, and he will undoubtedly require the same information as Nick.

Nick said that once he received the requested information that he could run the conflict search relatively quickly.

Jonathan H. Newman, Esq. | Newman Ferrara LLP
1250 Broadway, 27th Floor | New York, NY 10001
P: 212-619-5400 | F: 212-619-3090
jnewman@nfllp.com | www.nfllp.com

CONFIDENTIALITY NOTICE: The accompanying e-mail transmission is protected by the attorney-client privilege and is intended to be read by the designated individual/entity.  If you are not the recipient so named, or the employee or authorized agent responsible for delivery of this transmission to the intended recipient, you are prohibited from reading, disseminating, distributing, or copying this transmission.  If you have received this communication in error, please notify the sender immediately and delete any copy of the original transmission from your computer system.  Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free.

**From:** Julia Keelty <keelty@me.com>
**Date:** Thursday, April 3, 2014 12:39 PM
**To:** Jonathan Newman <jnewman@nfllp.com>
**Subject:** law firms

* **Alston + Bird LLP**
* **Baker & Hostetler LLP**
* **Brinks Hofer Gilson & Lione**
* **Cadwalader, Wickersham & Taft LLP**
* **Choate Hall & Stewart LLP**

- Connolly Bove Lodge & Hutz LLP
- Covington & Burling LLP
- Duane Morris LLP
- Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
- Fish & Richardson P.C. – FIRM OF THE YEAR, PATENT LAW
- Foley & Lardner LLP
- Fulbright & Jaworski L.L.P.
- Greenberg Traurig LLP
- Goodwin Procter LLP
- Harness, Dickey & Pierce, P.L.C.Jones Day
- K&L Gates LLP
- Kaye Scholer LLP
- Kenyon & Kenyon LLP
- Kirkland & Ellis LLP
- Knobbe, Martens, Olson & Bear LLP
- Kramer Levin Naftalis & Frankel LLP
- Lerner David Littenberg Krumholz & Mentlik LLP
- Leydig, Voit & Mayer, LTD.
- Mayer Brown LLP
- McAndrews, Held & Malloy, Ltd.
- McDermott Will & Emery LLP
- Morrison & Foerster LLP
- Nutter McClennen & Fish LLP
- Perkins Coie LLP
- Proskauer Rose LLP
- Ropes & Gray LLP
- Sidley Austin LLP
- Sterne, Kessler, Goldstein & Fox P.L.L.C.
- Taft Stettinius & Hollister LLP
- WilmerHale
- Woodcock Washburn LLP
- Weil, Gotshal & Manges LLP

Julia Keelty
Keelty@me.com
410-404-1477

Julia Keelty
Keelty@me.com
410-404-1477

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

## THE**RECORDER**

# SAP Shuffles Legal Lineup to Defend First-of-its-Kind PTO Ruling

**Scott Graham, The Recorder**

April 4, 2014



Edward Reines, Weil Gotshal and Manges partner

Jason Doiy

Software giant SAP has retained Weil, Gotshal & Manges partner Edward Reines to try to save the company from a $391 million patent judgment—and help thrash out the balance of power between the Federal Circuit and the U.S. Patent and Trademark Office in the wake of the America Invents Act.

Reines and Weil Gotshal are taking over as principal appellate counsel to SAP from Finnegan, Henderson, Farabow, Garrett & Dunner, according to a March 31 filing in the case, as Versata Software closes in on collecting a massive award that was affirmed by the U.S. Court of Appeals for the Federal Circuit last spring.

The Patent Trial and Appeal Board has since canceled a key Versata patent in the first ruling of its kind under a new administrative procedure set out in the 2011 America Invents Act. SAP is trying to use the PTAB decision to nullify Versata's judgment.

The AIA's postgrant procedures have been welcomed by some lawyers as an opportunity for the patent office to take a second look at vague or overly broad patents. Others have criticized

the PTAB for moving too aggressively to extinguish patents. "We don't need death squads," is how Federal Circuit Chief Judge Randall Rader put it in a speech earlier this year at UC-Hastings.

The impending fight between SAP and Versata is an early test of the controversial process and raises fresh questions about how conflicting rulings from the PTO and federal courts should be resolved.

Versata's lawyers at McKool Smith are attacking the PTAB decision at the Federal Circuit, saying the board wildly overreached the authority laid out in the AIA. "There's no indication whatsoever that Congress intended this to supplant final judgments from Article III courts," McKool Smith partner Scott Cole said in an interview last week.

The firm also contends that the PTAB has improperly enlarged the field of patents it's empowered to review, construed claims too broadly, and applied a legal test—Section 101 patent eligibility—that it's not authorized to apply. "They've interpreted the scope of their new powers broadly, and I guess that shouldn't be surprising," Cole said.

Some of the nation's largest patent holders, including 3M, Qualcomm, General Electric, Amgen and Eli Lilly, have started lining up to provide amicus curiae support for Versata.

It will fall to Reines, the president of the Federal Circuit Advisory Council and a staunch supporter of the court, to defend the PTAB's exercise of power. The usually talkative Reines, who just won a big ruling for SAP at the Federal Circuit on Friday, declined to comment on the case.

Meanwhile, the clock is ticking on SAP. The Supreme Court denied certiorari of the $391 million award in January. A Texas magistrate judge entered "final judgment" for Versata on March 26 despite SAP's desperate pleas for a stay in light of the PTAB decision.

A MATTER OF HIERARCHY

Pricer is the name of a computer program developed by Trilogy Software, now Versata, to optimize pricing based on the type of product, customer and the customer's location. The process traditionally required consulting multiple tables of data, but Versata organized the data into hierarchies and computerized it. Pricer was praised as a "breakthrough," according to Judge Rader's opinion for the Federal Circuit last May, and it generated $5 million a year in revenue from companies such as IBM, Lucent and Motorola.

While Versata's patent application was pending, SAP developed its own hierarchical pricing product which, according to Rader's opinion, the company touted as similar to Pricer. Versata sued, leading to two trials in the Eastern District of Texas.

SAP was represented the first time around by a Howrey team that included future Northern District Magistrate Judge Paul Grewal. The jury returned a verdict of $139 million for Versata. A Fish & Richardson team, led by partner Thomas Melsheimer, handled the second trial, which resulted in a $345 million award—$391 million with prejudgment interest. Fish has continued to represent SAP in the district court.

From the PTAB's point of view, the case never should have gone before a jury. PTAB Judges Sally Medley, Michael Tierney and Ramu Elluru concluded that Versata's business method claims are ineligible for protection under Section 101 of the Patent Act. The same issue that split the Federal Circuit into five different factions and appeared to bedevil the Supreme Court last month didn't seem to give the PTAB judges much pause.

"The concept of organizational hierarchies for products and customers is abstract as it represents a 'disembodied concept,' a basic building block of human ingenuity," the judges ruled unanimously. "While the challenged claims are drafted to include computer hardware limitations, the underlying process that is implemented on such hardware could also be performed via pen and paper."

McKool Smith, which represented Versata in both trials and before the Federal Circuit, objects on numerous grounds.

The first and most strenuous is timing—judgment was already final at the district court when SAP petitioned the PTAB, and the Federal Circuit affirmed a month before the PTAB issued its decision. Cole acknowledged that the AIA allows courts to stay litigation during covered business method review. But by referring to trial dates and discovery deadlines, the AIA "clearly contemplates" they be issued early in a case—not postjudgment, he says.

SAP argues that the Federal Circuit ruled in Fresenius v. Baxter that the PTO's cancellation of a patent can supersede a Federal Circuit decision, so long as some issues are still being litigated on remand. Fresenius was itself controversial within the Federal Circuit, leading to a dissent from a denial of en banc review by three of the judges.

Second, Versata argues that the AIA procedure for covered business methods is expressly limited to financial products and services. The PTAB ruled that the legislative history of the AIA "supported the notion that the definition be broadly interpreted." That includes activities that are "incidental" or "complementary" to financial activity, the PTAB ruled.

Versata further objects that the PTAB used a method of claim construction known as broadest reasonable interpretation. That's the standard for initial patent examination, and it works there only because patentees are free to amend their claims, Versata argues.

The PTAB says the patent office has been using broadest reasonable interpretation for 100 years and isn't inclined to stop. Plus, the AIA gave the PTO "new and expanded" authority to establish such rules for postgrant review, the PTAB judges concluded.

Finally, Versata contends that the AIA limits covered business method review to challenges under Section 102 for novelty and Section 103 for nonobviousness—not Section 101. In any event, the claims are "not directed to an abstract idea, but to a particular and very practical software application" that is tied to a machine, Versata argues in its brief to the Federal Circuit.

That argument may have to wait for the Supreme Court's decision later this year in Alice v. CLS Bank. In the meantime, Versata and McKool Smith will try to take the money and run at the district court, even as SAP looks for new ways to keep the case alive. "This is no way to conduct

litigation," McKool Smith partner Samuel Baxter wrote in a filing last month, "even when there is no more litigation to conduct."

*Contact the reporter at sgraham@alm.com.*

# EXHIBIT 48

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Sunday, March 09, 2014 9:19 PM
**To:** Andrew Kim
**Cc:** Brian Busse
**Subject:** IOdapt

**Attachments:** image001.jpg
Thank you.  Let us know if you would like to consider us for the  IOdapt case.  We would be excited to have the chance to work together.  Best, Ed

On Mar 5, 2014, at 6:37 PM, "Andrew Kim" <akim@netgear.com> wrote:

> Yeah that's pretty awesome.  Congrats Ed.  RRR seems like a pretty cool dude and a great friend too.
> Cheers,
> Andrew
> **Andrew Kim**
> *SVP, Corporate Development and General Counsel*
> **O** 408.890.3055  **M** 408.933.8363
> 350 East Plumeria Drive, San Jose, CA 95134
>
> <image001.jpg>
> **From:** Brian Busse
> **Sent:** Wednesday, March 05, 2014 6:34 PM
> **To:** Reines, Edward; Andrew Kim
> **Subject:** RE: Federal Circuit
> Wow.  That's impressive, Ed.  Thanks for sending this along.  I don't think my mom has ever spoken that highly of me.
> By the way, you may have saw/heard that we settled our Ruckus cases.  As part of the settlement, we are not going forward with the appeal.  Nevertheless, thanks again for talking with us about our [now dead] appeal.
> **From:** Reines, Edward [mailto:edward.reines@weil.com]
> **Sent:** Wednesday, March 05, 2014 6:29 PM
> **To:** Andrew Kim; Brian Busse
> **Subject:** Federal Circuit
> Gentlemen, as you continue to consider us for your Federal Circuit and other needs, I thought the below email from Chief Judge Rader might be helpful.  Regardless of his comment, please do not circulate this widely outside of Netgear absent a specific need.  All The Best, Ed
>
> Begin forwarded message:
>
>> **From:** "Chief Judge Rader, Randall R." <RR@cafc.uscourts.gov>
>> **Date:** March 5, 2014 at 3:24:12 PM EST
>> **To:** Edward Reines <edward.reines@weil.com>
>> **Subject: Congratulations**
>>
>> Ed,
>>      On Wednesday, as you know, the judges meet for a strictly social lunch.  We usually discuss politics and pay raises.  Today, in the midst of the general banter,

one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately

# EXHIBIT 49

**From:** Reines, Edward [edward.reines@weil.com]
**Sent:** Sunday, June 15, 2014 5:10 PM
**To:** Sundermeyer, Michael; Burke, William
**Subject:** RE: Silver Peak

████████████████████████████████████████████████████

**From:** Flaum, Keith
**Sent:** Tuesday, April 01, 2014 1:15 PM
**To:** Reines, Edward
**Subject:** FW: Silver Peak

Will let you know what I hear. Thanks.



**Keith A. Flaum**

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
keith.flaum@weil.com
+1 650 802 3090 Direct
+1 650 868-8393 Mobile
+1 650 802 3100 Fax

---

**From:** Flaum, Keith
**Sent:** Tuesday, April 01, 2014 1:15 PM
**To:** Brett Nissenberg; Ryan Damon
**Subject:** Silver Peak

Hi Guys:

Hope all is well. I always feel a bit awkward in doing this, but I understand that things might not have gone so well in the trial court on Silver Peak.  My partner, Ed Reines, specializes in patent appeals and knows the judges extremely well.  In fact, see below re: an email to Ed from the Chief Judge who handles appeals.  In addition, Ed recently had Judge Robinson in our offices to speak at a roundtable with him.  I understand that judge Robinson is the judge that might be involved in the appeal. Anyway, thought you might want to talk to Ed and see if he can help.  Talk to you soon.



**Keith A. Flaum**

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
keith.flaum@weil.com
+1 650 802 3090 Direct
+1 650 868-8393 Mobile
+1 650 802 3100 Fax

**From:** Reines, Edward [mailto:edward.reines@weil.com]
**Sent:** Tuesday, April 01, 2014 1:07 PM
**To:** Flaum, Keith
**Subject:** FW: Congratulations

As requested.

**From:** Chief Judge Rader, Randall R. [mailto:RR@cafc.uscourts.gov]
**Sent:** Wednesday, March 05, 2014 12:24 PM
**To:** Reines, Edward
**Subject:** Congratulations

Ed,

On Wednesday, as you know, the judges meet for a strictly social lunch. We usually discuss politics and pay raises. Today, in the midst of the general banter, one of my female colleagues interrupted and addressed herself to me. She said that she was vastly impressed with the advocacy of "my friend, Ed." She said that you had handled two very complex cases, back to back. In one case, you were opposed by Seth Waxman. She said Seth had a whole battery of assistants passing him notes and keeping him on track. You were alone and IMPRESSIVE in every way. In both cases, you knew the record cold and handled every question with confidence and grace. She said that she was really impressed with your performance. Two of my other colleagues immediately echoed her enthusiasm over your performance.

I, of course, pointed out that I had taught you everything you know in our recent class at Berkeley together . . . NOT! I added the little enhancement that you can do the same thing with almost any topic of policy: mastering the facts and law without the slightest hesitation or pause!

In sum, I was really proud to be your friend today! You bring great credit on yourself and all associated with you!

And actually I not only do not mind, but encourage you to let others see this message.

Your friend for life, rrr

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 50

**From:** naomi.waltman@cbs.com
**Sent:** Wednesday, April 09, 2014 2:29 PM
**To:** Richieri, Kenneth (richierk@nytimes.com)
**Subject:** HPL Appeal: Reines Info

**Attachments:** E. REINES CV.pdf; Daily Journal Reines article.pdf; Federal Circuit
Hi Ken,

It was nice talking to you today. As promised, here is some info on Ed Reines. His bio can be found at the following link:  http://www.weil.com/edwardreines/

Also attached please find a listing of some of his recent appellate cases, an article about him that appeared in today's *San Francisco Daily Journal,* as well as an email from Chief Judge Radar that he authorized me to share with you. In addition to his outstanding advocacy skills and his well-deserved stellar reputation, he happens to be an all-around good guy. I know he's done work for some of the members of the JDG group, so if you are looking for some additional feedback, you should feel free to reach out to Kevin Kramer at Yahoo! or Andrea Townsend at Turner.

I also spoke to Ed after our call and he said he would welcome the opportunity to meet with you in person the next time he is in New York. In any event, I've probably given you more than you need or want, but if you want any additional info, please let me know.

Best regards,

Naomi


Naomi B. Waltman, Esq.
Senior Vice President & Associate General Counsel
CBS
51 West 52nd Street
New York, New York 10019
212-975-2552 (telephone)
212-975-3930 (facsimile)
naomi.waltman@cbs.com (email)

# EXHIBIT 51

Search this website…

HOME    PRACTICE AREAS    OUR FIRM    CASE RESULTS    **TESTIMONIALS**    LIBRARY    FAQ    BLOG    THURSWELL IN THE NEWS    OFFICE TOUR

## Michigan Clients and Peers Review Our Detroit Injury Attorneys

Our clients highly recommend the hard-working attorneys at Thurswell Law. Click on the thumbnails to hear what they have to say about their experiences with our firm:



*"Super heroes, Super Lawyers…there is no difference when saving lives!  You have proven to possess insight, integrity and compassion for those who suffer or who have suffered injustice. Your efforts and dedication in securing the future of our daughter, Gina, will never go unappreciated.  We forever thank you and your staff at Thursell Law for your continuous support!"* **- The Lucaj Family**

*"Jerry Cares. Jerry has been a champion for justice and protecting the rights of folks injured and disabled by negligent doctors. He has been representing everyday people for over 45 years. His track record is second to none and his experience in the area of birth trauma and medical malpractice can not be duplicated. He is uniquely qualified to get the job done and in the end, results matter. I highly recommend Jerry as one of the very best lawyers in the business. I would trust him to handle a medical malpractice case for me or anyone in my family."* **- Scott Goodwin, Personal Injury Attorney at Goodwin & Sciezska**

*"I have had the pleasure of knowing and observing Jerry Thurswell and the members of his firm for many years. Before I became a judge, I had cases with Jerry, who was my opponent several times. He was always an honorable litigator and human being. His word was his honor and he did justice for his clients. I became a Wayne County Circuit Court Judge and over the 21 years on the bench, Jerry and members of his firm came into our courtroom many times. I saw firsthand the professional excellence that Jerry and his team exuded. I witnessed the compassion that they have for their clients. The Thurswell firm places the clients' interests and protection first and foremost; coupled with their legal expertise, their professional work is of the highest caliber."* **- Judge Jeanne Stempien, Retired**

*"Jerry Thurswell has a natural talent of understanding his clients and their needs, making him stand out as a sought-after personal injury attorney in the area. He is attentive and has the best interests of his clients in mind when making any decision related to the case. He has access to the very best of medical professionals for consults to ensure that his clients receive the best possible settlement. With Jerry, you never feel like you're just a number. He makes you a part of the process and makes you feel like you're his one and only case. He is a professional in every sense of the word, a fine gentleman, and anyone would be fortunate to have Jerry on their team."* **- Judge Barry Howard, Retired**

**Quick Contact Form**

Please complete the form below and we will be in touch with you shortly

Do you have any legal questions? We are here to help.

Chat now

First Name

Last Name

Birthday

Address

City

State

Zip Code

Phone Number

Email

Tell Us About Your Case:

**8 A C 3**

Enter Captcha

Contact Us

Free Offer



Free Offer - Cellphone Holder
*One per valid email address only

Learn More »

*"I have known Jerry Thurswell for many years having been classmates in law school. I later served for 24 years as a Circuit Court Judge in Oakland County, Michigan. During that period, I had frequent contact with Jerry and watched him found and lead a major personal injury law firm. Jerry is well regarded and respected as a trial lawyer with a reputation as a fierce advocate for his clients. Jerry cares deeply for those he represents and gives his all to secure a just and fair result. Anyone would be at a great advantage with Jerry on their legal team."* **- Judge Edward Sosnick, Retired**

*"Thank you for taking care of our Adrianna. We counted on you and you did not disappoint. Forever Grateful, Italy waits for you, our home is your home always."* **- Adrianna, Maria & Antonio Gargano**

*"I want to thank you for your heroic effort this past week to win the battle for patient safety and our profession. THANK YOU! I am very grateful."* **- Mark J. Bernstein**

*"The Staff at the Thurswell Law Firm, every person offers a gift or contribution, however small or large, which does not go unnoticed. A sincere thank you for your support in securing the future of our daughter, Gina Lucaj!"* **- Gina, Christina, Anton & the Lucaj Family**

*"I just wanted to say I really appreciate and respect you for being who you are. I thank God everyday for placing you in my life as well as in my son's life. I will always be grateful for the love and kindness that you've shown me and marino. May God richly bless you!"* **- Leah**

*"Just wanted to let you know how thankful our family is knowing God has placed you in our life for us to be blessed. Thanks for all you've done in helping my daughter receive what was due to her."* **- Rae Anderson and Family**

*"Thank you and your team for all that you have done for us and Roy. As you said, nothing will compensate for loss, but we appreciate the hard work and dedication from your side in order to reach closure. If you ever decide to visit Lebanon or Kuwait please do not hesitate to contact us. It would be great seeing you."* **- Moe & Rima Moussa**

*"I never in my life thought that I would need a lawyer for any reason, but when I found out I would need one, it's nice to know I got the right one. Thank you for your time and your expertise. All though I do miss working (I liked what I did for a living), we are adjusting and getting on with our lives. Thank you once again, you will never know how much you helped us."* **- Jeffery Collins**

*"I want to thank you all again for all the work you did for me. If I know anyone that needs a law firm, I will give them your number."* **- Kathryn Maddox**



Bio | Latest Posts



### Gerald Thurswell

Attorney at Thurswell Law Firm

In 1968, Gerald E. Thurswell founded The Thurswell Law Firm to secure justice for seriously injured people and their families. Mr. Thurswell has achieved an "AV" rating for the past 20 years, the highest possible rating for superior legal ability according to the Martindale-Hubbell organization. At the Thurswell Law Firm, he leads a legal team of 14 expert attorneys. His 46 years of legal experience represents thousands of hours of formal education, research knowledge and repeated success in the courtroom. Mr. Thurswell is a highly regarded expert in medical malpractice, birth injury and auto accident litigation.

