## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

|  |  |  |
|---|---|---|
| In re EDWARD R. REINES, | ) | No: 14-MA004 |
| *Respondent.* | ) | |
| | ) | (Filed Under Seal) |

### DECLARATION OF PROFESSOR THOMAS D. MORGAN

I, Thomas D. Morgan, declare under penalty of perjury that:

1.     I am a 1965 graduate of the University of Chicago Law School and a member of the Bar of Illinois. I am the S. Chesterfield Oppenheim Professor of Antitrust and Trade Regulation Law, Emeritus, at The George Washington University Law School where I was on the faculty from 1989 to 1998 and from 2000 to 2013. From 1998 to 2000, I was the first Rex E. Lee Professor of Law at J. Reuben Clark Law School, Brigham Young University. From 1980 to 1985, I was Dean, and from 1985 to 1989, Distinguished Professor at Emory University School of Law. From 1966 to 1980, less time for military service, I was a professor at the University of Illinois College of Law.

2.     The subject of most of my teaching and scholarly research has been professional responsibility and ethics, i.e., the professional obligations of lawyers and judges. I have taught courses in that subject one or more times each year since 1974. I have authored or co-authored numerous publications, including a widely-used law school casebook in the subject, *Professional Responsibility: Problems and Materials* (12th Edition 2014), published by Foundation Press. I served as one of two Associate Reporters for the American Law Institute's *Restatement of the Law (Third): The Law Governing Lawyers*, published in 2000, and as one of two Associate

1

Reporters for the American Bar Association's Commission on Revision of the Model Rules of Professional Conduct, the Ethics 2000 Commission, whose work led to extensive revision of the ABA Model Rules in 2002. I serve on the Editorial Board of the ABA/BNA Lawyers' Manual of Professional Conduct. I have received two awards for lifetime contributions to legal ethics scholarship – the American Bar Foundation Keck Award in 2000 and the New York State Bar Association Sanford D. Levy Award in 2008. My curriculum vitae listing my publications, presentations and other professional activities and awards is attached to this declaration.

3.    The law firm of Williams & Connolly has retained me as an expert in this matter on behalf of its client Edward R. Reines, the respondent herein. I have rendered expert opinions on questions concerning lawyers' professional conduct, standards of care, and fiduciary duties in affidavits, depositions and testimony in over 85 litigated cases, and my declarations, affidavits and testimony as an expert in those fields have been admitted in state and federal courts all over the country. I have known Judge Rader for several years in his role as an adjunct member of the George Washington Law School faculty; I do not know the respondent, Edward R. Reines. I have had no contact with either one in connection with my work on this matter. I am being compensated at my current regular rate for time expended in preparing this declaration.

4.    I have reviewed the following documents prior to preparation of this declaration:

a.    Email message from Chief Judge Randall R. Rader to Edward R. Reines, dated March 5, 2014.

b.    Email messages from Edward R. Reines, or sent on his behalf, and the recipients' responses thereto, dated on or shortly after March 5, 2014, forwarding Judge Rader's message to persons that I understand to be representatives of clients, former clients and potential clients. (Exhibits 4 – 49 to Mr. Reines' Response to the Order to Show Cause). I understand that Exhibit

2

50 was sent by Mr. Reines' client to a non-client member of a common interest group.

c.    Email messages sent to Mr. Reines' family and to retired U.S. District Judge Joseph Farnan that also attached Judge Rader's email message of March 5, 2014.

d.    News article at wsj.com, dated May 22, 2014.

e.    Letter from Chief Judge Rader to the Judges of this Court, dated May 23, 2014.

f.    Text of address given by Chief Judge Rader before the Federal Circuit Bar Association, also dated May 23, 2014.

g.    Various news stories and blog posts, dated on or shortly after May 23, 2014.

h.    Order of this Court, dated June 5, 2014, that Edward R. Reines show cause why he should not be disciplined for conduct unbecoming a member of the bar of this Court.

i.    Declaration of Mr. Reines attached to his Response to the Order to Show Cause as Attachment A.

5.    In my professional opinion, Edward R. Reines has not engaged in "conduct unbecoming a member of the bar" of this Court, the standard used in Federal Rule of Appellate Procedure 46(b)(1)(B) and in the Order to Show Cause to Mr. Reines.  Indeed, I respectfully suggest that for this Court to impose discipline on Mr. Reines would be legally unjustified and even raise constitutional questions.

a.    In its Order to Show Cause, the Court has correctly identified *In re Snyder*, 472 U.S. 634 (1985), as the leading case on the authority of a federal Court of Appeals to impose discipline on a member of its bar.  But perhaps the most important aspect of *In re Snyder* was the Supreme Court's *refusal* to let the Court of Appeals for the Eighth Circuit impose discipline.

b.    In the course of seeking reimbursement under the Criminal Justice Act, lawyer Snyder wrote an intemperate letter to the District Court condemning the kinds of documentation

the court required him to supply and asking to be removed from the list of those who would

accept indigent criminal defense work. The Chief Judge of the Eighth Circuit believed the tone

of the lawyer's letter reflected "a total lack of respect for the legal process and the courts" and he

issued an Order to Show Cause why the lawyer should not be suspended from practice before the

Court. The Court of Appeals, *en banc*, gave the lawyer several chances to apologize for the tone

of his letter, but he refused to do so, saying that the content of the letter was protected by the

First Amendment and that he did not view his letter as "one of disrespect for the Court." The

Court of Appeals disagreed and imposed a six month suspension. *Matter of Snyder*, 734 F.2d 334

(8th Cir. 1984).

c.      The Supreme Court avoided Mr. Snyder's constitutional free speech claim and

focused instead on how serious misconduct must be to warrant suspension from practice before a

U.S. Court of Appeals. Chief Justice Burger wrote for a unanimous Supreme Court:

> "Read in light of the traditional duties imposed on an attorney, it is clear that
> 'conduct unbecoming a member of the bar' is *conduct contrary to professional standards
> that shows an unfitness to discharge continuing obligations to clients or the courts, or
> conduct inimical to the administration of justice*. More specific guidance is provided by
> case law, applicable court rules, and 'the lore of the profession,' as embodied in codes of
> professional conduct." 472 U.S. at 645 (emphasis added).

The Court concluded that, "even assuming that the letter exhibited an unlawyerlike rudeness," it

did not "rise to the level of 'conduct unbecoming a member of the bar' warranting suspension

from practice." 472 U.S. at 647.

d.      In the matter before this Court, the Order to Show Cause asks about a number of

emails sent by or on behalf of Mr. Reines (Exhibits 4 – 49 referenced above) to representatives

of current, former, and prospective clients. Those emails forwarded a copy of an unsolicited,

highly-complimentary email message that Judge Rader sent to Mr. Reines earlier this year.

Whatever one's judgment of the wisdom of forwarding the email might be, I respectfully suggest

4

that it in no sense "shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice."