## Newsletter Signup

Enter your email address...

## Gerald Thurswell

In 1968, Gerald E. Thurswell founded The Thurswell Law Firm to secure justice for seriously injured people and their families. A law school honors graduate at age 23, Mr. Thurswell has achieved an "AV" rating for the past 20 years, the highest possible rating for superior legal ability according to the Martindale-Hubbell organization.

At the Thurswell Law Firm, he leads a legal team of 14 expert attorneys. His 46 years of legal experience represents thousands of hours of formal education, research knowledge and repeated success in the courtroom. Mr. Thurswell is a highly regarded expert in medical malpractice, birth injury and auto accident litigation.

## Quick Links

Practic Areas

Our Firm

Testimonials

Library

Resources

Contact Us

## Our Location

The Thurswell Law Firm, PLLC
1000 Town Center, Suite 500
Southfield, MI 48075

Phone: 248-354-2222
Toll Free: 866-354-5544



**EXHIBIT 52**



## Practice Areas

CONSTRUCTION LAW

COMMERCIAL / BUSINESS LAW

LABOR LAW



FREE
CASE EVALUATION
Click Here to Get a
Case Evaluation
Today

## Testimonials

**Judge James J. Alfano, now retired Orange County Superior Court Judge:**

"I would highly recommend Ms. Ashley Baron...I presided in a five and a half week jury trial wherein Ms. Baron was the attorney for the Plaintiff. The trial revolved around the grading of a golf course...The defendant, composed of Chevron Land Development and Arvida, was represented by a large Orange County law firm....The jury after a short deliberation, rendered a verdict for Ms. Baron's client for almost a million dollars....I was called upon...to award attorneys fees to plaintiff. James Acret, Esq., the author of several books on construction law, testified in support of an award...that Ms. Baron had done an admirable job in trying the case. He also stated the fees billed had been extremely reasonable considering the complexity of the trial and the result obtained. I agreed with Mr. Acret and awarded the plaintiff almost all of its attorney's fees....I feel Ms. Baron demonstrated the highest level of competence in conducting the trial and feel she is a highly skilled litigator capable of performing complex civil jury and non jury trial work. Ms. Baron demonstrated both good technical and people skills, a rare combination."

**Timothy Mayeda, President, Lyle Parks Jr. Construction:**

"Our company has used Ms. Baron as our attorney over the past 4 years and we have been impressed by her extensive knowledge of construction law and her ability to re-invent the box for creative solutions. We found her to be extremely knowledgeable in the intricacies of the construction process and its real world application with regard to large projects of the type we build. We found her to be hard working, diligent and tenacious. We have been very pleased with her work and would highly recommend her for all your construction law and litigation needs."

**Tad Vaughn, Owner T.G.I. Vaughn, Architects:**

"There are lawyers that talk the talk but few can walk the walk and have the gravitas to take your construction case from contract to trial and win. Ashley Baron is one such outstanding attorney! When I spend money on legal issues, I want someone like Ashley Baron who gets me what I need without wasting my time or money. Her resume from



college on proves she is a winner and makes the other guys whiners through persistent use of her high IQ. Besides, I really like her and trust her with my future."

---

**Robert J. Wiggins, Sr. Project Manager, R. K. Skibsted Steel Corporation:**

"Ashley is one of the best litigators I know! She has vast knowledge of construction law and I highly recommend her."

---

**Richard Mason, Owner, Seagate Marketing:**

"Ashley Baron has served as my legal counsel for over twenty years. Her knowledge, analysis and application of the law make her a cutting edge attorney. As a long time business owner her advice and representation has been invaluable to me and my company. Her ability to assess a situation and apply the law based on the facts has been a winning combination. Without reservation, I recommend the Law Offices of Ashley A. Baron."

---

**Michael Page, President, PetroCo Energy Corporation:**

Ashley Baron "represented me…and I found her to be extraordinarily competent, she used her head, finished the job, and I got more than I bargained for. She is consistent, persistent, and realistic and is above all, tenacious. Ashley Baron is a fighter and a winner."

---

**Bob Rabun, Vice President, Lyle Parks Jr. Construction**

"The client's goal is Ashley's goal. Ashley provides both the detail and the big picture focus while staying on budget and working with all parites. I will continue to consult with Ashley on all my construction legal matters."



CONTACT US

Name
Phone
Email
Message

Submit

FOLLOW US ON

Orange County
13154 North Tustin Street, Suite 411
Orange, CA  92867

Park City
6300-H North Sage Wood Drive, Suite 390
Park City, Utah 84098

Phone (714) 974-1400
Fax (714) 974-1111

The information on this website is for general information purposes only. Nothing on this site should be taken as legal advice for any individual case or situation. This information is not intended to create, and receipt or viewing does not constitute, an attorney-client relationship.

© 2014 All Rights Reserved.



**EXHIBIT 53**

- [Home](#)
- [Resources](#)
- [Contact](#)

 Login





- ▾ [Our Firm](#)
  - ▸ [Practice Areas](#)
  - ▸ [Client Services](#)
  - ▸ [Case Studies](#)
  - ▸ [News Room](#)
- [Resources](#)
- [Contact](#)

 Login

# Our Firm

-- Judicial Praise ▼

## Judicial Praise

**What Courts Say About Us**

**Courts throughout the United States praise the work done by BR&B on behalf of injured investors and victims of price-fixing:**

In *In re Apollo Group Inc. Securities Litigation*, Master File No. CV-04-2147 PHX-JAT (D. Ariz.), Barrack, Rodos & Bacine was lead counsel for the institutional investor lead plaintiff and a class of injured investors it represented. BR&B secured a jury verdict for the full amount per share sought, which in the

aggregate could exceed $200 million, the second-largest securities litigation jury verdict since passage of the PSLRA. Although the case is now on appeal following rulings on post-trial motions, the court commented that trial counsel **"brought to this courtroom just extraordinary talent and preparation... The technical preparation, the preparation for your examination and cross-examination of witnesses has been evident in every single instance. The preparation for evidentiary objections and responses to those objections have been thorough and foresighted. The arguments that have been made in every instance have been well-prepared and well-presented throughout the case.* * * Likewise, for the professionalism and the civility that you – and the integrity that you have all demonstrated and exuded throughout the handling of this case – it has just, I think, been very, very refreshing and rewarding to see that. * * * [W]hat I have seen has just been truly exemplary."**

In *In re WorldCom, Inc. Securities Litigation*, No. 02 Civ. 3288 (DLC), before Judge Denise L. Cote in the United States District Court for the Southern District of New York, BR&B was co-lead counsel for the institutional investor lead plaintiff and the class of injured investors and achieved settlements in excess of $6.13 billion. After a partial settlement with one group of defendants in excess of $2.56 billion, the court stated, that **"the settlement amount ... is so large that it is of historic proportions." The court found that "Lead Counsel has performed its work at every juncture with integrity and competence. It has worked as hard as a litigation of this importance demands, which for some of the attorneys, including the senior attorneys from Lead Counsel on whose shoulders the principal responsibility for this litigation rests, has meant an onerous work schedule for over two years." The court further stated that "the quality of the representation given by Lead Counsel is unsurpassed in this Court's experience with plaintiffs' counsel in securities litigation. Lead Counsel has been energetic and creative. Its skill has matched that of able and well-funded defense counsel. It has behaved professionally and has taken care not to burden the Court or other parties with needless disputes. Its negotiations with the Citigroup Defendants have resulted in a settlement of historic proportions. It has cooperated with other counsel in ways that redound to the benefit of the class and those investors who have opted out of the class. The submissions of Lead Counsel to the Court have been written with care and have repeatedly been of great assistance." The court also found that "In sum, the quality of representation that Lead Counsel has provided to the class has been superb."**

---

- Overview
- Attorneys & Professionals
- Firm History
- Judicial Praise
- Firm Biography

- Philadelphia, PA

- San Diego, CA
- New York, NY
- Conshohocken, PA
- Lansing, MI
- Newark, NJ

© 2014 Barrack, Rodos & Bacine. All brand and product names are trademarks or registered trademarks of their respective companies.

BEAMS® is protected by U.S. Patent Nos. 7,146,333 B2, 7,593,882 B2, 7,844,583 B2 and 8,442,895.

- Disclaimer
- Privacy
- Sitemap
- Site Design

**EXHIBIT 54**

**Berger&Montague,P.C.**
ATTORNEYS AT LAW

# Judicial Praise For Our Securities Fraud Group - Securities Fraud Practice Group | Berger & Montague, P.C.

Federal and state judges across the United States have recognized and commended Berger & Montague's legal skills and extraordinary success in securities fraud class actions.

Berger & Montague's Securities Fraud Group lawyers are often recognized by federal courts for their ability to develop, guide and settle extremely large and complex securities fraud class actions. Some examples of remarks noting the skill, efficiency and expertise of our attorneys are below:

From Judge Jed Rakoff of the U.S. District Court for the Southern District of New York:

> The lead plaintiff has made "very full and well-crafted" and "excellent submissions" and a "very fine job [was] done by plaintiffs' counsel in this case." The attorney fees requested were "eminently reasonable" and "appropriately modest." This was "surely a very good result under all the facts and circumstances." In re Merrill Lynch Securities Litigation, No. 07-CV-09633 (S.D.N.Y. 2009).

From Chief Justice Steele and Justices Holland, Berger, Jacobs and Ridgely, of the Delaware Supreme Court, sitting en banc:

> "All I can tell you, from someone who has only been doing this for roughly 22 years, is that I have yet to see a more fiercely and intensely litigated case than this case. Never in 22 years have I seen counsel going at it, hammer and tong, like they have gone at it in this case. And I think that's a testimony -- Mr. Valihura correctly says that's what they are supposed to do. I recognize that; that is their job, and they were doing it professionally." In re Matter of the Philadelphia Stock Exchange, 945 A.2d 1123, 1143-44 (Del. 2008).

From Chancellor William Chandler, III of the Court of Chancery of Delaware:

> "Counsel, again, I want to thank you for your extraordinary efforts in obtaining this result for the class." Ginsberg v. Philadelphia Stock Exchange, Inc., C.A. No. 2202 (Del. Ch. 2008) ($99 million settlement).

From The Hon. Michael M. Baylson of the U.S. District Court for the Eastern District of Pennsylvania:

> "The Court is aware of and attests to the skill and efficiency of class counsel: they have been diligent in every respect, and their briefs and arguments before the Court were of the highest quality. The firm of Berger & Montague took the lead in the Court proceedings; its attorneys were well prepared, articulate and persuasive." In re CIGNA Corp. Securities Litigation, 2007 U.S. Dist. LEXIS 51089, at *17-18 (E.D. Pa. July 13, 2007) ($93 million settlement).

From The Hon. Thomas P. Greisa of the U.S. District Court for the Southern District of New York:

> "I find [that the settlement] has been the result of a great deal of good work and it's the best that could have been done in this case without any doubt.... [A]ll of you have done a great deal of work, and surmounted a really tremendous difficulty. . . , so it's wonderful to have it." In re Reliance Group Holdings, Inc. Securities Litigation (S.D.N.Y. 2006) ($15 million settlement).

From The Hon. David S. Doty of the U.S. District Court for the District of Minnesota:

> "[A] just result without the assistance of a governmental investigation," plaintiffs' co-lead counsel Berger & Montague "conducted themselves in an exemplary manner," "consistently demonstrated considerable skill and cooperation to bring this matter to an amicable conclusion," and "moved the case along expeditiously." In re Xcel Energy Securities Derivative "ERISA" Litigation, 364 F. Supp. 2d 980, 992, 995-996 (D. Minn. 2005) ($80 million settlement).

From The Hon. Stewart R. Dalzell of the U.S. District Court for the Eastern District of Pennsylvania:

"Thanks to nimble class counsel, this sum, which once included securities worth $149.5 million, is now all cash. Seizing on an opportunity Rite Aid presented, class counsel first renegotiated what had been stock consideration into Rite Aid Notes, and then this year monetized those Notes. Thus, on February 11, 2003, Rite Aid redeemed those Notes from the class, which then received $145,754,922.60. The class also received $14,435,104 in interest on the Notes."

and

"Berger & Montague, P.C. ... were extraordinarily deft and efficient in handling this most complex matter... [T]hey were at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write-down of over $1.6 billion in previously reported Rite Aid earnings. Their attention to detail was such that when Rite Aid's financial concerns led to its willingness to consider renegotiating the non-cash portion of the Rite Aid I settlement, counsel-aided by investment advisors Wilber Ross and Bear Stearns-ultimately monetized the entire settlement and gained the class interest of $14,435,104 when interest rates were the lowest they have been in over forty years. In short, it would be hard to equal the skill class counsel demonstrated here." In re Rite Aid Inc. Securities Litig., 269 F. Supp.2d 603 (E.D. Pa. 2003) (settlements totaling $334 million).

"As to the skill and efficiency of the attorneys involved, we can only echo what we said about some of the same lawyers in U.S. Bioscience, a litigation that was far ahead of public agencies like the Securities and Exchange Commission and the United States Department of Justice.... At the same time, these attorneys have, through the division of their labors, represented the class most efficiently." In re Rite Aid Inc. Securities Litig., 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (settlements totaling $334 million).

"The quality of lawyering on both sides, but I am going to stress now on the plaintiffs' side, simply has not been exceeded in any case, and we have had some marvelous counsel appear before us and make superb arguments, but they really don't come any better than Mrs. Savett ... and the arguments we had on the motion to dismiss [Mrs. Savett argued the motion], both sides were fabulous, but plaintiffs' counsel were as good as they come." In re U.S. Bioscience Securities Litig., Civil Action No. 92-0678, (E.D. Pa. 1994).

From The Hon. Marvin Katz of the U.S. District Court for the Eastern District of Pennsylvania:

"Class counsel did a remarkable job in representing the class interests." In re IKON Offices Solutions Securities Litig., Civil Action No. 98-4286 (E.D. Pa. 2000) (partial settlement for $111 million).

From Robert E Conner, Public Arbitrator with the National Association of Securities Dealers, Inc.:

"[H]aving participated over the last 17 years in 400 arbitrations and trials in various settings ... the professionalism and the detail and generally the civility of everyone involved has been not just a cause for commentary at the end of these proceedings but between ourselves [the arbitration panel] during the course of them, and ... the detail and the intellectual rigor that went into the documents was fully reflective of the effort that was made in general. I wanted to make that known to everyone and to express my particular respect and admiration." Steinman v. LMP Hedge Fund, NASD Case No. 98-04152 (2000).

From The Hon. Wayne R. Andersen of the U.S. District Court for the Northern District of Illinois:

"...[Y]ou have acted the way lawyers at their best ought to act. And I have had a lot of cases ... in 15 years now as a judge and I cannot recall a significant case where I felt people were better represented than they are here ... I would say this has been the best representation that I have seen." In re Waste Management, Inc. Securities Litig., Civil Action No. 97-C 7709 (N.D. Ill. 1999) ($220 million settlement).

From The Hon. Clarence C. Newcomer of the U.S. District Court for the Eastern District of Pennsylvania:

"[C]ounsel has conducted this litigation with skill, professionalism and extraordinary efficiency." In re Unisys Corporation Securities Litig., Civil Action No. 99-5333 (E.D. Pa. 1999).

From The Hon. Helen J. Frye of the U.S. District Court for the District of Oregon:

In order to bring about this result [partial settlements then totaling $54.25 million], Class Counsel were required to devote an unusual amount of time and effort over more than eight years of intense legal litigation which included a four-month long jury trial and full briefing and argument of an appeal before the Ninth Circuit Court of Appeals, and which produced one of the most voluminous case files in the history of this District.

and

Throughout the course of their representation, the attorneys at Berger & Montague ... have exhibited an unusual degree of skill and diligence, and have had to contend with opposing counsel who also displayed unusual skill and diligence. In re Melridge, Inc. Securities Litigation, No. 87-cv-1426 (D. Ore. 1996) ($58 million settlement).

From the Hon. William K. Thomas of the U.S. District Court for the Northern District of Ohio:

"In the proceedings it has presided over, this court has become directly familiar with the specialized, highly competent, and effective quality of the legal services performed by Merrill G. Davidoff, Esq. and Martin I. Twersky, Esq. of Berger & Montague...."

and

"Examination of the experience-studded biographies of the attorneys primarily involved in this litigation and review of their pioneering prosecution of many class actions in antitrust, securities, toxic tort matters and some defense representation in antitrust and other litigation, this court has no difficulty in approving and adopting the hourly rates fixed by Judge Aldrich." In re Revco Securities Litigation (N.D. Ohio 1993) ($36 million settlement).

From The Hon. Joseph F. Anderson, Jr. of the U.S. District Court for the District of South Carolina:

"I don't have a problem at all approving the settlement. In light of what you've said today and your submission to the Court and I am familiar with the case ... it was a sharply litigated case, with good lawyers on both sides and I think it's an ideal case for settlement. It's the largest settlement I've been called upon to approve in my eight years as a judge." In re Policy Management Systems Corporation, Civil Action No. 3:93-0807-17 (D.S.C. 1993) ($32 million settlement).

From The Hon. Harry R. McCue of the U.S. District Court for the Southern District of California:

"There can be no doubt that the public good was fully served by the attorneys for the plaintiffs in this case, because they invested their own time, their own money, they invested their special skills and knowledge to vindicate the rights and interests of the thousands of investors who invested their money and placed their trust in the integrity of the securities market.... I conclude that the achievement of plaintiffs' counsel under any of those tests was superior." In re Oak Securities Litig., 1986 U.S. Dist. LEXIS 20942 (S.D. Cal. 1986) ($33 million settlement).

From The Hon. John F. Keenan of the U.S. District Court for the Southern District of New York:

"The quality of work of plaintiffs' counsel on this case is also demonstrated by the efficient manner of prosecution.... At the settlement hearing, defense counsel conceded that plaintiffs' counsel constitute the 'cream of the plaintiffs' bar.' The court cannot find fault with that characterization." In re Warner Communications Securities Litig., 618 F. Supp. 735 (S.D.N.Y. 1985).

## Contact Us To Learn More Or To Report A Possible Securities Fraud

We invite you to learn more about our Securities Fraud Group. Berger & Montague welcomes referrals from other law firms and attorneys. If you have information about a fraud affecting institutional, individual or governmental investors, or to schedule a confidential discussion about a potential case, please fill out the contact form on the right, email us at info@bm.net, or contact a Securities Fraud Group shareholder. We are available to evaluate potential securities fraud cases without charge.

**EXHIBIT 55**

# The Law Offices of
# Robert L. Bogen

No attorney can guarantee results, but we promise
**100% effort on your behalf!**

**GLADES TWIN TOWERS**
2300 Glades Road
Suite 203-E
Boca Raton, FL 33431

June 16, 2014

Home (http://www.bogenlaw.com/)

Firm Profile
(http://www.bogenlaw.com/overview/)

Attorney Profile
(http://www.bogenlaw.com/attorneys/)

Practice Areas
(http://www.bogenlaw.com/aop/)

Published Recognitions
(http://www.bogenlaw.com/bar-registry-of-pre-eminent-lawyers/)

Press Room
(http://www.bogenlaw.com/press-room/)

Judicial Accolades
(http://www.bogenlaw.com/judicial-accolades/)

Statement of Client's Rights
(http://www.bogenlaw.com/statement-of-clients-rights/)

Knowledge Base
(http://www.bogenlaw.com/faq/)

Forms (http://www.bogenlaw.com/forms/)

Links (http://www.bogenlaw.com/links/)

Newsletters
(http://www.bogenlaw.com/newsletters-2/)

Blog (http://www.bogenlaw.com/blog/)

Contact Us
(http://www.bogenlaw.com/contact/)

Directions
(http://www.bogenlaw.com/directions/)

QUICK CONTACT FORM

To help you get started, please fill out the
form below and click submit - or if you
prefer, call our office at: (561) 394-6060

Name*

Enter Email*

Phone*



## Family Attorney Receives Open Court Judicial Praise

Okay. But my final word for today, because I'll probably see you folks again when I announce the
decision is, and I mentioned this to you before, but I want to mention to you again, your lawyers
have done a wonderful job for both of you. And both of them, I mean, I can tell you based upon
their presentation in the case, based upon the memorandums that I don't know if you've had a
chance to see, but I've looked at. A lot of it is in lawyerese-type of thing, but I certainly
understand what they, and their ability to grasp the issues and get me case law and do the things
they've done, clearly make both of them an extreme credit to our profession. And you know, I
don't see that often. I like to see that more often, but I don't. So you should be both thankful for
them for doing a great job under the circumstances.