6.      Paragraph 3 of the Order to Show Cause suggests that a principal concern of the Court in issuing the Order might be that Mr. Reines' conduct in forwarding Judge Rader's email could have violated ABA Model Rule 8.4(e). I respectfully suggest, however, what Mr. Reines did does not violate either the letter or the spirit of that rule.

a.      Rule 8.4(e) says that it is professional misconduct for a lawyer to "state or imply an ability to influence *improperly* a government agency or official or to achieve results by *means that violate the Rules of Professional Conduct or other law*" (emphasis added). The way the Model Rules are drafted, adjectives and adverbs like those I have highlighted turn out to be the key concepts in the rule. In Rule 8.5(e), the prohibition is of "improper" influence or means that violate legal standards. When one reflects on the rule, it is obvious that nothing in the text or spirit of Rule 8.4(e) prohibits a lawyer from suggesting that he or she is a persuasive advocate who can achieve results for clients by knowledge of the record, clear rhetorical images and other lawful means that enhance the administration of justice, not diminish it.

b.      Prior to ABA adoption of the current ABA Model Rules of Professional Conduct (1983), as amended, principal ethical guidance was provided by the ABA Model Code of Professional Responsibility (1970). Its provision that corresponded to Model Rule 8.4(e) was Disciplinary Rule 9-101(C): "A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official." The corresponding Ethical Consideration 9-4 explained:

> "Because the very essence of the legal system is to provide procedures by which matters can be presented in an impartial manner so that they may be decided solely upon the merits, any statement or suggestion by a lawyer that he can or would attempt to circumvent those procedures is detrimental to the legal system and tends to undermine

public confidence in it."

Once again, the rule did not prohibit good lawyering; what it prohibited was crossing the line from claiming effective advocacy into proposing or tolerating illegal conduct.

c.    The case that I believe best illustrates what Rule 8.4(e) prohibits is *In re Sears*, 364 A.2d 777 (N.J. 1976). Harry L. Sears was a prominent New Jersey lawyer and state senator who was hired by Robert Vesco, a financier then under S.E.C. investigation. Vesco's concern at the time was preventing the S.E.C. from getting access to his company records. Vesco asked Sears to approach a federal district judge *ex parte* to allay suspicion that Vesco was trying to cover up impropriety, and Sears agreed to do so. Apparently, Sears did *not* contact the judge but he told a Vesco associate that he had. Imposing a three year suspension, the New Jersey Supreme Court held: "In order to find a violation of Disciplinary Rule DR 9-101(C), it is sufficient that the attorney merely state or imply that he could influence the judicial tribunal improperly. It is irrelevant whether he actually makes the attempt or accomplishes the objective." 364 A.2d at 785.

d.    The *Sears* case captures what current Rule 8.5(e) is about. Sears agreed to do something for his client that was clearly improper. The proposed ex parte contact would have violated both the Federal District Court's own rules and the Rules of Professional Conduct.  And although the summary sentence from ABA/BNA Lawyers' Manual on Professional Conduct at 101:703, cited in this Court's Order to Show Cause, could be read more broadly, the cases cited in support of the summary are clearly based on statements of *improper* influence. They are like the facts in *Rey v. State*, 512 S.W.2d 40 (Tex.App. 1974), where the lawyer was suspended for asking client's father for $500 with which to buy a present for the judge.  In short, the conduct of lawyers found to have violated Model Rule 8.4(e) or its Model Code predecessor went far

beyond anything Mr. Reines did with Judge Rader's email.

7.      The Order to Show Cause suggests that, in forwarding the email, Mr. Reines may

have been improperly "implying a special relationship with [Judge Rader]," presumably because

Judge Rader's email calls Mr. Reines his "friend," indeed his "friend for life." Once again,

however, friendship between a judge and a lawyer traditionally has not constituted a prohibited

"special relationship" that itself suggests a possibility of exercising improper influence.

a.      It is beyond argument that there have been friendships between lawyers and

judges as long as we have had an Anglo-American legal system. Indeed, the Inns of Court in

London and bar associations in the United States were created in large part to further good

personal and professional relationships between judges and lawyers.

b.      Of course, some friendships are closer than others, and for many years, if the

relationship between a judge and a lawyer is so close that the judge has a personal "bias" in the

matter, 28 U.S.C. § 144, or the judge's "impartiality might reasonably be questioned," 28 U.S.C.

§ 455, the judge must recuse himself or herself from hearing a case in which that lawyer is

involved.

c.      The U.S. Judicial Conference Committee on Codes of Conduct examined when

friendship requires disqualification in its Advisory Opinion No. 11. The question posed was

whether the fact that one of the attorneys "is a friend of long-standing and is also a godfather of

one of the judge's children" could be said to "convey the impression that [the lawyer] is in a

special position to influence the judge" or cause the judge's "impartiality reasonably [to] be

questioned." The Opinion answered that it could not if "the relationship were simply one of

historical significance, the godfather being merely within the wide circle of the judge's friends,

and the obligation having been perfunctorily assumed." But if a lawyer-judge relationship "is

like that of a close relative," the opinion said, the judge's impartiality could be in doubt.

     d.      Professor Charles Geyh addresses a judge's "prior relationship with an attorney" in his book for the Federal Judicial Center, *Judicial Disqualification: An Analysis of Federal Law* (2nd ed. 2010). He cites *United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985), as a good illustration of the relatively unusual case in which friendship made disclosure and possible disqualification appropriate. In *Murphy*, the Judge and the U.S. Attorney became close friends when they served together as Assistant U.S. Attorneys. Their families now vacationed together, and indeed did so immediately after the trial in question in which the U.S. Attorney personally tried the case. On appeal, the defendant argued that he was entitled to a new trial before a different judge, so the Seventh Circuit expressly explored the implications of such a close judge-attorney friendship.

> "When a question arises about friendship between a judge and a lawyer, "[t]he twofold test is whether the judge feels capable of disregarding the relationship and whether others can reasonably be expected to believe that the relationship is disregarded." Advisory Opinion No. 11, Interim Advisory Committee on Judicial Activities (1970).

> "The statutory standard puts to the judge a question about the objective state of the legal and lay culture. The court must consider whether an astute observer in either culture would conclude that the relation between judge and lawyer (a) is very much out of the usual course, and (b) presents a potential for actual impropriety if the worst implications are realized. The inquiry is entirely objective, see *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460-61 (7th Cir. 1985), and is divorced from questions about actual impropriety.

>      * * *

> "In today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. A judge need not cut himself off from the rest of the legal community. Social as well as official communications among judges and lawyers may improve the quality of legal decisions. Social interactions also make service on the bench, quite isolated as a rule, more tolerable to judges." 768 F.2d at 1537.

The Court approved the view of "many courts" that "a judge need not disqualify himself just because a friend—even a close friend—appears as a lawyer," but it found the fact that the

judge and prosecutor were as close friends as these were should have been disclosed. At the end of the day, however, it found the objection was waived and the defendant had received a fair trial.

e.     As I suggested earlier in this declaration, I do not know Mr. Reines at all or Judge Rader well enough to have independent knowledge of the nature of their friendship.  I can say, however, that in my professional opinion, nothing in Judge Rader's email message to Mr. Reines or Mr. Reines' messages to the client groups suggests anything like the degree of personal relationship that would ordinarily require disclosure or Judge Rader's recusal in cases involving Mr. Reines.