**Honorable Martin H. Colin**
**Circuit Court Judge**
**December 16, 2008**
**(following five days of trial)**

Message*

SUBMIT



 (https://twitter.com/BogenLaw)

 (http://www.facebook.com/pages/Law-Offices-of-Robert-L-Bogen/100709430100638)

 (http://www.linkedin.com/company/2808463)

 (https://plus.google.com/108261882388484495451/about)

(http://www.bogenlaw.com/blog/feed/)



(http://www.martindale.com/Products_and_Services/Peer_Review_Ratings.aspx)

  

We also accept the following:

Tel: (561) 394-6060     Fax: (561) 361-9865     (/)

(http://www.linkedin.com/in/rober

Home (http://www.bogenlaw.com/)  |  Firm Profile (http://www.bogenlaw.com/overview/)  |  Attorney Profile (http://www.bogenlaw.com/attorneys/)

| Practice Areas (http://www.bogenlaw.com/aop/)  |  Published Recognitions (http://www.bogenlaw.com/bar-registry-of-pre-eminent-lawyers/)

| Press Room (http://www.bogenlaw.com/press-room/)  |  Judicial Accolades (http://www.bogenlaw.com/judicial-accolades/)

| Statement of Client's Rights (http://www.bogenlaw.com/statement-of-clients-rights/)  |  Knowledge Base (http://www.bogenlaw.com/faq/)

| Forms (http://www.bogenlaw.com/forms/)  |  Links (http://www.bogenlaw.com/links/)  |  Newsletters (http://www.bogenlaw.com/newsletters-2/)

| Blog (http://www.bogenlaw.com/blog/)  |  Contact Us (http://www.bogenlaw.com/contact/)  |  Directions (http://www.bogenlaw.com/directions/)

**Attorney Advertising.** This web site is designed for general information only.

The information presented at this site should not be construed to be formal legal advice nor the formation of a lawyer/client relationship. [ Site Map (/sitemap/) ] [ Bookmark Us ]

See our profile at Lawyers.com (http://www.lawyers.com/Florida/Boca-Raton/The-Law-Offices-of-Robert-L-Bogen-P-A--2508002-f.html) or Martindale.com (http://www.martindale.com/The-Law-Offices-of-Robert-L-Bogen/law-firm-1824522.html)

The Law Office of Robert L. Bogen is located in Boca Raton, FL and serves clients all over Palm Beach and Broward Counties, Florida, including but not limited to Boca Raton, Delray Beach, Boynton Beach, West Palm Beach, Deerfield Beach, Pompano Beach, Coconut Creek, Coral Springs, Parkland, Fort Lauderdale, Weston, and Pembroke Pines.

  (http://www.lawyers.com/)

**EXHIBIT 56**

HOME  |  CONTACT  |  BLOG  |  SUBSCRIBE TO OUR ENEWS

DISCIPLINARY/LICENSING PROCEDURES    DO I NEED AN ATTORNEY    PRACTICE AREAS    ATTORNEYS    TESTIMONIALS    RESOURCES

*The testimonials or endorsements listed below do not reflect all of the feedback the firm has received. Each case is unique and must be evaluated on its individual merits. Prior results do not guarantee a similar outcome.*

**From Clients**

**From Judges, Opposing Counsel and Other Lawyers**

**From Witnesses**

**Relating to State Bar v. Nifong**

# Testimonials From Judges, Opposing Counsel and Other Lawyers

"Ms. Brocker,

Just wanted to drop a quick line to express my gratitude.  I appreciate your generous gift of time and your willingness to help.  Thank you!

Frankly, your knowledge was quite reassuring.  I knew I had read of the rules change regarding a criminal/civil nexus, but could not recall whether it was proposed or had passed.  Your familiarity with the subject was outstanding. . . ."

*-An attorney seeking ethics advice from the State Bar*



"Dear Doug,

You did a tremendous job putting on a difficult case.  Further, you did it with a professionalism and grace that should give heart and comfort to all of us.  **Your ordering of the evidence, direct examinations, dynamic examination of Lt. [L], knowledge of the law and presentation was better than most lawyers twice your age and one of the best I've encountered in years**. . . . You did a wonderful job.  You are a terrific lawyer and a true professional.  It was a joy to appear with you."

*-Joseph B. Cheshire, V, opposing counsel in a State Bar disciplinary proceeding*

*Doug, Thank you very much for all your help. Without you, I don't know what I would have done -- my eternal appreciation!* "

- Newly-admitted North Carolina attorney concerning a hearing before the Board of Law Examiners

"[To the State Bar President]

I just wanted to drop you this note and thank the State Bar for the services of Deanna Brocker who mans the telephone to assist attorneys with ethical questions and issues.  Over the years, I have had the good fortune to review ethical issues with Deanna on occasion.  I believe this is an extremely valuable service to attorneys.  I have always found Deanna is not only knowledgeable, but also lends an understanding ear to the attorney's situation.  I just wanted to thank the State Bar for this very worthwhile service and tell you how helpful Ms. Brocker has been to me in several situations over the years."

*-Attorney who had sought ethics advice from the State Bar*

"Doug,

. . . .  I was not being facetious Friday when I left and said that Judge Dupree would be very proud of you.  Judges take a proprietary interest in law clerks.  You did what I thought was an exemplary job in a most difficult situation.  I thought your questions were substantively right on target.  **You prosecuted your case hard and very fairly, and I thought you exemplified the best that the law has to offer.**  I meant every word when I said that Judge Dupree would be very proud of you.  He really truly would be. . . . You really did a magnificent job."

*-Federal District Court Judge in North Carolina (Adverse character witness in State Bar*

*disciplinary proceeding)*

"Doug,

You are a tremendous asset to the State Bar and you will be difficult to replace."

*-Past State Bar President*

"Doug,

You have been a great resource for me and one in whom I place absolute confidence."

*-Past State Bar President*

"Dear Deanna,

. . . . You have been a tremendous help to me over the last several years whenever I have professional ethics legal questions.  Your responses to my rather esoteric and sometimes crazy inquiries have always been exceptionally clear and well reasoned. . ."

*-Attorney who had sought ethics advice from the State Bar*

Doug, You have been a great resource for me and one in whom I place absolute confidence.

*-Past State Bar President*

---

© 2014 The Brocker Law Firm. Design by Winnow Creative LLC.



**EXHIBIT 57**



# CHRIS COSCA
ATTORNEY AT LAW

SPECIALIZING IN
## CRIMINAL DEFENSE
## & CIVIL DISPUTES
—FEDERAL AND STATE

AREAS OF EXPERTISE

OFFICE PROFILE

ATTORNEY PROFILE

TESTIMONIALS

RECENT RESULTS

FAQ

RESOURCE

CONTACT

HOME

1007 7th Street, Suite 210
Sacramento, CA 95814
(916) 440-1010

## Testimonials

"Mr. Cosca has now appeared before me on multiple occasions, including to try two murder cases. He always does an excellent job. This case was no exception. He is professional, prepared and a joy to have in the courtroom."                    The Honorable Helena Gweon, Sacramento County Superior Court Judge

"Chris,
I drive to work each morning and, while a little ashamed to admit it, that is my prayer time. I have been holding your family up in prayer. I am forever grateful for the effort that you put out for my son. If there is EVER anything that I can do for you or your family consider it done."
Sincerely, Patricia B.

"Chris, Words cannot express my gratitude for all of your hard work and guidance throughout the past month. Thank you so much for your help and for negotiating the best possible outcome. I feel truly blessed to have been represented by you. I am back on the horse and riding strong. I know that I will overcome and succeed in my life as I have always planned. I hope God blesses you and your family. Sincerely, B. B.

"Excellent trial lawyer. Always a pleasure to have in my courtroom."                    Honorable Sharon Lueras, Sacramento County Superior Court Judge

"Hey Chris, It has been too long since we have spoken, but I wanted to send you some thoughts. Every time the holiday season rolls around, I think of how thankful I am for you helping to get me through a few horrible months of my life. Actually- it isn't just around the holiday season...it is year round this thought comes to mind. You helped to get me through some scary stuff that could have sent my life on an unfortunate path, and for that, words cannot express the amount of gratitude I have for you. You allowed me to keep just living my life the way I imagined it. Now, here I am. 27 years old, married, career. Simply lucky to have an amazing life... I hope you know how much I appreciate your help. Merry Christmas to you and your family. I hope 2014 brings you excellent health and happiness."                    -A. B.

"Mr. Cosca did excellent work on behalf of his client and was a joy to have in trial."                    The Honorable Helena Gweon, Sacramento County Superior Court Judge

"Chris has handled everything from minor matters to muddier ones. He is very comfortable in the courtroom and "he shows well." He dresses as well as I do- and that says a lot about him. He understands the big picture and is a guy who pays attention to details. I have seen his court briefs and manners in front of the family court judge and the criminal court judge and how he handles the DA who is chasing me around. Nothing scares this guy! He is cool and calm. He knows his law and I am sure he can help your friend's son."
- Richard F.

"Chris, I can't thank you enough for helping me get through this process. I feel like a 1000 pounds have been lifted from my shoulders. Words cannot express how appreciative I am for all that you did for me."
- NL

"Once again... Thank you Mr. Cosca!!! I will never forget your kindness and your help! Never!"
- TZ

"Chris, I just wanted to write and say thanks for getting me the 12 years with half time. To be honest, I wasn't expecting anything less than 32 years. Not only was the motion written well- you were pretty elegant enough to get some points across in front of the judge- thanks a lot man, you rock! I am focused on getting sober when I get out of here, and like you say- no hard drugs!"
- David L.

"Excellent, gracious but tough attorney."
- The Honorable Lloyd Connelly, Sacramento County Superior Court Judge

"Dear Ms. Scully:
I wish to comment upon the exemplary performance of Chris Cosca in the matter of People v. Steve Bird, a jury trial, which I heard in 3/2000. The recent decision of the Court of Appeal speaks for itself. Because appellate decisions are limited to the issues raised, they seldom reflect the full nature of the trial court proceedings. In the Byrd matter, a 3 strikes case, the prosecution faced the considerable task of presenting evidence necessary to support the allegations (in a 15-count Information) that the defendant committed 7 separate armed robberies and attempted murder. Mr. Cosca was a very organized, tenacious, efficient, and perceptive prosecutor. He was exceedingly effective in both the pretrial (in limine) and trial stages, especially closing argument. He always makes good use of his time, was vigorous in argument yet respectful when issues or objections were resolved against him. He faced experienced opposition and did so with grace, skill,

perseverance, and professionalism, the kind that would make you extremely proud of him. The witnesses were largely young people working in a fast food restaurant to help support their education. They were terrified when they were robbed, and they were equally terrified to be sworn eye-witnesses in the jury trial. Mr. Cosca was very adept in accommodating these witnesses and making them feel comfortable in the courtroom setting. The 12 eyewitnesses were, as you might expect, less than completely consistent in their photographic or physical lineup ID's. Most said they were "sure" of the defendant's ID, while others stated they "thought" the defendant was the perpetrator. Mr. Cosca was able to handle these irregularities (and remember them) in a very useful and effective way that left no doubt in the jury's mind that the defendant was the perp. The closing argument of Mr. Cosca can only be described as exceptional. The case required (more than the average felony case) a close attention to detail, which Mr. Cosca was able to do in admirable fashion. It was a pleasure to be the trial judge in this case before such a well-prepared deputy of your office."
- Judge Talmadge Jones
Sacramento County Superior Court

"Dear Chris, This seems the time of year for some reflection and accordingly we wish to thank you for your professional help this past year. It certainly eased our minds."
- RR

"Dear Chris, Thanks for looking into (this). I'll never be able to express how grateful I am to you and (XX.) PS The adoption became final! The 'Silver Lining in the clouds.'"
- CC

"Dear Chris, Just a small 'Thank You' for everything you have done for the girls and me. Most especially, thank you for being supportive and treating us as people. " - A,L and B

"Chris, there are no words to tell you how happy we are. You have given X,X, and K a chance at life. You went in the court like 'Superman.' The whole family wants to wish you a very happy New Year. You did one super job for us. Thank you so much. Thank you!"
- J,J, S,J,

"Chris, you have been such an encouragement to my parents and me through this horrible ordeal. Your professionalism mixed with your sweet heart made us all feel a little more at ease and a little less like outsiders during this trial. You have even been a catalyst in the healing process. Give your family a hug and tell them thanks for the extra time this case took away from them."
- TG

"Hi Chris, I wanted to thank you for doing such a great job on my case.  After you left, I had to meet with the court clerk to go over the paperwork out in the hall.  She informed me that the judge never gives out community service and that he must have been in a good mood.  I feel very relieved this is almost over. I have signed up for my community service, which they have assigned me.  I hope to complete within 5 months of working weekends.

I have learned valuable lessons from all of this.  I just wanted you to know how much my family and appreciate your help and that I will refer you if I have an opportunity.

Take Care, ML

ChrisCoscaLaw.com

# EXHIBIT 58

# COTCHETT PITRE & McCARTHY LLP

**ABOUT US**

# Honors & Awards

Individually and collectively, the attorneys at Cotchett, Pitre & McCarthy, LLP have been recognized for excellence by clients, the legal community, business and industry groups and by numerous civic, cultural and nonprofit organizations. A few examples include the following:

## The Daily Journal

**Top 100 Lawyers in California**
Joseph W. Cotchett selected (every year since award's inception - Top 10)
Frank Pitre
Niall P. McCarthy

**Top 100 Women Litigators in California**
Nanci E. Nishimura

**Top Northern California Law Firm**
Cotchett, Pitre & McCarthy, LLP

**Awards for Various Legal Cases**

## California Lawyer

**Attorney of the Year (CLAY)**
Justin T. Berger and Niall P. McCarthy

## The National Law Journal

**"Plaintiff's Hot List"**
Cotchett, Pitre & McCarthy, LLP has been repeatedly recognized as a law firm on the cutting edge of litigation.

**Top 100 Verdicts in the United States**

## The American Lawyer

**Litigator of the Week**
Nancy L. Fineman

## Consumer Attorneys of California

**Trial Lawyers of the Year**
Ara R. Jabagchourian - Finalist (2011, 2012)

Aron K. Liang -  Finalist (2012)
Frank M. Pitre - Finalist (2000, 2004, 2011)
Niall P. McCarthy - Finalist (2005, 2011)
Justin T. Berger - Finalist (2008 and 2011)
Anne Marie Murphy - Finalist (2008)

**Consumer Advocate Award**
Joseph W. Cotchett

**Edward I. Pollock Award**
Frank M. Pitre

**Presidential Award of Merit**
Joseph W. Cotchett

# Super Lawyers and San Francisco Magazine

**Super Lawyers - Northern California**
Joseph W. Cotchett (Top 10 & Selected No. 1 over various years)
Frank M. Pitre  (Top 100)
Niall P. McCarthy (Top 100)
Steven N. Williams
Nancy L. Fineman
Mark C. Molumphy
Phil L. Gregory
Nanci E. Nishimura
Ara Jabagchourian

# The Recorder

**Top 50 California Lawyers Under 10 Years of Practice**
Matthew K. Edling (2012)
Justin T. Berger (2012)

# US News & World Report

Cotchett, Pitre & McCarthy, LLP (Best Lawyers)

# Lawdragon

**500 Leading Lawyers in America**
Joseph W. Cotchett
Frank M. Pitre
Nancy L. Fineman
Niall P. McCarthy

**Trial Lawyer Hall of Fame**
Joseph W. Cotchett (2011)

## Public Justice

**Trial Lawyer of the Year**
Joseph W. Cotchett - Finalist
Frank M. Pitre - Finalist
Steven N. Williams - Finalist.

## San Francisco 7x7 Magazine

Cotchett, Pitre & McCarthy, LLP (Bet the Company Litigation)

## ABC 7/KGO TV

**Profiles of Excellence Award**
Niall P. McCarthy

## Jack Berman Advocacy Center of the American Jewish Congress

**Community Service Award**
Mark C. Molumphy

## San Mateo County Chamber of Commerce

**Frances Bohannon Nelson Legacy Award**
Joseph W. Cotchett

## Armenian Bar Association

**20 Rising Stars Under 40**
Ara R. Jabagchourian

## American Italian Bar Service Award

Frank M. Pitre

## Golden State Antitrust Institute

**Antitrust Lawyer of the Year**
Joseph W. Cotchett (2011)

**San Mateo Bar Association Diveristy Award**
Joseph W. Cotchett (First Honoree)

# ACKNOWLEDGEMENTS

The law firm has been singled out for praise by various courts and judges. The following are just a few of the acknowledgements:

"*This settlement is extraordinary in that every single dollar of the cash funds will go to class members. It is extraordinary in that the claimants will receive 100 percent of the value of their claims, not as measured by the Court, not as measured on a litigated basis, but as measured by plaintiffs' own experts.*"

- Judge of the U.S. District Court

"*The Cotchett firm, in particular, has appeared before the court in other actions, and the performance of its attorneys to date in this and in other cases is a testament to the ability of these attorneys.*"

- Judge of the U.S. District Court

"*This court has had the distinct pleasure of having the parties in this case represented by some of the finest attorneys not only in this state but in the country.*" Cotchett, Pitre & McCarthy has "*well reputed experience in [consumer fraud] litigation.*"

- Judge of the U.S. District Court

"*I have a lot of experience in this kind of litigation*"… [and] "*the lawyers, many of whom I am personally familiar with, are top notch lawyers who have provided excellent representation.*"

- Judge of the Superior Court

"*The attorneys… displayed truly exceptional levels of skill and tenacity.*"

- Judge of the U.S. District Court

The California Court of Appeal described CPM as an "*experienced litigation firm that obtained a 'stupendous' result for the [client].*"

**EXHIBIT 59**

 

HOME | OUR FIRM | OUR PEOPLE | OUR SERVICES | OUR SUCCESSES | CURRENT CASES | NEW CASES | CONTACT US

# Praise from the Courts

**Courts routinely praise the work of Keller Rohrback attorneys on nationally prominent ERISA cases.**

• When appointing Keller Rohrback as lead counsel in the WorldCom ERISA litigation, U.S. District Judge Denise Cote stated:

"In thinking about lead counsel, and I've read all the submissions made to me in that regard, I have used the following criteria. I've looked at specific law firms and the materials they've sent me regarding their firms, to identify those that have an expertise in ERISA litigation. I've found it also useful to look and see whether or not a law firm has an expertise in bankruptcy litigation or bankruptcy law, such as would assist in this case, and an expertise generally in class action and complex litigation. And then I've looked at the law firms to try to identify a firm or firms with sufficient size to support this litigation on behalf of the plaintiff class. And in that connection, one firm when I apply those criteria stands out, and that is Keller Rohrback…Then I'm going to appoint Keller Rohrback lead counsel here."

• Later, when evaluating the settlement achieved by Keller Rohrback on behalf of the WorldCom plan, Judge Cote further added:

"Keller Rohrback has performed an important public service in this action and has done so efficiently and with integrity. It has cooperated completely and in novel ways with Lead Counsel for the Securities Litigation, and in doing so all of them have worked to reduce legal expenses and maximize recovery for class members. Keller Rohrback has also worked creatively and diligently to obtain a settlement from WorldCom in the context of complex and difficult legal questions. It still faces significant challenges in pressing forward with its litigation against Merrill Lynch. Keller Rohrback should be appropriately rewarded as an incentive for the further protection of employees and their pension plans not only in this litigation but in all ERISA actions."

• In *re WorldCom, Inc. ERISA Litig.*, No. 02-4816, 2004 WL 2338151, at *10 (S.D.N.Y. Oct. 18, 2004).