8.     What may be happening with respect to the view of lawyer-judge friendships seems to represent a change in what the Seventh Circuit in *Murphy* called "the objective state of the legal and lay culture." 768 F.2d at 1537.  I suggest that because the question of judges and lawyers being "friends" has come up most recently in connection with the use of social media, particularly Facebook.  The specific issue has been whether the social media status of "friend" implies a prohibited special relationship.

a.     There are many state opinions; the most complete current list seems to be the one appended to Arizona Supreme Court Judicial Ethics Advisory Committee Opinion 14-01 (May 5, 2014).  It is clear to all that being social media friends does not prove any *actual* ability to influence a judge improperly, and most states conclude that there is no absolute prohibition of judges and lawyers being social media friends, but each opinion cites *perception* concerns, many of which derive from the fact that the lay public has extensive access to social media.  Florida Supreme Court Judicial Ethics Advisory Committee Opinion 2009-20 (Nov. 17, 2009), for example, was especially worried that social media is frequently viewed by people who do not

understand how the judicial system works and thus who might get a false sense that a social

media "friend" would have special access to the judge.

    b.    Mr. Reines' own state of California provided the one of the most complete and

persuasive analyses of the issues presented in California Judges Association Judicial Ethics

Committee Opinion 66 (Nov. 23, 2010):

> "The same rules that govern a judge's ability to socialize and communicate in person, on paper and over the telephone apply to the Internet.

* * *

> "There is no ethical rule prohibiting judges from interacting with lawyers who appear before them. The commentary to Canon 4A [of the state Code of Judicial Conduct] points out that a judge should not be separated from the community in which the judge lives. Judges are not only allowed, but are encouraged to participate in bar association and other groups dedicated to the improvement of the law. Judges are permitted to participate in organizations such as the American Inns of Court where judges and lawyers interact socially in an effort to foster civility and professionalism. While bar associations are open to all lawyers, Inn of Court chapters limit their membership. Judges are permitted to join social and civic organizations that include attorneys who may appear before them."

    c.    The California opinion is detailed and examines factors to consider in evaluating

how a public online "friendship" might reasonably appear to others. Thus, being a "friend" who

exchanges sensitive personal information with a judge or lawyer is more likely to raise red flags

than being a friend who discusses bar association or other professional work, and the more often

the lawyer appears before the judge, the more limited a personal relationship should be. Indeed,

an Internet relationship could become so close as to require disclosure to parties and possibly

recusal in some cases. See, e.g., ABA Formal Opinion 462 (Feb. 21, 2013). But as discussed

above, the question of required disqualification is quite different from whether a judge may

properly identify a lawyer as a friend and whether the lawyer may do the same.

    d.    Ordinarily, of course, the public does not have access to email communication

10

"The Rise of Institutional Law Practice," 40 Hofstra L. Rev. 1005 (2012).

**B.    In the Fields of Economic Regulation and Administrative Law**

MODERN ANTITRUST LAW AND ITS ORIGINS: CASES AND MATERIALS
(West Publishing Co. 1994; 2nd Ed. 2001; 3rd Ed. 2005; 4th Ed. 2009; 5th Ed. 2014)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (West
Publishing Co. 1976)

ECONOMIC REGULATION OF BUSINESS: CASES AND MATERIALS (2nd
Edition 1985) (co-authored with J. Harrison & P. Verkuil)

REGULATION AND DEREGULATION: CASES AND MATERIALS (West
Publishing Co. 1997; 2nd Edition 2004) (co-authored with Harrison and Verkuil)

"The General Accounting Office: One Hope for Congress to Regain Parity of Power with
the President," 51 N. Carolina L. Rev. 1279 (1973)

Review of "Inner City Housing and Private Enterprise," 1972 U Ill. L Forum 833 (1973)

"Achieving National Goals Through Federal Contracts: Giving Form to an Unconstrained
Administrative Process," 1974 Wisconsin L. Rev. 301

"Toward a Revised Strategy for Ratemaking," 1978 U. Illinois L. Forum 21

"Procedural Impediments to Optimal Rate Making," in W. Sichel, Ed., Public Utility
Rate Making in an Energy-Conscious Environment (Westview Press 1979)

"Federal Chartering of Corporations" and "Shareholder Remedies in Corporations" in
M.B. Johnson, Ed., The Attack on Corporate America: The Corporate Issues
Sourcebook (McGraw-Hill 1978)

Review of "Economic Analysis and Antitrust Law," 33 Vanderbilt L. Rev. 1523 (1980)

"The Deregulation Bandwagon: Too Far, Too Fast?," 2 J. Law & Commerce 1 (1982)

Review of "Antitrust Stories," Antitrust Source, www.antitrustsource.com (Aug 2008)

"Antitrust Implications of Accreditation Standards That Limit Law School Enrollment,"
101 Antitrust & Trade Regulation Report 2508 (BNA, July 15, 2011).

**C.    In the Field of Legal Education**

"Computer-Based Legal Education at the University of Illinois:  A Report of Two Years'
Experience," 27 J. Legal Education 138 (1975) (with P. Maggs)

"Teaching Students for the 21st Century," 36 J. Legal Education 285 (1986)

"Thinking About Bar Examining: The Challenge of Protecting the Public," 55 Bar
    Examiner 27 (Nov.1986)

"President's Address", 90-1 AALS Newsletter 1 (Feb. 1990)

"Should We Oppose Ranking of Law Schools?, 90-2 AALS Newsletter 1 (Apr. 1990)

"Legal Education Organizations in Business," 90-3 AALS Newsletter 1 (Aug. 1990)

"The Challenge to Maintain Diversity in Legal Education," 90-4 AALS Newsletter 1
    (Nov. 1990)

"A Defense of Legal Education in the 1990s," 48 Wash. & Lee L. Rev. 1 (1991)

"Admission of George Mason to Membership in the Association of American Law
    Schools," 50 Case Western Reserve L. Rev. 445 (1999)

"Training Law Students For the Future: On Train Wrecks, Leadership and Choices," 6 St.
    Thomas L. Rev. 297 (2009).

"The Changing Face of Legal Education: Its Impact on What it Means to Be a Lawyer,"
    45 Akron L. Rev. 811 (2012).