"Additionally, courts have recognized that Keller Rohrback is particularly well suited to lead complex ERISA cases because of its unique combination of ERISA expertise and broad experience in other pertinent areas of law."

• In appointing Keller Rohrback as lead counsel in the HealthSouth ERISA litigation, U.S. District Judge Karon Bowdre, stated:

"I want to say that I was very impressed with all of the material that was submitted by all of the firms represented here today. All of you come from firms with just extensive background and I think your participation in this case would be very beneficial to the Court.

But I feel like I need to select counsel to go forward and to be in charge. And what I think will be best for the class is the selection of the firm of Keller Rohrback. I think that firm has more expertise, not only in ERISA class actions, but also in other areas that will prove beneficial to the class in this case.

I think Mr. Sarko's former occupation as a federal prosecutor and as a white collar criminal defense attorney will be particularly helpful in this case where the criminal aspects of the separate litigation that fortunately is not before this Court but I think there are going to be

## Contact

If you would like more information about our commitment to helping employees and retirees protect their retirement savings and other employment-related assets, please contact us via email or call us toll free at 800.776.6044.

some overlaps and some interplays that are going to have to be navigated and I think his expertise there can be very helpful to the class and to the Court in dealing with that.

So I am going to appoint that firm, then, as lead counsel with the instruction that, Mr. Sarko, you and his firm put together an executive committee or steering committee of lawyers to work with him in proceeding as he sees fit."

• Similarly, Judge Holmes in the Williams Cos. ERISA litigation, in appointing Keller Rohrback as lead counsel, stated:

"The Court finds that [Keller Rohrback] is experienced and qualified counsel who is generally able to conduct the litigation as lead counsel on behalf of the putative class. Keller Rohrback has significant experience in ERISA litigation, serving as co-lead counsel in the Enron ERISA litigation, the Lucent ERISA litigation, and the Providian ERISA litigation, and experience in complex class action litigation in other areas of the law. Mr. Sarko's presentation at []before the Court evidences Keller Rohrback's ability to adequately represent the class."

• Additionally, in the Ford ERISA litigation Judge Pepe stated:

"The vast experience of both Keller Rohrback and [proposed co-lead counsel] make them a superior choice for this type of case. They are well-versed in trial practice and in conducting discovery relevant to breach of fiduciary actions. Moreover, their experience has allowed them the opportunity to establish relationships with key experts in the field, as well as defense and insurance counsel who regularly appear in these actions, which should help to facilitate settlement alternatives."

• And Judge Buchwald in the Wachovia Corp. ERISA litigation stated:

"Keller Rohrback presents the most compelling case for appointment as interim lead class counsel based on (1) its extensive experience handling ERISA class actions and (2) the unitary leadership structure it proposes."

• In approving the settlement in the IKON Office Solutions ERISA litigation, Judge Katz observed:

"Plaintiffs' counsel clearly possess the expertise to litigate this matter effectively, as evidenced by the quality, timeliness and professional nature of their work before this court. The case has been vigorously litigated, from the filing of the initial complaint and its two subsequent amendments, through numerous discovery battles, a motion to dismiss, the several stages of argument concerning class certification, and the motions for summary judgment, partial summary judgment and decertification pending at the time that the parties reached tentative settlement."



Home | Our Firm | Our People | Our Services | Our Successes | Current Cases | New Cases | Contact Us | Antitrust and Trade Regulation | Appeals | Class Actions | Commodities and Futures Contracts | Consumer Protection | Constitutional Law | Employee Benefits and Retirement Security | Employment Law | Environmental Contamination | Fiduciary Breach | Financial Products and Services | Intellectual Property | International Law | Institutional Investors | Mass Personal Injury | Securities | Medical Negligence | Whistleblower

This website is maintained by the law firm of Keller Rohrback L.L.P. This is not an official website of any Court. The information on this website is not intended nor should it be used as a substitute for specific legal advice or opinions. Part of this website may constitute attorney advertising. Case results depend on a variety of factors unique to each case. Case results do not guarantee or predict a similar result in any future case.

Keller Rohrback L.L.P. | www.krcomplexlit.com | (206) 623-1900
1201 Third Avenue, Suite 3200, Seattle, WA 98101
Copyright © 2013-2014 Keller Rohrback L.L.P. and WEO MEDIA. All rights reserved.  Sitemap

# EXHIBIT 60

Criminal & DUI Defense attorney in Riverside, Orange County, Los Angeles, CA - Charles Kenyon

Call us: 855.871.3888    


**CHARLES KENYON**
CRIMINAL & DUI DEFENSE ATTORNEY

Home    About    Areas Of Practice    Firm Overview    Attorneys    Contact Us

## About

Home > About

**TESTIMONIALS**

> "The ultimate trial advocate"

OC Register

> "A model trial lawyer"

Ken Starr

> "An experienced, often brilliant lawyer"

Superior Court Judge

> "The type of lawyer you want handling serious cases"

Superior Court Judge

> "Mr. Kenyon won the jury over with such bad facts, I honestly thought he had no chance"

Chief Deputy District Attorney



Charles Kenyon founded his private practice in 2007, leaving behind a promising career as a Deputy District Attorney. After winning acclaim from the California State Legislature and being awarded Prosecutor of the Year by the District Attorneys Office, he founded a firm with a singular goal - to provide his clients with the best advocacy in criminal defense. Since 2007 he has served clients throughout Orange, Riverside, San Bernardino, and Los Angeles with incredible success, winning praise from judges, attorneys, and his clients.

Mr. Kenyon began his mastery of trial advocacy and criminal law while serving as a Deputy DA. He quickly gained a reputation as a fierce trial lawyer, where he collected accolades and awards throughout his tenure as a prosecutor. But Mr. Kenyon knew his calling would be not as a government lawyer but rather defending the rights of the accused. In 2007, he left his position as a Senior Felony Prosecutor to open his own practice. Mr. Kenyon opened his office with a singular focus - Criminal Defense. By specializing his practice, he ensures that every one of his clients receives the best representation possible.

Mr. Kenyon handles ALL types of criminal defense matters ranging from including serious felonies and three strikes cases, to misdemeanors and DUI cases.

**Charles Kenyon is a graduate of Pepperdine University School of Law, Cum Laude. He has a B.A. from Dartmouth College. He volunteers as a visiting adjunct professor at Pepperdine School of Law and works closely with the Law School's Trial Advocacy Team.

---

**QUICK INFORMATION**

Home
About
Areas Of Practice
Firm Overview
Attorneys
Contact Us

**AREAS OF PRACTICE**

Felony
Misdemeanor
DUI/DWI

**OUR LOCATION**

4129 Main St. #300A
Riverside, CA 92501

**Phone:** 855.871.3888

**Fax:** 714.843.6257

**E-mail:** charles@kenyonlawgroup.com

**SHARE**

 

Copyright © 2013 Charles Kenyon, Attorney at Law. All rights reserved.

**EXHIBIT 61**

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

OUR FIRM   PRACTICE AREAS   ATTORNEYS   CASES   NEWSROOM   PUBLICATIONS   CONTACT          SEARCH

## Attorneys

🖶 Print Page   ✉ Email Page

### Daniel W. Krasner | Partner



**New York**
270 Madison Avenue
New York, New York 10016

Phone:   212-545-4670
Fax:      212-545-4653
Email:    krasner@whafh.com

Mr. Krasner, a partner in the Firm's New York office, is the senior partner of Wolf Haldenstein's Class Action Litigation Group. He attended Yeshiva College (B.A. 1962) and Yale Law School (LL.B., 1965), and then began practicing law with Abraham L. Pomerantz, generally credited as the first "Dean of the Class Action Bar." He founded the Class Litigation Group at Wolf Haldenstein in 1976.

Mr. Krasner received judicial praise as early as 1978. *See, e.g., Shapiro v. Consolidated Edison Co.*, [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) & 96,364 at 93,252 (S.D.N.Y. 1978) ("in the Court's opinion the reputation, skill and expertise of . . . [Mr.] Krasner, considerably enhanced the probability of obtaining as large a cash settlement as was obtained"); *Steiner v. BOC Financial Corp.*, [1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) & 97,656, at 98,491.4, (S.D.N.Y. 1980) ("This Court has previously recognized the high quality of work of plaintiffs' lead counsel, Mr. Krasner"). *The New York Law Journal* referred to Mr. Krasner as one of the "top rank plaintiffs' counsel" in the securities and class action fields.

More recently, Mr. Krasner has been one of the lead attorneys for plaintiffs in some of the leading Federal MDL cases, including IPO Litigation in the Southern District of New York, the Mutual Fund Timing Litigation pending in the District of Maryland, and Madoff-related litigations pending in the Southern District of New York. Mr. Krasner has also been lead attorney in several precedent-setting shareholder actions in Delaware Chancery Court and the New York Court of Appeals; *American International Group, Inc. v. Greenberg*, 965 A.2d 763 (Del. Ch. 2009); *Kirschner v. KPMG LLP*, Nos. 151, 152, 2010 N.Y. LEXIS 2959 (N.Y. Oct. 21, 2010); *In re CNX Gas Corp. S'holders Litig.*, C.A. No. 5377-VCL, 2010 Del. Ch. LEXIS 119 (Del. Ch., May 25, 2010); *In re CNX Gas Corp. S'holders Litig.*, C.A. No. 5377-VCL, 2010 Del. Ch. LEXIS 139, (Del. Ch. July 5, 2010), appeal refused, 2010 Del. LEXIS 324, 2010 WL 2690402 (Del. 2010).

Mr. Krasner has lectured at Practicing Law Institute; Rutgers Graduate School of Business; and Federal Bar Council; and testified before Congress regarding shareholder litigation. Member: the Association of the Bar of the City of New York; Rockland County, New York State and American Bar Associations; Federal Bar Council, and before numerous other bar, industry and investor groups.

Mr. Krasner is admitted in the State of New York; Supreme Court of the United States; U.S. Courts of Appeals for the Second, Third, Fourth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits; U.S. District Courts for the Southern and Eastern Districts of New York, Central District of Illinois, and Northern District of Michigan.

**Practice Areas**

Class Action Litigation

Securities Litigation

**Related News**

05/02/13
Empire State Realty Trust Litigation Settlement Approved

04/10/13
WHAFH Obtains Final Approval of Historic Stuyvesant Town Settlement

11/29/12
Stuyvesant Town Class Action Parties Reach Settlement

03/08/10
Daniel Krasner Comments on Delaware High Court Litigation by AIG Shareholders Against Auditors

10/05/09
Court Approves Final Settlement in IPO Securities Litigation

10/16/08
Court Grants Preliminary Approval of American Pharmaceutical Partners Settlement

View All Related News

Our Firm | Practice Areas | Attorneys | Cases | Newsroom | Contact Us          Disclaimer | Site Map | Mailing List
© 2009 Wolf Haldenstein Adler Freeman & Herz LLP

**EXHIBIT 62**

# KURZMAN GRANT

HOME          ATTORNEYS          FAMILY LAW          ESTATE PLANNING          CONTACT          DIRECTIONS

## TESTIMONIALS

**AREAS OF PRACTICE**

Wills, Trusts & Estates        [Expand]

**What judges say:**

"I have found his legal acumen, compassion, dedication and reputation to be beyond reproach... I have observed such qualities to be uniquely admirable in Mr. Kurzman, and unsurpassed by others."
**-Hennepin County District Court, Fourth Judicial District**

"Mr. Kurzman has appeared before me on numerous occasions... He is always thoroughly prepared and is an extremely effective advocate. Mr. Kurzman's moral character is of the highest caliber. He is highly regarded in the legal community."
Anoka County District Court Judge, Tenth Judicial District

"Mr. Kurzman... has at all times been an effective advocate for his clients... Mr. Kurzman is an experienced trial attorney who is respected by his colleagues and members of the bench."
**-Ramsey County District Court, Second Judicial Districrt**

"The Court finds that [the other side] has little credibility. He has continuously lied his whole adult life. In this proceeding he admitted only what he knew [Ms. Grant] could prove. Everything else he claimed were lies. Investigation and hard work by [Ms. Grant] exposed many of his lies."
**-Rice County District Court Judge, Third Judicial District**

"Marc Kurzman is an outstanding trial lawyer with a long and enviable record of outstanding advocacy on behalf of his clients... a person of the highest moral

**IMPORTANT LINKS**

Why you need a lawyer

Questions you should ask

What others say about us

COPYRIGHT © 2008 KURZMANGRANT.COM | DISCLAIMER | SITE MAP | WEBMASTER | CONTACT

# EXHIBIT 63

**LOEVY & LOEVY**
A CIVIL RIGHTS LAW FIRM
312.243.5900 888.644.6459

WHY LOEVY?     BIG WINS
OUR ATTORNEYS     CONTACT US

GET HELP NOW 312.243.5900
TOLL FREE 888.644.6459

Loevy & Loevy > Praise from Federal Judges

# PRAISE FROM FEDERAL JUDGES

Loevy and his firm consistently produce written work that rivals that of any law firm in Chicago—not just those specializing in this particular field. In addition, Loevy's outstanding trial advocacy skills put him in the top tier of civil trial attorneys in the Chicago area.
- *Jimenez v. City of Chicago, 09 C 8081, 2012 WL 5512266 (N.D. Ill. Nov. 14, 2012)*

The Court has … had the opportunity to observe Kanovitz in action in other cases, primarily the aforementioned Young case, in which he served as principal counsel for a class of over 300,000 Cook County pretrial detainees and obtained an extraordinary result on their behalf. Kanovitz's written, oral, and trial advocacy skills are top-notch.
- *Jimenez v. City of Chicago, 09 C 8081, 2012 WL 5512266 (N.D. Ill. Nov. 14, 2012)*

Jon Loevy's poise, analysis, and demeanor in front of the jury, as well as his rappier-like cross-examination style, are reminiscent of the trial skills displayed by some of the nationally recognized trial lawyers in this community when they were the age that Jon Loevy is now. Additionally, Jon Loevy's overall performance ranks among the finest displays of courtroom work by a plaintiff's lead trial counsel that this court has presided over in several years.
- *Garcia v. City of Chicago, 01 C 8945, 2003 WL 22175620 (N.D. Ill. Sept. 19, 2003)*

Jon Loevy [is] an attorney whose experience, skill, and record of success in representing plaintiffs in police misconduct cases place him at the apex of attorneys who practice in that field.
- *Wells v. City of Chicago, 925 F. Supp. 2d 1036, 1041 (N.D. Ill. 2013)*

[T]he court is not unmindful of Jon Loevy's success in this case and his now established reputation as a singularly formidable trial lawyer in civil rights cases.

*- Robinson v. City of Harvey, 99 C 3696, 2008 WL 4534158 (N.D. Ill. Oct. 7, 2008)*

# GET HELP NOW
## CALL 312.243.5900
OR

**EMAIL NOW**

POLICE MISCONDUCT »

FRAUD WHISTLEBLOWER »

COMPLEX LITIGATION &
COMMERCIAL MATTERS »

THE Loevy & Loevy **DIFFERENCE**

| Big Wins | Attorneys | Practice Areas |



Like    0        **Tweet**   0

## FEATURED POSTS

### Chicago Police Sued to Force Release of Evidence of Possible Cell Phone Spying

The Chicago Police Department was sued Friday to force release of evidence that the department has purchased equipment that allows…

Read more >>

### Man Falsely Accused of Daley Center Rape Sues Accuser, Officers

After spending 11 years in prison for a rape he did not commit, Carl Chatman filed suit last month against…

Read more >>

### $12 Million Whistleblower Settlement Spotlights Rampant Cheating in Chicago's Minority Set Aside Programs

Construction Giant McHugh Used Sham Subcontractors to Funnel Money Away from Women and Minority-Owned

Firms CHICAGO, 5/1/14 – A politically-connected…

Read more >>

ARE YOU A REFERRING ATTORNEY?

BIG WINS | THE EXONERATION PROJECT | PRISONERS' RIGHTS PROJECT | CAREERS | CONTACT US

© 2014 by Loevy & Loevy. All rights reserved. | Disclaimer | Site Map | Privacy Policy
Remote Access | Loevy Intranet

**EXHIBIT 64**

# The O'Mara Law Firm

732-530-5305 | 800-416-6618 Toll Free

## Testimonials

---

*"Mr. O'Mara, I have been doing this stuff going close to 30 years, mostly in the criminal courts, as a prosecutor, defense attorney, and a Judge. I've never seen anybody as prepared for a criminal case as I saw you prepared for this case. You knew it inside and out. You knew things some of the experts didn't seem to think that they knew as well as you did. You should go out of here with your head held high. You represented your client to the fullest. You did your profession proud. I only pray and wish for the rest of my time on the bench, that I have attorneys such as you appearing in front of me and doing the professional outstanding job you did. You're a credit to your profession."*

Monmouth County Superior Court Judge
In open court, following a three week Vehicular Homicide / DWI jury trial

*"Mr. O'Mara, each case I watch you in, and I've had the privilege to do that for the 11 years I've sat here, you have never ceased to amaze me about how you come up with your knowledge of the law. And I always think, well, he can't better himself in the next case and I'll be darned if you didn't pull it off in this one. Incredible. Do you know, and as tough as I am on drunk driving, I think we've got to give Counsel his credit where it's due. I mean, how many lawyers would come in here and be that thorough? Believe me, it's like one in a million! My compliments to you, Mr. O'Mara. It's always—and as much as I dislike drunk driving—I have to admit, my job here is to be neutral, but the way you've done your research here, counsel? My compliments."*

Brick Township Municipal Court Judge
In open court, following the dismissal of a DWI Charge

---

**The O'Mara Law Firm**
25 Sycamore Avenue, Suite 2
Little Silver, NJ 07739
Phone: 732-530-5305
Toll free: 800-416-6618
Fax: 732-530-9955
Little Silver Law Office

---

Articles

© 2014 by The O'Mara Law Firm. All rights reserved. Disclaimer | Site Map
Privacy Policy | Legal Marketing® by FindLaw, a Thomson Reuters business.

**EXHIBIT 65**



Legal Simplified • Lawyers Verified℠

## The Law Offices of Robert G. Cummings



Robert Cummings
2000 Broadway Street
Redwood City, CA 94063
*Redwood City Criminal Defense Law Firm*

**Call: 650-458-5575**

**Office Location**

Map data ©2014 Google

Directions      View Larger Map

Summary          Attorney Profile          Testimonials

### Testimonials

"As a trial attorney, Rob is concurrently engaging and tenacious. His positions on legal points are always well researched and presented."
- California Superior Court Judge

"Mr. Cummings is one of the most formidable, yet personable trial attorneys I have come across in my three decades of law enforcement."
-  Los Altos Police Sergeant

"Mr. Cummings has proven himself to be a zealous, well-reasoned and extremely articulate advocate."
-  California Superior Court Judge

"Rob is extremely bright, articulate individual. He possesses an open, inquiring, insightful intellect.  Rob also exhibits exemplary inter-personal skills, dealing tactfully with competing demands"
-  Assistant United States Attorney

"Mr. Cummings is an extremely able and dedicated attorney who has the ability to accomplish a wide range of tasks in a high pressure environment exceptionally well".
- California Superior Court Judge

"Rob's breadth of experience in criminal and civil litigation, as well as his education and expertise in accounting and taxation, give him a "skill-set" that is unusual for so young a man."
- California Superior Court Judge

"My observations of Mr. Cummings during the jury trials showed that he has both excellent legal skills and the proper demeanor – qualities that are necessary to be a successful trial attorney."
 - California Superior Court Judge

"While arguing motions, Mr. Cummings is always well prepared with case law, common sense-logic and a high-degree of persuasiveness.  At all times he is courteous and professional, yet driven with ultimate victory in mind."
- Los Altos Police Officer

"He has presented himself as well prepared and knowledgeable. He is affable and communicates well with all attorneys, judges, and court staff.  He has proven himself to be very competent in court settings including evidentiary hearings on motions and in trials."
- California Superior Court Judge

"He is poised, articulate, sincere, and engaging, with a competitive nature but a thoughtful and open-minded perspective."
 - California Superior Court Judge

**Get Started Now!**
Call 650-458-5575
or fill out our form

* Name

* Email

* Phone

City

State

Please explain your legal situation.