**Participation in Public Programs:**

**A.  Endowed Lectures Given**
    Mellon Lecture, University of Pittsburgh - 1981
    Altheimer Lecture, University of Arkansas (Little Rock) - 1987
    Dunwody Lecture, University of Florida - 1990
    Lane Foundation Lecture, Creighton University - 1990 & 2010
    Tucker Lecture, Washington & Lee University - 1990
    Pirsig Lecture, Wm. Mitchell Law School - 1996
    Van Arsdell Lecture, University of Illinois - 1997
    Keck Award Lecture, American Bar Foundation - 2000
    Tabor Lecture, Valparaiso University - 2003
    Sullivan Lecture, Capital University - 2004
    Miller-Becker Lecture, University of Akron - 2011
    Lichtenstein Lecture, Hofstra Law School - 2012
    Payne Lecture, Mississippi College – 2012

## B. Representative Programs on Which Served as Speaker or Panelist

Let's Make a Deal (the Ethics of Negotiation) - ABA Conference on Professional Responsibility (Palm Beach) - June 1992

Reporting a Client's Continuing Crime or Fraud - ABA Conference on Professional Responsibility (Chicago) - May 1993

Ethical Issues in Representing Older Clients - Fordham University School of Law (New York) - December 1993

Problem of Representing a Regulated Client, Eleventh Circuit Judicial Conference (Orlando) - May 1994

Ethical Issues in Products Liability Cases - Products Liability Committee of the ABA Litigation Section (Tucson) - February 1995

Ethical Issues Arising in the O.J. Simpson Case - University of Washington School of Law (Seattle) - May 1995

Competition Policy for the New South Africa (Pretoria) - November 1995

Ethical Issues in Representing Children - Fordham University School of Law (New York) - December 1995

Are We a Cartel? The ABA/DOJ Consent Decree - AALS Annual Meeting (San Antonio) - January 1996

Professional Responsibilities of the Law Teacher - AALS (Washington) - July 1996

Ethical Issues for Mediators and Advocates - ABA Annual Meeting (Orlando) - August 1996

Legal Issues in Cyberspace - ABA Annual Meeting (Orlando) - August 1996

Teaching Legal Ethics by the Problem Method - College of William & Mary--Keck Foundation Conference (Williamsburg) - March 1997

Litigators Under Fire: Handling Professional Dilemmas In and Out of Litigation - televised ALI/ABA CLE program (Washington) - April 1997

Conflicts of Interest in the New Forms of Law Practice - South Texas Law School Symposium (Houston) - September 1997

Fiduciary Obligations in Dismissal of a Law Firm Partner - Washington & Lee Law
School Symposium (Lexington, VA) - April 1998

Impact of Disciplinary Action on Lawyer's Status as Certified Specialist - ABA
Committee on Specialization National Roundtable (Washington) - May 1998

Conflicts of Interest in the Restatement of the Law Governing Lawyers - National
Organization of Bar Counsel (Toronto) - July 1998

The Ethics of Teaching Legal Ethics - Association of American Law Schools
(Washington) - October 1998

The New Restatement of the Law Governing Lawyers: What Is It & How Does It Affect
Your Practice? - Assn of Bar of City of New York (New York) - November 1998

Imputation, Screens & Personal Conflicts - ABA Conference on Professional
Responsibility (La Jolla) - June 1999

The Future of Legal Education - Dedication of Sullivan Hall, the new Seattle University
Law Building (Seattle) - October 1999

Legal Ethics in the New Millennium - J. Reuben Clark Soc. (Dallas) - November 1999

Unauthorized Practice of Law and Ethical Risks to Lawyers from Multistate Practice -
ALAS Telephone Seminar (Chicago) - December 1999

Ethics 2000: Rewriting the Standards for Lawyer Conduct - American Intellectual
Property Law Association (La Quinta, CA) - January 2000

Real World Pressures on Professionalism - University of Arkansas at Little Rock Law
School (Little Rock, AR) - February 2000

Professional Responsibility Issues Arising Out of Electronic Commerce - ABA Section
of Public Contract Law (Annapolis, MD) - March 2000

Multidisciplinary Practice: Curse, Cure or Tempest in a Teapot - American Intellectual
Property Law Association (Pittsburgh, PA) - May 2000

Ethics 2000: Proposed Changes in the Law Governing Lawyers - Conference of Chief
Justices (Rapid City, SD) - July 2000

Attorney Standards in Federal Courts and Developments in the Multidisciplinary Practice
Controversy - Conference of Chief Justices (Baltimore) - January 2001

Multijurisdictional Practice - Turner Seminar (Memphis) - February 2001

24

Ethical Issues in Large Firms – Ass'n of Legal Administrators (Baltimore) - May 2001

Law Firm Ancillary Services - ALAS Annual Meeting (Bermuda) - June 2001

New Rule 1.6 on Disclosure of Confidential Client Information - ABA Civil Justice Roundtable (Washington) - March 2002

Ethics for Corporate In-House Counsel - American College of Investment Counsel (Chicago) - April 2002

Treading Water: A Young Lawyer's Guide to Ethics in Varying Practice Environments - ABA Tax Section Young Lawyers Committee (Washington) - May 2002

Shifting Ethical Sands: Ethics 2000 and Beyond - Federal Communications Bar Ass=n (Washington) - June 2002

Multijurisdictional Practice - ABA Forum on Franchising (Phoenix) - October 2002

The Sarbanes-Oxley Act of 2002 and the ABA Task Force on Corporate Responsibility Report (ALAS Telephone Seminar) - October 2002

At the Bar and in the Boardroom: The Ethics of Corporate Lawyering - Federalist Society (Washington) - Nov. 2002

Law Firm Risk Management: Post-Enron Challenges - Hildebrandt Conference (New York) - Nov. 2002

Future Regulation of Securities Lawyers - ABA Section of Business Law, Committee on Federal Securities Regulation (Washington) - Nov. 2002

What Lawyers Need to Know to Comply with the New SEC Professional Conduct Rules - ABA Section of Business Law Televised Forum (Washington) - Feb 2003

Ethics in Representing Organizational Clients After Sarbanes-Oxley - ABA Section of Business Law Spring Meeting (Los Angeles) - April 2003

Corruption in the Executive Suite: The Nation Responds - National Teleconference from ABA Public Utility Section Spring Meeting (Washington) - April 2003

Sarbanes-Oxley Revolution in Disclosure and Corporate Governance: Complying with the New Requirements - ABA National Institute (Washington) - May 2003

Client Confidentiality, Corporate Representation and Sarbanes-Oxley - ABA National Conference on Professional Responsibility (Chicago) - May 2003

25

Friend or Foe: The Restatement of Law Governing Lawyers - ABA National Legal Malpractice Conference (La Jolla) - September 2003

Where Were the Lawyers in Enron? - Cato Institute (Washington) - October 2003

Testified before the House Subcommittee on Capital Markets' Hearing on the Role of Attorneys in Corporate Governance (Washington) - February 2004

The Lawyer-Lobbyist "on the Frontier": What Legal and Ethical Rules Apply? - ABA Mid-Year Meeting (San Antonio) - February 2004

The Client(s) of a Corporate Lawyer - Capital U. Law School (Columbus) - March 2004

Ethical Issues Facing Public Interest Law Firms - Heritage Foundation (Washington) - October 2004

Drafting an Ethical Code for a Diverse Legal Profession - Univ. of Memphis Law School (Memphis) - October 2004

Ethical Issues in International Trade Cases - International Trade Trial Lawyers Association (Washington) - November 2004