* Please enter the security code shown below:

pU5E2

Submit

&lt;&lt; Attorney Profile

The Lead Counsel Rating
Copyright © 2014 LawInfo.com, Inc. All rights are reserved.
No portion of this site may be reproduced in any manner in any medium without the express written consent of LawInfo.com, Inc.

**EXHIBIT 66**

## LAW OFFICE OF
# Edward Scher, PLC
*Representing People Whose Injuries Have Changed Their Lives*

Richmond, VA
**804-421-6000**

Home

Firm Overview

Attorney Profile/Honors

Practice Areas

Testimonials

Million Dollar Case Results

FAQs and Articles

Maps & Directions

Contact Us

**6912 Three Chopt Road
Suite D
Richmond, Virginia 23226
Phone: 804-421-6000
Fax: 804-421-6101**

## Testimonials

Judges, clients, and other attorneys have expressed their thoughts on Richmond, Virginia personal injury lawyer Edward Scher's legal ability. Take a look.

**What judges have said about Edward Scher
What clients have said about Edward Scher
What other lawyers have said about Edward Scher**



**Comments from judges**

*"[O]ne thing I have learned over the past two years in dealing with Mr. Scher is he's established a good reputation and good integrity with this court."*
Transcript, Eccleston v. Harley Davidson, et al., Case No. 6J790

*"You really do an incredible job... I don't know whether I told you that before, but you do. You really —when I am down, I am hoping that I will have you tomorrow, because the profession gets so many knocks. But people like you make a big difference because you do your job, and you do it as thorough as anybody that comes in this court. I am proud of that."*
Transcript, United States v. Murchison, Case No. 3:95CR36-01.

*"Let me say this Mr. Scher. I wish every lawyer that came in here came as well prepared as you.... I always feel safe when I see you in here, because I know the person is going to get full and complete representation."*
Transcript, United States v. Dranoff, Case No. 3:93CR108.

Mr. Scher *"conducted himself in all proceedings before the Court with knowledge, efficiency, and professionalism."*
Letter, United States v. Del Toro, Case No. 3:94CR100-01.

As his *"performance in this case proves, [Ed Scher is] very competent in representing clients in complex...litigation."*
Court Order, Diamond Star Building Corp. v. The Sussex Company Builders, Inc. Case no. 3:92cv191.

**Back to top**

**Letters from clients**

*"As you know, our case was both long and involved, spanning four years. During this time, I was always impressed with your honesty, fairness and attention to detail.... The real crowning achievement, however, was your performance during the trial. It was a masterpiece. It was clear... that we were better prepared, more enthused, and better represented at the trial.... So, to conclude, thanks for the professionalism that you brought to the attorney-client relationship."*

*"Needless to say we are all happy to have this thing behind us but I want you to know how much we all appreciated the splendid way in which you...went about this matter from the earliest preparations to the final negotiations. I don't see how we could possibly have been represented any better and it was a personal pleasure for me to work with you."*

*"[We were] very pleased with the speed, quality and thoroughness of the services you rendered."*

*"Your talent for resolving problems in your clients' favor was rewarded by the judge far beyond my ability to add or subtract, by his approving smile and loud 'Good job.' May I add my gratitude for the kindness, empathy which you showed to your client; the careful instruction and most of all the discretion and circumspection which, with honor, make a gentleman."*

*"Mr. Scher, from the outset, could not have been more courteous and helpful. His attention to my problem and the manner in which he handled it was, simply put, impressive. I would also like to*

point out that during the time Mr. Scher worked on my case not only was he thorough, but he also demonstrated a feel for the nuances of the case.… It was my pleasure to deal with your firm and in particular to work with Mr. Scher."

"Ed did a very professional job.… I greatly appreciated his professionalism, enthusiasm, and conscientious preparation."

**Back to top**

### Other lawyers have said

Listed in *The Best Lawyers in America* for personal injury litigation (2007, 2008, 2009, 2010, 2011, 2012, 2013); for commercial litigation (2010, 2011, 2012, 2013); and "Bet-The-Company Litigation" (2010, 2011, 2012, 2013)
Selected as a *Virginia Super Lawyer* for personal injury litigation (2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013)
Listed as one of the "Top 50 Virginia Super Lawyers" (2006, 2007)
Received an AV® Peer-Review Rating,™ the highest rating possible from other attorneys for legal ability and ethical standards according to a survey by Martindale-Hubbell

**Back to top**

### Contact the Law Office of Edward Scher, PLC today

If you or a loved one has been seriously injured due to someone else's negligence, you might be entitled to compensation. **Contact the Law Office of Edward Scher, PLC** for a free consultation.





Virginia's Largest Personal Injury Verdicts
Obtained By Edward Scher And Co-Counsel
2001   2003   2007   2008
Virginia's Largest Settlement
Obtained By Edward Scher And Co-Counsel
2009



Home     Firm Overview     Attorney Profile     Practice Areas     Testimonials     Million Dollar Case Results     Maps & Directions     Contact Us

Edward Scher is a member of the Virginia State Bar and is not licensed to practice law in other jurisdictions.

PLEASE NOTE: CASE RESULTS DEPEND UPON A VARIETY OF FACTORS UNIQUE TO EACH CASE. THE CASE RESULTS DESCRIBED HERE DO NOT GUARANTEE OR PREDICT A SIMILAR RESULT IN ANY FUTURE CASE WE UNDERTAKE.

This website is designed for general information only and does not contain legal advice. No attorney-client relationship is created by your review or use of this website. Communications with Edward Scher or the Law Office of Edward Scher, PLC through this website, by email, or otherwise does not create an attorney-client relationship in connection with any legal matter for which we do not already represent you. No attorney-client relationship will be created without the express written agreement of the Law Office of Edward Scher, PLC. Absent such a relationship, communications through this website or by email or otherwise may not be treated as confidential.

Do not send confidential or time-sensitive information to Edward Scher or the Law Office of Edward Scher, PLC through the e-mail form on this website. The Law Office of Edward Scher, PLC cannot represent you on a new matter until the firm determines that there is no conflict of interest and that it is willing and able to accept the matter. Unless and until the Law Office of Edward Scher, PLC has informed you in writing that it is willing and able to accept your matter, do not send the firm any information or documents that you consider to be private or confidential.

[ Site Map ] [ Bookmark Us ]

Copyright ©2009 Edward E. Scher

# EXHIBIT 67



**Home**   **Our Attorneys**   **Support Staff**   **Practice Areas**   **Guides & Information**   **Contact Us**



**Storobin Law Firm**
**291 Broadway, 17 Floor**
**New York, N.Y. 10007**
**Phone: (646) 350-0601**
**Fax: (646) 350-0631**
**info@storobinlaw.com**

"Global legal expert".
- Investor's Business Daily on David Storobin.

"A well-recognized legal expert".
- Examiner.com on David Storobin.

"An asset to the legal profession".
- NY Supreme Court Justice Silverman on David Storobin.

"I came away from the interview feeling very honored that Mr. Storobin was a guest on the program."- Shaun O'Mac, radio host.

"David is an excellent no-nonsense attorney who gets results."
- Steven Brodsky, Esq.

"A true professional and a pleasure to work with. I wish all attorneys had the same verve!"
- Anthony DiStefano, Esq.

Storobin Law Firm PLLC is a New York law firm that provides top quality representation at affordable fees. We represent clients in Family Courts in Manhattan, Brooklyn, Queens, Bronx, Staten Island, Long Island and Westchester, focusing on custody, child support, prenuptial agreements and orders of protection.

Some wonder if they need a lawyer in Family Court. But those who already have been through the process before know that you not only need a family lawyer, but you need one who will fight for your family as if it was his own, one who will be knowledgeable and experienced not just in Family Law, but in the specific Family Court where your case will be held. A good Family Law Attorney can make a significant difference in the outcome of your case. Choose wisely. Choose The Storobin Law Firm.

- Our Family Attorneys were praised by judges, lawyers, clients and the media. They were called "*global legal expert*","*an asset to the legal profession*" and "*highly respected by the legal community*". (Learn more about our **family law attorneys**.)

- The Family lawyer assigned to your case will fight for you and your family. Whether you need to be protected with an order of protection or fight against it, whether you are looking to make visits supervised or lift supervision, whether you are looking to pay more or less, we are here to fight for your rights in Family Court.

- The New York Child Support or Custody attorney assigned to your case will be someone who is focusing on your county and type of casee.

- Our Custody and Child Support lawyers regularly advance their knowledge with advanced attorney courses to make sure they understand the latest Family Court developments.

- Your Child Support & Custody attorney will understand not just how to fight against substantive issues (guilty or not guilty), but also procedural issues.

- Personal attention and dedication to every client, every time.

- Pay a low retainer fee that you can afford instead of spending $10,000 or more the first time you see your Family Lawyer. Good lawyers must be affordable to be able to help people, so we charge reasonable legal fees.

- **Family Court Appearances**: $550.

- **Family Court Petitions**: $275.

- **Out of court work**: $275 an hour.

- **Prenuptial Agreement (drafted by our firm)**: $950.

- **Prenuptial Agreement (review only)**: $650.

© 2004-15 All rights reserved. Hockey Web Design. | Phone: (646) 350-0601 | Fax: (646) 350-0631 | Email: info@storobinlaw.com

**EXHIBIT 68**

S                                                                516-678-2800

| Home | Firm Overview | Attorney Profile | Practice Areas | In The News | Testimonials | Directions | Contact Us |



" Corruption Charges Tossed "
- Newsday

## Case Results
Wednesday, June 18, 2014

**Manhattan DWI Murder Trial Ends With Acquittal On All Charges:**

After 3 week jury trial, Navy veteran cleared

**Federal Indictment Dismissed On Eve Of Trial:**

Federal prosecutors dismiss conspiracy and bribery indictment of school construction authority official on eve of jury selection

**Nassau Jury Acquits Man Of All Charges At Murder Trial:**

After 2 1/2 week jury trial, bank clerk exonerated

- Click here for More Case Results -



## Testimonials

*"As District Attorney of Nassau County for 31 years and a former federal prosecutor, I have encountered some of the best criminal defense attorney's in New York State. The hallmarks of a truly phenomenal criminal lawyer are the ability to be both a great trial lawyer and a strong negotiator, while maintaining credibility at all times. William Petrillo possesses these skills. He has earned a stellar reputation within the legal community as an outstanding, gifted trial attorney. Always a gentleman, honest and ethical, Mr. Petrillo is a fierce, persuasive litigator and a tough, fair negotiator. I would unequivocally recommend him to anyone in need of a criminal lawyer."*

**Honorable Denis Dillon - Former District Attorney, Nassau County and Former Federal Prosecutor**

*"If I or a loved one ever need the services of a criminal defense attorney, Bill Petrillo is the one I would count on for representation. No higher praise can be given to a fellow lawyer. Mr. Petrillo not only possesses excellent trial skills, but is also skillful at negotiating favorable dispositions for his clients. He treats everyone he encounters with respect and has earned the respect of Judges, prosecutors and law enforcement personnel. He is passionately devoted to his clients and constantly thinking of ways to benefit them. Finally, he is scrupulously honest and ethical while fighting tirelessly for the people he represents."*

**Fred B. Klein - Retired, Chief of Homicide, Nassau County District Attorney's Office - Retired Attorney General**

*"Both as a prosecutor and as a defense attorney, Bill Petrillo tried many cases in front of me in Nassau County Court. He won just about every one of those trials. When an attorney constantly wins trials it means that jurors respect him. When jurors respect an attorney they will listen to him, will follow his line of reasoning and give serious consideration to his various arguments. To get jurors to that point the attorney must project honesty, must balance fairness with understanding for all involved, have an absolute knowledge of the facts of the case and the applicable law, and he must be able to create an atmosphere of mutual respect with the judge. Bill Petrillo possesses all of these qualities."*

**Honorable Donald DeRiggi - Retired, Nassau County Court Judge**

*"As a prosecuting attorney for almost 30 years, I have observed many trial lawyers. Of the few that I judged to be excellent, only one was uniquely skilled in all of the qualities that contribute to tremendous success in the courtroom. His name is Bill Petrillo. A brilliant strategist who leaves no stone unturned, Bill has a rare natural gift for trying cases. He is a passionate lawyer and has won cases that were considered unwinnable."*

**James Watson - Retired Deputy Bureau Chief, Nassau County District Attorney's Office and Former Federal Prosecutor**

*"Bill Petrillo is a giant in the criminal defense community. Time and again I have observed him fearlessly battle the government, negotiate extraordinary plea deals, obtain the dismissal of indictments or acquittals after trial. He regards his clients as family and tries to protect them accordingly."*

**Kevin T. Kearon, Esq. - Past President, Criminal Courts Bar Association of Nassau County**

*"As a judge, I presided over felony cases for ten years. Bill Petrillo appeared before me on many occasions. He is as tenacious and talented an attorney as I ever encountered. Bill is an extraordinary advocate and I would strongly recommend him."*

**Honorable Victor M. Ort - Retired Nassau County Judge**

---

*"Bill Petrillo is a relentless super-talent with incredible drive, focus and work ethic. He has a razor sharp mind and is lightning quick on his feet. Bill is as powerful, energetic and persuasive in the courtroom as any lawyer I have ever seen."*

**Michael S. Lamonsoff, Esq. - Board of Directors New York State Trial Lawyers Association and Member of New York State Ethics Committee**

---

*"Mr. Petrillo is one of the most talented, hard working, compassionate, ethical and moral individuals I have ever known."* J.H.

---

*"Mr. Petrillo is a miracle worker. When faced with a situation that others told me was all but impossible to be resolved in a tolerable manner, Mr. Petrillo did the impossible. Throughout the whole process he was knowledgeable, honest, available, and incredibly professional. Having first gone to other highly recommended lawyers I was able to get a sense of different types of attorneys. Not only was the outcome something that the other attorneys couldn't dream of, but Mr. Petrillo's personality and general demeanor was miles beyond the others. In an incredibly trying time he was calming. But while he was pleasant to deal with personally, he also is incredibly fierce in the courtroom. You get the sense that what he does is not just his job, but his passion. There is nobody I would trust more." Z.K.*

---

*"I was under state and federal investigation for multiple potential charges in a year long investigation. The first lawyer I consulted with suggested we go to the US Attorneys office, cooperate and agree to a quick plea, despite my telling him I had done nothing wrong. Shortly after that consultation I was given Mr. Petrillo's name from a friend who knew a criminal court Judge. It became obvious to me during my first meeting with Bill that his level of knowledge and expertise was far superior than my original lawyer. He had a completely different analysis of my case and the best course of action to take. Ten months later, without me ever speaking to law enforcement, eleven people were arrested. I was never prosecuted and will be forever grateful to William Petrillo." M.O.*

---

*"Not only are you a phenomenal and brilliant lawyer, you are an amazing human being and we are grateful to know you on any level. Thank you for everything." S.E.*

---

*"Bill and his staff treated me with kindness and respect and the utmost professionalism which is very important when you are facing the uneasiness of criminal prosecution. Besides having a very impressive track record in the courtroom, it was apparent to me and my family that Bill is highly respected and well-liked by judges, lawyers and prosecuting attorneys. He was able to negotiate a great outcome in my case. If I opted to go to trial, there is not a shred of doubt in my mind that Bill was the man I wanted by my side. For a man who makes no promises, he sure delivers." R.M.*

---

*"I consider myself extremely fortunate to have worked with William Petrillo when I was facing multiple felony charges. From our first meeting I felt Bill's passion for under taking whatever was necessary to insure that I receive proper representation. He is endowed with an extraordinary talent for understanding the client's fears and concerns while offering honest and straight forward information and advice. Mr. Petrillo is one of the hardest working people I ever met. He kept me fully informed as to the process and progress of my case. Finally, as opposed to many other attorneys who are not court experienced; Mr. Petrillo shined in court. His presentation of the details of my case held the courtroom captive. Not only did everyone come to understand the complications of the situation, but, more importantly, the resolution of the case reflected the hard work, diligence and devotion to his client. It is my great pleasure to recommend Mr. William S. Petrillo." A.M.*

---

*"About a year and a half ago I ran into some legal trouble and needed legal representation. My wife's cousin is a corporate lawyer and she referred us to William Petrillo. Having never been on the wrong side of the law, I didn't know what to expect. I also didn't know if this would affect my employment status. I had a laundry list of concerns and questions. After my first consultation with Bill, he immediately struck me as personable, professional, confident and honest. He told me what all of my options were and also gave me his personal opinion. My best interest was always his primary concern. He always reiterated that no matter what legal avenue I chose to go down, he was in my corner 100%. I felt extremely confident that I had the chosen the right guy. And I definitely did. From the first court appearance right up to my last, Bill and his associate, Karen Bobley, always put their best foot forward. They never wanted to settle for anything less than what I had hoped for. At the end of my court proceedings, I did get the outcome I was looking for, and my friends and co-workers could not believe that it was possible, under the circumstances. I owe it all to Bill and his team. Whenever I needed legal documentation, for work or other purposes, Jennifer, Bill's office manager, was always on top of things. Jennifer would call me the day before any court appearances, as a reminder, and also give me the heads up on what would happen at that appearance. Whenever I had questions, Jennifer usually had an answer and if she didn't, Bill would, personally, return my call by the end of the day. Words do not truly describe the high level of service I received. Bill and company made a very stressful situation very manageable and I am forever grateful. Not only is Bill a great lawyer, but he's a wonderful person.*

*And that's what separates him from the rest. So,if you ever find yourself in a legal bind, don't take chances or try to cut corners. Protect yourself and go with one of the best, William Petrillo." O.W.*

Law Offices of Wiliam S. Petrillo - Long Island
11 Clinton Avenue Rockville Centre, New York 11570
Office: (516) 678-2800 Fax: (516) 766-6121

Law Offices of Wiliam S. Petrillo - Manhattan
80 Maiden Lane New York, New York 10038
By Appointment Only

E-Mail: williampetrillo@gmail.com | © 2013 All Rights Reserved. | Privacy Policy | Sitemap

Attorney Advertising - Prior results do not guarantee a similar outcome

**EXHIBIT 69**



"The wisdom of our sages and the blood of our heroes has been devoted to the attainment of trial by jury. It should be the creed of our political faith ..."

– Thomas Jefferson

Home    About    Case Highlights    Media & News    Testimonials    Contact    (310) 497-1974

■  **Testimonials** ■

"Steve Levine is one of the best, if not the best of California's defense attorneys. He brings a hefty weight of experience and know-how to the courtroom and is able to carry the most difficult cases to successful completion with a level of professionalism and dedication unrivaled in today's legal world. If you are looking for a top notch lawyer to represent you in a legal matter, look no further."

**-- James D.**
Civil Rights Attorney

"I am an entertainment lawyer, and refer ALL my criminal cases to Steve. Every client, bar none, has gotten a positive result, and each one has been impressed with Steve's know-how, knowledge of the system and knowledge of the people in the system. And each client was doubly impressed with how accessible Steve was; how he returned all phone calls promptly, and took the time to answer all of their questions."

**-- Martin S.**
Entertainment Attorney

"I was charged with a gross vehicular manslaughter and was looking at 12 years in prison. My first lawyer never returned phone calls, and when I did see her in court, she gave me the run around. I found Steve through a referral, and was immediately impressed with his knowledge and compassion. He hired an accident reconstructionist, alcohol expert, and traffic expert, and through a series of negotiations, got my charge reduced, and I spent one year in prison. I am out now, and am eternally grateful to Steve."

**-- Steve M.**
...Client

"Steve has appeared in my court on dozens of occasions and has conducted several trials. I am always impressed with his professionalism, courtroom presence, and his tenacity in defending his clients. Over the years, I have recommended him to friends who need a criminal lawyer. Steve is a great person, and a great advocate."

**-- Jack H.**
Superior Court Judge

"There are no harder-working, smarter-thinking attorneys on the bar. I have the uptmost respect for Steve in Court and have seen him work the weakest cases to a successful outcome. Nothing short of phenonmenal given the dramatic efforts involved to bring about a strong case from nothing."

**-- Robert M.**
Court of Appeals Justice

"When I needed a good attorney to take my criminal case on appeal, I got a great one instead. Steve's research and writing skills are sick. He wrote an amazing opening brief, and reply brief, and his argument to the Court of Appeals was nothing short of magnificent. My conviction was overturned, and my life was returned to me. Steve did more for me than any person in my life."