Professional Regulation of Business Lawyers Isn't Going to Get Any Easier - ABA Section of Business Law (Washington) - November 2004

Problems for Corporate Lawyers in Complying with the Sarbanes-Oxley Act - New Jersey Corporate Counsel Association (Livingston, NJ) - January 2005

Avoiding Conflicts in Business Law Practice: Seven Deadly Sins - ABA Section of Business Law (Nashville) - April 2005

Fireside Chat on Legal and Accounting Ethics - SEC Historical Society (Washington) - November 2005

When Good Clients Go Bad - ALAS Annual Meeting (Toronto) - June 2006

Lawyers Face the Future - St. Thomas Univ. Law School (Minneapolis) - August 2006

Regulating Corporate Morality - George Washington Corporate & Business Law Society (Washington) - September 2006

Comments on Noisy Withdrawal - Case Law School Leet Symposium (Cleveland) - October 2006

The ABA Role in Law School Accreditation - Federalist Society Lawyers' Convention
(Washington) - November 2006

Investigative Techniques: Legal, Ethical and Other Limits - ABA Section of Antitrust
Law (National) - December 2006

Ethics Issues in Corporate Internal Investigations - Georgia Bar (Atlanta) - March 2007

Are Regulatory Lawyers' Ethical Obligations Changing? - ABA Section of Public Utility
Law (Washington) - April 2007

Antitrust Litigation Ethics From Soup to Nuts - ABA Section of Antitrust Law
(Washington) - April 2007

How to Survive in Today's Competitive Environment and Comply With the Rules of
Professional Conduct - Wisconsin State Bar (Milwaukee) - May 2007

Audit Response Letters: Will There Be Peace Under the Treaty? - ABA National
Conference on Professional Responsibility (Chicago) - May 2007

The Buried Bodies Case: Alive and Well After Thirty Years - ABA National Conference
on Professional Responsibility (Chicago) - May 2007

Organization and Discipline for an Independent Legal Profession - Visit of Leaders of the
Iraqi and Kurdistan Bar Associations (Washington) - November 2007

Feeling Conflicted? The Experts Opine and Prescribe - Tennessee Bar Foundation
(Nashville) - January 2008

Ethics Issues in Qui Tam Litigation - ABA National Institute on Civil False Claims
(Washington) - June 2008.

Ethics and the Lawyer-Lobbyist - ABA Administrative Law Conference (Washington) -
October 2008

Ethics in the Early Going - ABA Tort & Insurance Practice Section, Aviation & Space
Law Committee Litigation National Program (Washington) - October 2008

Professional Malpractice in a World of Amateurs - St. Mary's Law School Symposium
on Legal Malpractice (San Antonio) - February 2009

The World Economic Crisis and the Legal Profession - Order of Advocates of Brazil
(Brazilian counterpart of the ABA) - (Rio de Janeiro) - May 2009

Principles of United States Antitrust Law - Commissioners and Staff of the CADE
(Brazilian counterpart of the FTC) - (Brazilia) - May 2009

The World Economic Crisis, Antitrust Law and the Lawyer - Institute of Advocates of
Brazil (Brazilian counterpart of the ALI) - (Rio de Janeiro) - May 2009

The World Economic Crisis and Antitrust Law - American Chamber of Commerce -
(Bela Horizonte, Brazil) - May 2009

Antitrust Law: The Real U.S. Policies - Seminar celebrating the retirement of Prof. Joao
Bosco Leopoldino da Fonseca of the Federal University of Minas Gerais (Bela
Horizonte) - May 2009

Where Does It End? Duties to Former Clients - American Bar Association Center for
Professional Responsibility (Chicago) - May 2009

The Last Days of the American Lawyer - Creighton Law School (Omaha) - Oct. 2009

Ethics Challenges for National Security Lawyers In and Out of Government - ABA
Standing Committee on Law and National Security (Washington) - Nov. 2009

The Transformative Effect of International Initiatives on Lawyer Practice and Regulation:
The Financial Action Task Force Guidelines - Association of American Law
Schools Annual Meeting (New Orleans) - Jan. 2010

Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in
Aggregate Settlements - Humphreys Complex Litigation Center Conference on
Aggregate Litigation: Critical Perspectives (Washington) - March 2010

Abandoning Homogeneity in Legal Education - Georgetown Center for Study of
the Legal Profession Program on Law Firm Evolution: Brave New World or
Business as Usual? (Washington) - March 2010

Ethics Issues in Housing - ABA Forum on Affordable Housing (Washington) - May 2010

The Vanishing American Lawyer - Conference on Regulating and Deregulating Lawyers
- Institute for Advanced Legal Studies (London) - June 2010

The Vanishing American Lawyer - Federalist Society Podcast - Sept. 2010.

Developments in Ethics 2010 - ABA Teleconference - Jan. 2011

A Transforming Legal Profession: The Challenges for Bar Associations - National
Conference of Bar Presidents (Atlanta) - Feb. 2011

A Transforming Profession: The Challenges for Lawyers Starting Out - ABA Law
    Student Division (Washington) - Feb. 2011

A Transforming Profession: A Look Back Forty Years and the Challenges Ahead -
    Alabama Bar Annual Meeting (Point Clear) B July 2011
    Florida Bar Board of Governors (Palm Beach) B July 2011

On the Declining Importance of Legal Institutions B Conference at Michigan State Law
    School (East Lansing) - Sept. 2011

Calling Law a Profession Only Confuses Thinking About Challenges Lawyers Face -
    Conference at University of St. Thomas Law School (Minneapolis) - Sept. 2011

The Changing Face of Legal Education: Its Impact on What It Means to be a Lawyer -
    Miller-Becker Lecture at University of Akron Law School (Akron) - Oct. 2011

Law School Accreditation - Federalist Society (Washington) - Nov. 2011

Aggregate Litigation: Don't Let Your End Game Blow-Up - ALM Litigation Summit
    (Washington) - Nov. 2011

So Someone Objects to Your New Client - ABA Administrative Law & Regulatory
    Practice Section Fall Conference (Washington) - Nov. 2011

Ethical Dilemmas Facing Lawyers Practicing National Security Law - ABA Standing
    Committee on Law and National Security (Washington) - Dec. 2011

Needed Law Schools' Response to Changes in the Legal Profession - AALS Annual
    Meeting (Washington) - Jan. 2012

The Rise of Institutional Law Practice - Lichtenstein Lecture at Hofstra Law School
    (Hempstead, NY) - Feb. 2012

Blazing New Pathways Through the Legal World - Washington Area Legal Recruitment
    Administrators Association (Washington) - Mar. 2012

Ethics in Privacy and Social Media - ABA Antitrust Section (Washington) - Mar. 2012

Ethical Issues in Alternative Litigation Funding – Humphries Center at GW Law
    (Washington) – May 2012

The Vanishing American Lawyer: The Road Ahead -- Utah Bar (Sun Valley, ID) -- July
    2012

The Vanishing American Lawyer: The Changing Legal Profession -- Federal Bar Ass'n (Memphis, TN) -- Oct. 2012