**-- Justin T.**
...Client

"When I met Steve, I was in jail, having just been convicted of a felony sexual battery of a patient. My life was in ruins. Steve obtained bail for me on appeal, wrote a 40-page new trial motion, and got the same judge who convicted me to toss my felony conviction. And when the same judge tried to stick me with a lesser conviction, Steve appealed to the Court of Appeal, and the Court of Appeal tossed that conviction as well! I am not sure if the prosecutor liked Steve after that, but I thank my lucky stars each day that I hired Steve. I got my license back, and can now provide for my family. Thank you Steve!"

**-- Hossein B.**
...Client

"I was charged with six separate crimes, and had been suspended from my job. Steve came to my house to meet my wife and four children to explain to them, in person, I had been wrongfully accused. Steve also spoke to my employer, and while I was unable to work, I still got paid. That helped so much. After months of information gathering, and several motions, the case went to trial, and Steve was amazing, convincing the jury to acquit me on all counts. The jury thanked Steve after the trial, and commented on his passion for my case and great closing argument. I am back at work, Steve saved my life."

     **-- Jess S.**
     ....Client


"I was guilty, but there was an explanation. I did not want to be deported. Steve worked up my case, and engaged in several negotiations with the prosecutor. I could see from my seat in the audience that the prosecutor, court staff and judge all liked and respected Steve. Steve consulted an immigration attorney to determine what charges would not subject me to deportation, and he put together a package showing my life achievements along with letters in support. I am not sure how he did it, but through his perseverance, I received a plea bargain that was immigration proof, and I was not deported. I am so grateful to Steve and all of the hard work he did on my behalf."

     **-- George M.**
     ....Client


"When I met Steve, I had met three lawyers before him. He was the only lawyer not to bullshit me. He told me the negatives and the positives, and what could and could not be done. And he did not pressure me. I hired Steve, and if anything, he undersold his abilities. He was able to get my charge reduced to a misdemeanor, and eventually, the case was dismissed."

     **-- Ron T.**
     ....Client


"I was arrested on a felony domestic violence charge, and was very, very scared. I met Steve, and he explained that he would try to convince the police and prosecutor not to file my case as felony. He wrote letters, and made follow up phone calls, and my case was instead set for an office hearing, after which, the case was not filed. I went from be a felon to a free man. Steve always returned my calls, and always made me feel better about this ordeal. Thank you Steve."

     **-- Scott S.**
     ....Client


 

Home | About Steve | Practice Areas | Testimonials | Case Highlights | Media & New s | Blog | Contact Me

© 2014 All Rights Reserved. Steven Graff Levine Law Offices is a legal entity practicing in the State of California and provides legal services under authority of the state, California Bar #140585 – rights and materials on this website are the property of respective owners

# EXHIBIT 70

# TRANSCRIPT: THE HONORABLE JUDGE RANDALL R. RADER, CHIEF JUDGE OF THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT: THE MOST PRESSING ISSUES IN IP LAW TODAY

## RANDAL R. RADER[†]

I've thought a good deal about what I wanted to communicate to you and I know what I'm going to start with but beyond that I'm not really sure. Let me tell you what is one of the great challenges of our profession, and what I think we need to do to address that challenge. Our challenge is the expense and delay of the litigation system. Now that's an enormous topic. We could each testify as to the complications we've seen in one trial after another. The difficulties we've had in getting to a resolution and particularly we could probably all talk about the vast expense of discovery and how that often operates against just outcomes. In fact I'm sure there are those of us here who can testify to the expense of the system actually becoming a blackmailing agent. Rather than pursue a just outcome, often the litigant has to settle early just to escape the cost of litigation. This is not an unusual scenario for us, but it ought to be extremely troubling to us. There isn't one of us in the bar that hasn't raised our arm at one time in the past and made a commitment to not only uphold the laws, but to do equal justice under those laws. I'm not sure we are pursuing just outcomes when we make them contingent upon economics, upon strategies of delay, upon tactics that use the system against just outcomes.

Now let me tell you a little bit about what the Federal Circuit is doing to address this and see if I can't enlist you to help me. You just heard me say and I'll say often, it's one of the common themes with me, that our Court is only as good as its bar and on this one we need you. I think this cost and delay issue is largely attributed to our discovery system. Now our discovery system has a certain majesty and we all understand its purpose, that by exchanging information early in the process we can perhaps reach a settlement and forgo the cost and difficulty of litigation, but it's operating to exactly the opposite effect when it

---

[†] The Honorable Chief Judge Randall Rader was appointed to the United States Claims Court (currently the U.S. Court of Federal Claims) by Ronald Reagan in 1988. He was appointed to the U.S. Court of Appeals for the Federal Circuit by George H.W. Bush in 1990. Judge Rader became Chief Judge of the Court of Appeals for the Federal Circuit (C.A.F.C.) on June 1, 2010. As well as sitting as Chief Judge on the C.A.F.C., Chief Judge Rader has worked as a professor at George Washington University School of Law, Munich Intellectual Property Law Center as well as programs in Tokyo, Taipei, Beijing and New Delhi. Chief Judge Rader is also a co-author of the patent law textbook, "Cases and Materials on Patent Law."

becomes so expensive that it defeats the purpose of finding the proper outcome in legal disputes.

The Federal Circuit has authorized its Chief Judge, and by the way, there is a little message there. The Federal Circuit works together. We discuss these things. You hear the Chief Judge talking about it and stepping up front, but only because the Court is taking this direction and the Court has asked the Chief Judge to address this discovery problem. The Chief Judge has convened the Court's Advisory Council and the Advisory Council has appointed along with the Chief Judge a select committee to address the particular cost of e-discovery. There are six leading district judges from all around the country. There are a few distinguished academicians. There are patent practitioners on both the plaintiff's and defendant's side of the bar and we are discussing this problem, but I think I wanted to give to you the speech that I gave when we first convened this committee and the President of the Federal Circuit Advisory Council introduced me. I gave this speech then and I think I want you to hear the same speech.

I said, "I believe in a little injustice." Now judges do not profess to believe in injustice, but I believe in a little injustice. Let me tell you the context in which I make that statement. You see, inevitably as we pursue some kind of limitation on the cost of discovery, it's going to mean that there will be a case in the future, somewhere, where a document will not be discovered that might have changed the outcome of that case. It will be that last document, which was at the bottom of the hundredth box and because we cut off discovery at the seventieth box or the thirtieth, they are going to not find that record and there's going to be a sense that that is an unjust result. I want to say right up front in this process that I believe that injustice is the right result. Let's let that injustice occur because it must occur to achieve a greater justice, to achieve the greater justice of efficiency in the system.

I can tell you it's the sorts of things we are thinking about and we'll need input, cooperation, work. We are thinking about a limitation on the number of record custodians that could be discovered in the electronic context. Maybe three, and in larger cases the judge would have the option to raise that number to four or five. Those custodians would be the only ones that you would deliver the whole computer database to and discover everything about their participation in this patent litigation process. Another way to perhaps achieve that end may be stated in the alternative, would be to limit the number of search terms, five, seven. Beyond those three custodians and those five search terms the discovery could proceed but it would proceed at the expense of the requester shifting the economic incentives in a different direction, and perhaps encouraging a more targeted discovery that would deliver the relevant information before you had to start paying for it yourself.

Now we're lawyers. Let us talk for just a minute about what we know will be the biggest attack on that. It's somewhat inconsistent with the Federal Rules of Evidence, which says essentially all relevant information is discoverable. All of a sudden the committee will be putting a limitation on the amount of relevant information you can get without paying for it yourself. I think that would have to be justified on the basis of the disproportionate impact of this discovery expense on patent litigation, and I have a study on that. The Federal Judicial Center did a study and it studied e-discovery across the civil litigation system. It found, of course, the expected delays and expenses, but then they had a whole paragraph talking about one area where the impact was disproportionately higher and they said at least sixty percent higher than any other area of civil litigation and that was patent litigation. Of course we can understand why: technical material, vast number of involved parties, corporate parties, patent prosecuting parties, scientists, commentators, experts. There's just unlimited potential for contributors to the electronic records here and add to it the economic significance of the patent system and you see how that disproportionate impact has occurred.

Let me spin this out for you as how I see this potentially happening. I see, potentially, the committee that we have appointed coming up with a proposed rule for the use in district courts. I see that being adopted by the Advisory Council of the Federal Circuit. I see it being published by them as advisory to the district courts, without any direct involvement by the Federal Circuit, for reasons that are very clear: because of the first district judge that implements it. Can anybody figure out why I put six district judges on the committee? I'm hoping that one of them will want to implement their own recommendation and it will come, inevitably, on appeal to the Federal Circuit and I would hope, anticipate and indeed recommend that it will go on appeal then to the Supreme Court. You have got a classic made issue.

The Federal Circuit is once again stepping away from the rules that govern the rest of the judiciary. It needs to be reviewed and actually, in each step of that process you are going to come into play. It is going to come into play as soon as the Federal Circuit Advisory Council has published in some form this recommendation. You are going to have the opportunity, dean, you and your academics, I'd hope to get some law review articles and commentaries on this: is this too far? Is it too little? Is it legally coherent? I would hope that the practitioners here would use all or parts of it in their cases. I would hope that then, as it is appealed, you would of course if it's your case, bring the case to the Federal Circuit. It would probably have to be a mandamus petition, and you would need to be encouraged to bring a mandamus, but what do you notice? The Federal Circuit has granted a lot of those recently. All the transfer motions, for example, standard wisdom, as the dean and his colleagues will tell you is that a

mandamus motion is a bad idea.  It has enormously high standards of proof against it.  You have to prove an abuse of discretion, but the Federal Circuit has been willing to do that, and I think we have to with our unique nature as a national court.  We have difficulty in reaching those procedural issues unless they come in that form.  Recognizing that, I would urge you to bring the case.  It will come to the Federal Circuit, and then you are on to the Supreme Court.  There you can all participate both at the Federal Circuit and the Supreme Court level with amici, amicus briefs.

Once again we are only as good as you are and if you also believe in a little injustice, I would like to have you start thinking right now.  In fact you do not have to wait for the recommendations by our committee.   You can start now using creative techniques to try and limit the expense of discovery.  It doesn't matter whether you are on the plaintiff or defendant side. I think you have that obligation because you also raised your arm and swore to uphold justice and I think a little injustice is necessary to uphold greater justice.  Well there is my primary message.

I will give you a choice from here.   I can talk about, in fact we'll vote.  I like democracy.  We'll vote.  We can talk about other areas of importance to the federal circuit.  Areas where the Federal Circuit's directions are changing or challenges it faces.  So we will call that "Challenging Future at the Federal Circuit."  That's number one.  Number two, we'll give you a second option.  That is "The international Market and its Implications for Legal Practice in the United States."  We'll call that "The Market Wins;" and I will give you a third option.  The third option is, I hate to give this one to you because I know you are going to bite on it, "The Great Cultural Divide: The Supreme Court vs. The Federal Circuit."  There you go.  Three topics I forgot what I called the first one, ah the "Challenging Future of the Federal Circuit."  Oh I should build this up with a little music, no?  I can do "I Can't Get No Satisfaction!"  I can!  Number two, "The Market Wins."   Number three, I forgot number three.  How many for number one?  The patent lawyers, you can never trust patent lawyers.  Number two the market wins.  Oh look at that.  Number three the great cultural divide.  Oh golly I'm going to have to count.  No I got a better idea.  This is why you have deans. Dean, please stand up. The dean is going to decide which has the most hands. How many for number one, "Directions of the Federal Circuit?"  Number two, "The Market Wins?"  This is the close one dean.  Hold them up there the dean's looking!  Number three, "The Great Cultural Divide?"  Ok two! Now see the nice thing is, if you don't like it, talk to the dean.  There goes your fundraising dean. You made forty enemies.  Thanks, that was the topic I wanted to talk about.

Now two weeks ago I was in Sydney, Australia and I gave a commencement address at their second or third largest law school in Sydney.  Couple thousand

people with all of the parents and everyone there and I gave some offhand advice. For instance I told them, "Never grow up! I still have a rock band!"  They liked that but that was pandering of the audience as commencement speakers must do. You have to also, as a commencement speaker, say something intelligent and this was my attempt.  I said, "Your generation has a great responsibility to correct the great failure of my generation."  Now see you don't know what generation you're in.  I think I'm in that young lady's generation right over there and you think I'm in yours, don't you?

Our generation failed by attempting to build vast one way walls around our country that allowed in all the benefits of international trade and the market place and competition but prevented us from the untoward implication of that competition.  Of having to work a little harder on weekends than we wanted to, or having to lose jobs if we were not as productive and efficient as our foreign competitors.  We wanted to bring in the benefits while insulating ourselves against any of the costs; we erected law after law with that basic underlying philosophy, and we failed.  The market won.

There is international competition in every phase of our lives.  I spent the afternoon trying to convince the dean's students that we're the nation that understands that the least.  Again, one quick illustration: at the request of Judge Kong, the Chief Judge of the Supreme People's Court (dear friend of mine), I stopped on the way from Taipei to Beijing in Shanghai and they rushed me out to East China Technical and Political University.  After the obligatory meetings with the President and his key councilors, I was shepherded into a large auditorium. There were seven hundred students there.  Now, all universities in China are state owned and they have a state rule that no one can teach the students unless they are a member of the faculty. So the first act was for the President to arise and to make me a member of the East China University faculty and if you come to my office I will proudly show you my credentials.

Then for the next three hours I taught these seven hundred kids in English and I had eye contact with them as I do with all of you.  Of that seven hundred there may have been fifty who weren't following and didn't understand the English. The other six hundred and fifty were in tune and beyond in tune.  They were challenging me with questions and searching attempts to understand if I understood.  Are we ready for that?  I wish I could convey to you the intensity of their enthusiasm to learn everything they can, not about their law: they've got that down.  They want to learn about our law.  They want to know what the Federal Circuit is doing.  They would have voted for that first topic in a heartbeat.  They want to know everything about the Federal Circuit and what influences its decision making and how do I participate in Federal Circuit decisions.  Do you think that about the Supreme People's Court?  I think you should be, by the way.

I spent maybe an hour last night on my couch with my former clerk, who is the Chief Litigation Counsel for Intel, and she was explaining how she's worried about going to China because she was there ten years ago and they lost a case and are worried that is the inevitable outcome.   I tried to convince her of two things. One, Chinese judges are incredibly sophisticated in their understanding of the law, and two, they are making great progress in implementing intellectual property reforms. If we are not invested in influencing their decision making, how can we expect them to improve?

Well, I think I started by telling you about the one-way walls we tried to build; how our generation failed and the younger generation has the responsibility to tear down those walls and recognize what the market place has already recognized. Let me tell you how the Federal Circuit is participating in that.   The Federal Circuit is going to Tokyo, Japan.   It was to have been there next month but the tsunami has delayed us until September or October depending upon which hotel gives us the best offer.   We will hold in Tokyo a joint judicial conference with the Tokyo IP High Court.   Now what are the potential benefits from that?   Part of my hope here is to help the Tokyo IP High Court establish the kind of relationship we have.   I get to talk to you guys.   I just told you a minute ago what we are doing with e-discovery and I'm trying to challenge you to join me in a fight for greater justice here and inevitably I will get, both after this talk and throughout my time here, I'll get feedback.   I got feedback from your students today and I'm going to refine and improve the work of my court from what I learn from you and you are going to refine and improve your representation from what you learn from me.   That is something that is never a possibility with the Japanese judicial system.   By taking the Federal Circuit there and having a judicial conference where the judges sit up and are asked questions by the bar, and I'm sure the first ten questions will come from the American members of the bar who are present. But I've already planted about a few questions with the Japanese.   More will come and maybe we will have some more influence on their system but beyond that they will have an influence on our system, too.   As my Court and I see the vast impact that our decisions have not just here but in the Japanese economy.

How many IP professionals are there at Panasonic? Professionals, fully devoted to IP?   Eighteen hundred.   Where's my friend from 3M?   He was here earlier.   There he is, he left.   I was going to ask him how many he has but I guess I wouldn't know that.   I wonder if we understand the competition we face?   I wonder if we understand that the rest of the world knows that the American advantage in the marketplace is innovation and inventiveness, creativity, research, development, engineering.   That's what we do best and that has always been largely due to the magnificent protection and underpinning of the patent system.   I hope we understand that if we are to retain that edge we must maintain all of the

incentives that have created that edge, including the strength of the patent system. I know my friend Dave Kappos is working to that end.

By the way, just so you know all of the conspirators involved: how would Chief Judge Rader take his judges to Tokyo? How can he pay for that? The Federal Circuit budget? Ok he controls the budget but it doesn't have any money for foreign travel. Where's it coming from? Dave Kappos as part of his education fund, as part of his international relations fund, as part of his outreach is paying for my judges to go to Tokyo. Where we will learn the importance of their system and they will learn the importance of ours. And we will learn what we have to do in legal terms to keep our competitive edge in the marketplace. But that really isn't the agenda here.

The real agenda is the one beyond that: China. We will have a joint judicial conference with the Supreme People's Court in both Beijing and Shanghai. Two days in Beijing and one in Shanghai. Now you know why I stopped in Shanghai under Judge Kong's request. You also know why I'm trying to help his daughter get into George Washington University? Because this is a real important step to bring these two great economies together and help both of them understand that the legal systems underpin the success of the marketplace.

Courts have a responsibility to facilitate rather than frustrate the market. You see there's a greater agenda even than meeting with colleagues and learning from them and them learning from us and exporting the judicial conference mold and the closeness that we develop between bench and bar. Beyond that, I will speak with frankness that I seek judicial convergence. I seek awareness where judges making decisions on similar issues, maybe even with similar patents and similar parties around the world can consult, learn, and, to the extent possible, reach results that are consistent with each other. I don't think there is an international corporation with an executive that would misunderstand the value of that. You simply cannot have legal systems that require different products in different areas of the economy and the economy is global. You can't make different products for different countries and accommodate your whole systems to different legal regimes. Remember the one-way wall? Well those legal regimes have to facilitate rather than frustrate what the market is already demanding of us. Well beyond Japan, beyond China I'm already consulting with Director Kappos. He wants number three to be Korea. I want number three to be Russia. He'll win. Russia will be four. Korea will be three and I suppose Brazil fits in there somewhere and maybe we start over.

I guess I want to finish this theme by suggesting to you that you have to recognize that your success is contingent upon the success of this kind of venture. The competition around the world is not just for products but it is for services,

every kind of service.  Those kids that I told you about, those seven hundred kids that speak perfect English and can raise their hand and can ask me about footnote two in my last opinion.  I don't think I could even ask your professors, dean, if they know what was in footnote two of the Supreme People's Court most recent opinion.  We have got to raise our vision of what the legal profession requires of us.  Yes we have a little lawsuit that involves two people here, two companies here, maybe close neighbors, but the greater vision is how that lawsuit fits into the entire international jurisprudential system.  I hope I'm conveying a little bit of the vision of how that will affect you and how it must affect you and how you have to raise your sights.  You have to learn more about international systems.  Maybe I'm advocating that you come back here and take some of the dean's international comparative law classes.  Maybe that's what you need to recognize that you have a great responsibility in ways that facilitate their work worldwide not just statewide.

Well let me close by saying what I started with and that is that the Federal Circuit is really only as good as its bar, all these visions of improving the efficiency of the adjudicative system, of achieving some kind of judicial convergence that facilitates rather than frustrates the international marketplace.  All that probably depends more on you than it does on the Federal Circuit and I and I hope that I might have challenged you just a little bit to think what more you can contribute in both of those areas.   To addressing the most important deficiency of the American system of dispute resolution, the expense of discovery in trials, and what you can do to extend your client's influence effectively beyond the borders of the United States because that's where your client is thinking of going.  You certainly should not be limiting them.  With those closing words of challenge I thank you for all that you have contributed to my Court and me in the past.  I urge you to continue and look forward in answering a few questions.  Thank you.

Dean, do you mind if I take questions for a minute?  Now of course somebody has to raise their hand. Ok good.

Audience Question: I have a suspicion that you did talk to them about their enforcement of intellectual property rights and how that's affected so many American companies whose goods are copied and dumped on the marketplace.  How do they respond?

Chief Judge Rader: Excellent question.  China has had a reputation of being an abuser of intellectual property rights.   Copying and abusing rights with impunity and their court systems have not been the source of significant redress.  Two thoughts:  thought number one is kind of a humorous observation.  Have you been to New York?  You know that you can go on any street corner and buy you a

two dollar tie and a three dollar CD?  So it isn't just a Chinese problem but I think your point is well taken that there is a greater problem in China.  Although it is a world problem there's a unique aspect of it in China.  My response to that is twofold.  One is the Chinese judges are incredibly talented.  Of the judiciaries I've associated with and that's forty or fifty and I have good friends in many of those places the Chinese judges are the most talented and prepared.  They know the details.  They are good.