The Professional World Facing New American Lawyers – 2012 Georgia Convocation on Professionalism (Atlanta) -- Nov. 2012

Testimony -- ABA Task Force on the Future of Legal Education (Dallas) -- Feb. 2013

Public Ownership of Stock in Law Firms -- Federalist Society Teleforum -- Apr. 2013

The ABA's 2012 Changes in Ethics Rules -- ABA Antitrust Section Spring Meeting (Washington) -- Apr. 2013

Proposals for Training Required for Bar Admission – AALS Annual Meeting (New York) – Jan. 2014

Law Professors of the Future: A New Balance of Teaching, Scholarship and Service? – AALS Annual Meeting (New York) – Jan. 2014

Are Lawyers Vanishing? – Transportation Lawyers' Ass'n (St. Petersburg, FL) – May 2014

## Major Civic and Professional Activities:

### A. In the Field of Professional Responsibility

Associate Reporter, American Law Institute Restatement of the Law (Third), The Law Governing Lawyers, 1986-2000

Associate Reporter, American Bar Association Ethics 2000 Commission, 1998-99

Reporter, American Bar Association Commission on Professionalism, 1985-86

Member, Advisory Board, ABA/BNA Lawyers' Manual on Professional Conduct, since 1984; Chair 1986-87 & 1992-93

Member, Advisory Council, Project on a Digital Archive of the Birth of the Dot Com Era: The Brobeck Papers, Library of Congress and Univ. of Maryland, 2005-2009

Chair, Federalist Society Practice Group on Professional Responsibility and Legal Education 2005-2007

Member, Drafting Committee, Multistate Professional Responsibility Examination, National Conference of Bar Examiners, 1986-89

Member, Committee on Professional Ethics, Illinois State Bar Association, 1974-1980; Vice Chair 1979-80

**B.    In the Fields of Economic Regulation and Administrative Law**

Vice Chair, ABA Section of Administrative Law & Regulatory Practice, 2001-2002

Consultant, Administrative Conference of the U.S., 1975-1979 & 1985-1989

Council Member, ABA Section of Administrative Law, 1983-1986

Chair, Section on Law and Economics, Ass'n of American Law Schools, 1979-1980

**C.    In the Field of Legal Education**

President, Association of American Law Schools, 1990

Member, AALS Executive Committee, 1986-1991

Chair, AALS Special Committee on ABA Accreditation Standards, 2010

Chair, AALS Nominating Committee for President-Elect and Members of the Executive Committee, 2010 (Member 2008 & 2011)

AALS Delegate to the ABA House of Delegates, 2011-2013

Chair, AALS Long Range Planning Committee, 1988-1989

Member, Planning Committee for Workshop on Tomorrow's Law Schools: Economics, Governance and Justice, 2013

Member, AALS Special Committee on Faculty Recruitment Practices, 2005-2007

Member, AALS Committee on the Ethical and Professional Responsibilities of Law Professors, 1988-1989

**Special Honors Received:**

Illinois State Bar Foundation, Honorary Fellow (1988) (for contributions to study of lawyer professionalism)

American Bar Foundation, Keck Foundation Award (2000) (for distinguished scholarship in legal ethics and professional responsibility)

New York State Bar Association, Sanford D. Levy Professional Ethics Award (2008) (for lifetime contributions to legal ethics scholarship)

**Legal Consulting:**

Testified in twenty-five contested trials or hearings involving issues such as lawyer discipline, disqualification, right to fees and malpractice.

Gave depositions in twenty-nine cases resolved prior to trial.

Submitted declarations or affidavits in thirty-four other cases, typically in connection with motions for summary judgment or to disqualify.

**Organization Memberships:**

American Bar Association
American Law Institute (Life Member)
American Bar Foundation (Fellow)
Illinois State Bar Association
Illinois Bar Foundation (Honorary Fellow)
ABA Center for Professional Responsibility
Association of Professional Responsibility Lawyers
American Judicature Society

**Current as of July 2014**

between a lawyer and a judge in the way it has access to their Facebook postings. That might

make perception concerns go away. But it might increase other concerns, and apparently shortly

after Judge Rader's and Mr. Reines sent their respective email messages, the U.S. Judicial

Conference Committee on Codes of Conduct issued Advisory Opinion No. 112 (March 2014).

Page 112-3 of the opinion says that:

> "In the Committee's view, * * * any frequent interaction between a judge or
> judicial employee and a lawyer who appears before the court may 'put into question the
> propriety of the judicial employee's conduct in carrying out the duties of the office."
> Employee's Code, Canon 2. With respect to judges, communication of this nature may
> "convey or permit others to convey the impression that they are in a special position to
> influence the judge." Judge's Code, Canon 2B. A similar concern arises where a judge or
> judicial employee uses social media to comment – favorably or unfavorably – about the
> competence of a particular law firm or attorney."

    e.      That statement about judicial responsibilities is pointed and seems to establish a

rule for judges that implicitly addresses the changing state of the culture as the Committee

understands it. Giving advice to *judges* about what *judges* may and may not do in a changing

world is central to the Codes of Conduct Committee's work, but while U.S. Judicial Conference

Advisory Opinions regulate judges, they do not themselves regulate lawyer conduct. Mr. Reines

is a California lawyer whose conduct was consistent with the standards that govern him and the

judges in his state, and up until Advisory Opinion No. 112, the principal focus of the Federal

Judicial Center had been issues relevant to judicial disqualification, not the permissible content

of individual email messages. I respectfully suggest that there is no legal basis for obliging Mr.

Reines to have anticipated Advisory Opinion No. 112, and no legal basis for finding Mr. Reines

conduct to be professionally improper.

    f.      There can be absolutely no dispute that if Mr. Reines had promised to – or

claimed the ability to – exercise improper influence with one or more judges of this Court, his

actions would have been improper. But in my professional opinion, fairly read, Judge Rader's

11

email – and Mr. Reines' notes forwarding that email – do not suggest any basis for improper influence. The message that Mr. Reines received and passed on to clients is that Mr. Reines had done an excellent job of oral advocacy and represented his clients very well. Nothing in that message is inconsistent in any way with either the text or the spirit of Model Rule 8.4(e) or Federal Rule of Appellate Procedure 46(b)(1)(B).