Point number two, Premier Jiabao, two weeks ago, no two months ago, my time gets away from me, told his nation that they are to acquire five times as many patents as they did this year in the next five year period, and they will do it.  I say jokingly they may have to count the same thing three or four times to get there but they will still make the numbers and they have surpassed just this last year Japan and Korea to become the second largest filer in the United States Patent and Trademark Office.  Right behind U.S. filers Chinese filers are second.  Remember there's a difference between the Chinese judge and me.  The Chinese judge is an officer of the state commanded to carryout state policy.  With that exhortation of the Premier echoing in their ears the Chinese judges know that they have a responsibility to enforce intellectual property and it was this kind of message I was telling to my Intel friend that I was talking to the other night.  The winds are changing.  Now the only way they are going to change is if we help them change.  So we've got to work on that on behalf of our clients as well.  I acknowledge there has been a history of some failure in the People's Republic but I have hopes for improvement and hope to be part of the process that makes that happen.  Another question?

Q:  You didn't mention visiting India on the tour.  Is there any reason why that was left off your list?

Chief Judge Rader:  I have been to India twelve times in the last twelve years and no it will probably be on the list at some point.  India is tough to crack but I do acknowledge it needs some attention as well.  Yes.

Q:  In view of your ascension to the Chief's chair and there has been some turnover on your Court in recent years.  Do you foresee, or is there any current move to address, a few of the aspects of law that are currently uncertain or in development perhaps en banc or on the panel level?  I'm thinking of administrative law questions?

Chief Judge Rader (Jokingly):  Now you didn't choose that topic that was question number one.  I'm not going to answer that.

Q: Then I ask question number one.

Chief Judge Rader:  Wonderful question and I think the easiest way for me to give a quick answer is [to indicate where] we are now working. If you didn't see today the court issued another order for an en banc consideration of a case.  The court is going to be reconsidering the joint infringement issue that flows from the BMC/PaymenTech case and the MuniAuction case and the case we are taking en banc, Akamai, and I probably should note that McKesson is out there too.  So there is that en banc case.  We have pending at the moment five others, well four others if you recognize that TiVo came out yesterday.  I know that's the most en bancs in any single year of any Chief Judge's tenure and there will be more.  The answer is, yes the court is taking very seriously its responsibility to clarify areas of law, trying to more than any time in the past work together to achieve en banc consideration and clarification of some of those key areas.

Here is where you come in again, my bar.  You need to help us identify those proper areas that need en banc clarification.  Now this is whole other speech but the brief version is, the problem is: we get an en banc reconsideration request in every case.  If you lose, you request en banc.  How does the bar signal to us which ones really need consideration that are not just a losing complaint but a real area of confusion and ambiguity?

Crowd:  Private email

Chief Judge Rader:  Private email.  I'm going to pretend I didn't hear that but the answer is you need to work together.  If we would get on a case or cases a united group of en banc reconsideration amicus petitions from AIPLA and IPO and the ABA and every other committee out there and, dean, get your academicians going too and get them included in the whole thing.  When you see that kind of concerted action then we are convinced this one needs the attention we can give it. I know that's not an easy request.  It takes time to go through committees and things, but you have to speed that up so that you can work together and give me better indication of which cases you want to be on next year's en banc list which will be greater than this year's. Yes

Q: We often get requests from counsel who have been unsuccessful in front of your Court to participate in the en banc consideration process but typically the deadlines are very short and so certainly it would make our job much easier if the Court was at least on occasion amenable to extensions of time in order to give some of the potentially more important cases more organized consideration.  Our senses have been, at least under prior chief judges, that perhaps because of the potential huge crush of these types of petitions in nearly every case that extensions were very rarely granted.  Do you have a sense for that?

Chief Judge Rader: It's a good point. And once again maybe the answer is the same. If it is a single request for an extension from an apparently disgruntled party we are not too inclined to grant that. If once again I got requests from AIPLA, IPO, ABA and every other committee that you represent, the Minnesota IP community the New York IP community. If I got a concerted request for an extension I'm sure the Court would recognize that this is a request that ought to be granted so that you have time to finish your work. So it's a good point but again there is an important distinction there.

By the way let me tell you a secret. The secret is standing right back there, two of them, right there together, John and Dena. They are secrets because they are former Federal Circuit clerks, actually my clerks. They are the great secret of the Federal Circuit. Dena and John are examples, they are both magnificent technical experts as well as legal talents and currently I have a Ph.D in biomedical science. I have a master's degree in chemistry. I have an electrical engineer, and I have a computer programmer, a master in computer science. That gives me a great ability to deal with technical issues but now of course my four clerks do not cover every discipline. But remember, every judge has four clerks. That means there are about fifty of them out there plus a core of special technical assistants that work for the Chief Judge and the rest of the Court. That means there are probably about fifty five highly trained scientists as well as lawyers and if I can't get the answer to the scientific question from my law clerks, which I usually can. They can go down the hall and get it from somebody else who has it. It is all there under one building, under one roof. The great secret of the Federal Circuit that makes us very proficient with scientific and technical issues as well as legal and yes I try to export that to the foreign judiciaries too and tell them that you need that kind of resource. By the way the Tokyo IP High Court imported a group of senior examiners who perform that function for them. Thanks for being here guys.

Q: You also left out Europe in your list. I was wondering if you could comment on the common European patent initiative and what you think of that.

Chief Judge Rader: I love this topic and it gets another whole speech. Let me just tell you the funny version. You know what he's talking about. The nations of Europe have been trying to figure out a way to have a Federal Circuit. Why? Because they realize they are competing with us. They recognize they are competing with China and frankly the fractionated system in Europe frustrates that competition. So they want to have a Federal Circuit and their problem is language. So about ten years ago I was at a conference at Fordham in New York and there was a group of about thirty European judges there. They were discussing the language problem for their new court and a hot and heavy debate broke out as to what should be the language used in the court. By the way the

European Union has proposed the use of any language within the European Union.  Can you imagine litigating a patent case in Maltese or Finish?  That would alone defeat the proposition.  The EPO, the European Patent Office, wants to confine it to the three languages of the European Patent Convention: English, French and German.  But the debate at this particular time, and by the way that's what's scotched the most recent effort because Spain insists on being the fourth major language supported by the Italians who want to be the fifth and that can't work.

So the debate rages and the French were saying of course their language should be first. After all it is the lingua franca and it reminds me of another quick story.  I was seated at a state dinner next to the ambassador of France and it came time to pick up our knives and forks and I turned to the ambassador and said, "How do you say bon appetit in French?"  I thought that was quite funny.  He didn't, but back to the story. The debate was raging.  The French insisting upon their language being the lingua franca of judicial system they're going to create.  At one point my dear friend Nick Pumphrey, God rest his soul, he's left us, turns to me with a smirk on his face and says, "Well there's one judge here who's not European and let's hear what he thinks."  All the faces turn to me and I have a personality defect. That is when under pressure I resort to humor at all expenses to take the pressure off.  So I looked to them all and said, "Could someone remind me who won the Battle of Waterloo?"  Actually it's the right answer.  Actually the reason England was able to devote its resources to colonizing the world was because they won the Battle of Waterloo and they made their language the lingua franca of the commercial marketplace.  If Napoleon had won I think it would have gone the other way.  We would have been speaking French on the internet, not English.  So the answer is probably the right answer but diplomacy.  Actually I have even told that story since at several international judge's meetings and am always apologizing to the Italians but then I point out they were on both sides of the Battle of Waterloo, which they usually were in European history—on  both sides.  The bottom line is, yes, at some point there will be a European central federal circuit court.  Why? Because the market will drive it just as it is going to drive you whether you rise to my challenge to get ahead of it or not.  They will have to, to compete with the Federal Circuit and with China, who is going to be our competition.  So they will achieve that but they sure are making it tough on themselves.  The politics of that is so enormously complex.  It would be fun to talk it through with you, but once again thank you for inviting me.  It's been a great pleasure.  It's the greatest honor of my life to be able to represent one of the greatest institutions that our nation has created, the Federal Circuit.  Thank you very much.

**EXHIBIT 71**

## The State of Patent Litigation

### Chief Judge Randall R. Rader
### United States Court of Appeals for the Federal Circuit

### E.D. Texas Judicial Conference

Yesterday I returned to my room to find this magnificent book entitled _AMERICA'S TEAM.  To my surprise, the book was not about the Washington Redskins, but my real question is simple: After the results of the game last night, does the sender wish to stand and let me know that he sent the book?

Every year the President of the United States addresses Congress to assess the State of the Union.  Before I presume to address the state of patent litigation, I am anxious to confess that I come far short of presidential stature, but then you are not the Congress either.  At current approval ratings, perhaps we are both better off.

As long as Congress continues their rolling approval of temporary budgets to prevent a governmental shutdown, I have the great privilege of presiding over patent disputes.  As you can imagine, I have seen the state of patent litigation evolve over the past two decades and have also heard various reactions from some of the legends of our profession.

From the lawyer's perspective, I can give the state of patent litigation in two words: NOT ENOUGH.    For the corporate litigant, I can predict a similar two-

word evaluation: TOO . . . EXPENSIVE; for the Patent Office: GOOD START; for the damages expert: DEMANDING SUPPLY; for the venture funding firm: PROFIT PROSPECT; for the legal academic: CRITICISM BONANZA; for the judges: NO COMMENT; from my perspective: NEEDS IMPROVEMENT!

<div align="center">I</div>

Let me introduce my topic with a story: Several years ago our government sent me to China on a mission of importance.   In Beijing, I met with the U.S. Ambassador, Sandy Rand, who asked me to encourage the Chinese judiciary to enforce non-Chinese IP rights as aggressively as Chinese rights.   Now I must confess that I saw a great danger in advising the highly-skilled Chinese judges on the administration of their own law in their own jurisdiction.   I could, however, advocate, as I have often in foreign nations, the need for an international standard of judicial performance.   Under this international standard, to some degree implicit in TRIPS, courts must enforce IP regardless of the character, nationality, ownership, or origin of those rights.

With that determination, I traveled south to Shanghai and delivered my address to a large gathering of judges and IP professionals:   Courts have an obligation to render the same justice to all nationalities!   I finished with a flourish. The applause had not subsided when the hand of the President of the Shanghai

High Court shot into the air.   I acknowledged my friend and he arose with a simple question:    "Is that the way they do it in the Eastern District of Texas?"

When the clamor died down, I answered: "While I do not have any statistics on Texas judgments, I would not be surprised if juries in Marshal or Tyler are pretty hard on foreign corporations, BUT," I continued, "you have to understand that in East Texas, anyone who comes from East of Shreveport or West of Dallas is considered 'foreign.'"

My attempt at humor dampened the impact of the question for that audience, but the question itself has haunted me.   In truth, the US must adhere to the high principles it preaches.   We need to equalize the playing field for plaintiffs and defendants, whether they are home grown or foreign, a solo garage inventor or a Fortune 100 Company.   The landscape of patent litigation is changing, and likewise, we need to keep evaluating and adapting with it.   The question of my friend in Shanghai is a reprimand, a threat, a challenge, but most important, a call to IMPROVE.

Now the Shanghai question singled out the Eastern District of Texas, but we are all in this together.   No doubt "ED Tex" gets much of the attention only due to its emergence as a focal point for IP enforcement in the US, as did E.D. Virginia and Delaware before it.   As I suggest, we are all responsible for the implicit reprimand in that Shanghai question—trial judges, trial attorneys, corporate IP

managers, IP rights holders, and yes, appellate judges, too. Moreover I would suggest that our responsibility to improve has recently multiplied. I do not need to remind anyone that a consortium of buyers purchased a couple thousand patents recently for billions, with a B! With the market prophesying the importance of our work, and the increase of media attention and consumer interest, we must raise our vision and strengthen our resolve to respond to the challenge in the Shanghai question.

To better qualify myself to call our discipline to a higher vision and a stronger resolve, I sought more first-hand trial experience. Although I had presided as a trial judge in Washington, Chicago, Brooklyn, Syracuse, Oakland and more, I undertook to act as a District Judge in Texas. I was very grateful that Chief Judge Folsom, Judge Ward, Judge Davis, and Judge Clark welcomed me to their district and made extensive arrangements for my visit. I must say, I knew my fellow judges were happy to share their heavy dockets, but I was not quite prepared for the extent of their generosity. Without any intention to embarrass, I thought I had volunteered to preside over one patent case; I got six! Now THAT's Southern hospitality! (Incidentally, Chief Judge Folsom's prediction was correct. Of the six, only one went all the way to trial.)

The experience allowed me to break in my cowboy boots, enjoy some real Texas barbecue at the Country Tavern, and swelter in unbreakable 100 degree heat.

4

And of course, I have a few observations from my experience as a trial judge as well:  First, the quality and dedication of the judges in the Eastern District of Texas is inspiring.  I do not need to tell this audience that they preside with vast grace and skill.

Next, the juries also inspired me.  As I noted, I have presided over juries in many jurisdictions.  Invariably up to twenty percent of my jury pool made every attempt to evade their civic duty.  Not in Marshal!  Every person was willing to make sacrifices, if necessary, to serve.  I observed many jurors who served despite hardships.  In particular, I can still see the face of one lady who announced that she alone owned and operated a radio station, and did not know what would happen to her radio business if she was picked for the jury.  When she was selected as juror number 3, she did not voice a single complaint.  She assumed her seat and served attentively and effectively for an entire week.  Based on my limited experience, I heartily commend the jurors of the Eastern District of Texas.

At this point, however, I want to return to the Shanghai question and its implicit challenge to improve our administration of justice.  With that challenge echoing in our ears, I would like to focus on six ways to improve patent litigation:

1.    Discovery management and control.   In the electronic age, discovery procedures designed for the 19th and 20th centuries just do not work for complex

patent litigation. For example, blanket stipulated orders requiring the production of all relevant documents leads to waste.    Courts must control the cost and efficiency of electronic discovery.

2.    Summary judgment.    In these vast technical lawsuits, summary judgment is the key to efficient resolution of disputes.    The bar has a responsibility to work with the bench to present, if at all possible, a summary judgment motion, or maybe TWO, that can end the litigation or narrow the case to dimensions more amenable to settlement.

3.    Transfer motions and Joinder.    In an era when 14 different districts have stepped forward and volunteered to expertly handle patent disputes, the bar should again work with the bench to file cases or find venues that best suit the convenience of parties and logical distribution of these important cases. Moreover the trend towards an excess number of parties also unnecessarily multiplies the complexity of already-complex litigation.

4.    Early procedural and substantive valuation of cases.    All patents and all patent cases are not created equal!    The bar needs to work with the bench to determine at an early stage the economic value of the case for both parties.    With that evaluation in mind, the court may then tailor its timing and procedures to make sure a billion-dollar case gets a "billion-dollar" process and a thousand-dollar case gets its due as well.

5.    Rules and Practice.    Much of the value of our US system of adjudication lies in the individuality and independence of the judges themselves. At the same time, our courts need to understand that these complex and demanding patent cases profit from an announced and dependable set of procedural rules that all parties understand in advance.

6.    Troll and grasshopper control.    No doubt you would like to know right now what this entails, but I am going to keep you in suspense on this last category.

Oh yes, and there is a seventh recommendation, tailored to ED Tex, which I will also save to the end.

## II

Every person in this room understands that the greatest weakness of the US court system is its expense.    And the driving factor for that expense is discovery excesses.    Electronic recordkeeping in the modern age has multiplied the expense of looking behind every curtain.    As we all understand, the modern electronic age has rendered old discovery processes obsolete or, at least inappropriate for the vast complexity and volume of large patent disputes.    Patent cases, in particular, produce disproportionally high discovery expenses.    In one 2010 report, the Federal Judicial Center determined that "Intellectual Property cases had costs almost 62% higher, all else equal…."

We all understand as well that those expenses multiply exponentially when attorneys use discovery as a tactical weapon. Generally, the production burden of expansive e-requests outweighs their benefits. I saw one analysis that concluded that .0074% of the documents produced actually made their way onto the trial exhibit list—less than one document in ten thousand. And for all the thousands of appeals I've evaluated, email appears even more rarely as relevant evidence.

Our courts are in danger already of becoming an intolerably expensive way to protect innovation or prove freedom to operate. These vast expenses can force accused infringers to acquiesce to non-meritorious claims. This only serves as an unhealthy tax on innovation and open competition.

To address this problem, the Advisory Council of the Federal Circuit created a special subcommittee to draft a model rule for e-discovery governance. The subcommittee included some vastly skilled judges and attorneys from various regions and backgrounds. For this conference, I will note that Judge Everingham participated extensively and effectively as a member of that subcommittee. After the subcommittee's work, the entire Federal Circuit Advisory Council considered and unanimously adopted the model rule that I have the honor of unveiling today.

This proposed Model Order on E-Discovery in Patent Cases should serve as a helpful starting point for district courts to enforce responsible, targeted use of e-

discovery in patent cases. The goal of this Model Order is to streamline e-discovery, particularly email production, and require litigants to focus on the proper purpose of discovery—the gathering of material information—rather than on unlimited fishing expeditions.

This Model Order begins with a discovery process whereby the parties exchange core documentation concerning the patent, the accused product, the prior art, and the finances before seeking email production. Just as Federal Rule of Civil Procedure 30 presumptively limits cases to ten depositions and seven hours per deposition, this Model Order presumptively limits the number of record custodians and the number of search terms for email production requests. When the default numbers with limits on depositions were first included in the Federal Rules, veteran lawyers panicked that these limits were arbitrary and would prevent the discovery of critical information. But after two decades of experience, few question the wisdom of these limits. And the era of the endless deposition is fortunately over.

Under this new e-discovery model order, each party seeking email production presumptively gets 5 custodians per producing party and 5 search terms per custodian. However, the parties may jointly agree to modify these limits or request court modification for good cause.

The Order also contemplates that a discovering party may exceed the discovery limits.   If the party wants to exceed those limits, however, they do so at their own expense.   I believe cost shifting will encourage more conscientious requests, as we all know, when you are ordering drinks at a bar, you order a little more wisely when you know you are paying the tab!

One other point, a large source of e-discovery cost is the pre-production review of documents by attorneys.   Even with claw-back provisions, pre-production review is often necessary to ensure adversaries do not receive privileged or sensitive but irrelevant documents.   This Model Order addresses attorney-client and work product protections to minimize expensive pre-production review.

In sum, the Model Order of the Advisory Council of the Federal Circuit promises to bring some discipline to e-discovery expenses.   Of course, for this Model Order to have a real impact, district judges will need to put these suggestions (or some variation) into practice.   Fortunately, district courts have inherent power to control their dockets to further "economy of time and effort for itself, for counsel and for litigants."   *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936).   I would respectfully ask our bar to work with the bench to implement this first improving vision.   I will attach the model order to the printed version of this speech.

III

Next, the patent litigation system needs more effective, summary judgment practice.   At this point, I want to repeat something I said before: our US common law system profits vastly from the independence and individuality of the judicial officers who render the judgment that ultimately characterizes the system.   These individual judges often have varying conceptions of the best way to supply that judgment.   Moreover individual parties and attorneys, who vastly influence the procedural posture of every case, also have varying procedural strategies and objectives.

Nonetheless, as you have come to realize, much of my message can be summarized with an allusion to the "goose that laid the golden egg" fable. Needless to say, if we cannot control the cost, complexity, and complications of patent litigation, the litigants that we serve will simply find a better way, or a better place, to resolve their disputes.    Unchecked and uncontrolled inflation of litigation costs can potentially kill our golden goose and leave us empty handed. But, YES, I would also slightly amend the "goose" fable for our setting.   Patents and inventions are essential to the global economy, and in our case, geese are laying eggs—resolving patent   disputes—all around the world.   If the US system requires a litigant to "feed the goose" ten ounces of gold only to get a golden egg of five ounces in return, obviously geese from other counties that don't require

11

such an investment, such as Germany or Japan or China, become more appealing. We must be careful not to drive away our golden goose by self-imposed encumbrances.

Summary judgment can streamline processes and, at the same time, produce a proper record for decision and appeal.   As the Supreme Court wisely explained in Celotex, summary judgment is not a "disfavored procedural shortcut," but rather an integral part of the Federal Rules "to secure the just, speedy and inexpensive determination of every action."