9.    What I suggest that this case illustrates instead is one form professional marketing takes in the modern practice of law. In my professional opinion, Mr. Reines' conduct in calling attention to a positive development in his career was entirely consistent with the standards applicable to such marketing. His conduct was a kind that is constitutionally-protected and ultimately seen as in the public interest.

a.    Prior to 1977, legal ethics standards around the country might have discouraged Mr. Reines from circulating Judge Rader's message. See, e.g., ABA Code of Professional Responsibility (1970), Disciplinary Rule 2-101(A): "A lawyer shall not * * * participate in the use of any form of public communication that contains professionally self-laudatory statements calculated to attract lay clients." Because Judge Rader's message praised Mr. Reines, passing it along would have been considered a "self-laudatory" act, although even before 1977, lawyers could communicate with one another and individually-addressed correspondence to lawyers and other friends would not have constituted a prohibited "public communication."

b.    But whatever professional standards once required, they dramatically changed after the Supreme Court decision in *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977). *Bates* involved a state's attempt to impose discipline on two lawyers who ran a newspaper ad for a "legal clinic" offering low fees for defined legal services. The state said that prohibiting lawyer advertising raised no constitutional issue because it was "commercial speech," which *Valentine*

12

*v. Chrestensen*, 316 U.S. 52 (1942), had said may be subject to regulation. In *Bates*, the Supreme

Court rejected the view that lawyer advertising may be subject to "blanket suppression." There is

a public interest, the Court said, in allowing lawyers to disseminate accurate information about

themselves. The availability of reliable information serves important needs of clients, and

lawyers have a constitutional right to circulate such information.

     c.     Professional limitations on lawyer marketing since 1977 can be traced directly to

the following caveat in *Bates:*

> "Advertising that is false, deceptive, or misleading, of course is subject to
> restraint. * * * For example, advertising claims as to the quality of services * * * are not
> susceptible to measurement or verification; accordingly, such claims may be so likely to
> be misleading as to warrant restriction." 433 U.S. at 383-84.

Thus, ABA Model Rule of Professional Conduct 7.1 now provides:

> "A lawyer shall not make a false or misleading communication about the lawyer
> or the lawyer's services. A communication is false or misleading if it contains a material
> misrepresentation of fact or law, or omits a fact necessary to make the statement
> considered as a whole not materially misleading."

Comment 2 to Model Rule 7.1 explains:

> "A truthful statement is also misleading if there is a substantial likelihood that it
> will lead a reasonable person to formulate a specific conclusion about the lawyer or the
> lawyer's services for which there is no reasonable factual foundation."

And Comment 3 to Model Rule 7.1 continues:

> "Similarly, an unsubstantiated comparison of the lawyer's services or fees with
> the services or fees of other lawyers may be misleading if presented with such specificity
> as would lead a reasonable person to conclude that the comparison can be substantiated."

     d.     The very next year, in *Ohralik v. Ohio State Bar Association*, 436 U.S. 477

(1978), and *In re Primus*, 436 U.S. 412 (1978), the Court established professional standards for a

lawyer's direct personal contact with potential clients, i.e., other than through broad advertising.

ABA Model Rule of Professional Conduct 7.3 reflects those cases, makes the accuracy of the

13

communications subject to Rule 7.1, and further provides:

> "(a)     A lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain, unless the person contacted: (1) is a lawyer, or (2) has a family, close personal, or prior professional relationship with the lawyer."

e.     Further, the Supreme Court has made clear in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), that a judge's subjective sense that communication between a lawyer and prospective clients is "undignified" is not a sufficient basis for imposing discipline.

> "[A]lthough the State undoubtedly has a substantial interest in ensuring that its attorneys behave with dignity and decorum in the courtroom, we are unsure that the State's desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgment of their First Amendment rights." 471 U.S. at 647-48.

f.     Mr. Reines' forwarding of Judge Rader's email was clearly consistent with the professional standards I have outlined. First, Mr. Reines emails do not even constitute "real-time electronic contact" of the kind prohibited by Model Rule 7.3. Rather, they are written electronic communications analogous to letters or print ads that a recipient may take time to consider, or even ignore entirely. Second, even if Mr. Reines had engaged in in-person communication, where the courts have suggested the need for regulation is greatest, Mr. Reines would have satisfied Model Rule 7.3(a) in that all the communications were with other lawyers or people with whom he had a close personal or prior professional relationship. Third, even if one believed passing along Judge Rader's email was undignified or unwise, professional standards did not require Mr. Reines to act other than he did, nor would constitutional standards likely have permitted limiting his actions.

g.     Most important to see, Model Rule 7.1 does not permit Mr. Reines to say simply that "I'm a top-flight oral advocate" or "Federal Circuit watchers think I argue cases very well." The *Bates* case makes clear that such information is constitutionally-protected and providing it is

14

in the public interest, but consistent with the caveat from *Bates* quoted earlier, Comments 2 & 3 to Model Rule 7.1 permit the statements only if the lawyer has a "reasonable factual foundation" and can provide "substantiation" for the claims. Judge Rader's email provided the "reasonable factual foundation" and the "substantiation" for the message any lawyer in Mr. Reines situation would hope to convey about his or her ability. And the best way to tell the story accurately and completely was to attach the email itself to Mr. Reines' own communication. In short, in my professional opinion, far from violating today's lawyer professional standards, Mr. Reines' actions were consistent with both the letter and the spirit of those standards.

10.     The consequences of Judge Rader's email have been understandably unsettling, and in retrospect, all might wish that Mr. Reines had kept Judge Rader's email to himself. In my professional opinion, however, imposing professional discipline on Mr. Reines would be both unjustified and unjust.

a.     Mr. Reines' communications with representatives of current, former, and prospective clients, almost all of whom were lawyers, were professional in tone and free of any claim of special influence with Judge Rader or other members of this Court. The responses that Mr. Reines received likewise reflect an understanding that Mr. Reines had been congratulated for his professional distinction, not for any improper or special influence.

b.     The relevant cases and ethics opinions that Mr. Reines had before him at the time he acted did not reasonably suggest that his conduct was improper. Even if one assumes that Mr. Reines would or should act differently in the future, I respectfully submit that nothing about forwarding Judge Rader's email to these client groups constituted "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice," the standard used by the

15

Supreme Court in *In re Snyder*, 472 U.S. 634 (1985), to define the basis upon which a United States Court of Appeals may impose disciplinary sanctions upon a member of its Bar.

July 7, 2014
_____
Date

_____
Thomas D. Morgan

16

**Curriculum Vitae**
**THOMAS D. MORGAN**

### Personal Data:

Born:  February 8, 1942, in Peoria, Illinois

Home Office: 4251 Gulf Shore Blvd. N., Apt. 11D, Naples, FL 34103    (239) 263-7353

E-mail: tmorgan@law.gwu.edu

### Undergraduate Education:

Northwestern University, Evanston, Illinois, 1959-62
B.A. degree, highest distinction   Member, Phi Beta Kappa

### Legal Education:

University of Chicago Law School, Chicago, Illinois, 1962-65
    J.D. degree with honors; Member, Order of the Coif
    Comment Editor, Volume 32, University of Chicago Law Review

### Professional Experience:

Oppenheim Professor of Antitrust and Trade Regulation Law, Emeritus, since 2014

Oppenheim Professor of Antitrust and Trade Regulation Law, George Washington
    University, 1989-1998; 2000-2013

Rex E. Lee Professor of Law, Brigham Young University, 1998-2000

Dean, Emory University School of Law, 1980-85
    Distinguished Professor of Law 1985-89

Professor of Law, University of Illinois, 1974-80
    Associate Professor, Illinois, 1970-74; Assistant Professor, Illinois, 1966-67

Visiting Professor, Brigham Young University, Fall 1994
    Monash University (Australia), Spring 1988
    Cornell University, Winter 1974

Special Assistant to Assistant Secretary of Defense, 1969-70
    Attorney, Office of Air Force General Counsel, 1967-69

Bigelow Teaching Fellow, University of Chicago Law School, 1965-66

**Publications:**

**A.    In the Field of Professional Responsibility**

THE VANISHING AMERICAN LAWYER (Oxford University Press 2010)

PROFESSIONAL RESPONSIBILITY: PROBLEMS AND MATERIALS (Foundation
    Press 1976); 2nd Edition 1981; 3rd Edition 1984; 4th Edition 1987; 5th Edition
    1991; 6th Edition 1995, 7th Edition 2000, 8th Edition 2003, 9th Edition 2006, 10th
    Edition 2008 (co-authored with R. Rotunda); 11th Edition 2011; 12th Edition 2014
    (co-authored with R. Rotunda and J. Dzienkowski); all with Teachers' Manuals.

SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (published
    annually since 1981) (co-authored with R. Rotunda)

AMERICAN LAW INSTITUTE, RESTATEMENT OF THE LAW (THIRD): THE
    LAW GOVERNING LAWYERS (2000) (with C. Wolfram & J. Leubsdorf)

LAWYER LAW: COMPARING THE ABA MODEL RULES OF PROFESSIONAL
    CONDUCT WITH THE ALI RESTATEMENT (THIRD) OF THE LAW
    GOVERNING LAWYERS (2005)

LEGAL ETHICS (Gilbert Law Summaries) (8th Edition 2005)

"Where Do We Go From Here with Fee Schedules?," 59 A.B.A.J. 1403 (1973)

"The Evolving Concept of Professional Responsibility," 90 Harvard L. Rev. 702 (1977)

"Appropriate Limits on Participation by a Former Agency Official in Matters Before an
    Agency," 1980 Duke L.J. 1

"Conflicts of Interest and the Former Client in the Model Rules of Professional Conduct,"
    1980 American Bar Foundation Res. J. 993

"The Fall and Rise of Professionalism," 19 U. Richmond L. Rev. 451 (1985)

"Screening the Disqualified Lawyer: The Wrong Solution to the Wrong Problem," 10
    Univ. Arkansas (Little Rock) L. J. 37 (1987-88)

"An Introduction to the Debate over Fee Forfeitures," 36 Emory L. J. 755 (1987)

"Public Financial Disclosure by Federal Officials: A Functional Approach," 3
    Georgetown J. Legal Ethics 217 (1989).

"The Quest for Equality in Regulating the Behavior of Government Officials: The Case of Extrajudicial Compensation," 58 George Washington L. Rev. 490 (1990)

"Thinking About Lawyers as Counselors," 42 Florida L. Rev. 439 (1990)

"Vintage Freedman in a New Bottle," Review of Freedman, Understanding Lawyers' Ethics, 4 Georgetown J. Legal Ethics 847 (1991)

"Heroes for Our Time: Going Beyond Ethical Codes," Clark Memorandum (Brigham Young University), Fall 1992, p. 23

"Economic Reality Facing 21st Century Lawyers," 69 Washington L. Rev. 625 (1994)

"Sanctions and Remedies for Attorney Misconduct," 19 S. Illinois U. L. Rev. 343 (1995)

"Legal Representation in a Pluralist Society," 63 George Washington L. Rev. 984 (1995) (co-authored with Robert W. Tuttle)

"American Perspectives on the Duty of Loyalty: Conflicts of Interest and Other Issues of Particular Concern to the International Practitioner," in Mary C. Daly & Roger J. Goebel, Eds., Rights, Liability, and Ethics in International Law Practice (1995)

"Law Faculty as Role Models," in ABA Section of Legal Education, Teaching and Learning Professionalism: Symposium Proceedings (1996)

"Suing a Present Client," 9 Georgetown J. Legal Ethics 1157 (1996), reprinted in 1 Journal of Institute for Study of Legal Ethics 87 (1996)

"Conflicts of Interest in the *Restatement*: Comments on Professor Moore's paper," 10 Georgetown J. Legal Ethics 575 (1997)

"Whose Lawyer Are You Anyway?," 23 William Mitchell L. Rev. 11 (1997)

"Use of the Problem Method for Teaching Legal Ethics," 39 William & Mary L. Rev. 409 (1998)

"Conflicts of Interest and the New Forms of Professional Associations," 39 S. Texas L. Rev. 215 (1998)

"What Insurance Scholars Should Know About Professional Responsibility," 4 Conn. Insurance L. J. 1 (1997-98)

"Interview with Professor Thomas Morgan on Professional Responsibility," 13 Antitrust 4 (Fall 1998).

"The Impact of Antitrust Law on the Legal Profession," 67 Fordham L. Rev. 415 (1998)

19

"Toward a New Perspective on Legal Ethics," Am Bar Foun, Researching the Law (2000)

"Real World Pressures on Professionalism," 23 U. Ark. (Little Rock) L. J. 409 (2001)

"Practicing Law in the Interests of Justice in the Twenty-First Century," 70 Fordham L. Rev. 1793 (2002)

"Toward Abandoning Organized Professionalism," 30 Hofstra L. Rev. 947 (2002)

"Creating a Life as a Lawyer," 38 Valparaiso L. Rev. 37 (2003)

"Sarbanes-Oxley: A Complication, Not a Contribution in the Effort to Improve Corporate Lawyers' Professional Conduct," 17 Georgetown J. Legal Ethics 1 (2003)

"The Client(s) of a Corporate Lawyer," 33 Capital U. L. Rev. 17 (2004)

"Educating Lawyers for the Future Legal Profession," 30 Okla City U. L. Rev. 537 (2005)

"The Corporate Lawyer and the Perjury Trilemma," 34 Hofstra L. Rev. 965 (2006)

"It's Not Perfect, But the ABA Does a Key Job in State-Based Regulation of Lawyers," 11 Tex. Rev. of L. & Politics 381 (2007)

"Comment on Lawyers as Gatekeepers," 57 Case Western Res. L. Rev. 375 (2007)

"Professional Malpractice in a World of Amateurs," 40 St. Mary's L. J. 892 (2009).

"It's Not Your Parents' Profession Anymore: The Changing Course of Legal Careers," GW Law School Alumni Magazine, Summer 2010, p. 18.

"Should the Public Be Able to Buy Stock in Law Firms?" 11 Engage 111 (Sept. 2010).

"Client Representation vs. Case Administration: The ALI Looks at Legal Ethics Issues in Aggregate Settlements," 79 George Washington L. Rev. 734 (2011).

"Realistic Questions About Modern Lawyer Regulation," part of an on-line symposium at http://truthonthemarket.com/2011/09/19/thomas-morgan-on-realistic-questions-about-modern-lawyer-regulation.

"Calling Law a 'Profession' Only Confuses Thinking about the Challenges Lawyers Face," 9 U. St. Thomas L.J. 542 (2011).

"On the Declining Importance of Legal Institutions," 2012 Mich. St. L. Rev. 255.