At some personal peril, let me refer to my experience in Texas.   As I mentioned, I received 6 cases.   Of that number, a jury verdict concluded one case, three settled after the court indicated some of its directions in pre-trial motions and arguments, and the court resolved two more by summary judgment.   Of course, I do not suggest that five-sixths of all cases can reach resolution through aggressive pre-trial proceedings.   Nor do I suggest that a third of all cases deserve summary judgment.   The actual numbers may be even higher.

I do suggest that it is the duty of the bar to assist the bench in presenting proper motions to reduce the time and expense of lengthy proceedings.   As I suggested before, this improvement requires the parties to present a summary judgment motion, or maybe two, that either resolves the case entirely or reduces it to dimensions amenable to settlement. The bar must realize that it too has a stake

12

in pursuing a more efficient adjudicatory system.    Now, I realize that not every case can be entirely dismissed on a motion; but I do believe most cases have specific issues that can be resolved on summary judgment.    The bar has the first responsibility to present summary judgment motions that identify these particular issues.    The Federal Circuit receives and resolves the vast majority of its patent cases under summary judgment rules.    The same should probably apply to district courts.    Besides, aggressive summary judgment practice clears a congested trial court docket for cases that really deserve a full trial.    We must strive to use summary judgment tools effectively to control costs and keep our golden goose healthy.

<div align="center">IV</div>

Next, transfer motions and joinder practice.    I am not going to present a lengthy dissertation on the legal merits of a correct venue.    I am not even going to discuss courts and counsel as public servants who should seek the best interests of its clientele.    Instead I am going to appeal to your common sense.    Plaintiffs, you must evaluate whether your chosen venue is a rational option BEFORE filing a Complaint.    Before setting the wheels of the litigation machine in motion and expending party and judiciary efforts, give all your options equal consideration. The Northern District of California, the District of Delaware, or the Eastern

District of Texas should not be chosen by default, or for attorney convenience, especially with 12 other districts participating in the Patent Pilot Program.

Moreover, the best way for us to strengthen our judicial system is to share and promote other venues.   Think about it!   In your personal relationships, you actually advance yourself by advancing others.   When you praise and aggrandize others, the reflection enhances you!   Courts and counsel are really no different!   If courts and counsel share and promote other forums where appropriate, in the long run, they are really promoting themselves as the most reasonable and the most respectable of all.

I would ask you to remember too that in the long run our US judicial system is really competing with the world.   In that sense, a conscientious effort to pursue and continue litigation in a more convenient and proper US district court is really advancing ourselves on the world stage where it most matters.

On joinder, I will just note that the Federal Circuit Advisory Council, under the dynamic leadership of its Chairman Ed Reines, intends to turn its full attention to the trend toward cases and appeals with many parties.   This trend is very evident and worrisome to our Court as well.

V

All patents and all patent cases are not created equal!   Case management is really the skill of giving each case the time and effort it deserves.   Of course, the

most fundamental aspect of that skill is learning to discern the true value of each case.   At this point, I could use the standard verbalization that I have used throughout this speech about "the bar has the obligation to assist the bench in evaluating cases," but frankly that will not work for this area of improvement—damages and accurate case valuation.   Every attorney seems to believe, genuinely, that his or her case is the most important one on any judge's docket.

Thus, for this improvement, I think I am addressing primarily the judges.   I recommend that trial judges use their authority, including DAUBERT inquiries, to ascertain early in the case the approximate dollar value of the case.   With some searching inquiry into the parties' damages model, the trial judge can get a good idea of the worth of the contested technology and its implications in the market place.   The parties also benefit from early damages discussions and disclosures because it can provide a realistic evaluation of both Defendant's exposure and Plaintiff's damages calculation and further promote early and effective mediation. This inquiry can occur at the onset of the case during case management conferences or even a little later in connection with *Markman* hearings.

With an understanding of the case's true worth, the trial judge would then be poised to identify cases that would benefit from tailoring the standard procedures to fit the case and its significance.   In colloquial terms, the court may adjust timing and procedures of the case to make sure a billion-dollar case gets a "billion-

dollar's worth" of process—adequate time and witnesses and confidential information protections and more—and a thousand-dollar case gets . . . well, less.

May I observe at this point that I am reluctant to advise masterful district judges about case management.  In truth, I believe that these judges know this subject better than me.  Still I am concerned that our system as a whole tends to overlook and "undervalue" the damages and valuation stage of our adjudicatory process.  From the attorney's standpoint, we understand that the defendant wants to avoid damages discussions because it seems to admit that remedies are warranted.  And the plaintiff wants to postpone remedies discussions until it has shown fault because damages will escalate in the face of established culpability. Therefore, I suggest to my fellow judges that we are going to have to take the initiative to improve patent procedure by intervening ourselves to get a realistic valuation of the case much earlier.

## VI

Rules.   Again this improvement involves me in the uncomfortable enterprise of advising my brighter and more experienced colleagues.  I do not want to enter the debate about the merits of the strict patent case rules of the Northern District of California or more lenient rules in some other District.   I merely want to suggest that clear and defined rules make every game fairer. Particularly in the 14 districts that have enlisted for the Patent Pilot Project, I

would suggest the merits of some uniform procedures that clarify expectations in advance. With expectations settled, the bar involved in the case can then focus on an efficient way to achieve each step of the process.

## VII

At last we have reached the one that you wanted to hear about right at the outset: Troll and grasshopper control! Of course, before we can control trolls and grasshoppers, we have to know who they are. And again, OF COURSE, that is the difficulty! Even some Supreme Court justices have referred to the non-practicing entity, the proverbial NPE. We also all understand that the NPE designation sweeps in some unintended "culprits" like universities and research clinics and can also extend to almost every corporation and business because they practice only a fraction of their patent portfolio. For that reason, I have always preferred an alternative definition of a "troll," namely, any party that attempts to enforce a patent far beyond its actual value or contribution to the prior art.

Every "troll" discussion, however, needs a note of balance. Just as trolls litter the patent system with marginally meritorious lawsuits, so the system also suffers from the IP "grasshopper." The IP grasshopper is the entity that is quick to steal the "inventor-ant's" work and research investment because he did no work himself and the winter of competition approaches. We can recognize the grasshopper because he refuses to pay any license fee until his legs and claws are

held to the proverbial litigation fire.     Once again, a grasshopper is hard to define, but I can venture a description according to the same basic notion that helped us identify the troll:   A grasshopper is any entity which refuses to license even the strongest patent at even the most reasonable rates.

Frankly I am not sure who causes more meritless litigation—the troll asserting patents beyond their value or the grasshopper refusing to license until litigation has finally made it impossible to avoid.   I am surer, however, that both the troll and the grasshopper tend to blame and feed off of each other.     Neither deserves encouragement or tolerance.   And so that gets us to the prospect of controlling trolls and grasshoppers.

As I have suggested, it is difficult to control the troll or the grasshopper in advance because they cannot really be identified until their abuse is already over— the troll has lost its case of little value or gotten negligible value for a nominally winning case; the grasshopper has finally accepted a reasonable license fee after dragging the court and the patent owner through years of litigation.   The troll and the grasshopper only emerge after the case is over and the court has lost its ability to remedy the abuse.

Well . . . not so fast!   The court does have one remaining option to control trolls and squash grasshoppers—reverse the fees and costs!   When the case is over and the court can identify a troll or a grasshopper, I strongly advocate full-

18

scale reversal of attorney fees and costs!   Of course, the bar can help here by making a motion.   While I understand that the case must qualify as exceptional, I believe that adequate documentation of "trolls" or "grasshoppers" would qualify. Keep in mind that the Federal Circuit reviews a finding of an exceptional case for clear error and the award of attorney's fees for a very infrequent abuse of discretion.   Just one further word:   this improvement suggestion is not really discarding the American rule that each party pays its own attorney.     Instead this fee reversal recommendation is a tool to discourage cases that are brought only to obtain revenue from litigation avoidance instincts.     In that sense, this recommendation is part of the responsibility of the bench and bar to protect the integrity of the US judicial structure.

<div align="center">VIII</div>

I think I promised one more recommendation, in this case, specifically targeted at ED TEX!   My recommendation is really quite simple and based on personal experience:   Marshall really needs more good restaurants!

<div align="center">IX</div>

I want to return for just a moment to the Shanghai question that should strengthen our determination to improve.   I told you my smart aleck answer to the question, but in truth, I went on to give a more complete answer.   I noted that far less than 4% of all patent cases reach the trial stage and many of those trials do not

<div align="center">19</div>

employ a jury.    Nonetheless the prospect of trial and the specter of a jury—whether in Texas or any other state—can drive parties to settlement at unjustified rates.    Settlement, by and large, is essential to the success of the US system of dispute resolution.    Without settlements, the system would collapse under its own weight.    Nonetheless, those settlements must occur on fair, neutral, and justified economic terms, not as the result of stratagems, threats, or fears.    Otherwise our system is failing.

We all, bench and bar alike, owe our system more than we can ever repay. We know that our liberties are priceless and we know that we owe much of that liberty to our law enforcement and judicial systems.    Moreover we know that our discipline—patent law—fosters prosperity and economic growth regardless of upturns or downturns in the market.    Bearing that in mind, we have an obligation to pass this system on to our children and their children in as good or better shape than we found it.    We need to ensure that patent law continues to serve its purpose of fostering innovation and that patent litigation does not become an unwieldy, unpredictable, and unaffordable burden on innovation.    Thus, I encourage each of us, bench and bar alike, to raise our vision and strengthen our resolve to make our courts and our patent litigation better in the future.    We need to answer that Shanghai question in the future with a single uniform response: we do not allow our courts to be used for anything, except the pursuit of justice!    Thank you.

# AN E-DISCOVERY MODEL ORDER

## INTRODUCTION

Since becoming a staple of American civil litigation, e-discovery has been the subject of extensive review, study, and commentary. *See The Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production* (2d ed. June 2007).   In view of the growing concern about e-discovery, the Federal Rules of Civil Procedure were amended in 2006 to more fully address e-discovery.   Likewise, several district courts have adopted local e-discovery rules.[1]

Despite these amendments, e-discovery continues to present a broad spectrum of challenges, such as preservation obligations, production format, and the disproportionate cost of e-discovery.[2]   Patent cases, in particular, tend to suffer from disproportionally high discovery expenses.   *See* Emery G. Lee III & Thomas E. Willging, *Litigation Costs in Civil Cases: Multivariate Analysis* 8 (Fed. Judicial Ctr. 2010) ("Intellectual Property cases had costs almost 62% higher, all else equal, than the baseline 'Other' category."); s*ee also* Thomas E. Willging et al., *Discovery and Disclosure Practice, Problems, and Proposals for Change: A Case-*

---

[1]  District Courts in Delaware, Kansas and Maryland have adopted e-discovery local rules.   The Seventh Circuit has adopted an e-discovery pilot program.

[2]  The following are the main cost areas for e-discovery:

**Collection:**   Forensically sound (*e.g.*, preserving the document date) collection can require a trained specialist.   Costs will include vendor fees and/or licensing fees, and media related charges. Inactive data requires restoration and software licensing fees.

**Processing:**   Requires use of licensed assessment or review tools (more than 1 tool are often used for this process).   Expenses will include data and text extraction, de-duplication, imaging fees, project management time and potential hosting fees.   Frequently includes narrowing or broadening the scope of collection based on results.

**Review:**   Requires continued hosting and licensing fees.   Project management time is necessary for database setup and management, additional keyword filtering/assessment and searching.   If human review is involved, this is the largest area of cost.

**Production:**   Requires any additional data and image conversion, text extraction and/or appropriate language OCR generation.   Tech time will include dealing with problematic files (*e.g.*, Excel).   Also requires endorsement and control numbering.   Costs will also be incurred for project management/tech time and media related charges.

**Post Production:**   Project management and load time for importing productions into production review tool or index. Additional costs for associating native files to records.

*Based National Survey of Counsel in Closed Federal Civil Cases* 38-39 (Fed. Judicial Ctr. 1997) (finding that patent cases "stood out for their high discovery expenses"). Such expenses are compounded when attorneys use discovery tools as tactical weapons, which hinders the "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

In recent years, the exponential growth of and reliance on electronic documents and communications has exacerbated such discovery abuses. Excessive e-discovery, including disproportionate, overbroad email production requests, carry staggering time and production costs that have a debilitating effect on litigation. Routine requests seeking all categories of Electronically Stored Information often result in mass productions of marginally relevant and cumulative documents. Generally, the production burden of these expansive requests outweighs the minimal benefits of such broad disclosure.

Most discovery in patent litigation centers on what the patent states, how the accused products work, what the prior art discloses, and the proper calculation of damages. These topics are normally the most consequential in patent cases. Thus, far reaching e-discovery, such as mass email searches, is often tangential to adjudicating these issues.

As technology and knowledge play an increasingly important role in our economy, the courts must not become an intolerably expensive way to resolve patent disputes. Specifically, litigation costs should not be permitted to unduly interfere with the availability of the court to those who seek to vindicate their patent rights—the enforcement of such rights is both an obligation of the legal system and important to innovation. Likewise, disproportionate expense should not be permitted to force those accused of infringement to acquiesce to non-meritorious claims. This only serves as an unhealthy tax on legitimate commerce.

Fortunately, district courts have inherent power to control their dockets to further "economy of time and effort for itself, for counsel and for litigants." *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936). Our objective is thus narrow, but important. The accompanying Model Order Limiting E-Discovery in Patent Cases is intended to be a helpful starting point for district courts to use in requiring the responsible, targeted use of e-discovery in patent cases. The goal of this Model Order is to promote economic and judicial efficiency by streamlining e-discovery, particularly email production, and requiring litigants to focus on the proper purpose of discovery—the gathering of material information—rather than permitting unlimited fishing expeditions. It is further intended to encourage

discussion and public commentary by judges, litigants, and other interested parties regarding e-discovery problems and potential solutions.

## DISCUSSION OF THE MODEL ORDER

Hard-worn experience in patent cases and recent commentary teach that efforts to identify comprehensively the discovery issues or to produce all "relevant" documents at once at the outset of the case can result in the vastly overbroad production of e-discovery.  Indeed, the practice of gathering huge amounts of information at the front of a case and running broad key searches as the issues emerge has come under increasing question.  The recently published *Judges' Guide to Cost-Effective E-Discovery* critiqued this practice sharply:

> Some argue that e-discovery is best accomplished by taking large amounts of data from clients and then applying keyword or other searches or filters. While, in some rare cases, this method might be the only option, it is also apt to be the most expensive. In fact, keyword searching against large volumes of data to find relevant information is a challenging, costly, and imperfect process.

Anne Kershaw & Joe Howie, *Judges' Guide to Cost-Effective E-Discovery* 4 (Fed. Judicial Ctr. 2010).

Hence, this Model Order requires a discovery process whereby the parties exchange core documentation concerning the patent, the accused product, the prior art, and the finances before making email production requests.  Moreover, email production requests should be focused on a particular issue for which that type of discovery is warranted.  Much as Federal Rule of Civil Procedure 30 presumptively limits cases to ten depositions and seven hours per deposition,[3] this Model Order presumptively limits the number of custodians and search terms for all email production requests.  However, the parties may jointly agree to modify these limits or request court modification for good cause.

This is not to say a discovering party should be precluded from obtaining more e-discovery than agreed upon by the parties or allowed by the court.  Rather, the discovering party shall bear all reasonable costs of discovery that exceeds these

---

[3] Such limits have reformed deposition practice, making it more efficient. *See* Fed. R. Civ. P. 30(a), 1993 Advisory Committee Notes (explaining that Rule 30 limits the number of depositions a party may take in order to "to emphasize that counsel have a professional obligation to develop a mutual cost-effective plan for discovery in the case").

limits.  This will help ensure that discovery requests are being made with a true eye on the balance between the value of the discovery and its cost.

A large source of e-discovery cost is the pre-production review of documents by attorneys or other human reviewers.  Even with clawback provisions, this pre-production review is often undertaken to avoid the disclosure of privileged or other sensitive documents to adversaries.  Accordingly, this Model Order addresses concerns regarding waiver of attorney-client privilege and work product protection in order to minimize human pre-production review.

**E-Discovery Committee**

Chief Judge James Ware (ND Cal)
Judge Virginia Kendall (ND Ill)
Magistrate Judge Chad Everingham (ED Tex)
Chief Judge Randall Rader (Fed. Cir.)
Tina Chappell
Richard "Chip" Lutton
Joe Re
Edward Reines
Steve Susman
John Whealan

Addendum: Discovery Model Order

|  |  |
|---|---|
| Plaintiff, | |
| v. | |
| Defendant. | Case No. |

**[MODEL] ORDER REGARDING E-DISCOVERY IN PATENT CASES**

The Court ORDERS as follows:

1.    This Order supplements all other discovery rules and orders.   It streamlines Electronically Stored Information ("ESI") production to promote a "just, speedy, and inexpensive determination" of this action, as required by Federal Rule of Civil Procedure 1.

2.    This Order may be modified for good cause.   The parties shall jointly submit any proposed modifications within 30 days after the Federal Rule of Civil Procedure 16 conference.   If the parties cannot resolve their disagreements regarding these modifications, the parties shall submit their competing proposals and a summary of their dispute.

3.    Costs will be shifted for disproportionate ESI production requests pursuant to Federal Rule of Civil Procedure 26.   Likewise, a party's nonresponsive or dilatory discovery tactics will be cost-shifting considerations.

4.    A party's meaningful compliance with this Order and efforts to promote efficiency and reduce costs will be considered in cost-shifting determinations.

5.    General ESI production requests under Federal Rules of Civil Procedure 34 and 45 shall not include metadata absent a showing of good cause.   However, fields showing the date and time that the document was sent and received, as well as the complete distribution list, shall generally be included in the production.

6.    General ESI production requests under Federal Rules of Civil Procedure 34 and 45 shall not include email or other forms of electronic correspondence (collectively "email").   To obtain email parties must propound specific email production requests.

7.    Email production requests shall only be propounded for specific issues, rather than general discovery of a product or business.

8.    Email production requests shall be phased to occur after the parties have

exchanged initial disclosures and basic documentation about the patents, the prior art, the accused instrumentalities, and the relevant finances. While this provision does not require the production of such information, the Court encourages prompt and early production of this information to promote efficient and economical streamlining of the case.

9.      Email production requests shall identify the custodian, search terms, and time frame. The parties shall cooperate to identify the proper custodians, proper search terms and proper timeframe.

10.      Each requesting party shall limit its email production requests to a total of five custodians per producing party for all such requests. The parties may jointly agree to modify this limit without the Court's leave. The Court shall consider contested requests for up to five additional custodians per producing party, upon showing a distinct need based on the size, complexity, and issues of this specific case. Should a party serve email production requests for additional custodians beyond the limits agreed to by the parties or granted by the Court pursuant to this paragraph, the requesting party shall bear all reasonable costs caused by such additional discovery.

11.      Each requesting party shall limit its email production requests to a total of five search terms per custodian per party. The parties may jointly agree to modify this limit without the Court's leave. The Court shall consider contested requests for up to five additional search terms per custodian, upon showing a distinct need based on the size, complexity, and issues of this specific case. The search terms shall be narrowly tailored to particular issues. Indiscriminate terms, such as the producing company's name or its product name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction. A conjunctive combination of multiple words or phrases (*e.g.*, "computer" and

"system") narrows the search and shall count as a single search term.   A disjunctive combination of multiple words or phrases (*e.g.*, "computer" or "system") broadens the search, and thus each word or phrase shall count as a separate search term unless they are variants of the same word.   Use of narrowing search criteria (*e.g.*, "and," "but not," "w/x") is encouraged to limit the production and shall be considered when determining whether to shift costs for disproportionate discovery.   Should a party serve email production requests with search terms beyond the limits agreed to by the parties or granted by the Court pursuant to this paragraph, the requesting party shall bear all reasonable costs caused by such additional discovery.

12.    The receiving party shall not use ESI that the producing party asserts is attorney-client privileged or work product protected to challenge the privilege or protection.

13.    Pursuant to Federal Rule of Evidence 502(d), the inadvertent production of a privileged or work product protected ESI is not a waiver in the pending case or in any other federal or state proceeding.

14.    The mere production of ESI in a litigation as part of a mass production shall not itself constitute a waiver for any purpose.